UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

NO. 23-1839
_____

**UNITED STATES,**
**APPELLEE**

**v.**

**IAN FREEMAN,**
**APPELLANT**
_____

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE
_____

**BRIEF AND ADDENDUM OF IAN FREEMAN**
_____

Richard Guerriero
1st Circuit Bar ID 1164673
Oliver Bloom
1st Circuit Bar ID 1211240
Lothstein Guerriero, PLLC
39 Central Square, Suite 202
Keene, NH 03431
(603) 352-5000
richard@nhdefender.com
oliver@nhdefender.com

Mark L. Sisti
1st Circuit Bar ID 37832
Sisti Law Offices
387 Dover Road
Chichester, NH 03258
(603) 224-4220
info@sistilawoffices.com

TABLE OF CONTENTS

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ............................8

JURISDICTIONAL STATEMENT ........................................................9

ISSUES PRESENTED FOR REVIEW ..................................................10

STATEMENT OF THE CASE ...........................................................11

    *Overview* ...........................................................................11

    *Freeman's Background* ..........................................................11

    *The Government's Investigation and Indictments* .............................13

    *The Jury Trial* ....................................................................16

    *Freeman Sold Bitcoin Without Having Registered with FinCEN* ...............16

    *The Government Claimed that Freeman Knew Scammers Were Using His Business to Steal from Innocent Victims and to Launder Money* .................17

    *The Government Claimed that Freeman Did Not Pay Taxes.* .................20

    *Jury Instructions, Verdict, and Post-Trial Proceedings* .......................21

SUMMARY OF ARGUMENTS ........................................................23

ARGUMENT ON ISSUE NO. 1: THE TRIAL COURT ERRED IN NOT GRANTING THE MOTION TO DISMISS COUNTS 1 AND 2 .........................25

    *The Defense Moved to Dismiss Counts 1 and 2* ..............................25

    *The Question of Law Raised by the Motion to Dismiss Is Subject to De Novo Review* ...........................................................................26

    *This Case Is Governed by the 2001 Version of § 5330, Which Only Refers to "Funds," and Not By the 2021 Amendment Which Added the Phrase "Value Which Substitutes for Currency* ..............................................27

    *The Government and the District Court Wrongly Concluded that Registration Was Possible Under § 5330 Without Reference to Any Regulations* .................30

    *Congress Did Not Intend by the Use of the Single Word, "Funds," in the 2001 Version of § 5330, to Anticipate the Invention of Virtual Currency and Authorize Its Regulation by FinCEN 15 Years Later* .........................................36

        *Determining the Plain and Ordinary Meaning of "Funds" Does Not Answer the Question* .................................................................36

        *The Major Questions Doctrine Applies to this Case.* .......................38

*Virtual Currency Has Grown from Its Invention in 2008 to Be a Major Part of the United States and World Economy* ............................................................39

*This Case Is Like the Cases in Which the Court Has Followed the Major Questions Doctrine to Conclude that Congress Did Not Intend to Authorize Regulation of a Large Part of the Economy Without a Clear and Detailed Expression of Its Intent* ..............................................................................42

*A Colorable Textual Argument Is Not Enough to Overcome the Major Questions Issue* ......................................................................................45

*The Age of the Statute on Which the Regulation Is Based Shows that Congress Did Not Intend to Regulate Virtual Currency* ..................................................46

*Congress's Later Amendment of § 5330 Implies that Virtual Currency Was Not Previously Captured by the Statute* ..............................................................46

*FinCEN Admitted that It Had to Expand Its Authority Beyond the Statutory Language to Capture Virtual Currency* ..........................................................49

*Reversing the Trial Court's Decision Regarding the Motion to Dismiss Requires Vacating the Money Transmitting Convictions and a New Trial on the Other Counts* ..........................................................................................52

ARGUMENT ON ISSUE NO. 2: SPILLOVER PREJUDICE FROM THE MONEY LAUNDERING COUNT REQUIRES A NEW TRIAL, ESPECIALLY IF THE COURT AGREES THAT COUNTS 1 AND 2 SHOULD HAVE BEEN DISMISSED ..................................................................................54

*Standard of Review* ............................................................................54

*A New Trial Is Required When There Is "Compelling Prejudice" Such that a "Miscarriage of Justice Looms* ..................................................................54

ARGUMENT ON ISSUE NO. 3: THE EVIDENCE WAS INSUFFICIENT TO SUPPORT CONVICTIONS FOR TAX EVASION ..............................................60

ARGUMENT ON ISSUE NO. 4: THE SENTENCE OF 96 MONTHS WAS SUBSTANTIVELY UNREASONABLE..................................................................63

CONCLUSION ..................................................................................67

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a) ........................68

CERTIFICATE OF SERVICE ..............................................................68

## TABLE OF AUTHORITIES

Cases

*Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U.S. 758 (2021)..........................................................................................................44

*Beazell v. Ohio*, 269 U.S. 167 (1925) .......................................................................29

*Bielski v. Coinbase, Inc.*, 87 F.4th 1003 (9th Cir. 2023) .........................................40

*Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974) ...................................................33

*Calder v. Bull,* 3 U.S. (3 Dall.) 386 (1798).............................................................29

*CFTC v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018) ...................................41

*FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)) ............ passim

*Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011) ..............................58

*Gonzales* v. *Oregon*, 546 U.S. 243 (2006)...............................................................43

*Holguin-Hernandez v. United States*, 589 U.S. 169 (2020) ...................................63

*King v. Burwell*, 576 U.S. 473 (2015) ......................................................................38

*Loper Bright Enters.v. Raimondo*, 603 U.S. __ (2024) ...........................................38

*Marshall Field & Co.* v. *Clark*, 143 U.S. 649 (1892).............................................39

*National Federation of Independent Business* v. *Occupational Safety and Health Administration*, 595 U.S. 109 (2022) (*per curiam*)..............................................44

*O'Connor v. Oakhurst Dairy*, 851 F.3d 69 (1st Cir. 2017). ...................................49

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47 (2006)......49

*Sansone v. United States*, 380 U.S. 343 (1965);......................................................60

*Stone v. INS*, 514 U.S. 386 (1995) ...........................................................................48

*United States v. Abdelaziz,* 68 F.4th 1 (1st Cir. 2023)..................................... 54, 55

*United States v. Benoit*, 975 F.3d 20 (1st Cir. 2020) ...............................................64

*United States v. Budovsky*, No. 13cr368 (DLC), 2015 U.S. Dist. LEXIS 127717 (S.D.N.Y. Sep. 23, 2015)..................................................................33

*United States v. Changpeng Zhao*, 23-CR-179 (W.D. Wash. 2023)......................65

*United States v. Charles Randol*, 23-CR-440 (C.D. Cal. 2023) ............................65

*United States v. Correia*, 55 F.4th 12 (1st Cir. 2022)......................................... 54, 55

*United States v. Dion*, 37 F.4th 31 (1st Cir. 2022) ................................................26

*United States v. e-Gold, Ltd.*, 550 F. Supp. 2d 82 (D.D.C. 2008) ................... 32, 33

*United States v. Emilor, S.A.*, No. 6:07-cr-1, 2008 U.S. Dist. LEXIS 112865 (E.D. Tex. Apr. 30, 2008) ...............................................................................34

*United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014) ..............................37

*United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501 (2d Cir. 1991) .............33

*United States v. Gurry*, 427 F. Supp. 3d 166 (D. Mass. 2019)...............................55

*United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020) .......................... 37, 40

*United States v. Hogan*, 861 F.2d 312 (1st Cir. 1988)...........................................60

*United States v. Hugo Mejia*, 21-CR-8 (C.D. Cal 2021) ........................................65

*United States v. Joseph Farace*, 21-CR-294 (D. Md. 2024) ..................................66

*United States v. Lavoie*, 433 F.3d 95 (1st Cir. 2005)....................................... 60, 61

*United States v. Lord*, 915 F.3d 1009 (5th Cir. 2019) ...........................................40

*United States v. Márquez-García*, 862 F.3d 143 (1st Cir. 2017) ...........................64

*United States v. Martin*, 520 F.3d 87 (1st Cir. 2008) .............................................63

*United States v. Molina*, 407 F.3d 511 (1st Cir. 2005)...........................................29

*United States v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016) ............................37

*United States v. Parigian*, 824 F.3d 5 (1st Cir. 2016) ...........................................26

*United States v. Perez-Melendez*, 599 F.3d 31 (1st Cir. 2010)...............................58

*United States v. Pomponio*, 429 U.S. 10 (1976) ...................................................61

*United States v. Pupo*, 995 F.3d 23 (2021) ........................................................64

*United States v. Rodríguez-Martinez*, 778 F.3d 367 (1st Cir. 2015) ......................58

*United States v. Sempos*, 772 F.2d 1 (1st Cir. 1985) ...........................................62

*United States v. Theresa Tetley*, 17-CR-738 (C.D. Cal. 2018) .............................66

*United States v. Thomas*, 666 F. Supp. 2d 139 (D. Me. 2009) ...............................60

*United States v. Toth*, 33 F.4th 1 (1st Cir. 2022) ...............................................33

*United States v. Yuri Lebedev*, 15-CR-769 (S.D.N.Y. 2017) .................................65

*Utility Air Regulatory Group v. E.P.A.*, 573 U.S. 302 (2014) ................... 38, 43, 46

*Wayman* v. *Southard*, 23 U.S. 1 (1825) ...............................................................39

*West Virginia v. E.P.A.*, 597 U.S. 697 (2022) ........................................ 38, 42, 45

Statutes

18 U.S.C. § 1956(h) .............................................................................................9

18 U.S.C. § 1960 ........................................................................................ passim

18 U.S.C. §§ 371 .............................................................................................9, 25

18 U.S.C. §3742(a) .............................................................................................9

26 U.S.C. §7201 .................................................................................................9

28 U.S.C. §1291 .................................................................................................9

31 U.S.C. § 5330 ........................................................................................ passim

Other Authorities

David W. Perkins, Cong. Rsch. Serv., R45427, *Cryptocurrency: The Economics of Money and Selected Policy Issues* (April 9, 2020) ...............................................40

*Economic Well-Being of U.S. Households in 2021* 45 (May 2022); United States Census Bureau ....................................................................................................41

Jerry Brito and Andrea Castillo, *Bitcoin: A Primer for Policymakers*, Mercatus Center, George Mason University (2013) ...........................................................40

*New Vintage 2021 Population Estimates Available for the Nation, States and Puerto Rico* ...................................................................................................41

*Today's Cryptocurrency Prices by Market Cap* .....................................................41

U.S. Dep't of Treasury, FinCEN, FIN-2013-G001, *Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (Mar. 18, 2013) ...................................................................................50

Regulations

31 C.F.R. § 1022.380 ...............................................................................................28

Proposed Legislation and Legislative History

2021 NDAA. Improving Laundering Laws and Increasing Comprehensive Information Tracking of Criminal Activity in Shell Holdings Act ......................48

Combating Money Laundering, Terrorist Financing, and Counterfeiting Act of 2019 ................................................................................................................47

H.R. 1414 ..................................................................................................................47

Himamauli Das, *Prepared Remarks of FinCEN Acting Director Him Das, Delivered Virtually at the American Bankers Association/American Bar Association Financial Crimes Enforcement Conference*, FinCen (Jan. 13, 2022) ...............................................................................................................49

Improving Laundering Laws and Increasing Comprehensive Information Tracking of Criminal Activity in Shell Holdings Act .........................................47

S. 1883...............................................................................................................47

S. 2563...............................................................................................................47

*The Present and Future Impact of Virtual Currency: Joint Hearing before the Subcomm. on Nat'l Sec. and Int'l Trade and Fin. and the Subcomm. on Banking, Hous., and Urb. Aff.*, 113th Cong. 210 (2013).....................................................51

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Oral argument should be heard in this matter because the brief raises complicated and unresolved questions regarding whether sellers of virtual currency were required to register with the federal agency, FinCEN, prior to changes Congress made to the law to the in 2021. In addition, the brief raises issues regarding "spillover prejudice" and whether a new trial should have been granted when the district court acquitted Freeman of one count of the indictment after trial.

JURISDICTIONAL STATEMENT

This is an appeal in a criminal case from a final judgment of conviction in the District Court of New Hampshire. A jury found Defendant-Appellant, Ian Freeman, guilty on December 22, 2022. App. 2234.[1] On October 2, 2023, the district court imposed the final judgment and sentence for convictions as provided in 18 U.S.C. § 371, 18 U.S.C. § 1960, 18 U.S.C. §1960(b)(1)(B) and (C), and 18 U.S.C. § 1956(h), and 26 U.S.C. §7201. Add. 1-3; App. 2641, 2650, 2661 (amended on 10/10/2023 and 2/9/24). The notice of appeal was filed on October 10, 2023. App. 2659. This Court has jurisdiction pursuant to 28 U.S.C. §1291 and under 18 U.S.C. §3742(a) as an appeal of a sentence imposed under the Sentencing Reform Act of 1984.

---

[1] References to the record are as follows:
"Add. #" refers to the page numbers of the Addendum to this brief;
"App. #" refers to the page numbers of the Joint Appendix;
"S.App. #" refers to the page numbers of the Joint Sealed Appendix.

ISSUES PRESENTED FOR REVIEW

Issue No. 1: Freeman moved to dismiss counts of conspiring to and operating an unlicensed money transmitting business because, during the relevant time period, Congress had not authorized any federal agency to require businesses which sell virtual currency to register with FinCEN. Did the district court err in denying Freeman's motion?

Issue No. 2: Did the district court err in denying Freeman's motion for a new trial as a result of "spillover prejudice" arising from post-trial acquittal on the count of money laundering?

Issue No. 3: Is the evidence presented at trial sufficient to support Freeman's conviction of tax evasion charges.

Issue No. 4: Is Freeman's sentence of 96 months in prison unreasonable?

STATEMENT OF THE CASE

*Overview.*

The government accused Ian Freeman of unlawfully selling bitcoin from 2016 to 2021 because he did not have a license from the federal government, because he allegedly knew scammers were using his bitcoin sales to defraud victims, and because he allegedly violated tax laws relating to the sales. Freeman responded that he was not required to have a license, that he did not knowingly play a role in defrauding any victim or in laundering any money, and that he did now owe any taxes. The trial judge denied Freeman's motion to dismiss the licensing charges before trial. Freeman was convicted at trial, but the judge later dismissed the substantive money laundering count. The trial judge sentenced Freeman to 96 months in prison on the remaining counts. Freeman now appeals.

*Freeman's Background.*

Over twenty years ago, in 2002, Freeman created a radio talk show, App. 1907, "Free Talk Live," which has a "libertarian message." App. 1913. Freeman created the show because other talk shows were too controlling and did not allow callers or guests to speak freely and disagree with each other. App. 1908. Freeman started Free Talk Live in Florida, where he grew up. App. 906-08. He later moved to Keene, New Hampshire, in 2006 where the show eventually grew to be a

syndicated show on 180 radio stations. App. 1907. Freeman remained in Keene where the operative facts of this case developed. App. 1999.

In 2013, Freeman established the Shire Free Church, the primary mission of which was to "foster peace." App. 1915. Freeman saw the church as being in the same tradition as Quakers and Jehovah's Witnesses. *Id*. He thought the church would be a good compliment to Free Talk Live, where he was already "talking about peace and liberty and individual freedom and morality." *Id*.

When Freeman learned about bitcoin in 2010-2011, he realized that it could help promote his views on freedom. In his words, bitcoin allows "individuals to control their own finances without the involvement of some centralized so-called authority." App. 1911. In 2014, believing that it would help foster peace by keeping the government out of private financial transactions and would "disempower the warmongering state," Freeman began selling bitcoin as part of his church's mission, first via bitcoin vending machines, and subsequently on LocalBitcoins.com and Telegram. App. 1916-20, 1925, 1972. Those activities grew to include other individuals and churches they had formed. App. 1938-40, 1962-66. Freeman viewed the churches as promoting the beliefs that he and his friends held, regardless of how they were viewed by the government. App. 1916-17, 2065.

Based on his own research, as well as advice from an attorney, Freeman did not believe he was required to obtain approval or licensing from any agency in order to sell bitcoin. App. 1634-38, 2036-44. However, he took steps to make sure he and his customers were identified and to warn his customers of possible scams. App. 1927-38. The son of one of the victims testified to Freeman's role helping to recovery the money. App. 2082-86. In addition, having researched income tax law, Freeman believed that a church was not required to pay taxes on revenue received from selling bitcoin. App. 1993-94.

*The Government's Investigation and Indictments.*

The FBI and other government agencies began investigating Freeman in 2017. App. 609. The government monitored Freeman's comments on Free Talk Live. App. 2027-29, 2055-57. It also installed telephone pole cameras and surveilled the home in Keene, where Freeman lived with his girlfriend and friends. App. 652-55. The government investigated Freeman's sales of bitcoin. App. 364-407, 418-30, 434-76, 482-505, 610. The government discovered that Freeman, by his own account, was selling bitcoin without having registered with FinCEN, the Treasury agency which claimed authority to regulate sales of bitcoin as a money transmitting business under 31 U.S.C. § 5330. The government also discovered that some purchasers of bitcoin from Freeman were the victims of romance scams or other fraudulent activities by third parties. App. 1453-54. The government

focused much of its investigation on documenting the frauds perpetrated on those victims and the losses they suffered. App. 606-13, 1335, 1451-52, 1536, 1668.

On March 15, 2021, the government indicted Freeman for conspiracy to operate an unlicensed money transmitting business (Count 1), operation of an unlicensed money transmitting business (Count 2), conspiracy to commit wire fraud (Count 3), six counts of wire fraud (Counts 5, 6, 7, 10, 14, 15), continuing financial crimes enterprise (Count 19), and money laundering (Count 20). App. 61-69. In the same indictment, five other individuals were charged as coconspirators of Freeman or otherwise connected to his allegedly unlawful efforts to sell bitcoin. Those codefendants were Colleen Fordham, Renee Spinella, Andrew Spinella, Nobody (his legal name), and Aria DiMezzo. *Id.*

The next day, the government obtained a search warrant and conducted searches of the home in Keene, as well as several other addresses. App. 623, 700, 705-6. The search at Leverett Street began between 5:00 and 6:00 a.m. App. 658, 664, 1990. Approximately 25 government agents, including a SWAT team, raided the residence. App. 696. The agents were armed with tactical gear, assault rifles, two BearCat armored vehicles, one armed with a battering ram, and at least one "flash bang" grenade. App. 657-58, 697, 1542-45.

Freeman and those in his home, including his girlfriend, were surprised by the raid. App. 1989-91. They exited the home at gunpoint, in night clothes, some

carrying their pets. App. 1991-92. There were firearms in the home but no one contended there was any resistance or violence by Freeman or the others. App. 667, 670, 678, 1575. Freeman was arrested and held in custody for approximately two months before he was granted conditional pretrial release. App. 13, 19. Over the following months, all of the defendants except Freeman and DiMezzo made plea bargains. App. 26-27.

When Freeman and DiMezzo did not make plea agreements, the government brought a superseding indictment. App. 70-88. Freeman joined a motion filed by DiMezzo to dismiss the two counts charging both with operating, and conspiring to operate, an unlicensed money transmitting business. App. 89-111. Freeman joined that motion, as recognized by the District Court's order and a docket entry. App. 31, 33, 112-13. The motion argued that, during the relevant time frame in the superseding indictment, Congress had not authorized any federal agency to adopt regulations requiring bitcoin sellers to be licensed. The government objected to the motion. App. 114-34.

On September 1, 2022, the district court held a hearing on the motion to dismiss and then denied it by oral order, with a written order to follow. Add. 63-67; App. 33-34, 139-91. The Court issued its written order after trial, on August 22, 2023. Add. 72-106; App. 2270-2304.

*The Jury Trial.*

Freeman's jury trial started on December 6, 2022. The government presented twenty-eight witnesses over eight days. App. 276-1828. Fifteen of the witnesses were government employees, investigators, or analysts. App. 340, 540, 605-6, 689, 699, 704, 709, 914, 923, 1118, 1129, 1333, 1666, 1707, 1715. Another two worked in finance or cryptocurrency. App. 852, 1601. Four witnesses were former associates or co-defendants of Freeman who had grants of immunity from the government or plea agreements. App. 732-36, 804-6, 1028-30, 1033-34, 1233, 1236. In addition, the government presented the testimony of seven alleged victims who purchased bitcoin at the behest of third parties who were defrauding the victims and sought to avoid detection by having the victims pay them in bitcoin. App. 1140, 1164-65, 1199-1201, 1297, 1468, 1578, 1641.

*Freeman Sold Bitcoin Without Having Registered with FinCEN.*

Much of the government's evidence focused on proving that Freeman sold bitcoin, a fact he did not deny. App. 1916-19, 1925. Government witnesses described how virtual currency and virtual currency exchanges work, App. 342-63, 1601-04, financial regulations, App. 541-72, 1604-22, and that Freeman bought and sold bitcoin during the relevant time frame from 2016 to March 15, 2021. App. 364-476, 482-505, 609-23, 1336-52. The government witnesses referred to chatlogs and other supporting evidence in their testimony. App. 383-407, 418-30,

434-76, 482-505, 1360-1454. Freeman did not deny that he sold bitcoin during that time period. App. 1916-19, 1925, 1979-80, 2061-62.

Similar testimony documented that Freeman had not registered, in his own name or for his churches, as a money transmitting business with FinCEN. App. 565-66, 572-78, 874, 911, 1563. Here again, Freeman did not dispute that fact. To the contrary, he told financial institutions he didn't have to register, App. 1628, 1633-38, 2044, and he confirmed that position at trial. App. 1968-72.

At the conclusion of the trial, the district court judge instructed the jury that it should find Freeman guilty if he knowingly operated a business which sold bitcoin, and conspired with others to do so, while failing to register with FinCEN as a money transmitting business. App. 2184-91. This instruction was the natural consequence of the judge having rejected Freeman's pretrial argument that Congress had not authorized licensing bitcoin sellers. Not surprisingly, considering the court's instruction and the facts, the jury convicted Freeman of operating an unlicensed money transmitting business and conspiring to operate an unlicensed money transmitting business. App. 2217-18, 2234-36.

*The Government Claimed that Freeman Knew Scammers Were Using His Business to Steal from Innocent Victims and to Launder Money.*

The government also asserted that Freeman knew his bitcoin sales were being used to launder money. The theme of the government's case was that

17

Freeman "had a golden rule." App. 300-01, 307-08, 310, 318-19, 2051, 2067, 2101. According to the government, this golden rule was, "What you do with your bitcoin is your business. Don't tell me what your plans are." App. 300, 308. The government said that philosophy amounted to willful blindness and it invited scammers to use the business to launder money deriving from romance scams and other fraudulent activities. App. 2099, 2102, 2112.

The government presented evidence that banks often closed Freeman's accounts. App. 449, 455, 489, 765-66, 874, 905, 943, 950-51, 1066, 1086, 1377-82, 1562. The evidence showed that, while Freeman had his own Know Your Customer process, App. 819, 835, 2622-23, he was not registered with FinCEN, and therefore he could not file Suspicious Activity Reports. App. 578. The evidence established that Freeman was charging commission rates of roughly 10 to 20 percent, App. 428, 467, 499-500, 1555, 1724-28, which the government repeatedly told the jury he charged as a price for anonymity to cater to scammers. App. 300-01, 305, 2094-96, 2111-12, 2162. However, there was also evidence which showed that Freeman's rates on bitcoin kiosks "were exactly in line with the market," App. 789, 794, that Freeman "wasn't trying to take advantage of anybody with the fees," App. 790, that his prices on LocalBitcoins were competitive with other sellers on the marketplace, App. 2014, that there were risks associated with online sales, App. 763, 1038, 1050, 1926, and that there were no customer

18

complaints about Freeman's fees. App. 1837, 1875. In addition, Freeman and the

Shire Free Church respected its customers' privacy. App. 378, 1494, 1496, 2068.

The government offered seven witnesses who had been the victims of

various scams, specifically romance scams, App. 1142, 1202, 1224, 1298-99,

1469, 1579-81, 1642-44; inheritance scams, App. 1144, 1203; or social security

scams, App. 1168; and who were directed by their scammers to purchase bitcoin

from Freeman or his associates. App. 1148-52, 1172-78, 1180-84, 1204-17, 1302,

1473, 1479, 1584-85, 1646-47. Some received wire transfers from other

individuals into their account or shared their bank accounts with their scammers

before purchasing bitcoin from Freeman. App. 1301, 1304, 1645, 1661. The

government drew particular attention to the advanced age of some of the victims,

App. 517, 561, 613, 1396, or the difficulty the buyers had taking "selfie" photos.

App. 490, 2053-55, 2057.

The defense established that the victims' banks routinely did not inquire into

the large withdrawals made by the victims. App. 509-10, 1194-95, 1324, 1487-88,

1599, 1663-64. And that the victims continued to send money after being warned

of fraud, App. 1227-29, or after the banks closed their accounts. App. 1305-06. As

noted above, Freeman operated under his own name. App. 365, 515, 527, 538. He

went to great lengths to document his bitcoin sales and the identities of the buyers,

storing information on his computer, App. 1386-1453, and frequently confirmed on

phone calls with the buyers that they wanted to purchase bitcoin. App. 837, 1489, 1591, 1599-1600, 1654, 1664-65. This information proved helpful to the government in identifying scam victims. App. 521-22. Moreover, the victims sometimes lied to Freeman when he followed up. App. 1932-33. Government witnesses confirmed that money launderers do not typically use their own name or contact information. App. 513, 527, 536-37.

*The Government Claimed that Freeman Did Not Pay Taxes.*

The government's witness, Colleen Ranahan, from the Internal Revenue Service (IRS), established that Freeman did not file tax returns from 2016 through 2019. App. 1718. She reviewed two spreadsheets of Freeman's LocalBitcoins transactions, estimated his yearly commission, and predicted his taxes owed. App. 1718-28. She also estimated his deductions. App. 1729, 1731-33. However, she admitted that she relied only on data from LocalBitcoins. App. 1735-36. She also admitted that the IRS never sent any letter to Freeman or his churches to clarify the situation, as would normally happen. App. 1737-39. Moreover, she also testified that she did not include in her estimate other costs, like property taxes or charitable giving, that might change the calculus in an itemized deduction. App. 1740. Thus, she concluded that she, as the government's sole witness on the tax issue, could not say whether Freeman owed any taxes or not. App. 1740.

*Jury Instructions, Verdict, and Post-Trial Proceedings.*

At the conclusion of the trial, the district court instructed the jury prior to its deliberations. After deliberations, the jury convicted Freeman on all counts. App. 2234-36.

Freeman had moved orally under Rule 29 for a judgment of acquittal as to each count at the end of the prosecution's case-in-chief, and he renewed the motion at the end of the defense's case. App. 1793, 1801-03, 1815-20, 2091. In both instances, the Court announced that the motions remained under advisement. App. 1826, 2091. Both sides briefed the issues further. App. 2237-65. On August 22, 2023, the district court granted Freeman's motion for a judgment of acquittal under Rule 29 with respect to Count 3 of the indictment alleging money laundering but denied the motion as to the other counts. App. 2270- 2304.

On September 5, 2023, Freeman filed a Motion for Reconsideration of the Court's August 22, 2023, decision regarding the Rule 29 motion, as well as a Motion for New Trial. App. 2445-67. The United States objected to both. App. 2468-75. On September 11, 2023, the Court held a hearing and denied the motions. Add. 107-130; App. 54-55.

At sentencing, the government sought a guidelines sentence, App. 2431, which the PSIR estimated at between 188 and 235 months. PSIR ¶108; S.App. 29. The defense sought a sentence of 38 months. App. 2305, 2307-08. On October 2,

2023, the district court sentenced Freeman to a term of imprisonment of 60 months on Counts 1s, 2s, and 29s through 32s, and a term of 96 months on 28s, to be served concurrently, along with two years of supervised released on Counts 1s, 2s, and 28s through 32s, to run concurrently, and a fine of $10,000. Add. 1-9; App. 55-56, 2641-49. The other Counts were dismissed pursuant to Local Rule 48.1. App. 2641. The court later issued amended judgments addressing the fine and restitution. Add. 1-9.

## SUMMARY OF ARGUMENTS

The court should reverse the trial court's denial of the motion to dismiss the unlicensed money transmitting counts. Those counts cannot stand because, during the relevant time period for this case, Congress had not authorized any federal agency to issue regulations requiring the registration of sellers of virtual currency. The applicable statute only authorized requiring registration of those who were engaged in the transmission of "funds." However, that law was written in 2001 before Congress could have intended "funds" to include virtual currency. Moreover, because of the scope and importance of virtual currency in today's economy, the Supreme Court's major questions doctrine instructs that agencies may not claim expansive powers from long-extant and cryptic passages in a statute. In addition, legislative history shows that FinCEN, the regulatory agency, sought a change to bring virtual currency within the scope of the statute, confirming that the statute did not previously capture virtual currency.

In addition, the court should reverse the trial court's denial of the motion for a new trial based on "spillover" prejudice, following the trial court's post-trial acquittal of Freeman on the substantive money laundering count. The prejudice resulting from the government repeatedly referring to that count created a great risk of injustice. This conclusion is even more compelling if this court agrees that

the unlicensed money transmitting counts should have been dismissed, and recognizes the additional prejudice from those counts.

Freeman also challenges the sufficiency of the evidence regarding four counts of tax evasion because the government failed to prove either a tax deficiency or that he acted willfully.

Finally, Freeman asks the court to set aside his 96-month sentence as substantively unreasonable. The sentence is more than is necessary to promote the statutorily established goals of sentencing and far exceeds sentences imposed in other similar cases.

ARGUMENT ON ISSUE NO. 1: THE TRIAL COURT ERRED IN NOT
GRANTING THE MOTION TO DISMISS COUNTS 1 AND 2.

Counts 1 and 2 of the superseding indictment charged Freeman with

violating 18 U.S.C. §§ 371, 1960(a) and 1960(b)(1)(B) and (C), between 2016 and

March 15, 2021, by knowingly conspiring to and operating "an unlicensed money

transmitting business, . . . namely a virtual currency exchange business, that

involved the transportation or transmission of funds which failed to comply with

the money transmitting business registration requirements set forth in Title 31,

United States Code, Section 5330 ["§ 5330"], and the regulations prescribed

thereunder." App. 73, 75.

Thus, if § 5330 did not require a seller of virtual currency to register as a

money transmitting business during the years from 2016 to March of 2021, then

the these two counts cannot stand and the convictions must be vacated.

*The Defense Moved to Dismiss Counts 1 and 2.*

The defense moved to dismiss Counts 1 and 2 of the indictment on the

grounds that, prior to 2021, Congress did not authorize federal agency regulations

requiring the registration of businesses engaged in selling virtual currency. App.

89-111. The defense acknowledged that there is a textual argument, based on the

word "funds" in the definition of money transmitting business in § 5330, that

FinCEN was authorized to require registration of virtual currency sellers.

25

However, the defense argued that Congress did not by that one word anticipate the invention of, and authorize the regulation of, virtual currency. To the contrary, the Supreme Court's major questions doctrine, the history of virtual currency, the history of § 5330, FinCEN's own conduct, and other factors, show there was no authority prior to 2021 which authorized regulations requiring registration of virtual currency sellers.

The government objected on two primary grounds. App. 114-34. First, the government argued that the statute, standing alone without reference to any regulations, requires registration. App. 117-25. Second, the government said even if the regulations were at issue, Congress had authorized them. App. 125-33. The trial court denied the defense motion, agreeing with and elaborating on the reasons given by the government. Add. 10-67, 72-106.

*The Question of Law Raised by the Motion to Dismiss Is Subject to De Novo Review.*

"In reviewing a district court's denial of a motion to dismiss an indictment, we review legal questions de novo, any relevant factual findings for clear error, and the court's 'ultimate ruling' for abuse of discretion." *United States v. Parigian*, 824 F.3d 5, 9 (1st Cir. 2016). When there are factual issues, but they are not disputed, the standard of review is strictly de novo. *United States v. Dion*, 37 F.4th 31, 33-34 (1st Cir. 2022).

*This Case Is Governed by the 2001 Version of § 5330, Which Only Refers to "Funds," and Not By the 2021 Amendment Which Added the Phrase "Value Which Substitutes for Currency."*

Eighteen U.S.C. § 1960(b)(1)(B) prohibits the operation of a money transmitting business which "fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section." Thirty-one U.S.C. § 5330 requires the "registration" of "money transmitting businesses" with the Secretary of the Treasury. "FinCEN," the Financial Crimes Enforcement Network, a bureau of the Department of the Treasury, has implemented what it believes are registration requirements under these statutes. *See generally*, Registration of money service businesses, 31 C.F.R. § 1022.380 and https://www.fincen.gov.

Congress has changed the definition of a "money transmitting business." In 2001, the USA PATRIOT Act amended 31 U.S.C. § 5330(d)(1)(A) to provide that "money transmitting business" means any business which,

> …provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;

27

Uniting and Strengthening America by Providing Appropriate Tools Required to

Intercept and Obstruct Terrorism (USA PATRIOT) Act Of 2001, Pub. L. No. 107-

56, 115 Stat. 272, 328 (2001).

The 2001 definition of a "money transmitting business" was in effect for

nearly 20 years, until January 1, 2021. In Public Law 116-283, effective January 1,

2021, Congress addressed for the first time whether "virtual currencies" should be

within the scope of the registration requirement of 31 U.S.C. § 5330. Congress

found that "the mission of FinCEN should be to continue to safeguard the financial

system from illicit activity," and that "although the use and trading of virtual

currencies are legal practices, some terrorists and criminals, including transnational

criminal organizations, seek to exploit vulnerabilities in the global financial system

and increasingly rely on substitutes for currency, including emerging payment

methods (such as virtual currencies), to move illicit funds." William M. (Mac)

Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No.

116-283, 134 Stat. 3388, 4552 (2021). Based on this finding, Congress added

language to include money transmitting businesses which deal in virtual currency.

Pub. L. No. 116–283, § 6102(d)(2)(A), replaced the word "funds" with the words

"currency, funds, or value that substitutes for currency," so that the statute now

reads:

(1) Money transmitting business. The term "money transmitting business"
    means any business other than the United States Postal Service which—

28

> (A) provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of currency, funds, <u>or value that substitutes for currency</u>, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;

31 U.S.C. § 5330(d)(1)(A) (underline added). The emphasized language in this version, which became effective in 2021 - "or value that substitutes for currency" – was not in any prior version of the statute.

The applicable time frame for Counts One and Two is January 2016 to March 15 of 2021. App. 70. The current version of § 5330 did not become effective until January 1, 2021. Moreover, the statute allows 180 days for the required registration. § 5330(a)(1). Therefore, Freeman could not be prosecuted under the new version of the statute for a failure to register during the first three months of 2021 because, the issue of criminal liability is governed by the substantive criminal law in effect during the operative timeframe for the indictment. *See Beazell v. Ohio*, 269 U.S. 167, 169-70 (1925); *see also Calder v. Bull,* 3 U.S. (3 Dall.) 386, 388-89 (1798); *United States v. Molina*, 407 F.3d 511, 525 (1st Cir. 2005).

Thus, the version of 31 U.S.C. § 5330 which was is in effect from 2001 until January 1, 2021, applies to this case. That version refers to "funds," and does not

29

include the expansive phrase "or value that substitutes for currency." As set forth below, a variety of circumstances show that in 2001 Congress could not have intended, and did not intend, the single word "funds" to bring virtual currency within the scope of § 5330.

*The Government and the District Court Wrongly Concluded that Registration Was Possible Under § 5330 Without Reference to Any Regulations.*

In response to the defense assertion that Congress never authorized regulations regarding the registration of virtual currency sellers, the government first responded that it does not matter whether FinCEN had authority to adopt any regulations regarding the registration of sellers of virtual currency because 18 U.S.C. § 1960(b)(1)(B) can be violated by a failure to register as required by the statute, without reference to any regulation. The government's position is that § 1960(b)(1)(B) criminalizes a failure "to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section." App. 117 (underline in original). Relying on the "or," the government argued, and the district court agreed, that "a person may violate § 1960 by failing to comply with the registration requirements of 31 U.S.C. § 5330, but not necessarily the regulations prescribed thereunder." Add. 85; App. 2283. The district court noted that section 5330(a)(1) mandates that an operator of a money transmitting business "shall register" with

the Secretary of the Treasury and therefore concluded that the "statute alone requires registration, regardless of what the regulations say." *Id.*

The government and district court are mistaken for a number of reasons.

While § 1960 criminalizes failure to register pursuant to § 5330 <u>or</u> the regulations prescribed thereunder, § 5330 itself only provides for one means of registration – compliance with the regulations adopted as required by that statute. Section 5330(a)(1) provides that a money transmitting business "shall register with the Secretary of the Treasury." The very next subsection, § 5330(a)(2) states that the Secretary "shall prescribe, by regulation, <u>the</u> form and manner for registering" "[s]ubject to the requirements of subsection (b)." (underline added). Then, § 5330(b) provides that "registration of a money transmitting business under subsection (a) shall include," certain information (name, location, officers, etc.). Thus, the registration required by subsection (a)(1) is registration pursuant to regulations required by (a)(2), which shall include the information listed in (b).

Subsection (b) is not a list of information which a business could provide directly to the Secretary of the Treasury to skip over the regulatory registration process. Rather, as stated in § 5330(a)(2), the information in subsection (b) is the information the Secretary must require as part of the registration process in the regulations adopted by the Secretary as mandated by § 5330(a)(2). The registration requirements in subsection (a)(1), (a)(2), and (b) are directly linked and dependent

31

on one another. The statute simply does not provide for any other means of registration except the one means as provided in subsections (a)(1), (a)(2) and (b).

The district court stated that "Freeman was not charged with failing to follow the required 'form and manner' of registration under the regulations; rather, he was charged with failing to register all together." Add. 85; App. 2283. The district court would be correct if § 5330 provided for registration either by compliance with some procedure defined exclusively within the text of the statute, or by compliance with the Secretary's regulations, because there would then be two ways of violating § 1960 by failing to register. However, § 5330 simply does not provide any means of registration other than compliance with regulations adopted by the Secretary. The only way to violate the registration requirement in § 1960 is to fail to register by the one means prescribed in § 5330.

While Freeman submits that the statute is clear on its face, as explained above, he notes that case law does not resolve the issue. Nonetheless, the minimal case law does favor Freeman because the government has acknowledged and courts have stated provisions of the Bank Secrecy Act have no effect until implementing regulations are issued. For example, in *United States v. e-Gold, Ltd.*, 550 F. Supp. 2d 82 (D.D.C. 2008), a district court stated that the "Government also explain[ed] that Section 5330, part of the Currency and Foreign Transactions Report Act, 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1829(b) and 1951-

1959 (also known as the Bank Secrecy Act), <u>did not have any effect until implementing regulations were issued by Treasury</u>." *e-Gold*, 550 F. Supp. at 95 (citing *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 26 (1974)) (underline added).

*Cal. Bankers*, the Supreme Court case quoted in *e-Gold,* makes the point event more clearly:

> Under the Act, the Secretary of the Treasury is authorized to prescribe by regulation certain recordkeeping and reporting requirements for banks and other financial institutions in this country. Because it has a bearing on our treatment of some of the issues raised by the parties, <u>we think it important to note that the Act's civil and criminal penalties attach only upon violation of regulations promulgated by the Secretary; if the Secretary were to do nothing, the Act itself would impose no penalties on anyone.</u>

*Cal. Bankers Ass'n*, 416 U.S. at 26 (emphasis added). Admittedly, this Supreme Court case dealt with older provisions of the Bank Secrecy Act in Title 12 and Title 31, but this court and other courts have acknowledged the history of the BSA. *United States v. Toth*, 33 F.4th 1, 3 (1st Cir. 2022); *United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 503 (2d Cir. 1991). Considering the quoted language from *e-Gold* and *Cal. Bankers*, if § 5330 did not have any effect until implementing regulations were issued, it cannot be said that registration under the statute alone, without reference to the regulations was possible.

Freeman notes that there is some case law which may support the position of the government and the district court. In *United States v. Budovsky*, No. 13cr368 (DLC), 2015 U.S. Dist. LEXIS 127717 (S.D.N.Y. Sep. 23, 2015), the defendant

sought to dismiss a portion of the indictment arguing that Treasury's regulations were inapplicable to his digital currency. *Id.* at \*22-23. The court rejected the argument because "criminal liability under § 1960(b)(1)(B) rests in part on a failure to comply with registration requirements, including those set forth in § 5330 or in § 5330's regulations." *Id.* at \*23. However, the district court decision in *Budovsky* is distinguishable from Freeman's case because the defendant in *Budovsky* argued that no regulation required his foreign business to file cash transaction reports under 31 U.S.C. § 5113, and therefore his business did not meet the definition of a money transmitting business in 31 U.S.C. § 5330(d)(1)(B), as alleged by the government. In contrast, the allegation against Freeman was that he was required to register under § 5330(D)(1)(A), because his business was transmitting "funds," a term which Freeman contends FinCEN unilaterally expanded without authorization from Congress (see below). Also in the government's favor may be *United States v. Emilor, S.A.*, No. 6:07-cr-1, 2008 U.S. Dist. LEXIS 112865, at \*14-15 (E.D. Tex. Apr. 30, 2008) but that is Magistrate opinion as to which the district court noted, "[a]ll that has been decided is the Indictment need not allege the definitions contained in Section 5330 or the regulations prescribed under such section." *United States v. Emilor*, No. 6:07-cr-1, 2008 U.S. Dist. LEXIS 40870, at \*5 (E.D. Tex. May 21, 2008).

Regardless of the unsettled case law, in the trial of this case, FinCEN and the government seemed to describe only one means of registration. Theodore Vlahakis, a senior compliance officer at FinCEN, testified that:

> …all money services businesses, including money transmitters, must register with FinCEN within 180 days after their business is established by completing what's called an RMSB, a registration of money services businesses. It's also called FinCEN Form 107. That form basically just has fields corresponding to information relating to the type of business, the types of services it offers, you know, locations, address, identifying information, bank account information, location of supporting documentation, and that's, in a nutshell, what the registration form is asking about.

App. 549-50. The required fields in Form 107, summarized by Mr. Vlahakis, require more information than is listed in 31 U.S.C. § 5330(b) [Contents of Registration], indicating that adequate registration requires not just the information listed in § 5330(b), but also the information required by the Secretary of the Treasury's discretionary regulations.

Similarly, the government argued in its opening that, "Ian Freeman is charged with operating an unlicensed money transmitting business, meaning that he didn't register that business with FinCEN. And FinCEN's records will show it." App. 305. Finally, even the trial judge, in his instructions to the jury, appeared to assume that the only means of registration was by complying with FinCEN's regulations. App. 2187.

For these reasons, the district court erred in concluding that the government could prove a violation of 18 U.S.C. § 1960 for failing to register without also proving a failure to comply with regulations adopted by Treasury and FinCEN.

*Congress Did Not Intend by the Use of the Single Word, "Funds," in the 2001 Version of § 5330, to Anticipate the Invention of Virtual Currency and Authorize Its Regulation by FinCEN 15 Years Later.*

In the alternative, the government argued that, if the only way to comply with § 5330 was by following regulations, then such regulations were authorized by Congress when it enacted the 2001 version of § 5330 which required registration of businesses engaged in the transmission of "funds." The district court agreed with the government that the use of the word "funds" by Congress in 2001 was sufficient authorization for the regulation of virtual currency after it was invented in 2008. Add. 86-89. As explained below, the government and the district court are incorrect.

> *Determining the Plain and Ordinary Meaning of "Funds" Does Not Answer the Question.*

The district court's order denying the motion to dismiss focused on "whether the plain and ordinary meaning of 'funds' as used in 18 U.S.C. § 1960 includes bitcoin." Add. 82. The district court, like other courts, stated that the ordinary meaning of "funds" encompasses bitcoin. Add. 82-83, 86. However, Freeman never argued otherwise. In fact, the defense pointed out in its the motion to dismiss

that courts have consistently found that bitcoin qualifies as "funds" or "money." And the Freeman cited those cases for the district court. App. 107-108. *See, e.g., United States v. Harmon*, 474 F. Supp. 3d 76, 80, 90 (D.D.C. 2020) ("the Court concludes that bitcoin is money"; collecting cases reaching the same conclusion); *United States v. Murgio*, 209 F. Supp. 3d 698, 707 (S.D.N.Y. 2016) ("Bitcoins Are 'Funds' Under § 1960"); *United States v. Faiella*, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014) ("Bitcoin clearly qualifies as 'money' or 'funds'").

Freeman's argument was never whether, in a dictionary or in common usage, virtual currency would fall within the definition of "funds." The issue is whether, in 2001, Congress would have predicted the invention of an entirely new kind of financial instrument in 2008, and its rise to become a multi-trillion dollar industry, and then, based on that prediction, prospectively authorized the regulation of virtual currency by the use of one word. Freeman contends that "the use of the word 'funds' in 2001 could not have been intended to authorize federal agencies to regulate the entire universe of virtual currency transactions, a part of the U.S. and global economy which did not exist when Congress wrote the 2001 law." App. 95. This court should reach the same conclusion and find that the district court erred in not granting the motion to dismiss.

*The Major Questions Doctrine Applies to this Case.*

"Agencies have only those powers given to them by Congress." *West Virginia v. E.P.A.*, 597 U.S. 697, 723 (2022). The ordinary rules of statutory interpretation do not apply when a federal agency would presume great power from a minimal basis in the law. As emphasized by six members of the United States Supreme Court:

> [T]here are "extraordinary cases" that call for a different approach—cases in which the "history and the breadth of the authority that [the agency] has asserted," and the "economic and political significance" of that assertion, provide a "reason to hesitate before concluding that Congress" meant to confer such authority.

*Id.* at 721 (quoting from *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160 (2000)). *See also Loper Bright Enters.v. Raimondo*, 603 U.S. __, __ (2024) (slip op., at 27-28); *Utility Air Regulatory Group v. E.P.A.*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast "economic and political significance.") (quoting from *Brown & Williamson*, 529 U.S. at 160); *King v. Burwell*, 576 U.S. 473, 485-86 (2015). In such cases, the Court has adopted a "major questions" doctrine to rein in "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *W. Virginia*, 597 U.S. at 724.

As explained by Justice Gorsuch, the major questions doctrine protects the Constitution's separation of powers. *W. Virginia*, 597 U.S. at 737 (Gorsuch, J.,

concurring). Justice Gorsuch noted that "[i]n Article I, 'the People' vested '[a]ll' federal 'legislative powers . . . in a Congress.' Preamble; Art. I, § 1." *Id.* Therefore, "'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *Id.* (quoting *Wayman* v. *Southard*, 23 U.S. 1 (1825)) (Gorsuch, J., concurring). Ensuring that legislation comes from Congress and not from agencies of the Executive branch "is 'vital to the integrity and maintenance of the system of government ordained by the Constitution.'" *W. Virginia*, 597 U.S. at 737 (quoting *Marshall Field & Co.* v. *Clark*, 143 U.S. 649, 692 (1892)) (Gorsuch, J., concurring).

This is a major questions case. Virtual currency is a new and massive area of the economy which has provoked much political debate and social controversy. Congress did not intend, when it used the word "funds" in 2001, before virtual currency ever existed, to authorize agencies to regulate this vast part of the economy. Such a minimal basis in the law cannot be the foundation of FinCEN's regulation of every business which transmits virtual currency.

*Virtual Currency Has Grown from Its Invention in 2008 to Be a Major Part of the United States and World Economy.*

Virtual currency did not exist before 2008. Bitcoin, invented that year, was the very first virtual currency. David W. Perkins, Cong. Rsch. Serv., R45427,

*Cryptocurrency: The Economics of Money and Selected Policy Issues* (April 9, 2020) at 1. Like other virtual currencies or "cryptocurrencies," Bitcoin is "a decentralized form of electronic or digital currency that exists only on the [i]nternet." *Harmon*, 474 F. Supp. 3d at 80 (quoting *United States v. Lord*, 915 F.3d 1009, 1013 n.1 (5th Cir. 2019) and collecting cases). Bitcoin depends on public ledgers and blockchain technology to validate changes to the ledgers and prevent improper manipulation of the ledgers. Perkins, *supra* at 7; *see generally Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1007 (9th Cir. 2023)*;* Jerry Brito and Andrea Castillo, *Bitcoin: A Primer for Policymakers*, Mercatus Center, George Mason University (2013) at 1.

Bitcoin and other virtual currencies are not issued by any government or bank. *Bielski*, 87 F.4th at 1007; Perkins, *supra* at i, 1. In addition, while money historically has either "intrinsic value or derived value from government decree," virtual currencies like bitcoin "employ user agreement, a network of users, and cryptographic protocols to achieve valid transfers of value." *Id.* at i.

Since its invention, virtual currency has grown to be a major part of the economy. The Congressional Research Service explains that, "[s]ince 2009, cryptocurrencies have gone from little-known, niche technological curiosities to rapidly proliferating financial instruments that are the subject of intense public interest." *Id.* at 1. By 2020, the year before Congress amended § 5330, according to

a 2021 Federal Reserve analysis, approximately 12 percent of U.S. adults (roughly

31 million Americans) "held or used cryptocurrencies in the prior year." Board of

Governors of the Federal Reserve System, *Economic Well-Being of U.S.*

*Households in 2021* 45 (May 2022); United States Census Bureau, CB21-208, *New*

*Vintage 2021 Population Estimates Available for the Nation, States and Puerto*

*Rico* (December 21, 2021).

The value of the virtual currency sector of the economy has also grown

tremendously. Between July 2010 (the earliest date for available data) and May

2024, the price of one bitcoin grew from approximately 6 cents to more than

$60,000, and the overall market capitalization grew from less than $200,000 to

approximately $1.2 trillion. *Bitcoin to USD Chart*, (last visited July 3, 2024). *See*

*generally CFTC v. McDonnell*, 287 F. Supp. 3d 213, 218-19 (E.D.N.Y. 2018). The

total market capitalization for all virtual currencies is nearly double that,

approximately $2.22 trillion. *Today's Cryptocurrency Prices by Market Cap*,

https://coinmarketcap.com/ (last visited July 3, 2024).

Thus, in a little over fifteen years, virtual currencies went from not existing

to being a multi-trillion dollar part of the economy.

*This Case Is Like the Cases in Which the Court Has Followed the Major Questions Doctrine to Conclude that Congress Did Not Intend to Authorize Regulation of a Large Part of the Economy Without a Clear and Detailed Expression of Its Intent.*

The most recent major questions case is *West Virginia v. EPA*. In that case, Congress had authorized the EPA to regulate coal-fired power plants by setting standards for the emission of pollutants into the air. After years of reading the statutory authority as focused on the emission of pollutants from individual plants, the EPA adopted a new and expansive view of its regulatory authority. The EPA imposed regulations not aimed at the emission of pollutants from individual plants, but rather at the place of coal-fired plants in the entire electricity generation grid. The EPA reasoned that the authority to restrict pollutants included the authority to restrict the production of electricity from coal-fired plants so that more electricity would be produced from wind, solar, and sources of energy which produced fewer pollutants. Thus, the EPA adopted regulations which required that coal-fired plants to either reduce their own production of electricity or subsidize production from cleaner sources. However, the Supreme Court rejected this assertion of regulatory authority as invalid. The Court found that the major questions doctrine applied because the EPA was attempting to "substantially restructure the American energy market." *W. Virginia*, 597 U.S. at 724. Although there was a "plausible textual basis" in the statute for the EPA's actions, the Court found it "'highly unlikely that Congress would leave' to 'agency discretion' the decision of how much coal-based

42

generation there should be over the coming decades." *Id.* at 723, 730 (quoting *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U.S. 218, 231 (1994)). A "decision of such magnitude and consequence rests with Congress itself." *W. Virginia*, 597 U.S. at 735. Therefore, the Court invalidated the regulatory scheme adopted by the EPA.

Other cases confirm the same principles. For example, in *Brown & Williamson*, the Court found that the statutory authority of the Food and Drug Administration to regulate "drugs" and "devices" did not extend to the power to regulate, and even ban, tobacco products. 529 U.S. at 126-127, 137. The Court rejected the FDA's "expansive construction of the statute," because "Congress could not have intended to delegate" so much power "in so cryptic a fashion." *Id.* at 160. In *Utility Air Regulatory Group v. E.P.A.*, the Court addressed another question regarding the EPA's authority. The issue was whether the EPA could construe the term "air pollutant," in a specific provision of the Clean Air Act, to cover greenhouse gases. *Id.* at 310-13. Although there was some basis in the text of the relevant statute, the Court held that permitting the EPA to assume such authority would have allowed it to regulate millions of small sources, such as hotels and office buildings, that had never before been subject to such requirements. *Id.* at 310, 324. In *Gonzales* v. *Oregon*, 546 U.S. 243 (2006), the Court rejected the Attorney General's claim that he could rescind the license of any

43

physician who prescribed drugs for assisted suicide when the only basis for the claimed authority was a statute permitting the revocation of licenses in the "public interest." *Id.* at 261. The Court found the "idea that Congress gave [the AG] such broad and unusual authority through an implicit delegation . . . is not sustainable." *Id.* at 267. *See also Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U.S. 758 (2021) (*per curiam*); *National Federation of Independent Business* v. *Occupational Safety and Health Administration*, 595 U.S. 109 (2022) (*per curiam*).

The circumstances in this case are very much like those in the foregoing Supreme Court cases. A federal agency, FinCEN, decided to regulate a multi-trillion-dollar sector of the economy in which tens of millions of Americans participate, solely on the basis of one word – "funds" – in a statute written long before virtual currency existed. Regardless of whether there is possible textual basis for viewing virtual currency as "funds," there is very little basis to think that Congress intended in 2001 to convey such vast power to a federal agency. Congress did not know about virtual currency at the time because it did not exist. More importantly, it is highly unlikely that Congress intended "to delegate such a sweeping and consequential authority in so cryptic a fashion." *W. Virginia v. EPA*, 597 U.S. at 721 (cleaned up); *Brown & Williamson*, 529 U.S. at 160.

44

*A Colorable Textual Argument Is Not Enough to Overcome the Major Questions Issue.*

The major questions cases directly address the argument raised by the government and accepted by the district court that if the ordinary meaning of "funds" includes virtual currency, then Congress has authorized regulation. The *West Virginia v. EPA* majority noted that, in each of the major questions cases, there was "colorable textual basis" for the assertion of the power to regulate. *W. Virginia*, 597 U.S. at 722. However, that is insufficient where a major question is involved. It is simply "common sense" that Congress would not give an agency great power without detailed and explicit authorization. *Id.* at 722-23 (quoting *Brown & Williamson*, 529 U.S. at 133).

> Extraordinary grants of regulatory authority are rarely accomplished through "modest words," "vague terms," or "subtle device[s]." *Whitman v. American Trucking Assns, Inc.*, 531 U.S. 457, 468, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001). Nor does Congress typically use oblique or elliptical language to empower an agency to make a "radical or fundamental change" to a statutory scheme. *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 229, 114 S. Ct. 2223, 129 L. Ed. 2d 182 (1994).

*W. Virginia*, 597 U.S. at 723.

Thus, "separation of powers principles and a practical understanding of legislative intent," *W. Virginia*, *id.*, counsel against interpreting a single word to convey vast power, effectively finding "elephants in mouseholes." *Whitman*, 531 U.S. at 468. A regulatory agency must show "something more than a merely

plausible textual basis.…The agency instead must point to 'clear congressional authorization' for the power it claims." *W. Virginia*, 597 U.S. at 723 (quoting *Utility Air*, 573 U.S. at 324).

> *The Age of the Statute on Which the Regulation Is Based Shows that Congress Did Not Intend to Regulate Virtual Currency.*

The Court has also explained that when "an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' *Brown & Williamson*, 529 U.S. at 159, we typically greet its announcement with a measure of skepticism." *Utility Air*, 573 U.S. at 324. For example, in *NFIB v. OSHA*, 595 U.S. at 114-19, the Court rejected OSHA's attempt to impose a COVID vaccine mandate based on a statutory provision adopted 50 years before the pandemic.

The same principles apply here. It is highly unlikely, if not inconceivable, that when Congress used the word "funds" in the 2001 amendment to 31 U.S.C. § 5330, it was anticipating the advent of virtual currency and a seismic change in the national and world economy.

> *Congress's Later Amendment of § 5330 Implies that Virtual Currency Was Not Previously Captured by the Statute.*

The reaction of Congress to the tremendous growth of virtual currencies after 2008 was not to assume that they were already covered by § 5330. Rather, Congress struggled with deciding how to classify and regulate virtual currencies.

46

Even after virtual currencies had become well known, Congress considered and repeatedly rejected legislation to assign regulatory authority to agencies like FinCEN. For instance, in September 2018, the House passed H.R. 6411, the "FinCEN Improvement Act of 2018." That act would have added the "value that substitutes for currency" language which eventually became law in 2021. However, the Senate failed to pass that legislation in 2018. FinCEN Improvement Act of 2018, H.R. 6411, 115th Cong. (2018).

In 2019, Congress tried again. The House passed H.R. 1414, the "FinCEN Improvement Act of 2019," but again, it died in the Senate. FinCEN Improvement Act of 2019, H.R. 1414, 116th Cong. (2019). In the same year, the Senate tried its own version, S. 1883, the Combating Money Laundering, Terrorist Financing, and Counterfeiting Act of 2019, and although it made it out of committee, it went no further. Combating Money Laundering, Terrorist Financing, and Counterfeiting Act of 2019, S. 1883, 116th Cong. (2019). Another attempt, S. 2563, the Improving Laundering Laws and Increasing Comprehensive Information Tracking of Criminal Activity in Shell Holdings Act, which would have "[e]nsure[d] the inclusion of currency and future payment systems in the AML-CFT regime by updating the definition of 'coins and currency' to include digital currency" failed to even make it out of committee, although its text formed the basis for the AML provisions of the 2021 NDAA. Improving Laundering Laws and Increasing Comprehensive

47

Information Tracking of Criminal Activity in Shell Holdings Act, S. 2563, 116th Cong. (2019). Only in late 2020, overriding President Trump's veto, did Congress finally add the language "value that substitutes for currency" to the law. William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388, 4552 (2021).

This history shows that for years, Congress was well aware of the growth of virtual currencies, and that Congress considered, but repeatedly rejected, until 2021, adding the term "value that substitutes for currency" to federal law or deciding which agency or agencies would regulate virtual currencies. If the word "funds" in the 2001 version of § 5330 had already captured virtual currencies like bitcoin, Congress would not have needed to spend years deciding whether and how to expand the scope of the statute.

Drawing this conclusion from the history of virtual currencies and Congress's efforts to amend § 5330 is entirely consistent with well-known rules of statutory construction. We should presume that the law was amended in 2021 because Congress thought the word "funds" was insufficient to capture virtual currencies and that the additional phrase "or value that substitutes for currency" was necessary to achieve that goal. As explained by the Supreme Court, "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995). Reading the statute

as having already captured virtual currency in the word "funds," deprives the 2021 amendment of any real and substantial effect. *See also Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 57-58 (2006) ("We refuse to interpret the Solomon Amendment in a way that negates its recent revision, and indeed would render it a largely meaningless exercise.").

Similarly, we should assume that "funds" does not include within its scope "value that substitutes for currency" because to do so would violate the rule against surplusage which instructs that courts "must give independent meaning to each word in a statute and treat none as unnecessary." *O'Connor v. Oakhurst Dairy*, 851 F.3d 69, 73 (1st Cir. 2017). If the word "funds" already included within its scope "value that substitutes for currency," then that phrase would be redundant – surplusage. Presumably, Congress does not amend statutes to add redundancies.

*FinCEN Admitted that It Had to Expand Its Authority Beyond the Statutory Language to Capture Virtual Currency.*

A former acting director of FinCEN, Himamauli Das, stated that the 2021 updates to the Patriot Act, including the amendment to § 5330, were necessary because the 2001 law "*never anticipated the challenges of the 2020s*: *digital assets*…." Himamauli Das, *Prepared Remarks of FinCEN Acting Director Him Das, Delivered Virtually at the American Bankers Association/American Bar Association Financial Crimes Enforcement Conference*, FinCen (Jan. 13, 2022) (emphasis added). *See also*, *id.* ("[a]s the digital world increasingly becomes the

49

financial world – and *vice versa* – we need a regulatory regime to match, <u>one that</u> <u>accounts for crypto and other digital assets</u>….") (italics in original, underline added).

Moreover, FinCEN has acknowledged that its regulation of virtual currency arose from its own initiative rather than from a directive from Congress. FinCEN did not purport to regulate virtual currency until 2013, long after the invention of bitcoin in 2008. The agency issued a regulation in 2011 followed by guidance in 2013 stating FinCEN was claiming authority to regulate virtual currency. In that 2013 guidance, FinCEN wrote that "'virtual' currency is a medium of exchange that operates like a currency in some environments, but does not have all the attributes of real currency." U.S. Dep't of Treasury, FinCEN, FIN-2013-G001, *Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (Mar. 18, 2013). In the same context, FinCEN recognized that the word "funds" in the 2001 version of § 5330 did not capture virtual currency. FinCEN stated that it had to go beyond the regulation of "funds" in order to regulate virtual currency:

> The term "other value that substitutes for currency" encompasses situations in which the transmission does not involve currency [defined as the coin or paper money of a country], **or funds**, but instead involves something that the parties to a transaction recognize has value that is equivalent to or can substitute for currency.

50

*Id*. at sec. 1.2.1 (emphasis added). Jennifer Shasky Calvery, then-director of FinCEN, explained to Congress that FinCEN was adding language to bring virtual currency within the scope of FinCEN's authority, saying "[t]he updated definitions . . . accommodate the development of new payment systems, including virtual currency." *The Present and Future Impact of Virtual Currency: Joint Hearing before the Subcomm. on Nat'l Sec. and Int'l Trade and Fin. and the Subcomm. on Banking, Hous., and Urb. Aff.*, 113th Cong. 210 (2013) at 36. FinCEN provided similar information to Congress in 2018. *See Illicit Use of Virtual Currency and the Law Enf't Response: Hearing before the House Subcomm. on Terrorism and Illicit Fin. Committee on Fin. Serv.*, 115th Cong. 102 (2018) at 9, 25.

Under our Constitution, the regulation is supposed to come after the statutory authorization. Yet, that is not what happened regarding the requirement that bitcoin sellers register with FinCEN. Here, the agency recognized that the statute did not authorize the regulation, but nonetheless believed there was a need for the regulation. To that end, FinCEN expanded its authority to regulate not just the transmission or exchange of funds, but also to regulate the transmission or exchange of "value that substitutes as currency" for the purpose of including virtual currency. As acknowledged by one former Trial Attorney with the U.S. Department of Justice's Money Laundering and Asset Recovery Section in testimony before Congress, the 2021 revision of § 5330 "codified FinCEN's

previous position that the definition of a financial institution and money transmission business included businesses involved in the transmission or exchange of 'value that substitutes for currency.'" *Crypto Crime in Context: Breaking Down the Illicit Activity in Digital Assets: Hearing before the House Subcommittee on Digital Assets, Financial Technology and Inclusion*, 118th Cong. (2023) at 11. In other words, the regulation came before the authorization from Congress.

*Reversing the Trial Court's Decision Regarding the Motion to Dismiss Requires Vacating the Money Transmitting Convictions and a New Trial on the Other Counts.*

Since § 5330 only provides for one means of registration and since Congress did not authorize regulations requiring the registration of virtual currency sellers until 2021, the district court should have granted the motion to dismiss Counts 1 and 2. Therefore, Freeman asks this court to reverse the decision of the trial court denying the motion to dismiss and vacate his convictions for conspiring to operate and operating an unlicensed money transmitting business.

In addition, the court should vacate the convictions on the remaining counts and order a new trial because of the "spillover prejudice" which resulted from trying the counts which should have been dismissed before trial with the remaining counts. Since Freeman also seeks a new trial as to the other counts as a result of spillover prejudice from the money laundering count of which he was acquitted by

the district court after trial, the combined spillover prejudice, as the basis for a new

trial on all counts, is briefed in the next section.

ARGUMENT ON ISSUE NO. 2: SPILLOVER PREJUDICE FROM THE
MONEY LAUNDERING COUNT REQUIRES A NEW TRIAL, ESPECIALLY
IF THE COURT AGREES THAT COUNTS 1 AND 2 SHOULD HAVE BEEN
DISMISSED.

After the trial, the district court granted Freeman's motion for a judgment of

acquittal under Rule 29 with respect to the substantive money laundering count of

the indictment. Freeman sought a new trial on the grounds of spillover prejudice as

far as the other counts, App. 2245-50, but the district court denied that motion.

Add. 126-128.

*Standard of Review.*

A district court's decision denying a new trial on the grounds of spillover

prejudice is reviewed for an abuse of discretion. *United States v. Correia*, 55 F.4th

12, 36-37 (1st Cir. 2022).

*A New Trial Is Required When There Is "Compelling Prejudice" Such that a*
*"Miscarriage of Justice Looms."*

When a defendant is convicted of multiple counts but then acquitted post-

trial of one (or some) of the counts, a new trial may be warranted because the

evidence regarding the acquitted charge(s) prejudiced the jury with regard to the

remaining charges. This is sometimes called "spillover prejudice" and the defense

claims are sometimes referred to as claims of "retroactive misjoinder." *See United*

*States v. Abdelaziz,* 68 F.4th 1, 61 (1st Cir. 2023); *United States v. Gurry*, 427 F.

54

Supp. 3d 166, 196 (D. Mass. 2019). "Prejudicial spillover occurs when the evidence admitted to prove a charge as to which the defendant was acquitted was so extensive, inflammatory, and prejudicial that it necessarily spilled over into the jury's consideration of his guilt on other charges." *Correia*, 55 F.4th at 36 (quotations and citations omitted).

A defendant seeking a new trial on the grounds of spillover prejudice has an admittedly high burden. He must show "compelling prejudice" such that a "miscarriage of justice looms." *Abdelaziz*, 68 F.4th at 61; *Correia*, 55 F.4th at 36-37 (citations and quotations omitted). A review of the trial evidence shows that there is compelling prejudice in this case.

The government relied heavily on the money laundering charge to paint Freeman as a person connected to the sale of illegal drugs and to enhance his culpability for otherwise regulatory offenses. In its opening statement, the government said:

> And, finally, he's charged with one count of money laundering based on his sale of bitcoin to an undercover officer [Pavel Prilotsky] who was pretending to be a drug dealer. . . .

App. 316.

> [Pavel] told Mr. Freeman that he was a drug dealer. And he didn't say anything that night, but the next time that Pavel wanted to purchase bitcoin, Freeman told him in a text, and I'm going to read it, "you told me you sell drugs. Therefore, to assist you with buying bitcoin would be considered money laundering. Money laundering requires knowledge of the illegal

activity. I don't think you're an undercover agent, but you got a little too loose-lipped. Sadly, that means I cannot knowingly sell bitcoin to you."

App. 318. Consistent with its opening, the government emphasized those points in its examination of Prilotsky. App. 968, 1012, 1019.

In closing, the government used the allegation that Freeman facilitated the laundering of the proceeds of drug sales to characterize the entirety of Freeman's bitcoin sales, linking the allegations by saying, "Freeman intentionally set up a bitcoin money-transmitting business to help scammers and other criminals." App. 2094. In addition, the government used the claim regarding bitcoin and the supposed drug dealer to argue that Freeman was similarly willfully blind with regard to other bitcoin sales.

> Freeman suspected the undercover was engaged in criminal activity, and he advised the undercover accordingly, because he knew. And then, when the undercover finally told Freeman explicitly that he was a drug dealer, look closely at Freeman's response. Quote: You got a little too loose-lipped, so I'm not opposed to the sale of drugs. I do need to be careful. Sadly, that means I can'T KNOWINGLY, in all capital letters, sell you bitcoin.
>
> I'd ask you to apply your common sense to that conversation. If Freeman believed that the undercover was a legitimate business person who had been investing in bitcoin who then sprung out of the blue that he was actually a criminal drug dealer using Freeman's services to launder funds, how would you expect Freeman to act? Anger? Disgust? Get away from me? Not Ian Freeman. He chastises the undercover for being too loose-lipped, for violating the Don't tell me what you're doing with the bitcoin golden rule....
>
> Consider the red flags that Ian Freeman ignored in these transactions, the obvious facts showing that these transactions were suspicious. Why did he ignore them? Once again, because he knew, he knew his business was laundering criminal proceeds under this no-questions-asked policy. That was

his plan: Look the other way. He was what the judge will describe to you; he was willfully blind.

App. 2100-02.

So, that is the case. Freeman set up a money-laundering business by transmitting bitcoin in exchange for dollars under a don't ask, don't tell policy, knowing that it would cater to scammers and other criminals.

App. 2125.

If the court agrees with Freeman and vacates the two unlicensed money

transmitting convictions, then the case for spillover prejudice is even stronger

because the government also portrayed Freeman's failure to register with FinCEN

as part of his plan to get away with committing the other crimes. In closing the

government connected the failure to register with the other crimes by describing

the failure to register as one of the ways Freeman was able to commit the other

crimes without detection.

And you know that Freeman helping these scammers was a key part of the scheme. He was helping them hide the tracks by making the money trail invisible. That's what money laundering is, hiding the origin of the funds. It's money laundering pure and simple. Now, Freeman understood that there were two institutions that could cause him trouble with his scheme, and those were the government and the banks. So, let me talk to you for a minute about the government. This is where the unlicensed money servicing business comes in. You learned from FinCEN representative Mr. Valahakis that money transmitters present a particular danger of money laundering, and for that reason money transmitters must register with the government.

App. 2116.

He knew how to hide from the government and the banks. . . . Freeman is a money-laundering tax cheat who refused to register with FinCEN so that he

could operate his criminal scheme under the radar. It's no one else's fault. It's his.

App. 2133-34.

The manner in which the government presented its case shows that the jury could not have considered the other charges without being prejudiced by the description of a Freeman as a money launderer and by the alleged illegality of his failure to register with FinCEN. The government's case was largely a willful blindness case, with the theme that Freeman "had a golden rule" App. 300-01, 307-08, 310, 318-19, 2051, 2067, 2101, which was, "What you do with your bitcoin is your business. Don't tell me what your plans are." App. 300, 308, 2099, 2102, 2112.

Case law confirms that willful blindness can be difficult to prove beyond a reasonable doubt in such circumstances. *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) ("a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts"); *United States v. Rodríguez-Martinez*, 778 F.3d 367, 371 (1st Cir. 2015) ("Where the evidence presented does not support the inference that a defendant had knowledge of the crime, we have consistently found the evidence insufficient."); *United States v. Perez-Melendez*, 599 F.3d 31, 43 (1st Cir. 2010) ("A significant body of case law from other circuits exists in which insufficiency of evidence was found where a defendant may have

known he was participating in an illegal activity but there was little or no evidence to suggest that the defendant knew that the activity involved drugs specifically, and we adopt that position here.").

The spillover prejudice from the money laundering count, as well as the unlicensed money transmitting counts, solved this problem for the government. That prejudice made a very close case into an unfairly strong case for the government. For these reasons, the prejudice is clear and compelling, and the danger of a "miscarriage of justice looms." The court should order a new trial on all remaining counts.

ARGUMENT ON ISSUE NO. 3: THE EVIDENCE WAS INSUFFICIENT TO SUPPORT CONVICTIONS FOR TAX EVASION.

Freeman challenges the sufficiency of the evidence to support his convictions of tax evasion. To convict a defendant for tax evasion, "the government must show (1) the existence of a tax deficiency, (2) an affirmative act constituting an evasion or attempted evasion of the tax, and (3) willfulness." *United States v. Lavoie*, 433 F.3d 95, 97 (1st Cir. 2005) (citing *Sansone v. United States*, 380 U.S. 343, 351 (1965); 26 U.S.C. § 7201). This court reviews the evidence in the light most favorable to the government, taking all reasonable inferences in its favor, and asks whether "a rational factfinder could find, beyond a reasonable doubt, that the prosecution successful proved the essential elements of the crime." *Lavoie*, 433 F.3d at 98 (quoting *United States v. O'Brien*, 14 F.3d, 703, 706 (1st Cir. 1994)).

While a formal assessment by the IRS is not required to prove the existence of a tax deficiency, *United States v. Hogan*, 861 F.2d 312, 316 (1st Cir. 1988), it can help the government prove that a tax was due and owing. However, with respect to Freeman, the government did not demonstrate, through a valid assessment, that there was a tax deficiency. *See, e.g., United States v. Thomas*, 666 F. Supp. 2d 139, 146 (D. Me. 2009). Rather, in Freeman's case, the government called as a witness Colleen Ranahan from the IRS who testified that Freeman had not filed tax returns from 2016 to 2019. App. 1717-18.

60

Ranahan acknowledged that the IRS typically sends audit letters to taxpayers informing them of unpaid tax liability, but that between 2016 and 2019, the IRS never sent Freeman a letter. App. 1737-39. Moreover, Ranahan only reviewed a portion of Freeman's financial records, specifically those from LocalBitcoins.com, to estimate his commission rate, and then to estimate his possible tax due. App. 1718-28. In her calculations she allowed for deductions which she thought were appropriate based on the information provided by the government. App. 1729-40.

Ranahan admitted that she did not consider deductions which might have been itemized if other information was available such as overhead, property taxes, charitable deductions, and the like. App. 1740. Finally, and most significantly, Ranahan admitted it was possible that Freeman did not owe any taxes at all.

Q. Right. In fact, if he went through an itemization, detailed, and you sat down with him, quite frankly, he may owe nothing, right?

A. Correct.

*Id*. Considering this admission, the evidence is insufficient as to the element of a tax deficiency.

To prove a defendant's willfulness in a tax case, "the government must show more than just that he acted in careless disregard for the truth" because "underreporting could be caused by inadvertence or negligence." *Lavoie*, 433 F.3d at 98. Instead, willfulness "requires the 'intentional violation of a known legal duty.'" *Id*. (quoting *United States v. Pomponio*, 429 U.S. 10, 12 (1976)). The

government's evidence, however, only established that Freeman did not file tax returns between 2016 and 2019. They offered no evidence that Freeman had previously filed tax returns. *See, e.g., United States v. Sempos*, 772 F.2d 1, 2 (1st Cir. 1985) (finding a prior history of regularly filing timely returns would allow a jury to infer knowledge of obligation a known legal duty). Freeman testified that he received no letters or notifications from the IRS regarding back taxes, App. 1994, and that he did not believe he had "any obligation to file documents as churches under the IRS rules don't pay taxes," App. 1995, and that he researched tax liabilities for churches. App. 2047-49, 2050-51. Considering this evidence, a rational juror could not find beyond a reasonable doubt that Freeman's failure to file taxes was willful.

Therefore, even viewing the evidence in the light most favorable to the government, no rational juror could find that the government proved beyond a reasonable doubt that Freeman had a tax liability for any of the four years, or that he acted willfully in failing to pay taxes. The four tax evasion convictions should be vacated and judgments of acquittal entered.

ARGUMENT ON ISSUE NO. 4: THE SENTENCE OF 96 MONTHS WAS
SUBSTANTIVELY UNREASONABLE.

The trial court's calculation of the guideline sentencing range was 210 to

262 months. App. 2570. The government argued that a guidelines sentence was

appropriate. App. 2602-03. Freeman asked for a downward variance and a

sentence of 38 months. App. 2573-79. The trial court sentenced Freeman to 96

months in prison. Add. 3; App. 2630, 2643. Freeman challenges the sentence

imposed by the district court as excessive and substantively unreasonable. The

defense preserved the issue by advocating for a sentence less than 96 months and

through a specific objection that the sentence of 96 months was substantively

unreasonable and inconsistent with the factors in 18 U.S.C. § 3553. App. 2634. *See*

*Holguin-Hernandez v. United States*, 589 U.S. 169, 174-75 (2020).

In considering a challenge to the substantive reasonableness of a sentence,

the abuse of discretion standard applies. *United States v. Vargas-Martínez*, 15

F.4th 91, 102 (1st Cir. 2021) (citing *Holguin-Hernandez*, 589 U.S. at 173). The

court evaluates substantive unreasonableness "under the 'totality of the

circumstances' to determine if there was a 'plausible sentencing rationale and a

defensible result.'" *United States v. Rand*, 93 F.4th 571, 579 (2024) (quoting

*United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008)). "[W]ithin wide limits,

deference is due to the trier's on-the-spot perceptions," *United States v. Vargas-*

*Davila*, 649 F.3d 129, 131 (1st Cir. 2011), and a sentence "will be vacated on the

ground of substantive unreasonableness only if it 'falls outside the expansive boundaries' of the universe of reasonable sentences." *United States v. Márquez-García*, 862 F.3d 143, 147 (1st Cir. 2017) (quoting *Martin*, 520 F.3d at 92). But the "'touchstone of abuse of direction review in federal sentencing is reasonableness.'" *United States v. Pupo*, 995 F.3d 23, 29 (2021) (quoting *United States v. Benoit*, 975 F.3d 20, 24 (1st Cir. 2020)).

Freeman's sentence of 96 months is not reasonable and is greater than is necessary to achieve the goals set forth in 18 U.S.C. § 3553.

Regarding Freeman's background, his criminal history was minimal. He was given two points under the guidelines for an Obstructing Government Administration misdemeanor that occurred over a decade prior to sentencing. PSIR ¶ 71; S.App. 19-20. He had one point from an Unsworn Falsification charge arising from a dispute about his voter card when he changed his name. PSIR ¶ 73; S.App. 21-22. And then two points were added because the instant offenses began while he was still subject to a suspended sentence for the unsworn falsification conviction. PSIR ¶76; S.App. 23. Furthermore, Freeman is not a violent person or a person without value to his community. To the contrary, numerous people explained at trial, App. 781, 827, 1828, 1848, 1855, 1860, 1863, 2079, and in letters to the court at sentencing, App. 2573, 2626, that he is a valued member of his community.

Regarding the offenses, the defense sought a 38-month sentence and submits that such a sentence was reasonable and consistent with, or even greater than, sentences imposed in similar virtual currency related money laundering crimes. Those examples include:

- *United States v. Changpeng Zhao*, 23-CR-179 (W.D. Wash. 2023), doc. 90 at 2; *id.*, doc. 1 (Information) at 7-8. The defendant was sentenced to four months in prison despite processing hundreds of millions of dollars of transactions to users in Iran, Cuba, and Syria.

- *United States v. Charles Randol*, 23-CR-440 (C.D. Cal. 2023), doc. 53; *id.*, doc. 7 (Plea Agreement) at 7. The defendant was also sentenced to four months' incarceration despite laundering millions of dollars in criminal proceeds.

- *United States v. Yuri Lebedev*, 15-CR-769 (S.D.N.Y. 2017), doc. 641, at 1-3. The defendant, who was accused with coconspirators of processing more than $10 million in transactions, was found guilty at trial of five counts and was then sentenced to a 16-month sentence.

- *United States v. Hugo Mejia*, 21-CR-8 (C.D. Cal 2021), doc. 39 at 1; *id.*, doc. 1 (Information) at 1-2; id., doc. 5 (Plea Agreement) at 13. The defendant, who pled guilty to operating an unlicensed money transmitting

business and money laundering, exchanging between $13 and $25 million in virtual currency, received only 36 months in prison.

- *United States v. Theresa Tetley*, 17-CR-738 (C.D. Cal. 2018), doc. 45, at. 1; *id*. doc. 31 (Sentencing Memorandum), at 7. The defendant, who pled guilty to operating an unlicensed money transmitting business and to money laundering, received twelve months and one day after processing between $6 and $9.5 million through her unlicensed business.

- *United States v. Joseph Farace*, 21-CR-294 (D. Md. 2024), doc. 97 at 1-2; *id*., doc. 79 (Plea Agreement) at 11-12. Joseph Farace, who pled guilty to one count of conspiracy to commit money laundering, after having been accused of sending thousands of bitcoin valued at millions of dollars, was sentenced to 19 months.

A sentence of 38 months would have been a substantial sentence which reflected the seriousness of offenses, promoted respect for the law, provided just punishment, and deterred Freeman and others from engaging in such conduct in the future. A sentence of 96 months is so far beyond that is necessary to achieve those goals that it is unreasonable. This court should correct that error and reduce Freeman's total sentence in prison to 38 months.

CONCLUSION

For all of the foregoing reasons, the defendant requests that the court reverse the trial court's denial of his motion to dismiss counts 1 and 2 of the indictment, that the court enter judgments of acquittal on the four tax evasion counts, that the court order a new trial on any remaining charges, and that the court vacate the sentence of 96 months in prison and remand for imposition of a sentence of 38 months or less depending on whether any convictions are affirmed.

Date: July 3, 2024

/s/ *Richard Guerriero*
Richard Guerriero
1st Circuit Bar ID 1164673
Oliver Bloom
1st Circuit Bar ID 1211240
Lothstein Guerriero, PLLC
39 Central Square, Suite 202
Keene, NH 03431
(603) 352-5000
richard@nhdefender.com
oliver@nhdefender.com

Mark L. Sisti
1st Circuit Bar ID
Sisti Law Offices
387 Dover Road
Chichester, NH 03258
(603) 224-4220
info@sistilawoffices.com

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)

I, Richard Guerriero, hereby certify that the foregoing brief of Appellant

Ian Freeman complies with the type-volume limitation of FRAP 32(a)(7)(B):

1. This brief contains 12,980 words, not including the parts of the brief

exempted by FRAP 32(a)(7)(B)(iii).

2. This brief has been prepared in a proportionally spaced typeface using

Microsoft Word for Office 365 (2024) in 14-point Times New Roman.

/s/ *Richard Guerriero*
Richard Guerriero
1st Circuit Bar ID 1164673
NH Bar ID 10530

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion was forwarded by

electronic mail through the ECF system on July 3, 2024, to Assistant United States

Attorneys David Lieberman, Georgiana MacDonald, and John Kennedy, of the

United States Attorney's Office, 55 Pleasant Street, 4th Floor Concord, NH 03301.

A copy of the motion was mailed by U.S. Mail to Appellant, Ian Freeman, 34755-

509, at the FMC Devens, 42 Patton Rd, Devens, MA 01434.Filing on July 3, 2024.

/s/ *Richard Guerriero*
Richard Guerriero
1st Circuit Bar ID 1164673
NH Bar ID 10530

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

NO. 23-1839

_____

**UNITED STATES,**
**APPELLEE**

**v.**

**IAN FREEMAN,**
**APPELLANT**

_____

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE

_____

**ADDENDUM TO BRIEF OF IAN FREEMAN**

_____

Richard Guerriero
1st Circuit Bar ID 1164673
Oliver Bloom
1st Circuit Bar ID 1211240
Lothstein Guerriero, PLLC
39 Central Square, Suite 202
Keene, NH 03431
(603) 352-5000
richard@nhdefender.com
oliver@nhdefender.com

Mark L. Sisti
1st Circuit Bar ID
Sisti Law Offices
387 Dover Road
Chichester, NH 03258
(603) 224-4220
info@sistilawoffices.com

**Table of Contents**

2024-02-07 - Second Amended USDC Judgment (doc. no. 389 …………..…………………………………..…………………………………1

2022-09-01 - Motion to Dismiss Hearing Transcript (doc. no. 268) …………………..…………………………………………………………..10

2023-07-28 - Endorsed Order Granting Rule 29 Motion …………………………………..…………………………………..68

2023-08-22 - Memorandum Order Denying Motion to Dismiss and Granting Rule 29 Motion (doc. no. 332)……………………………..……………………..72

2023-09-11 - Transcript of Denial of Motion to Reconsider MTD (doc. no. 362) …………………………………………..………………………………107

2024-07-03 - 18 U.S.C. 1960 (effective prior to 2021) …………………………………………………………………..131

2024-07-03 - 31 U.S.C. 5330 (effective prior to 2021) ……………………………………………….…………………..132

AO 245C (Rev. 09/19)  Amended Judgment in a Criminal Case
USDC-NH (8/21)  Sheet 1

(NOTE: Identify Changes with Asterisks (*))

# UNITED STATES DISTRICT COURT

District of New Hampshire

| UNITED STATES OF AMERICA | ) | **AMENDED JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| **v.** | ) | |
| IAN FREEMAN | ) | Case Number: 21-cr-41-1-JL |
| f/k/a IAN BERNARD | ) | USM Number: 34755-509 |
| **Date of Original Judgment:** 10/10/2023 | ) | Mark Sisti, Esq., Richard Guerriero, Esq., Oliver Bloom, Esq. |
| *(Or Date of Last Amended Judgment)* | ) | Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
    which was accepted by the court.

☑ was found guilty on count(s)    ls, 2s, 28s, 29s-32s of the Superseding Indictment
    after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§ 371 & 1960(a) & (b)(1)(B) | Conspiracy to Operate Unlicensed Money Transmitting Business | 3/15/2021 | 1s |
| 18 U.S.C. §§ 1960(a) and (b)(1)(B) and (C) | Operation of Unlicensed Money Transmitting Business | 3/15/2021 | 2s |
| 18 U.S.C. § 1956(h) | Conspiracy to Commit Money Laundering | 3/15/2021 | 28s |

The defendant is sentenced as provided in pages 2 through ____9____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s) _1-20 and Counts 4s-20s, 22s-24s, 33s_ are dismissed pursuant to LR 48.1. Count 21s dismissed by order of the court dated 8/22/23.

    It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

2/6/2024
Date of Imposition of Judgment

_Signature of Judge_

Joseph N. Laplante U.S. District Judge
Name and Title of Judge

2/9/24
Date

**ADDENDUM PAGE 1**

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
USDC-NH (8/21)      Sheet 1A

| Judgment — Page | 2 | of | 9 |

(NOTE: Identify Changes with Asterisks (*))

DEFENDANT: IAN FREEMAN
CASE NUMBER:  21-cr-41-1-JL

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 26 U.S.C.§ 7201 | Attempt to Evade or Defeat Tax | 7/15/2020 | 29s-32s |

**ADDENDUM PAGE 2**

AO 245C (Rev. 09/19)    Amended Judgment in a Criminal Case
USDC-NH (8/21)          Sheet 2 — Imprisonment

Judgment — Page __3__ of __9__

DEFENDANT:  IAN FREEMAN
CASE NUMBER:  21-cr-41-1-JL

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a
total term of :
Ninety-six (96) months. This term consists of a term of 60 months on Counts 1s, 2s, and 29s through 32s, and a term of 96
months on Count 28s, to be served concurrently.

☑ The court makes the following recommendations to the Bureau of Prisons:
The Court recommends that the defendant participate in substance abuse treatment while in Bureau of Prisons
custody. The Court also recommends the defendant be designated to a facility close to Keene, New Hampshire for
visitation with friends and community, which will facilitate good behavior and successful reentry.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m.   on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**ADDENDUM PAGE 3**

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
USDC-NH (8/21)      Sheet 3 — Supervised Release

(NOTE: Identify Changes with Asterisks (*))

Judgment—Page __4__ of __9__

DEFENDANT:  IAN FREEMAN
CASE NUMBER:  21-cr-41-1-JL

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

Two (2) years. This term consists of terms of 2 years on Counts 1 s, 2s, and 28s through 32s. such terms to run concurrently.

## MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, not to exceed 72 drug tests per year of supervision.
     ☐   The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.   ☐   You must make restitution in accordance with 18 U.S.C. § 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.   ☑   You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☐   You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐   You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

## ADDENDUM PAGE 4

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
USDC-NH (8/21)         Sheet 3A — Supervised Release

|  |  | Judgment—Page | 5 | of | 9 |

DEFENDANT:   IAN FREEMAN
CASE NUMBER:  21-cr-41-1-JL

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.   You must answer truthfully the questions asked by your probation officer.
5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.   You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____        Date  _____

ADDENDUM PAGE 5

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
USDC-NH (8/21)   Sheet 3D — Supervised Release

(NOTE: Identify Changes with Asterisks (*))

Judgment—Page   6   of   9

DEFENDANT:   IAN FREEMAN f/k/a IAN BERNARD
CASE NUMBER:   21-cr-41-1-JL

## SPECIAL CONDITIONS OF SUPERVISION

Substance Abuse Treatment, Testing, Abstinence
1. You must participate in a substance use treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program (provider, location, modality, duration, intensity, etc.). You must pay for the cost of treatment to the extent you are able, as determined by the probation officer.
2. You must not use or possess any controlled substances without a valid prescription. If you do have a valid prescription, you must disclose the prescription information to the probation officer and follow the instructions on the prescription.
3. You must submit to substance abuse testing to determine if you have used a prohibited substance. You shall pay for the cost of testing to the extent you are able, as determined by the probation officer. You must not attempt to obstruct or tamper with the testing methods.
4. You must not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive substances (e.g. synthetic marijuana, bath salts, etc.) that impair a person's physical or mental functioning, whether or not intended for human consumption, except with the prior approval of the probation officer.

Financial Requirements and Restrictions
5. You must provide the probation officer with access to any requested financial information and authorize the release of any financial information. The probation office may share financial information with the Financial Litigation Unit of the U.S. Attorney's Office.
6. You must not incur new credit charges, or open additional lines of credit without the approval of the probation officer.
7. If the Judgment imposes a financial penalty, you must pay the financial penalty in accordance with the Schedule of Payments sheet of this judgment. You must also notify the court of any changes in economic circumstances that might affect the ability to pay this financial penalty.
8. During the period of supervised release or probation, unless you have already done must, within six months of sentencing or release, whichever is later:
(i) Cooperate with the Examination and Collection Division of the IRS;
(ii) Provide to the Examination Division all financial information necessary to determine your tax liabilities;
(iii) Provide to the Collection Division all financial information necessary to determine your ability to pay restitution;    and
(iv) Make a good faith effort to pay all delinquent and additional taxes, interest, and penalties, including the $281,588.69 tax loss associated with this case.

Employment Restrictions
9. You must not operate any money service business and/or cryptocurrency business or establish any new business or charitable organization without the prior approval of the probation officer.

Place Restrictions
10. You must not go to, or remain at, any place where you know controlled substances are illegally sold, used, distributed, or administered without first obtaining the permission of the probation officer.

Search and Seizure
11. You must submit your person, property, house, residence, vehicle, papers, computers (as defined in 18 U.S.C. § 1030 (e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States Probation Officer. Failure to submit to a search may be grounds for revocation of release. You must warn any other occupants that the premises may be subject to searches pursuant to this condition. The probation officer may conduct a search under this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

## ADDENDUM PAGE 6

AO 245C (Rev. 09/19) Amended Judgment in a Criminal Case
USDC-NH (8/21)        Sheet 5 — Criminal Monetary Penalties

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page __7__ of __9__

DEFENDANT:  IAN FREEMAN f/k/a IAN BERNARD
CASE NUMBER:  21-cr-41-1-JL

## CRIMINAL MONETARY PENALTIES ***

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution *** | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 700.00 | $ 3,502,708.69 | $ 40,000.00 | $ | $ |

☐  The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑  The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee    *** | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| K.M. | | $230,000.00 | |
| M.A | | $92,000.00 | |
| D.V. | | $755,000.00 | |
| R.A. | | $45,000.00 | |
| S.J. | | $40,750.00 | |
| J.S. | | $31,000.00 | |
| J.R. | | $67,000.00 | |
| S.W. | | $2,700.00 | |
| H.J. | | $811,624.00 | |
| J.B. | | $12,400.00 | |
| **TOTALS** | $ 0.00 | $ 3,502,708.69 | |

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑  The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☑  the interest requirement is waived for  ☑  fine  ☑  restitution.

☐  the interest requirement for the  ☐  fine  ☐  restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**ADDENDUM PAGE 7**

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
USDC-NH (8/21)      Sheet 5B — Criminal Monetary Penalties                                          (NOTE: Identify Changes with Asterisks (*))

| | | Judgment — Page | 8 | of | 9 |

DEFENDANT:  IAN FREEMAN
CASE NUMBER:  21-cr-41-1-JL

## ADDITIONAL RESTITUTION PAYEES  ***

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| D.W. | | $28,000.00 | |
| S.K. | | $68,000.00 | |
| R.S. | | $343,250.00 | |
| P.B. | | $281,900.00 | |
| L.Ba. | | $11,200.00 | |
| L.Be. | | $36,450.00 | |
| L.G. | | $31,100.00 | |
| C.J. | | $2,600.00 | |
| J.C. | | $32,000.00 | |
| S.L. | | $151,400.00 | |
| C.M. | | $39,000.00 | |
| D.Z. | | $20,000.00 | |
| B.D. | | $12,356.00 | |
| D.B. | | $3,680.00 | |
| G.G. | | $56,000.00 | |
| J.T. | | $7,850.00 | |
| M.G. | | $5,860.00 | |
| T.A. | | $3,000.00 | |
| Internal Revenue Service | | $281,588.69 | |

* Findings for the total amount of losses are required by Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

## ADDENDUM PAGE 8

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
USDC-NH (8/21)        Sheet 6 — Schedule of Payments

Judgment — Page ___9___ of ___9___

DEFENDANT:   IAN FREEMAN f/k/a IAN BERNARD
CASE NUMBER:   21-cr-41-1-JL

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A   ☑   Lump sum payment of $   700.00   due immediately, balance due

   ☐   not later than _____ , or
   ☑   in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☑ F below; or

B   ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or  ☐ F below); or

C   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☐   Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E   ☐   Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   ☑   Special instructions regarding the payment of criminal monetary penalties:

   It is ordered that the defendant shall pay to the United States a fine of $40,000.00, which is due within 60 days of sentencing. It is further ordered that $3,502,708.69 currently in the custody of the United States Marshals Service as part of Asset ID # (21-FBI-005722) be paid to the Clerk of Court for the District of New Hampshire to be used to satisfy the restitution order within 10 days of receipt

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk, U.S. District Court, 55 Pleasant Street, Room 110, Concord, N.H. 03301. Personal checks are not accepted.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate. |
|---|---|---|---|
| | | | |

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☑   The defendant shall forfeit the defendant's interest in the following property to the United States:   ***
    The Preliminary Order of Forfeiture shall be made a part of the sentence and included in the judgment.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**ADDENDUM PAGE 9**

**\*\*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 5-30-2023**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                              \*
UNITED STATES OF AMERICA                      \*
                                              \*   21-cr-41-01-JL
            v.                                \*   21-cr-41-02-JL
                                              \*   September 1, 2022
IAN FREEMAN AND ARIA DIMEZZO                  \*   9:45 a.m.
                                              \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


APPEARANCES:


For the Government:        Seth R. Aframe, AUSA
                           Georgiana MacDonald, AUSA
                           John J. Kennedy, AUSA
                           U.S. Attorney's Office




For the Defendants:

 (Ian Freeman)             Mark L. Sisti, Esq.
                           Sisti Law Offices


 (Aria DiMezzo)            Richard Guerriero, Esq.




Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453


**ADDENDUM PAGE 10**

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  The Court is now in session and has
 3    before it for consideration a motion hearing in criminal case
 4    21-cr-41-JL, United States versus Ian Freeman, et al.
 5            THE COURT:  All right.  Good morning everybody.
 6            We're here on a motion to dismiss the latest
 7    indictment, which is the superseding indictment.  I have a
 8    copy of it right here which I've been reviewing with an eye
 9    toward this motion.  It's dated April 25th of this year.
10            I've read your submissions of course.
11            Mr. Sisti and Mr. Guerriero are here for the
12    defendants.
13            I've got three AUSAs here, AUSAs MacDonald,
14    Kennedy, and Aframe, for the prosecution.
15            All right.  It's your motion, defense.  I'm
16    listening.
17            MR. GUERRIERO:  Good morning, your Honor.
18            THE COURT:  Good morning.
19            MR. GUERRIERO:  My expectation is mostly that the
20    Court would have a lot of questions, but I do think I can
21    summarize our argument fairly succinctly.
22            THE COURT:  I do think I understand it.  I really
23    do.  I probably won't have that many questions, but I get it.
24            Go ahead.
25            MR. GUERRIERO:  Okay.  I mean, at the outset that's
```

```
 1   what I'm -- I don't need to make a formal presentation.  I'm
 2   happy to have a question at any time.
 3           Our argument is fairly simple.  Our position is
 4   that Congress has not authorized any federal agency to require
 5   the registration of money transmitting businesses that are
 6   involved in the exchange of virtual currency or fiat currency,
 7   and that argument is based on the statutory history.  And,
 8   most importantly, and this is really sort of the crux of our
 9   case, most importantly on the recent U.S. Supreme Court
10   decision in West Virginia versus EPA.
11           I mean, frankly, I think that we're on the leading
12   edge of something here because that case really was a sea
13   change and makes a lot of the cases that came before it,
14   especially district court cases dealing with Chevron and those
15   sort of issues, I think it undermines a lot of those cases,
16   and even in the U.S. Supreme Court we have to follow that.
17           THE COURT:  I think that's fair.
18           MR. GUERRIERO:  So our argument, as I said, is that
19   this statute was enacted in 2001 before virtual currency
20   bitcoin was ever invented.  Seven years before it.
21           So after that -- or in that statute there is one
22   word which the government clings to, the word funds, and they
23   say that because the statute authorizes the Secretary of the
24   Treasury and FinCEN to require a licensing of money
25   transmitters, that funds should be read to include that.
```

**ADDENDUM PAGE 12**

```
 1          Our position is not based on the definition of the
 2   word funds.  As we said in our motion, many courts have found
 3   that the word funds can be interpreted to include virtual
 4   currency.  That's not our point any more than it was the point
 5   in Utility Air, as explained in the Utility Air case, as
 6   explained by the Supreme Court in the West Virginia case that
 7   someone could argue that greenhouse gases fall within the
 8   scope of the word pollutant.  Of course it does, and that's
 9   why the West Virginia case says -- the point is not whether
10   there is a plausible basis in the text of the statute.  The
11   point is whether Congress clearly authorized a federal agency
12   to regulate a big, new, socially important part of the
13   economy.  And what we tried to demonstrate in our motion is
14   that virtual currency is exactly that, and that the major
15   questions doctrine recently described by the Supreme Court, I
16   think it's for the culmination of a whole line of cases, that
17   under that doctrine this is such an area, and, therefore, it
18   was wrong for FinCEN and the Department of Treasury to have
19   this requirement.
20          That's our argument in a nutshell.
21          THE COURT:  Okay.  But can't the government's case
22   proceed without -- let's assume you're right about that.
23   Let's assume that you're right about the idea that -- does it
24   matter if the statute itself authorizes the registration of
25   this activity?
```

**ADDENDUM PAGE 13**

```
1              MR. GUERRIERO:  Right.  And that's the first --

2              THE COURT:  It doesn't really matter what FinCEN

3      says, right?

4              MR. GUERRIERO:  I think it does, and here's why.

5              First of all, an interesting, just sort of a

6      preliminary point, but in the government's first argument they

7      take great pains to emphasize that the word or is used in the

8      statute, but actually in the superseding indictment in this

9      case they refer to a violation of the requirement and they say

10     and the statute and the regulations.

11             THE COURT:  They do.

12             MR. GUERRIERO:  And there's a good reason for that.

13     Because Congress doesn't enforce any statute.  The statute has

14     no meaning without regulation, and that is exactly why this

15     same statute says the Secretary of Treasury shall pass

16     regulations implementing this statute.

17             Another way to think about it is --

18             THE COURT:  Yeah, but the agency that is enforcing

19     the statute now isn't the Treasury.  It's DOJ.

20             MR. GUERRIERO:  Well, it's FinCEN which I --

21             THE COURT:  DOJ is.  DOJ is the one in court

22     enforcing the statute.  That's my point.

23             MR. GUERRIERO:  Okay.  All right.

24             THE COURT:  And aren't they able to interpret the

25     statute reasonably?  I mean, look, that's my point.  Does it
```

**ADDENDUM PAGE 14**

```
 1   really matter what FinCEN does?  If the DOJ says the statute

 2   requires this registration and views this conduct as violating

 3   the law, what difference does it make what FinCEN says about

 4   it?

 5              MR. GUERRIERO:  Well, because FinCEN decides who's

 6   within the scope of this and according to their own guidance,

 7   and in fact that's what the indictment says.  FinCEN is -- you

 8   know, the failure to --

 9              THE COURT:  Where does the indictment say that?

10              MR. GUERRIERO:  Excuse me again?

11              THE COURT:  Where does the indictment say that,

12   that FinCEN decides who comes under the statute?  I don't read

13   the indictment that way.

14              MR. GUERRIERO:  Well, the indictment doesn't say

15   that.  The indictment says failure to comply with the statute

16   and the regulations, which I think they should say because the

17   statute says the Department of Treasury shall adopt these

18   regulations.

19              THE COURT:  Well, looking at Count 1, right?

20              MR. GUERRIERO:  Yep.

21              THE COURT:  Look at Count 1, paragraph 12.  It says

22   that Freeman, DiMezzo, and others unlawfully, wilfully, and

23   knowingly violated federal law in violation of a statute.

24              Now it says in the next paragraph it was part of

25   the object of the conspiracy, and it describes the conduct as
```

```
 1   failure to comply with money transmitting business regulations
 2   set forth in the statute and the regs, right?
 3              MR. GUERRIERO:  Right.  Well, one way to look at it
 4   is this.  There's only one registration required.  Like, if I
 5   came in and said I registered per the statute so I ignored the
 6   CFRs, that wouldn't make any sense because the -- I mean, and
 7   if you think about -- I mean, it really almost goes to the
 8   constitutional basis of how these things work.
 9              Congress passes a law, the Executive Branch
10   enforces it, and the only way for it to make any sense is to
11   say, well, the statute is implemented by these regulations and
12   then the enforcement, the execution of it.
13              THE COURT:  Well, yeah, but statutes authorize
14   agencies to enforce them and implement them and all that, but
15   this isn't a civil case, like, brought by FinCEN.  This isn't
16   some -- you're not before FinCEN.  You're not before the
17   Treasury.  You're before the district court on an indictment
18   brought by DOJ.
19              They also have to interpret law, and their
20   interpretation is this conduct violates the law and they got a
21   grand jury to agree.
22              MR. GUERRIERO:  Well, I think their allegation is
23   you failed to register as required by FinCEN, and that is what
24   the law says.  The law says the Treasury Department shall pass
25   regulations to govern who regulates and how.
```

**ADDENDUM PAGE 16**

```
 1              I mean, an example of it is the statute also I
 2    think -- as for certain agents, it authorizes FinCEN to set a
 3    cut-off point.  So it's clearly -- the statute delegates the
 4    authority to FinCEN or to the Department of Treasury --
 5              THE COURT:  No disagreement.
 6              MR. GUERRIERO:  -- to determine the scope, okay?
 7              THE COURT:  Well, yeah, but to determine the scope
 8    where the statute is ambiguous.  I mean, that's the way it
 9    works.  That's the Chevron doctrine.  Chevron hasn't been
10    overruled.  It's been supplanted by the major case doctrine,
11    right?
12              MR. GUERRIERO:  Right.
13              THE COURT:  The major case and questions doctrine,
14    but that's a doctrine of statutory interpretation.  I mean,
15    that's what that is as far as I've ever known.
16              I admit West Virginia does kind of push it to a new
17    level, I'm not disagreeing, but up till then every case I had
18    ever read that was a major case doctrine was sort of a we
19    decline to apply Chevron because this is such a major social
20    and political question that we, the Court, need to interpret
21    the statute.
22              MR. GUERRIERO:  Exactly.
23              THE COURT:  Okay.  Let me get to the nub of it.
24              MR. GUERRIERO:  Okay.
25              THE COURT:  So can't I say Richard's right --
```

**ADDENDUM PAGE 17**

9

1   Guerriero is right, this is a major case doctrine type of

2   question, I'm not going to defer to FinCEN's interpretation of

3   the statute, but I read the statute and I read the word funds,

4   and I think it applies to bitcoin?  See, that's the way the

5   major case doctrine works.

6          Now, the Court of Appeals might disagree, the

7   Supreme Court might disagree, but the major case doctrine

8   doesn't say case dismissed.  It says don't defer to FinCEN on

9   the meaning of the statute.  And under these doctrines as I

10  have always understood them, the only time you rely -- the

11  only time Congress is deemed to have delegated, unless it's an

12  express delegation, right, is if the statute is ambiguous, and

13  is this ambiguous?  I don't think so.

14         MR. GUERRIERO:  I think you're half right, your

15  Honor.  And, respectfully, the point at which I think that the

16  Court is incorrect is in saying that -- the Court is in a

17  position of determining what this word means in the statute.

18  That's not the question.  The question is did Congress

19  expressly authorize regulation in this major, new, different,

20  socially important area.

21         I mean, look, I'll just be frank with the Court.

22  If the Chevron doctrine applies, if the normal rules of

23  statutory interpretation apply, we lose, okay?  I grant that.

24         And what we're saying is that those rules do not

25  apply for exactly the reasons set forth in the West Virginia

```
 1   case, and the question is not is there a plausible textual

 2   basis, because that's what you were just describing.  The

 3   Court found a plausible textual basis.  West Virginia says,

 4   no, that is not the test.  We often found a plausible textual

 5   basis.

 6           The question is not just what did Congress intend,

 7   but because this is such a big area and because it's so

 8   important, did Congress actually intend to authorize

 9   regulation in this area, and that's our argument.

10           THE COURT:  I don't know.  I think Congress clearly

11   did intend.  The question is whether -- see, what you're

12   telling me is this isn't a question of statutory

13   interpretation, this is a question of executive branch

14   authority, right?  Your point is there's been no delegation to

15   regulate bitcoin.

16           MR. GUERRIERO:  No, clearly --

17           THE COURT:  At least not until the 2021 amendments,

18   right?

19           MR. GUERRIERO:  Right.

20           THE COURT:  Now, I admit that the indictment here

21   does make this a little more complicated because it keeps

22   invoking the regs, and I'll have some questions to the

23   prosecutors about that, what that means for jury instructions

24   and evidence and all of that, but -- yeah.

25           But you're asking me to apply the major case
```

**ADDENDUM PAGE 19**

```
1   doctrine in a way that I don't ever -- like, for example, in a
2   criminal context, and in ways I've never seen it applied.
3   I've always seen the major case doctrine applied -- it's not
4   like it's applied every day.  It's a kind of marginal doctrine
5   of statutory interpretation until and maybe if West Virginia
6   made it more.  I get it.
7              MR. GUERRIERO:  That is my point.
8              THE COURT:  I know.
9              MR. GUERRIERO:  And our point is that -- I mean,
10  these particular counts -- not the fraud related counts, the
11  money laundering counts, but these particular counts, these
12  are regulatory offenses.  I mean, I think even the government
13  would describe it that way.  I think that they're regulatory
14  offenses.  They're a failure to get a license to engage in a
15  particular business.
16             THE COURT:  All offenses are regulatory offenses
17  really, aren't they?
18             MR. GUERRIERO:  Well --
19             THE COURT:  I mean, let me ask you this way.
20  Suppose these prosecutors here superseded again, all right?
21  Pick a Wednesday.  They go into the grand jury.  They come out
22  with a brand-new indictment.  It looks exactly the same, but
23  there's no reference to the regulations.  Do you still have
24  the same motion?
25             MR. GUERRIERO:  Yes.  Yes, we have the same motion
```

**ADDENDUM PAGE 20**

 1   because I don't think you can read the -- you can't ignore the

 2   part of the statute that says that the Secretary of the

 3   Treasury shall adopt regulations enforcing this statute.

 4            I mean, again, think of it this way.  I couldn't

 5   say, oh, I didn't register with FinCEN.  I just looked at the

 6   statute and made up my own registration and mailed it into the

 7   Treasury.  I mean, you would be --

 8            THE COURT:  Well, but you could say I read the

 9   statute -- actually, you could.  You could say I registered

10   with the Treasury based on the statutory language.  Why

11   couldn't you?

12            MR. GUERRIERO:  Because the statute says

13   this statute -- it doesn't say the word implemented, but it

14   says the Secretary of Treasury shall provide regulations for

15   the enforcement of this statute, and it's clearly what was

16   intended.

17            As I say, I mean, until we filed this motion it was

18   even how the government read it.  I mean, it was clearly

19   everybody -- a reasonable reading of the statute is you pass

20   the statute and you have regs that enforce it, and that's how

21   it works in every other instance.  I mean, I can't think of

22   another instance where a business would say we're going to

23   ignore the regs and we're just going to comply with the

24   statute.  I mean, I don't think the government cited --

25            THE COURT:  You could comply with the regs by

1   complying with the statute.  That's the point.

2        Generally delegations that aren't -- you know,

3   pre-2021 if the -- you know, you can look at 2021 as changing

4   the law adding bitcoin or adding virtual currency, right, to

5   the regulatory scheme, but you can also read it as clarifying

6   the law.  Like it wasn't clear and we want to make it clear.

7   But it already did regulate virtual currency and bitcoin by

8   its clear statutory language based on the word funds.  You

9   could interpret it that way.

10       The point is the way this works -- my understanding

11  is when Congress has -- like the Chevron doctrine.  When

12  Congress has ambiguously expressed something with ambiguity in

13  an area regulated by the executive agency, that's an implicit

14  delegation of authority to the agency to interpret and enforce

15  the statute.

16       The way they do that -- what a regulation really

17  is -- what a rule really is is a refinement, an interpretation

18  of a statute.  That's all good, but that delegation only

19  happens when a statute is ambiguous.  And if it's not

20  ambiguous and the statute is clear, there's been no such

21  delegation and this Court doesn't have to defer to the

22  agency's interpretation.

23       The fact that this agency interpreted it as

24  applying to bitcoin pre-amendment is interesting, but I don't

25  have to defer to it.  I can not defer to it.  I can interpret

```
 1    the law and say it applied to bitcoin.

 2              You're saying I can't do that because of the major

 3    cases.

 4              MR. GUERRIERO:  That's right.

 5              THE COURT:  I don't know if that's true or not.  I

 6    don't think it is, but I don't know.  It certainly isn't

 7    something they're creating precedent for.  I mean, specific

 8    precedent for, you know.

 9              MR. GUERRIERO:  Right.  I mean, neither side has a

10    post Virginia versus EPA case dealing with this kind of issue.

11              THE COURT:  True.  The burden is on you in this

12    situation, though, don't you think?

13              MR. GUERRIERO:  Excuse me?

14              THE COURT:  Isn't the burden on you in this

15    situation?  I mean, you're citing West Virginia for a fairly

16    novel proposition of law, that a criminal indictment has to be

17    dismissed because FinCEN/Treasury has exceed its authority in

18    regulating bitcoin or at least had before the 2021 amendments.

19    That's your argument.

20              MR. GUERRIERO:  Well, I mean, I guess -- I don't

21    have this in my motion, but your question makes me think of a

22    hypothetical.

23              What if one of the coal-powered plants that was at

24    issue and suppose one of them said -- this is kind of more of

25    a hypothetical than the facts of the case, but what if some
```

```
 1   coal-powered plant said, you know, we're not going to
 2   subsidize some other industry and we're not going to reduce
 3   our production, and we're putting it in our notes that
 4   everybody can see later that we're going to do that in a
 5   knowing way.  I would think that would probably at some point
 6   be criminal conduct, and in that case that coal-powered plant
 7   would have exactly the same kind of motion that we have here.
 8   That there was never any authority to impose that requirement,
 9   that regulation.
10          I mean EPA -- there are many environmental
11   situations where -- and I've been co-counsel, civil counsel,
12   in many cases where an environmental case comes close to being
13   a criminal case.  Because if there's some sort of knowing
14   pollution, knowing violation, knowing skirting of the
15   standards, it becomes a criminal case.
16          So I think in that hypothetical they would have
17   exactly the same argument that we have here.
18          And if I can just go back to one of your Honor's
19   other points?
20          THE COURT:  Of course.
21          MR. GUERRIERO:  In terms of ambiguity of the
22   statute in this area, in this kind of major area, as I said --
23   and I think the government acknowledges this implicitly.  They
24   say that this is a big, new thing, and then they still try to
25   include it within funds.
```

```
 1            But, I mean, think of it this way.  Before five or

 2    six years ago, like, nobody knew anything about virtual

 3    currency.  Like, you could buy a pizza for one bitcoin.  And

 4    now it's this multi trillion-dollar industry that's advertised

 5    during the Super Bowl.  I mean, it's a huge change.  And so to

 6    say it's not the kind of major questions area just doesn't fit

 7    with the facts.

 8            THE COURT:  That's the thing about the major

 9    questions doctrine, though, not to be critical of our Supreme

10    Court, but, you know, a lot of things can be thought of as

11    major questions.

12            You know, my first exposure to the whole doctrine

13    was the King v. Burwell case on Obama Care.  I should call it

14    the Affordable Care Act, right?  But there was really no

15    question that was a major political social question.

16            I'm not saying this isn't.  I'm not.  But, see,

17    again -- here's I think our disagreement.  It's not that I

18    have a problem with the idea that this is a major question.  I

19    don't even know because, like, what passes for a major

20    question is by no means clear under the law yet.  But if I

21    agree with you that it is, all that says to me the way I

22    understand the major case doctrine is that it means I don't

23    defer to FinCEN in interpreting the criminal statute.  That's

24    what it means.  It means when I look at funds, I don't have to

25    go to FinCEN to say does funds include bitcoin.  Yes, it does
```

```
 1    according to FinCEN.  I don't have to do that.  I can tell it
 2    from the statute.  So I don't defer.  And it's up to the Court
 3    to interpret the statute.  To me it's a doctrine of statutory
 4    interpretation.  To you it's a doctrine of executive
 5    authority, and I don't think those things have to be, those
 6    two ideas have to be contradictory.  Because to me even if
 7    it's a doctrine of executive authority, it's an executive
 8    agency's authority to interpret its enabling legislation.
 9    Like, I'm allowed to be -- we, as an agency, are allowed to be
10    in this area doing this work.
11              And that's why I asked you, well, let's suppose
12    there was no regs, could this prosecution still be underway if
13    these regs didn't exist, if we struck this language from the
14    indictment.  My sense is that it could, but, yeah.
15              MR. GUERRIERO:  I mean, my objection would be no
16    process for licensing was ever prescribed by the Secretary of
17    Treasury as commanded by Congress.  Therefore, there was no
18    requirement for somebody to register.  I mean, without the
19    regs, the statute is not implemented.
20              THE COURT:  Yeah, I think that -- to the extent
21    that that has validity, I think it applies to different counts
22    of the indictment differently.  As I read these counts, some
23    more or less include regulatory authority than others.
24              MR. GUERRIERO:  Your Honor, I want to make sure I'm
25    clear on this point.
```

**ADDENDUM PAGE 26**

```
 1              THE COURT:  Yeah.

 2              MR. GUERRIERO:  In terms of the Court having the

 3    authority to interpret the statute and the question being the

 4    interpretation of the statute, that's just not what the West

 5    Virginia case says.  I mean, the exact words are not merely

 6    plausible textual basis for agency action.  There has to be,

 7    "clear congressional authorization."

 8              Now, you might find, I suppose, that the use of one

 9    word, funds, written seven years before bitcoin was ever

10    invented was clear congressional authorization.

11              THE COURT:  See, I think of the Bostock case now.

12    Remember that Bostock case under Title VII, the case a couple

13    of years ago where the Supreme Court said workplace

14    discrimination against same sex relationships, right, against

15    sexual orientation call it, right, or sexual identity, and the

16    Supreme Court said, yeah, that's been unlawful since 1964.

17    That's what the word sex means.  Sex has been --

18    discrimination on the basis of sex has been unlawful.

19    Regardless of whether the EEOC figured it out, the agency to

20    implement it figured it out for many years, you know, Gorsuch

21    and the majority said sex means sexual orientation.  Sex means

22    sexual identity.  That's just what it means.

23              And so Justice Alito's point that, no, nobody

24    intended that, everybody agreed nobody intended that in 1964,

25    didn't matter because the words meant what they meant
```

**ADDENDUM PAGE 27**

```
 1    according to the majority.
 2            This is the same situation, right?  If funds means
 3    bitcoin, even if bitcoin wasn't on anybody's mind at the time,
 4    it means bitcoin.
 5            MR. GUERRIERO:  I guess I would disagree with that
 6    because I don't see how the Court could find clear
 7    congressional authorization if it didn't exist at the time.  I
 8    mean, this is a different thing.
 9            THE COURT:  Yeah.  Different because of course
10    sexual orientation existed at the time, yeah.
11            MR. GUERRIERO:  Right.  I mean, this -- you know, I
12    mean, the government and everyone refers to bitcoin as virtual
13    currency, but if you --
14            THE COURT:  Certain firearms that didn't exist at
15    the time of the Second Amendment, right, and yet --
16            MR. GUERRIERO:  Well, but this is -- this is really
17    a different thing.  Remember that it's not backed by any
18    government.  It doesn't have any intrinsic value.  It is a
19    thing that exists only on the Internet, you know, and so to
20    say that it's something that Congress was thinking about or
21    intended in 2001, it just -- I mean, the most that I think the
22    government can say is that, well, Congress was looking forward
23    to every possible kind of thing.  But if that was true, then
24    why did Congress add this language in 2020 of --
25            THE COURT:  It only means Congress is looking
```

 1   forward to funds.  That's all it means.  It doesn't mean every

 2   possible kind of thing.

 3          I mean, I understand your point, it exists only on

 4   the Internet, but I don't think the fact that it exists only

 5   on the Internet makes it any less real than greenbacks.  I

 6   think your clients would agree with that.  It's real.

 7          The point is it's not backed by any government,

 8   that's true, but -- I don't know.  I haven't done a deep dive

 9   on this, but in our country's history there were many types of

10   currencies.  Some were issued by the colonies and the states,

11   the early states, right?  Some were issued by the federal

12   government.  Some were issued by banks.  That's actually --

13          MR. GUERRIERO:  Well, that's an important

14   distinction because virtual currency -- I'm sorry.  I didn't

15   mean to interrupt.

16          THE COURT:  I'll just finish the point briefly.

17          Some were issued only by private institutions and

18   entities, yet my sense is they were still regulated by laws.

19          MR. GUERRIERO:  I believe they were.

20          THE COURT:  By state and federal laws.

21          So the fact that bitcoin didn't exist at the time

22   of the original enactment -- let me just say this.  It's not

23   that your arguments don't make sense to me.  It's just that

24   you're asking me to take the major case and questions doctrine

25   and apply it in a way that I'm not sure I can apply it.

```
 1            MR. GUERRIERO:  I think your Honor's point is
 2   incorrect for exactly one of the main reasons that bitcoin
 3   exists.  Every example you gave involves the two people to the
 4   transaction and a third party, the government, a bank, someone
 5   issuing the funds.  There is no third party in virtual
 6   currency.
 7            THE COURT:  But there was no third party when banks
 8   and financial institutions in the early times of the republic
 9   were issuing money.  They were doing it all the time.
10            MR. GUERRIERO:  The bank is a third party.
11            So, like, if you say -- like, suppose in the time
12   before there was a bank issuing -- before the government was
13   issuing any currency and you just had a bank note, you know,
14   like in a train robbery in the old movies and they just had
15   bank notes.  So if someone said I'm going to be a money
16   transmitter or a money exchanger for that, like, there is the
17   person doing the transmitting, there is the person that wants
18   the money transmitted, and then there's the bank that has
19   issued the note, the third party.
20            With virtual currency, with bitcoin, there is no
21   third party.  The interaction is between the person doing --
22   you know, the people doing the exchange.  There's not a third
23   party in --
24            THE COURT:  So this may be something I didn't --
25   I'm not sure how much this matters for our conversation, to be
```

**ADDENDUM PAGE 30**

```
1    honest, but now I'm just learning a little bit.

2             So in a bitcoin transaction the bitcoin itself is

3    literally created by the two parties in the transaction?  I

4    don't think so.  I don't.  Is that the case?

5             MR. GUERRIERO:  It exists on the Internet.  I mean,

6    and so it's -- I mean, I know that it's --

7             THE COURT:  You think that's a fantasy and a

8    phantom.  I think that's real.

9             MR. GUERRIERO:  Yep.

10            THE COURT:  I don't know why you're so old, but I'm

11   part of 2022 and I realize things on the Internet, they exist,

12   right?  I mean, that's not -- it's no less real.  It's no less

13   real because it's not paper or instrumentalized by a document,

14   is it?

15            MR. GUERRIERO:  No.  There's no -- it can be.

16            THE COURT:  So there is a third party.  Somebody

17   who's creating that environment for it to exist.  There's got

18   to be a way to express that the bitcoin exists independent of

19   the transaction between the two parties.

20            MR. GUERRIERO:  It is.  It's the blockchain on the

21   Internet.

22            THE COURT:  There you go.

23            MR. GUERRIERO:  It's the process that's on the

24   Internet.  That's where it exists.  And the blockchain is not

25   a party to anything, And that was the whole point.  I mean,
```

**ADDENDUM PAGE 31**

1  the reason that people wanted virtual currency was to be free

2  of government.

3           THE COURT:  Free, yeah.

4           MR. GUERRIERO:  That's the whole point.

5           THE COURT:  Understood.

6           MR. GUERRIERO:  Okay.  I think I covered most of my

7  points.

8           THE COURT:  I think you have, too.

9           It's not a -- I'm not trying to say it's, you know,

10 illogical or, like, you know, a crazy argument.  I'm just not

11 sure I'm prepared to dismiss a criminal indictment based on

12 it.

13          But I have some questions for the prosecution, and

14 maybe their answers will help me get there.

15          MR. GUERRIERO:  Thank you, your Honor.

16          THE COURT:  Help me get to discussing their

17 indictment, yeah.  I'm not sure that's where they want to go.

18          Here's the thing.

19          MR. AFRAME:  Yes.

20          THE COURT:  You did cite the regs in the

21 indictment.

22          MR. AFRAME:  Yes, because those are --

23          THE COURT:  Because -- tell me.

24          MR. AFRAME:  Because we allege in the conjunctive.

25 We've proven the disjunctive.  The statute says you can

```
 1  violate the law -- in 1960 says you can violate the law in two
 2  ways.  You can violate it by violating the registration
 3  requirement under 5330 or the regulations prescribed
 4  thereunder.
 5          So the right way to indict that is with the word
 6  and.  The right way to prove that is with the word or.
 7          THE COURT:  It's always been a weird thing about
 8  indictments.
 9          MR. AFRAME:  But it is --
10          THE COURT:  They allege in the conjunctive but you
11  can prove in the disjunctive.
12          MR. AFRAME:  And we will prove it in the or because
13  here I think, as I tried to lay out as clearly as I could, the
14  plain language of 5330 captures bitcoin.  But if it didn't and
15  the words were ambiguous and a regulation was prescribed that
16  said we take this ambiguous word funds and say it includes
17  bitcoin, then that, too, would be an alternative way to prove
18  it.
19          My point in my memo was we don't have to get to the
20  regulations because every Court, minus one magistrate judge's
21  opinion, has said that the word funds as used in 5330 in 1960
22  means bitcoin plainly.
23          And so whether FinCEN said it or not I think
24  doesn't matter, but it has said it and you could prove it
25  either way.
```

**ADDENDUM PAGE 33**

```
 1              THE COURT:  Let me ask you this question.  So
 2    suppose -- how would you feel about the proposition that I
 3    don't dismiss this indictment but I also don't want to buy
 4    that issue on appeal?  I don't instruct the jury on the regs.
 5    Like, for example, do you plan to call a witness on the regs?
 6              MR. AFRAME:  We are prepared to.
 7              THE COURT:  Do you plan to?  Because that's the
 8    question.  This could eliminate the issue by not talking about
 9    the regs.
10              MR. AFRAME:  So, I mean, I'll say -- I haven't
11    finalized them.  I've written draft jury instructions.  I
12    didn't talk about the regs because my view is that we get
13    there -- and I tried to do that in this brief as succinctly as
14    I could.  We can get there and I think I got there without
15    mentioning the regs.
16              THE COURT:  Yeah, I get it.
17              MR. AFRAME:  And that does -- as Mr. Guerriero
18    points out, that presupposes you conclude that the word funds
19    includes bitcoin.  But if it does, then you can follow the
20    chain from 1960(b)(1)(B) to 1530 to 5313 to 5312, and it all
21    uses the same word funds.  And so I think the registration
22    requirement is established by statute.
23              THE COURT:  Yeah, I mean, I certainly think the
24    statute can be read to establish it.  That's for sure.
25              Do you -- but you're not at this point -- at least
```

```
 1  for the purposes of this hearing you're not at the point where
 2  you're saying the Court could basically -- I don't want to use
 3  the word strike from the indictment because I don't want to
 4  undermine the grand jury's indictment, but just, I don't know,
 5  instruct the case based on statutory language without getting
 6  into the regs.
 7             MR. AFRAME:  Yes.  Honestly, I mean, they may
 8  object to this later, I don't know, something I think is
 9  important about a FinCEN witness is not this.  It's sort of
10  what does registration require one to do and what was not done
11  here that may be relevant to other parts of the case.
12             THE COURT:  Uh-huh.
13             MR. AFRAME:  Like, you know, suspicious activity
14  reports, other BSA requirements that do connect to
15  registration but then I think connect to our money laundering,
16  you know, willful blindness idea that, you know, there was
17  money laundering here.  And none of these things that one
18  might do to know what's going on in the transactions were
19  done, and it might be relevant to prove what those are.  I
20  don't think that gets to the 1960 count.  I think you get to
21  the 1960 count through the statute.
22             THE COURT:  Let me ask you some questions about the
23  West Virginia case then.
24             MR. AFRAME:  Yes.
25             THE COURT:  Because I don't think Mr. Guerriero is
```

1    incorrect when he says -- there is something about the <u>West</u>

2    <u>Virginia</u> opinion that -- there's something about the <u>West</u>

3    <u>Virginia</u> opinion that feels like it's treating the major case

4    doctrine as more than a doctrine of statutory interpretation.

5        MR. AFRAME:  Well, I don't think it says that

6    because I think it specifically says if -- as I understand it,

7    if we have what appears to be to the Court on its looking at

8    what's gone on a remedial overreach by the agency, if it feels

9    like a remedial overreach by the agency, we're not going to

10    rely on colorable statutory construction.  We're going to

11    require a clear statement.  That's a rule of statutory

12    construction.  If we feel like the remedial measures taken by

13    the agency are having a major affect on the U.S. economy, we

14    will not presume that merely colorable language is enough.  We

15    will demand a clear statement by Congress.

16        My understanding is that's a rule of statutory

17    construction.  In those circumstances we require a clear

18    statement where otherwise ambiguity would be enough.

19        My point on the major questions doctrine is there

20    is no remedial overreach here.  I mean, now we're past my

21    first argument.  You would have to say the statute is not

22    clear.  Now the government can't rely on the statute.  It

23    needs the regulations to prove its case.

24        And now the government -- and now the question

25    would be, well, can the agency reasonably conclude that funds

```
 1   includes bitcoin.

 2            THE COURT:  Yeah.

 3            MR. AFRAME:  And what would make it a major

 4   questions doctrine -- if having made that sort of initial,

 5   yes, we can cover bitcoin, I think it becomes the major

 6   questions doctrine if the agency then does something

 7   extraordinary with that determination, like put the coal

 8   business -- try to put the coal business out of business.  Try

 9   to eliminate tobacco in the United States.  Make every worker

10   get a vaccination or a test every week.

11            THE COURT:  So you're analogizing it with the West

12   Virginia scenario now, right?

13            MR. AFRAME:  Right.

14            THE COURT:  Okay.

15            MR. AFRAME:  They did something extraordinary.

16            And my point here is they did nothing

17   extraordinary.  They literally said virtual currency is

18   covered just like fiat currency.  What we make fiat currency

19   do is file a registration.  What are we going to do with

20   virtual currency?  File a registration.  It's exactly the same

21   remedy.

22            I think the major questions doctrine is about

23   extraordinary remedies, and that's why I brought you to the

24   Massachusetts versus EPA case in my papers where -- what the

25   Court said there is, you know, sometimes, you know, Congress
```

```
1    uses broad words.  Then that allows -- why does Congress do

2    that?  Because it can't foresee everything, and then the

3    agency gets to decide.

4         The overlay of West Virginia is if once they decide

5    they then do something like try to put the coal business out

6    of business in the United States, that gives us concern.

7         And I don't see that here.  I see the agency doing

8    what it did for fiat currency, it did for virtual currency.

9    No agency overreach.  No major question.

10        THE COURT:  That sounds to me like you're saying

11   then that you continue to view the major case doctrine -- the

12   major case and questions doctrine as a doctrine of statutory

13   interpretation.

14        MR. AFRAME:  Yes.  Because maybe the agency can do

15   something extraordinary like that.  But if it's going to have

16   that power, if the Court is going to say it has that power,

17   it's going to look for a clear statement by Congress and not

18   rely on what Justice Roberts calls colorable language, which

19   is not a clear statement.

20        THE COURT:  And Mr. Guerriero is calling plausible,

21   yeah.

22        MR. AFRAME:  Yeah.

23        THE COURT:  Which I don't think is an issue here.

24   I just don't.  It's not like it's whether it's plausible.  I

25   don't think it's a tough interpretive question.
```

**ADDENDUM PAGE 38**

```
1           MR. AFRAME:  No.

2           THE COURT:  All right.  I think you've got to be

3   prepared for the fact that if I deny this motion, I might be

4   pretty stingy with the regulatory talk at trial.

5           Now, you're telling me you don't even have it in

6   your jury instructions.  So that's a big issue off the table,

7   but this could come up.  I just want you to be aware of that.

8           MR. AFRAME:  Yeah, I mean, I think at the

9   appropriate time, which I don't think is today, we would argue

10  about what's the purpose of putting that on, but I don't

11  intend to put it on to say, oh, here's our proof that they

12  have to register.  I mean, I think we get to that element of

13  the offense without it.  I don't think -- I mean, the 1960

14  offense is a pretty easy offense to prove.  They don't have to

15  know they had to register.  They just have to know they didn't

16  register and they have to be running the business.

17          THE COURT:  Does it matter that you say in the

18  19 -- well, let me see.  Yeah, in the conspiracy, the 1960

19  conspiracy, yeah, you allege that their conduct violated the

20  statute but it was an object of the conspiracy to fail to

21  comply with the regs.

22          Does that matter?  And if so, why or why not?  And

23  tell me why not.  You might want to pull it out.  I'm looking

24  at paragraphs 12 and 13, right?

25          Paragraph 12 you say they conspired to violate
```

```
 1  1960, but in paragraph 13 you say it's a part and object of
 2  the conspiracy that Freeman and DiMezzo --
 3           MR. AFRAME:  Yeah, I see it.
 4           THE COURT:  Okay.
 5           MR. AFRAME:  So all we did there is quote the
 6  statutory language with the "and".  I mean, I think we're back
 7  to the same --
 8           THE COURT:  And that and's makes it disjunctive so
 9  you can go with one or the other.
10           MR. AFRAME:  Right.  The only difference in this
11  statutory language is making the "or" "and".  I guess I've
12  already explained why we did that.
13           THE COURT:  Yes.
14           MR. AFRAME:  So, you know, I think we can prove you
15  can allege -- I mean, I don't think this is a multi-object
16  conspiracy.  I just think we're saying that these requirements
17  can come from one of two sources.  And I think that's true,
18  they can come from one of two sources, but we only have to
19  prove one of them.
20           THE COURT:  One of them.  In your overt acts you
21  don't cite the regs at all.
22           MR. AFRAME:  No.  These are things they did to run
23  the business.
24           THE COURT:  Count 2 you don't cite the regs at all.
25           Count 3 you do cite the regs.
```

```
 1              MR. AFRAME:  Count 2 is the same.  We say -- in
 2    paragraph 17 we say under Section 5333 and regulations
 3    prescribed thereunder.
 4              THE COURT:  Oh, wait a minute.  I must have
 5    overlooked that.  Count 2 --
 6              MR. AFRAME:  Five lines from the bottom of
 7    paragraph 17.
 8              THE COURT:  Yes.  Thank you.
 9         Okay.  Disjunctive proof.  And I guess that holds
10    throughout the document.  Okay.
11              MR. AFRAME:  So, you know, I mean --
12              THE COURT:  All right.  Anything else you want to
13    tell me?
14              MR. AFRAME:  I don't think so.
15              THE COURT:  Mr. Guerriero, do you want to respond?
16              MR. GUERRIERO:  I want to reply on a couple of
17    points, your Honor.
18              THE COURT:  Take your time.
19              MR. GUERRIERO:  So the first thing that I would ask
20    the Court to do is look specifically at 5330(a)(2), and
21    5330(a)(1) is the requirement for registration.
22              Immediately after that, 5330(a)(2), the Secretary
23    of Treasury shall prescribe by regulation the -- not one of
24    the kind of ways -- the form and manner for registering a
25    money transmitting business.
```

**ADDENDUM PAGE 41**

```
 1              They're only talking about one kind of license or
 2    registration.  It says the form and manner.
 3              So to say that someone could register under the
 4    statute and completely ignore the regs, that's contrary to
 5    what the statute says.
 6              THE COURT:  Yeah, but that's just -- to me that's
 7    just like the agency has come up with a form you've got to
 8    fill out, that's all that is, and what it applies to.  I'm
 9    with you.
10              But remember he's saying he's not going to have to
11    prove that.  He can prove in the disjunctive.  He's saying I'm
12    prepared to go forward on the statute, not the reg.
13              See, I'm not disputing at all that Congress
14    authorized, well, post-amendment 2021 expressly authorized
15    this regulation of this currency, but I don't even think that
16    there's much of a question that it did so before and did so
17    reasonably.
18              But you don't have to get into whether it applied
19    to bitcoin before the 2021 amendments unless you think that
20    that delegation was in some way ambiguous.  That's the only
21    time you would have to decide -- that's the way the major case
22    doctrine works.  Look, you're citing one case, but it's not
23    the only case that talks about the major case doctrine.  It's
24    -- I think one way to look at it is, the way Mr. Aframe did,
25    was when the agency in its exercise of authority that was
```

1  delegated to it intrudes into an entirely unanticipated area

2  that, you know, rocks the foundations of our economy and

3  political system, well, that needs to be -- that needs to be

4  stricken.  That needs to be invalidated.

5          That's the thing.  I mean, I don't even know if

6  this qualifies, to be honest, as a major political and

7  economic question.  It's certainly important, but everything

8  is important or there wouldn't be federal legislation about

9  it.

10         It's different.  There's something different about

11  completely changing an entire industry.  Like, the entire

12  monetary system of the United States has not been undermined

13  by anything that FinCEN or the Treasury did vis-a-vis bitcoin,

14  has it?

15         MR. GUERRIERO:  Undermined may not be the word, but

16  has the entire financial system of the world been changed by

17  the advent of virtual currency?  Yes, it has.  Frankly, I

18  mean, it is literally a multi trillion-dollar segment of the

19  economy.

20         THE COURT:  No question.

21         MR. GUERRIERO:  I mean, like I said -- it's a

22  shocking amount of change in a short period of time.  I mean,

23  as I said, it was a novelty thing, you know, 12, 15 years ago

24  that only a few people were involved in, and now a single

25  bitcoin is worth tens of thousands of dollars.  And there's,

1    you know, like I said, advertisements on the Super Bowl.

2    Every major financial firm deals with it.  I mean, it is a

3    very large change.

4         And one of the reasons I put in my brief the market

5    capital valuation of the coal-powered electricity generation

6    part of the economy is this is a lot bigger than that, okay?

7    And even if the government says, well, we don't care about all

8    the virtual currency, we're only requiring some people to

9    register, I mean, this is, you know, many times over bigger.

10        So even if you say, well, only a percentage of the

11   people involved with bitcoin have to register, only a

12   percentage are actually doing transmitting and exchanging,

13   it's still a very large and impactful part of the economy

14   because they're servicing all those other people that are

15   owning bitcoin.  So I don't think the Court could correctly

16   find that it's not.

17        To go back to the questions you were asking

18   Attorney Aframe.

19        THE COURT:  Yep.

20        MR. GUERRIERO:  So what if this happens?  I mean,

21   you instruct the jury on the statute.  We ask you to include,

22   which I think we fairly could, the part of the statute that

23   says the Secretary of Treasury shall prescribe by regulation

24   the form and manner for registering a money transmitting

25   business.

1          THE COURT:  Doesn't he get to inject into the case

2     something you say is unlawful and then --

3          MR. GUERRIERO:  No.  I'm saying we want the jury to

4     know that we don't believe we violated the regulations, and

5     then the jury says what are the regs.

6          THE COURT:  Okay.  So if you make the regs part of

7     the case and the jury hears evidence on it, because I think

8     that would be fair, right, we don't think that these regs

9     required us to -- we don't think that these regs required

10    bitcoin to be registered.  We were trying to comply with the

11    law, right?  That's the -- okay.  What of it, though?  So what

12    of it?  I mean, so then what happens?

13         MR. GUERRIERO:  So then we're back to the issue of

14    whether or not these regulations are valid.

15         THE COURT:  So you would be saying we were trying

16    to rely on them, but they were invalid?

17         MR. GUERRIERO:  I'm sorry.  Can you say that again?

18         THE COURT:  You want to say as a defense, we were

19    trying to rely on the regs which we didn't think applied to

20    bitcoin, right?

21         MR. GUERRIERO:  No.  What I'm saying is that if the

22    allegation is that they failed to properly register, then we

23    should be able to request an instruction on the entire

24    statute.

25         THE COURT:  Okay.

**ADDENDUM PAGE 45**

1          MR. GUERRIERO:  And then the jury asks, well, what

2    are the regs.  I mean, would the Court instruct the jury there

3    are no valid regs as we want?  I don't think that you would do

4    that if you had decided with the government.

5          THE COURT:  I would instruct them on the applicable

6    law of the statute.  You're talking about a jury question,

7    like, during deliberations?

8          MR. GUERRIERO:  Sure.  Suppose you don't tell them

9    anything about the regs --

10         THE COURT:  This came up -- we had a case -- this

11   came up in the Suzanne Brown case, right, that, you know, I've

12   been dealing with for many years now, but the jury said -- the

13   jury asked a question that the regs answered, but nobody had

14   made the regs, at least knowingly made the regs part of the

15   record in the case.  We talked about, well, I could just tell

16   them the law about the regs.  I could do that.  And I think,

17   I'm trying to remember right, the defense didn't want to do

18   that.

19         What would you do?  If they asked the question,

20   what would you do?  Would you want me to just advise them -- I

21   don't think the prosecution would object to that.

22         So let's say I did that.  Would you agree that they

23   should hear about the regs if they asked that question?

24         MR. GUERRIERO:  If you had denied our motion and

25   were going to instruct the jury that the regs were lawful?

**ADDENDUM PAGE 46**

```
 1              THE COURT:  No, no.  Here's what I'm envisioning,
 2    okay?  I'm envisioning a trial that doesn't involve the regs
 3    which is I think what your question assumes.  Your question
 4    assumes they haven't heard anything about the regs, right?
 5              MR. GUERRIERO:  Well, it's certainly our position
 6    that the only registration requirement is the one imposed by
 7    the Treasury Secretary -- or implemented by the Treasury
 8    Secretary.  Because the statute says the form and manner for
 9    registering a money transmitting business.
10              THE COURT:  Maybe I lost it through your question.
11    Let's try it one more time.  The jury has a question.  What is
12    it?
13              MR. GUERRIERO:  Okay.  The jury says you've read to
14    us the statute that makes a reference to the regulations.
15    What are the regulations?
16              THE COURT:  Oh.  I'm not going to read them a
17    statute.  I'm going to give them jury instructions.
18              MR. GUERRIERO:  And I guess our request would be,
19    well, they have to be instructed that the form and manner of
20    registration is the one prescribed by the Treasury.
21              THE COURT:  By the regulations.
22              MR. GUERRIERO:  And the regulation is invalid.
23              THE COURT:  So let me assume your -- yeah, I'll go
24    with your facts that they hear the statute that makes
25    reference to the regulations and they ask me what?  They're
```

**ADDENDUM PAGE 47**

1    deliberating.  The note comes out and it says what?

2              Mark is trying to get your attention.

3              (Attorney Guerriero and Attorney Sisti confer)

4              MR. GUERRIERO:  What co-counsel suggested, which I

5    think is a good question, is what if the jury question is was

6    this activity contrary to the regulations?

7              THE COURT:  Normally I think -- if there hadn't

8    been any evidence about that, the answer would normally be you

9    haven't heard any evidence or testimony about the regulations.

10   That's normally what you do in a situation like that, right?

11             But let's assume -- because, frankly, that was the

12   question that came out in that earlier trial I was talking

13   about, and we talked about answering it, right, if both sides

14   could agree on an answer.  That's the only way you could do

15   that.

16             Okay.  So the question comes out.  I think, you

17   know, and I can't commit to anything that's going to happen at

18   this trial yet because we're not there, but I would probably

19   instruct them that you've been instructed on the law and you

20   are to apply it to the facts, and you haven't heard anything

21   about those regulations.  That's not the charge.

22             Because unless they're going to try to prove that

23   up, there's no reason for the jury to be involved with asking

24   that question, and that would be the answer for them, but I

25   think I would try to -- if we had a trial that didn't involve

1    the regulations, okay, if the prosecution didn't make it an

2    issue, I would try to instruct the jury in a way that didn't

3    provoke that question.  I guess I'm kind of undercutting your

4    hypothetical.

5         But if it did come out, I would instruct them to

6    focus on the law as I've instructed them and the facts as

7    they've heard them.  That's what I think I would do.

8         Now, it sounds like you're saying -- okay.  So

9    let's just play it out, though, because maybe I'm not thinking

10   of something that you're envisioning.

11        The question comes out, did their filing comply

12   with the regulations.  What would your answer be?  What would

13   you propose I do with that?

14        MR. GUERRIERO:  I would propose that you dismiss

15   those counts at that point because what you had done is -- we

16   had said, well, we're not going to decide that issue because

17   we're going to just say that you can go on the basis of a

18   violation of a statute.  You had not decided the validity of

19   the regs.  Once they ask that question, then I don't think we

20   can go forward.

21        THE COURT:  For today though I don't think -- yeah,

22   that's a good point, but I think that that's the kind of

23   bridge I would have to cross when I came to it.

24        What I will decide today -- I want to take a little

25   recess because I want to think this through a little bit more,

```
1    but I'm not sure -- I think my view at this point is that the
2    major case doctrine isn't even implicated by this question
3    because it's not an ambiguous statute, and I view that as a
4    doctrine of statutory interpretation.
5              But even if I agreed with you, I'm not sure I agree
6    that the major case doctrine is even implicated even if it is,
7    as you say, not just a doctrine of statutory interpretation
8    but a doctrine of the scope of regulatory authority.
9              That's probably what I would do for today's
10   purposes, but I would maybe be in the position of having to
11   refine that and adjust that come trial time.  I get it, but I
12   don't think it's a trial derailer to the extent you do, like
13   requiring a dismissal or a mistrial.
14             Now I'll have you plotting and planning of course
15   for a while, but that's just where I sit right now I think,
16   you know.
17             Okay.  It's a good question and it could happen.  I
18   would try to instruct the jury in a way to prevent it from
19   happening.  I really would, you know.  We'll see.
20             All right.  Let me take a recess.
21             Anybody want to say anything else before -- Mr.
22   Sisti, you haven't spoken.
23             MR. SISTI:  No.  I mean -- I'm sorry.  I hate to
24   cut in.
25             THE COURT:  That's okay.
```

```
 1            MR. SISTI:  But maybe it's the simple way I take a
 2   look at things.
 3            I think that what you're actually going to see --
 4   the practical aspect of this case is that an indictment is
 5   going to be read to the jury.  They're going to hear
 6   regulation.
 7            THE COURT:  This is you telling me you're going to
 8   read the indictment to the jury?
 9            MR. SISTI:  The indictment is out there.
10            THE COURT:  Well, it's out there, but they don't
11   usually read indictments.
12            MR. SISTI:  I'm going to tell them what my client
13   was charged with.  Why can't I tell them what my client was
14   charged with?
15            THE COURT:  I didn't say that.  I'm just asking you
16   how would they hear it and --
17            MR. SISTI:  And why wouldn't you take judicial
18   notice of it?  My client is sitting in this courtroom.  That
19   sheet of paper is what we're defending against.
20            THE COURT:  What brought him here.
21            MR. SISTI:  Yeah.  How are they then going to be
22   told, ignore the language, please ignore -- you know, please
23   ignore that behind the curtain?
24            THE COURT:  Well, actually, though, I think we've
25   both seen -- we've both seen in our careers prosecutors say
```

**ADDENDUM PAGE 51**

```
 1  we're not arguing X.  We're only arguing Y.  We're not asking
 2  you to convict him under variation X even though it's in the
 3  indictment.  We've seen that.  Aren't they free to do that?
 4          MR. SISTI:  They may be free to do that, but then
 5  the next layer of analysis is did the grand jury return that
 6  indictment based on the language within the four corners of
 7  the indictment, and is my client on trial on the regulation.
 8  The non-regulation, as we would put it.
 9          THE COURT:  Well, let me try to make it simple like
10  you just did.  Let's talk about a gun possession case, right?
11  The indictment says he possessed the .38 and the .357 Magnum.
12  It's right there in the indictment, .38 and mag, right?
13          MR. SISTI:  Uh-huh.
14          THE COURT:  And the prosecutor stands up and just
15  says to them we're not asking you to convict him on the
16  Magnum.  We haven't presented enough evidence on the Magnum.
17  We're asking you to convict him on the .38.
18              They can do that.
19          MR. SISTI:  Well, that's one way of looking at it.
20  The other would be that he's on trial for the possession of a
21  controlled drug, a controlled drug, and you name three or four
22  of them.
23          THE COURT:  Right.  Meth, fentanyl, cocaine.
24          MR. SISTI:  Yeah.  What did the grand jury come
25  back with?  Were they told they only had to find one?
```

**ADDENDUM PAGE 52**

```
 1              THE COURT:  I don't know what they were told
 2    because we don't know what grand juries normally are told,
 3    right, but if it says -- we know how to interpret indictments
 4    though, and if it says meth and coke and fentanyl, the jury
 5    can convict on any one of those.  Especially if the
 6    prosecution disavows one of them or two of them and the jury
 7    is only instructed, right?
 8              That could happen here.  I'm not saying you
 9    couldn't read the indictment to the jury, I'm really not,
10    because I think that's fair, but I'm not sure it meets the
11    problem.  It all depends, you're right, on how they are
12    instructed and what evidence they hear at trial.
13              MR. SISTI:  Right.
14              THE COURT:  What you're telling me though is that,
15    and I don't disagree, like, there's potentially a problem on
16    the horizon.  I get it.
17              MR. SISTI:  Yeah.  I mean, I'm just saying we're
18    inviting some confusion here, and I don't know why we would
19    want to do that when we can simplify the situation.  I guess
20    that's what I'm saying.
21              THE COURT:  Well, by dismissing the indictment.
22              MR. SISTI:  You can dismiss the indictment.  They
23    can bring another one.  I mean, how about that?
24              THE COURT:  I get it.  They'll have to if I
25    dismiss, or maybe they'll choose to if they don't want to buy
```

1    this issue.  I get it.  It's a fair point.  I get it.

2          MR. SISTI:  I mean, we don't mind -- you know, in

3    all honesty we don't mind the issue, but I don't know why we

4    would want to clutch onto it.

5          It is the first day of September.  I mean, there

6    are remedies that can be imposed at this point.

7          THE COURT:  True enough.  Fair point.

8          MR. SISTI:  Thank you.

9          THE COURT:  Mr. Aframe.

10          MR. AFRAME:  I guess I tried to discuss with you

11    sort of in good faith how I see the law.  I guess now I'm very

12    concerned that the strategy here is to inject the regulations

13    for the purpose of -- I mean, I don't see the argument that

14    they make as persuasive.  I know we're talking about buying

15    the argument on the Court of Appeals, and ultimately the Court

16    has an interest in that.  I, as the government, have an

17    interest in that.

18          I guess I don't see that argument as particularly

19    strong that -- you know, I mean, if the Court is not inclined

20    to agree with that argument, the simplest way is to just make

21    that ruling.  If that's not the Court's position, then, I

22    mean, I guess that's something else, but now I'm --

23          THE COURT:  Wait a minute.  I want to make sure I

24    understand you.  I'm not following you right now.

25          MR. AFRAME:  Sorry.

**ADDENDUM PAGE 54**

```
 1              THE COURT:  If I want to buy what argument?

 2              MR. AFRAME:  It seems like the Court was inclined

 3    to not take the challenge to the regulations as a violation of

 4    the major questions doctrine head-on.  And a way to avoid that

 5    question is to say we don't need the regulations because the

 6    statute gets us there.

 7              THE COURT:  Sure.  But, I mean, if that wasn't

 8    clear from everything I've said so far -- yeah, that is part

 9    of my thinking.

10              MR. AFRAME:  Right.  And I guess what's concerning

11    about the colloquy here is it doesn't seem like it's going to

12    go that easily.

13              THE COURT:  You think if I keep that out of the

14    case or you do in your presentation or me in my instructions,

15    you're afraid they're going to reinject it through some other

16    means?

17              MR. AFRAME:  Right.  And I guess I'm concerned

18    about that.  I mean, just from my own perspective -- and the

19    Court has its own, but I'm going to tell you my perspective.

20    From my own perspective, I'm more worried about that than

21    defending the ruling that these regulations are valid on

22    appeal.  I guess that's what I'm saying.

23              THE COURT:  Right.  Just plain valid.

24              MR. AFRAME:  The major questions doctrine does not

25    mandate the invalidation of FinCEN's registration requirement.
```

```
 1   That's what's concerning me about what I just heard.

 2           THE COURT:  Understood.  Okay.

 3           MR. GUERRIERO:  Can I just raise one other point,

 4   your Honor, quickly?

 5           THE COURT:  Yes.  Of course.

 6           MR. GUERRIERO:  We don't really know yet how the

 7   government would try to prove their case, but how are they

 8   going to prove failure to register other than calling someone

 9   from a regulatory agency and have them say they didn't comply

10   with our regulations?

11           THE COURT:  Well, because by -- all that person has

12   to say from FinCEN I guess or from the Treasury is there's no

13   record of any such registration.  It doesn't have to be an

14   opinion that there had to be or that it applies to bitcoin.

15   Just has it been registered.  You could open up that can of

16   worms, but that doesn't mean that they will.  It depends on

17   how they plan on trying their case, right?

18           MR. GUERRIERO:  Well, as I said, I don't know

19   exactly how they would present it, but I don't see how they

20   would present it --

21           THE COURT:  Well, I just told you how they would

22   present it.  Wouldn't they -- they would call up somebody from

23   an agency.  Do the records of the U.S. Treasury Department or

24   any subsidiary agency thereunder contain a registration by Mr.

25   Freeman of a bitcoin business, right?  And the answer would be
```

```
 1   yes or no.  It wouldn't have to get into a whole, well, was he
 2   required to with that witness.  That's how I think they would
 3   show it.
 4            MR. GUERRIERO:  But the only way that a person -- a
 5   representative from that agency, the only way they could
 6   answer that question is by reference to their own forms and
 7   regulations, and there is no other process for anybody to
 8   register.
 9            THE COURT:  But they didn't register.  That's all
10   they would be proving.  They didn't register.  There's no
11   record of a registration.
12            Remember my view of the law is the statute required
13   them to register.
14            Now, do your records have any record of such
15   registration?  No.
16            What else?
17            MR. GUERRIERO:  Okay.  Well, I'm just reiterating
18   what I said earlier, but the statute requires them to register
19   in the manner prescribed by the Secretary.  That's exactly
20   what it says.  It says the Secretary shall prescribe the
21   regulations for registration.
22            THE COURT:  But I guess it would be up to you to
23   develop that if you wanted to which is maybe kind of the
24   subsidiary way of introducing this that Mr. Sisti was
25   referring to a minute ago.
```

**ADDENDUM PAGE 57**

```
 1            MR. GUERRIERO:  I mean, maybe I'm not making myself
 2   clear.
 3            THE COURT:  Here's the thing.  So you say, well, is
 4   there a manner for bitcoin?  I mean, is there a manner of
 5   registration for bitcoin?  Is there a form?  Is there a this?
 6   Is there a that?  And the witness could answer, but that would
 7   be you.  That would be you putting it in the case, wouldn't
 8   it?
 9            MR. GUERRIERO:  But is the government going to -- I
10   mean, the government has to show not only that they failed to
11   register as required by the statute but they failed to
12   register in accordance with the regulations promulgated by the
13   Secretary.  I mean, that's what the statute says.  The manner
14   of registration shall be prescribed by the Secretary.
15            THE COURT:  I work for -- where do you register
16   these things?
17            MR. AFRAME:  FinCEN.
18            THE COURT:  I work for FinCEN.  Do you have a means
19   and manner, a recognized process for registering bitcoin?
20   Yes.  Has any such registration been made by these defendants?
21   No.
22            Problem?
23            MR. GUERRIERO:  Yes.  I think I would ask for a
24   directed verdict if that was all of the evidence because they
25   haven't introduced evidence of a failure to comply with the
```

**ADDENDUM PAGE 58**

1    regulations as prescribed by the Secretary, and the statute

2    requires that.

3              THE COURT:  Exactly.  The statute requires -- oh.

4              MR. GUERRIERO:  The statute requires the

5    regulations, and there's only one way of getting licensed.

6              THE COURT:  In my hypothetical I said, I asked does

7    your agency have a form, a manner, a means of registering

8    bitcoin?  Yes.

9              Now, it exists.  It didn't happen.

10             Why is that a directed verdict?

11             MR. GUERRIERO:  Because they can't introduce --

12             THE COURT:  And even if you get your directed

13   verdict, he said he's not going to the jury with that anyway

14   because it's disjunctive.  He's saying I'm going to go with

15   the statute.

16             MR. GUERRIERO:  Then what's the violation of the

17   statute?  If they didn't violate a reg, they didn't violate

18   the statute.

19             THE COURT:  Failure to register.  Period.

20             MR. GUERRIERO:  Okay.  I won't belabor it, but I

21   think that the registration requirement under the statute

22   requires regulations implementing it.

23             THE COURT:  In a certain way.  Oh, requires a

24   regulation before the obligation even arises to comply with

25   it?

```
 1              MR. GUERRIERO:  Exactly.  Exactly.  And it says the
 2   manner of registration shall be prescribed by the Secretary.
 3   The manner.  And so if they don't put in evidence of the
 4   manner in which the person violated the regulations, then they
 5   haven't proven a violation of the statute.
 6              THE COURT:  So your point is even if they don't
 7   focus on the regs, just the statute, they can't prove their
 8   case --
 9              MR. GUERRIERO:  Without proving --
10              THE COURT:  -- or the statute still requires a
11   manner of registration that somehow still implicates
12   administrative law in a way that the jury is going to have to
13   hear about it.
14              MR. GUERRIERO:  That's exactly right.
15              THE COURT:  What do you say about that, Mr. Aframe?
16              Your point is -- and I guess -- by the way, I
17   haven't forgotten your major point which is that these
18   regulations are lawful.  I'm with you.
19              MR. AFRAME:  Okay.  It says:  Any person who
20   controls or owns a money transmitting business shall register
21   the business with the Secretary of the Treasury not later than
22   180 days.
23              So they shall register the business.
24              Then the question is, what form do you have to -- I
25   mean, Mr. Guerriero takes a very broad meaning of the form and
```

1    manner.  I just take that to mean, okay, that's required by

2    the statute.  So as a matter of procedure --

3         THE COURT:  How it looks.

4         MR. AFRAME:  -- what do they have to do then?

5         They have to fill out the form.  They have to

6    provide this information, which by the way is in the statute,

7    and they have to send it to us at our office in Washington,

8    D.C., within 180 days of them doing that.

9         Have they done that?  No.  Have they filed anything

10    with you?  No.  Have you sent them letters telling them to?

11    Yes.  Have they filed anything?  No.

12         THE COURT:  So I'm just going to play it out.  Mr.

13    Freeman's on the witness stand.

14         You never have to take the witness stand.  Let's be

15    clear about that.  You know that.  You have great counsel.

16    It's just a hypothetical.

17         He gets on the witness stand.  I tried.  I looked

18    at the law, and I didn't see a means or manner that applied to

19    bitcoin.  I couldn't.

20         MR. AFRAME:  And that's because he understood the

21    major questions doctrine didn't require him to do so?

22         THE COURT:  No, just that I read it pre-2021.  I

23    read the statute and I didn't think the definition applied to

24    my business.

25         MR. AFRAME:  It doesn't matter because -- I mean,

```
1   he doesn't need that mens rea.  That's not what's required.
2   That's just what the law is now.  I mean, this is a crime that
3   doesn't require knowledge of the need to register.  It
4   requires only that you knew you didn't register, which he
5   knows he didn't register.  He might say I thought I didn't
6   have to, but that's not a defense said Congress.
7           THE COURT:  Mr. Guerriero's theory I guess assumes
8   that the registration necessarily implicates a certain means
9   and manner of registration that doesn't exist until a
10  regulation that applied to bitcoin has been promulgated.  I
11  know that's kind of -- you don't have to accept that.  I'm
12  just trying to appreciate the argument for what it is, and
13  that's what it is, right?
14          MR. AFRAME:  And there's no dispute that there is
15  such a regulation.  That just goes back to him saying that
16  regulation is invalid.  That regulation exists and has existed
17  throughout.
18          THE COURT:  We're super in the weeds, but it's
19  okay.
20          MR. AFRAME:  Yes.
21          THE COURT:  Brief recess.
22          MR. AFRAME:  Okay.
23          (RECESS)
24          THE COURT:  All right.  I realize, by the way, we
25  haven't talked about the motion for the bill of particulars.
```

 1    So I'll give you a ruling on this motion, and then we'll talk

 2    about that.

 3            All right.  This motion to dismiss is denied.  To

 4    me this is just a -- I don't think the major case and

 5    questions doctrine requires the dismissal of this indictment.

 6    I view the major case and questions doctrine not as a -- it

 7    certainly is a -- it's not primarily to the Court a doctrine

 8    about statutory administrative overreach.  It is a doctrine of

 9    statutory interpretation.

10            To the extent it's about statutory overreach or

11    about administrative overreach, it's only a question of

12    administrative overreach when applied to an administrative

13    agency's interpretation of its enabling legislation.

14            The bottom line though is it's a doctrine that

15    determines whether the Court needs -- Courts interpret

16    statutes, and the agency enforcing this statute is the

17    Department of Justice.  But in neither case, whether it's

18    FinCEN or DOJ, it's not a situation where the Court is

19    required to exercise deference to an administrative agency

20    interpretation, which is what the major case and questions

21    doctrine requires.

22            It's a scenario -- I tend to think of it in the way

23    Chief Justice Roberts described it in King v. Burwell.  It's a

24    question of whether the Court needs to defer to an agency's

25    interpretation of a statute in crucially important economic

1    and political questions.

2            Now, I'll explain in a minute or two why I don't

3    even think the doctrine applies to this particular

4    interpretive question, the alleged interpretation by FinCEN

5    that prior to the 2021 amendments its registration

6    requirements applied to bitcoin.

7            But that aside, there's no statutory ambiguity

8    here.  Funds clearly has always applied to bitcoin from the

9    time bitcoin came into existence.  Many Courts have ruled

10   that, and this Court agrees.

11           The legislative activities leading up to and

12   including the 2021 amendments don't change that.  The statute

13   was not changed vis-a-vis its application to virtual currency.

14   It's arguably clarified, but it was not an expansion of the

15   statute at least where virtual currency and bitcoin are

16   concerned.

17           So it doesn't matter to this Court what FinCEN's

18   interpretation of the statute was.  I'm not deferring to it.

19   I don't believe it's an ambiguous reference, the reference to

20   funds, which is the key reference here in the statute.  I

21   don't think it requires deference to any agency.  I think it's

22   an unambiguous term that encompasses bitcoin and did prior to

23   2021 when the amendments were enacted.  That's number one.

24           So, frankly, I don't need to decide whether the

25   major case and questions doctrine applies here.  I just

1    interpret the statute to cover bitcoin and require the

2    registrations at issue here.

3        I want to be clear about this.  There was a lot of

4    conversation in the hearing about removing the regs from the

5    criminal trial.  I'm not suggesting that that's legally

6    necessary at all.  It was just a sort of conversation to me

7    about the way the prosecution might have attempted to kind of

8    avoid this issue to the extent it's an issue.  I don't think

9    it's an issue.  So I just don't want to have anybody interpret

10   this as a ruling that somehow the administrative law scheme is

11   out of the case.  That's up to the prosecution.  I'm not

12   ruling that it needs to be.

13       So, number one, I don't think the major case and

14   questions doctrine is implicated here.

15       Number two, there's another reason I don't think

16   it's implicated here.  I don't think this is a major case or

17   question.  I'm not trying to say it's unimportant.  I'm just

18   saying that it doesn't rise to the level of major cases and

19   questions that have been recognized by the Supreme Court and

20   other courts in areas like the Affordable Care Act or the

21   environmental regulatory scheme implicated by the recent EPA

22   versus West Virginia case.  So that's number two.

23       Number three, even if this was a major case or

24   question, my view is that FinCEN was acting within its

25   authority based on a clear delegation.

```
 1          Congress's statement was that the agency could
 2   regulate "any other person who engages as a business in the
 3   transmission of funds, including any person who engages as a
 4   business in an informal money transfer system or any network
 5   of people who engage as a business in facilitating the
 6   transfer of money domestically or internationally outside of
 7   the conventional financial institution's system."
 8          In 31 U.S.C. 5330, the West Virginia case, the
 9   issue was whether a broader conception of EPA's authority was
10   within the power granted to it by the Clean Air Act, and the
11   EPA took it further than the statutory delegation.
12          This isn't that kind of situation at all.  When
13   Congress recently amended 5330 to include virtual currency, it
14   hadn't considered or rejected bills like that in the past,
15   which would suggest that FinCEN was attempting, like, some
16   type of regulatory workaround to these prior legislative
17   failures.  There were no such failures.
18          The amendment was to allow FinCEN "to continue the
19   financial system from illicit activity, counter money
20   laundering and the financing of terrorism, and promote
21   national security," skipping some text here, "Although the use
22   and trading of virtual currencies are illegal practices, some
23   terrorists and criminals sought to exploit vulnerabilities in
24   the global financial system and increasingly relied on virtual
25   currencies to move illicit funds."
```

**ADDENDUM PAGE 66**

1          I'm citing Public Law No. 116-283 there, 134

2    statute 3388.  Pinpoint cite to 4552 in 2021.

3          So, look, that's the ruling, though.  The major

4    case and questions doctrine is not implicated.  It's not

5    implicated because this is not an ambiguous delegation of

6    authority that requires judicial deference to Executive Branch

7    authority, number one.

8          Number two, it's not implicated because it's not a

9    major case or question in my view.  And, third -- well, if it

10   is implicated, I think FinCEN was in compliance.

11         Mr. Guerriero's very interesting argument about the

12   delegation of authority to FinCEN to establish the means and

13   manner of registration, I view that as really more just

14   procedural, you know, not that no such registration was

15   required until the establishment of such a process.

16         I will write an order on this.  I can't guarantee

17   you, though, it's going to be written by trial.  It may be.

18   It may not be.  Usually, like, when I write a suppression

19   order, I rule from the bench and don't issue the written order

20   until much later, if necessary, and that's how I'm going to

21   approach this, but the motion is denied.

22         All right.  Let's talk about the bill of

23   particulars.  I'll give you my take on this -- well, and you

24   can incorporate that into your argument.

25         I'm probably a little bit -- my approach of a bill

APPEAL,CLOSED,COLLATERAL,CONFLICT−FD,MAGAPP,PBrecused,SMrecused

**U.S. District Court**
**District of New Hampshire (Concord)**
**CRIMINAL DOCKET FOR CASE #: 1:21−cr−00041−JL−1**

Case title: USA v. Freeman et al

Date Filed: 03/15/2021

Date Terminated: 10/05/2023

Assigned to: Judge Joseph N. Laplante

Appeals court case numbers:
23−1839 Court of Appeals, No.
23−1771 Court of Appeals

**Defendant (1)**

**Ian Freeman**
*TERMINATED: 10/05/2023*
*formerly known as*
Ian Bernard
*TERMINATED: 10/05/2023*

represented by **Mark L. Sisti**
Sisti Law Offices
387 Dover Rd
Chichester, NH 03258
603 224−4220
Email: info@sistilawoffices.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Oliver Bloom**
Lothstein Guerriero
39 Central Sq, Ste 202
Keene, NH 03431
603−352−5000
Email: oliver@nhdefender.com
*ATTORNEY TO BE NOTICED*

**Richard Guerriero**
Lothstein Guerriero
39 Central Sq, Ste 202
Keene, NH 03431
603 352−5000
Email: richard@nhdefender.com
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 18 U.S.C. §§ 371, 1960(a) and (b)(1)(B) – Conspiracy to Operate Unlicensed Money Transmitting Business (1s) | Term of Imprisonment 96 months. Supervised Release 2 years with standard and special conditions. Special Assessment $700.00. Fine $10,000.00. Restitution and Forfeiture are ordered, however they are deferred until further hearing. AMENDED JUDGMENT: Fine corrected to $40,000.00. SECOND AMENDED JUDGMENT: Term of Imprisonment 96 months. Supervised Release 2 years with standard and special conditions. Special Assessment $700.00. Fine $40,000.00. Restitution $3,502,708.69, Preliminary Order for Forfeiture included in the judgment. |
| 18 U.S.C. §§ 1960(a) and (b)(1)(B) and (C) – Operation of Unlicensed Money Transmitting Business | Term of Imprisonment 96 months. Supervised Release 2 years with standard and special conditions. Special Assessment $700.00. Fine $10,000.00. Restitution and Forfeiture are ordered, |

**ADDENDUM PAGE 68**

| | |
|---|---|
| (2s) | however they are deferred until further hearing. AMENDED JUDGMENT: Fine corrected to $40,000.00. SECOND AMENDED JUDGMENT: Term of Imprisonment 96 months. Supervised Release 2 years with standard and special conditions. Special Assessment $700.00. Fine $40,000.00. Restitution $3,502,708.69, Preliminary Order for Forfeiture included in the judgment. |
| 26 U.S.C. § 7201 – Attempt to Evade or Defeat Tax (29s–32s) | Term of Imprisonment 96 months. Supervised Release 2 years with standard and special conditions. Special Assessment $700.00. Fine $10,000.00. Restitution and Forfeiture are ordered, however they are deferred until further hearing. AMENDED JUDGMENT: Fine corrected to $40,000.00. SECOND AMENDED JUDGMENT: Term of Imprisonment 96 months. Supervised Release 2 years with standard and special conditions. Special Assessment $700.00. Fine $40,000.00. Restitution $3,502,708.69, Preliminary Order for Forfeiture included in the judgment. |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18 U.S.C. §§ 371, 1960(a) and (b)(1)(B) – Conspiracy to Operate Unlicensed Money Transmitting Business (1) | Dismissed pursuant to LR 48.1. |
| 18 U.S.C. §§ 1960(a) and (b)(1)(B) and (C) – Operation of Unlicensed Money Transmitting Business (2) | Dismissed pursuant to LR 48.1. |
| 18 U.S.C. §§ 1343, 1349 – Conspiracy to Commit Wire Fraud (4) | Dismissed pursuant to LR 48.1. |
| 18 U.S.C. §§ 1343, 1344, 1349 – Conspiracy to Commit Wire Fraud and Bank Fraud (4s) | Dismissed pursuant to LR 48.1. |
| 18 U.S.C. § 1343– Wire Fraud (5–7) | Dismissed pursuant to LR 48.1. |
| 18 U.S.C. §§ 1343 – Wire Fraud (5s–20s) | Dismissed pursuant to LR 48.1. |
| 18 U.S.C. § 1343– Wire Fraud (10) | Dismissed pursuant to LR 48.1. |
| 18 U.S.C. § 1343– Wire Fraud (14–15) | Dismissed pursuant to LR 48.1. |
| 18 U.S.C. § 225 – Continuing Financial Crimes Enterprise (19) | Dismissed pursuant to LR 48.1. |
| 18 U.S.C. § 1956(a)(3)(B) – Money Laundering (20) | Dismissed pursuant to LR 48.1. |
| | Dismissed by order of the court dated 8/22/2023. |

**ADDENDUM PAGE 69**

18 U.S.C. § 1956(a)(3)(B) –
Money Laundering
(21s)

18 U.S.C. § 1957 – Money
Laundering                                    Dismissed pursuant to LR 48.1.
(22s–27s)

                                              Term of Imprisonment 96 months. Supervised
                                              Release 2 years with standard and special
                                              conditions. Special Assessment $700.00. Fine
                                              $10,000.00. Restitution and Forfeiture are ordered,
                                              however they are deferred until further hearing.
18 U.S.C. § 1956(h) – Conspiracy              AMENDED JUDGMENT: Fine corrected to
to Commit Money Laundering                    $40,000.00. SECOND AMENDED JUDGMENT:
(28s)                                         Term of Imprisonment 96 months. Supervised
                                              Release 2 years with standard and special
                                              conditions. Special Assessment $700.00. Fine
                                              $40,000.00. Restitution $3,502,708.69, Preliminary
                                              Order for Forfeiture included in the judgment.

18 U.S.C. § 225 – Continuing
Financial Crimes Enterprise                   Dismissed pursuant to LR 48.1.
(33s)

**Highest Offense Level
(Terminated)**

Felony

**Complaints**                               **Disposition**

None

**Plaintiff**

**USA**                          represented by  **Alexander S. Chen**
                                                DOJ–USAO
                                                Criminal Division
                                                53 Pleasant Street
                                                4th Floor
                                                Room 4152
                                                Concord, NH 03301
                                                603–230–2536
                                                Email: alexander.chen@usdoj.gov
                                                *ATTORNEY TO BE NOTICED*

                                                **Georgiana MacDonald**
                                                US Attorney's Office (NH)
                                                James C Cleveland Federal Bldg
                                                53 Pleasant St, 4th Flr
                                                Concord, NH 03301
                                                603 230–2582
                                                Email: georgiana.macdonald@usdoj.gov
                                                *ATTORNEY TO BE NOTICED*
                                                *Designation: Assistant US Attorney*

                                                **John J Kennedy**
                                                DOJ–USAO
                                                53 Pleasant Street
                                                Ste 4th Floor
                                                Concord, NH 03301
                                                603–225–1552
                                                Email: john.kennedy2@usdoj.gov
                                                *ATTORNEY TO BE NOTICED*

**ADDENDUM PAGE 70**

*Designation: Retained*

**Michael T. McCormack**
US Attorney's Office (NH)
James C Cleveland Federal Bldg
53 Pleasant St, 4th Flr
Concord, NH 03301
603 225−1552
Email: michael.mccormack2@usdoj.gov
*Designation: Retained*

**Seth R. Aframe**
US Attorney's Office (NH)
James C Cleveland Federal Bldg
53 Pleasant St, 4th Flr
Concord, NH 03301
603 230−2532
Email: seth.aframe@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/28/2023 | | **ENDORSED ORDER as to Ian Freeman re 265 MEMORANDUM IN SUPPORT OF DEFENDANT'S ORAL MOTION FOR A JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29.** *Text of Order: Counsel are notified that the court intends to grant the defendant's motion for judgment of acquittal under Rule 29 (doc. no. 265 ) with respect to Count 3 of the indictment alleging Money Laundering. This notice is issued to enable the Probation Officer to account for this expected ruling (which will be included in the court's order on the motion to dismiss, doc. no. 176 ) in the Presentence Report while maintaining the currently scheduled sentencing date.* **So Ordered by Judge Joseph N. Laplante. (jb)** (Entered: 07/28/2023) |

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


United States of America


     v.                                Criminal No. 21-cr-41-JL
                                           Opinion No. 2023 DNH 106P
Ian Freeman


**MEMORANDUM ORDER**

The defendant in this case, Ian Freeman, was tried on charges of operating an

unlicensed money transmitting business (Count 1), conspiracy to operate an unlicensed

money transmitting business (Count 2), money laundering (Count 3), conspiracy to

commit money laundering (Count 4), and four counts of attempt to evade or defeat taxes

for each year from 2016 to 2019 (Count 5-8).  Prior to trial, Freeman joined co-defendant

Aria DiMezzo's[1] motion to dismiss Counts 1 and 2.  After argument, the court denied the

motion by oral order.[2]  Following the court's ruling, DiMezzo plead guilty, and Freeman

went to trial.  After a 10-day trial, the jury returned guilty verdicts on all eight counts.

Freeman orally moved under Rule 29 for judgment of acquittal as to each count at the end

of the prosecution's case-in-chief, and he renewed the motion at the end of the defense

case.  The court took the oral motion under advisement and allowed Freeman's written

motion after trial.

---

[1] See Freeman Motion for Joinder (doc. no. 177); DiMezzo Motion to Dismiss (doc. no. 176).

[2] See Transcript of Motion Hearing (doc. no. 268).


**ADDENDUM PAGE 72**

In his motion for acquittal, Freeman incorporates the arguments for dismissal of Counts 1 and 2, which were first raised in DiMezzo's motion to dismiss.[3]  Freeman also argues that the trial evidence was insufficient to show that he knowingly engaged in the business of money transmitting, willfully joined a conspiracy to do so, or that any money "transmission" actually occurred.  As for Counts 3 and 4, Freeman contends that the evidence was insufficient to support the conclusion that he knowingly conducted a money laundering transaction or willfully joined a conspiracy to do so.  And finally, Freeman argues that the prosecution failed to prove beyond a reasonable doubt that he owed and evaded federal income tax, as alleged in Counts 5-8.

The court grants Freeman's motion for judgment of acquittal as to the money laundering count, upon finding that the evidence adduced at trial was insufficient to prove that Freeman knew that the prohibited transaction alleged in the indictment occurred.  For the reasons articulated in its oral order on the motion to dismiss, and those further explained below, the court denies Freeman's motion for acquittal as to the remaining counts.  This order also memorializes the court's oral order denying the motion to dismiss.  See, e.g., United States v. Joubert, 980 F. Supp. 2d 53, 55 n.1 (D.N.H. 2014), aff'd, 778 F.3d 247 (1st Cir. 2015) (noting a district court's authority to later reduce its

---

[3] See Freeman Rule 29 Motion (doc. no. 265) at 2.

prior oral findings and rulings to writing (citing In re Mosley, 494 F.3d 1320, 1328 (11th Cir. 2007))).[4]

## I.    **Applicable legal standards**

**Motion to dismiss**.  A criminal defendant may move to dismiss an indictment on the ground that it fails to state an offense based on a pure legal issue.  See Fed. R. Crim. P. 12(b)(3)(B)(v).  A motion to dismiss an indictment, however, is not a way to test the sufficiency of the evidence behind an indictment's allegations.  United States v. Guerrier, 669 F.3d 1, 4 (1st Cir. 2011).

**Motion for judgment of acquittal**.  "No person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The Fifth Amendment's due process clause "prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 309 (1979).  Accordingly, "[a]fter the prosecution closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  The court assesses "whether 'a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime.'"  United States v. Ortiz, 447 F.3d 28, 32 (1st Cir. 2006) (quoting United States v. Moran, 312 F.3d 480, 487 (1st Cir. 2002)).  If the "verdict 'finds support in a plausible

---

[4] To the extent there is any inconsistency between the factual and legal findings in the court's oral orders and its written order, this order controls.

**ADDENDUM PAGE 74**

rendition of the record,'" the conviction must stand.  United States v. Oliver, 19 F.4th 512, 516 (1st Cir. 2021) (quoting United States v. Echeverri, 982 F.2d 675, 677 (1st Cir. 1993)).

When reviewing the evidence, the court "take[s] all inferences in the light most favorable to the verdict . . . give[s] equal weight to both direct and circumstantial evidence, and . . . neither weigh[s] witness credibility nor require[s] the prosecution to 'eliminat[e] every possible theory consistent with the defendant's innocence[.]" Id. (quoting United States v. Rivera-Ruiz, 244 F.3d 263, 266 (1st Cir. 2001)).  It "evaluate[s] the sum of all the evidence and inferences drawn therefrom, and determine[s] whether that sum is enough for any reasonable jury to find all the elements of the crime proven beyond a reasonable doubt, even if the individual pieces of evidence are not enough when viewed in isolation." United States v. Santos-Soto, 799 F.3d 49, 57 (1st Cir. 2015).  In conducting a sufficiency review, however, "some degree of intellectual rigor is required" and the court must "reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative." United States v. Rodríguez-Martinez, 778 F.3d 367, 371 (1st Cir. 2015) (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)).

## II.  **Background**

Consistent with the Rule 29 standard, the court draws on the evidence that the prosecution presented at trial when reciting the facts.  This case concerns a business that

Freeman and his colleagues[5] operated, in which they charged their customers a fee for

exchanging fiat currency for virtual currency—specifically, bitcoin.

Freeman conducted the business, in part, on a website, localbitcoins.com.

Freeman also interacted with customers on Telegram, an application that allowed for

encrypted communications. He gave similar instructions to each of his customers as to

the method for conducting a transaction, and directed them to wire fiat currency to

particular bank accounts, some of which were held by his colleagues and others by

entities such as a "church" that he founded. Freeman then calculated the equivalent value

of bitcoin, less the transaction fee, and transferred that bitcoin to a "digital wallet." A

digital wallet is a program or device that stores virtual currency. Recipients of bitcoin

enjoy a level of anonymity, since the owner of a digital wallet is harder to identify than

---

[5] The court provisionally admitted certain out-of-court, co-conspirator statements at trial under Fed. R. Evid. 801(d)(2)(E), against the defendant's objection. See Trial Tr. Day 5 Afternoon (doc. no. 271) at 57:9-19 (orally finding the objected-to co-conspirator statements "admissible subject to review on request by the defendant at the end of evidence if necessary . . . ."). The First Circuit Court of Appeals has held that the court must make certain findings regarding the admissibility of such evidence. See, e.g., United States v. Diaz, 670 F.3d 332, 348 (1st Cir. 2012) ("A district court faced with a challenge to the admission of a co-conspirator's statement must provisionally admit the statement and then wait until the end of the trial to consider whether, in light of all the evidence, the following four conditions are satisfied by a preponderance of the evidence: (1) a conspiracy existed; (2) the defendant was a member of the conspiracy; (3) the declarant was also a member of the conspiracy; and (4) the declarant's statement was made in furtherance of the conspiracy." (internal citations omitted)); United States v. Merritt, 945 F.3d 578, 586 (1st Cir. 2019) ("To admit evidence of out-of-court statements made by a defendant's co-conspirator, 'the district court must determine by a preponderance of the evidence that the declarant and the defendant were members of the same conspiracy and that the statement was made in furtherance of the conspiracy.'" (quoting United States v. Paz-Alvarez, 799 F.3d 12, 29 (1st Cir. 2015))). Freeman did not renew his objection or request findings supporting the admission of the co-conspirator statements at the close of evidence. Nevertheless, the court finds that the requisite findings are fully supported by the evidence presented at trial, and the statements were properly admitted.

**ADDENDUM PAGE 76**

the owner of a bank account, for instance.  Over the course of the trial, several of

Freeman's customers testified that they were the victims of romance (or other online)

scams, and they purchased bitcoin from Freeman as part of those scams.  Specifically,

under the scammer's instruction, the victim deposited fiat currency into one of Freeman's

accounts in order to purchase bitcoin that ultimately entered a digital wallet associated

with the scammer.

      The money laundering charge centers on a bitcoin purchase completed by an

undercover agent at one of Freeman's bitcoin exchange machines located in New

Hampshire on August 25, 2020.  The agent—Special Agent Pavel Prilotsky with the

Internal Revenue Service Criminal Investigation Unit—initiated contact with Freeman on

localbitcoins.com in or around September 2019.  The agent asked to purchase bitcoin

from Freeman, and Freeman provided him with instructions on the information he

required and the account to which the agent should wire money for his purchase.  They

continued to interact and complete transactions on the website for a few months.  The

agent later asked if he could purchase bitcoin from Freeman through other means than

localbitcoins.com.  Freeman instructed the agent to contact him directly on Telegram.[6]

The agent communicated with Freeman several times on Telegram to complete additional

bitcoin purchases through bank wire transfers.  At one point, Freeman left a voice

message for the agent on Telegram, explaining that, if the agent sought to mail money, he

---

[6] Id.

should use the United States Postal Service, since a warrant is "supposedly" required to open packages sent through the U.S. mail.[7]

After some time passed, Freeman told the agent about his bitcoin exchange machines in New Hampshire, where customers could complete bitcoin purchases in person. The agent asked whether the machines utilized facial recognition technology, and Freeman assured him that the machines' identifying capabilities had been turned off. The agent continued to communicate with Freeman while completing an $11,000 transaction at a machine located at Thirsty Owl, an establishment in Keene, New Hampshire. Freeman discounted his standard 14% transaction fee to 10% for this purchase.[8]

The agent eventually told Freeman that the money he was exchanging for bitcoin was the product of drug sales. In a subsequent Telegram conversation on July 30, 2020, Freeman wrote, "unfortunately I can't sell you bitcoin because you told me too much about what you do."[9] The agent expressed disappointment, writing, "can't even use your ATM [bitcoin exchange machines]? I told a few of my buddies. They all got excited. Now don't even know what to respond to them."[10] Freeman replied, "[m]y answer to the

---

[7] Prosecution Trial Ex. 606 (audio).

[8] See Trial Tr. Day 4 Morning (doc. no. 270) at 116:11-16, 117:18-20.

[9] Id. at 128:4-5.

[10] See id. at 128:9-15.

**ADDENDUM PAGE 78**

question is, I can't KNOWINGLY assist you with financial matters."[11] The word

"knowingly" appeared in all capital letters.

> The agent inquired further into Freeman's position, and Freeman explained:
> You told me you sell drugs. Therefore, to assist you with buying bitcoin would be
> considered money laundering. Money laundering requires knowledge of the
> illegal activity. I don't think you are an undercover agent, but you got a little too
> loose lipped. So while I am not opposed to the sale of drugs, I do need to be
> careful. Sadly that means I cannot KNOWINGLY sell bitcoin to you.[12]

Again, the word "knowingly" appeared in all capital letters in the message.

On August 25, 2020, the agent halted Freeman outdoors as he was walking and

asked him if there was still a bitcoin exchange machine located at Thirsty Owl.[13]

Freeman recognized the agent, as they had met in person before. Freeman confirmed that

the machine was still there. The agent then asked whether he could use it, and Freeman

replied, "I can't tell you that you can use that."[14] The agent responded, "okay, thanks."[15]

Later that day, the agent purchased about $20,000 in bitcoin from the Thirsty Owl

machine. Freeman's standard 14% transaction fee, and not a discounted fee, applied to

this purchase.[16]

---

[11] Id. at 128:16-17.

[12] Id. at 129:17-23.

[13] The agent and Freeman were approximately 30 miles from Keene and Thirsty Owl during this conversation.

[14] Prosecution Trial Ex. 610A (video).

[15] Id.

[16] See Trial Tr. Day 4 Afternoon (doc. no. 279) at 19:10-17.

**ADDENDUM PAGE 79**

Freeman and the agent did not discuss the purchase after this point, and Freeman did not make an admission or otherwise indicate that he knew that the transaction took place. Law enforcement agents seized records from Freeman's home and home office, but the prosecution did not introduce any such records that memorialized or referred to the August 25 purchase. Further, while the prosecution presented evidence reflecting that Freeman monitored at least some of his bitcoin exchange machines at times, it did not elicit or introduce evidence that the August 25 transaction was specifically monitored, or that Freeman had actual contemporaneous or subsequent knowledge of the transaction.

## III.   Analysis

As noted above, Freeman first joined DiMezzo's motion to dismiss the unlicensed money transmitting business counts (Counts 1 and 2) and later incorporated the arguments from the motion to dismiss into his motion for acquittal on those counts.[17] The court first addresses Freeman's arguments for dismissal or acquittal as to Counts 1 and 2, and then turns to the remaining arguments in his motion for acquittal.

### A.   Operation of and conspiracy to operate an unlicensed money transmitting business (Counts 1 and 2)

Freeman premises his motion to dismiss on the assumption that the United States Attorney, in deciding to charge Freeman with operating and conspiring to operate an unlicensed money transmitting business, relied on (or needed to rely on) official guidance from FinCEN applying the Bank Secrecy Act's implementing regulations to persons

---

[17] See doc. no. 265 at 2 ("Additionally, the Church was not engaged in 'money transmitting'. The transactions involved church-owned Bitcoin. The Defendant incorporates all arguments and the pretrial Motion to Dismiss with regard to this aspect of our current Rule 29 motion.").

**ADDENDUM PAGE 80**

exchanging virtual currencies.  Specifically, in 2013, FinCEN issued guidance opining that an "exchanger" of virtual currency (as defined in FinCEN's regulations) that "(1) accepts and transmits a convertible virtual currency or (2) buys or sells convertible virtual currency for any reason is a money transmitter under FinCEN's regulations," and must register under 31 U.S.C. § 5330.  Under this guidance, an "exchanger is a person engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency."[18]

Freeman argues that FinCEN acted without authority from Congress in issuing this guidance and taking the position that the money transmitting business registration requirements apply to individuals or entities that exchange virtual currencies, like bitcoin. Absent such Congressional authority, Freeman avers, the agency guidance and regulatory interpretation are invalid under the major questions doctrine,[19] and Freeman's prosecution for operating an unlicensed money transmitting business cannot stand.

The prosecution responds that its charging decision (and ultimately, its proof at trial) depends on the statute itself, not the implementing regulations or FinCEN's associated interpretive guidance.  Under the plain meaning of the statute, Freeman knowingly conducted, controlled, managed, supervised, directed, or owned "all or part of an unlicensed money transmitting business," 18 U.S.C. § 1960(a), because that business involved the transfer of "funds" and "fail[ed]" to comply with the money transmitting

---

[18] 2013 FinCEN Guidance, FIN-2013-G0012013, at 2.

[19] W. Virginia v. Env't Prot. Agency, 142 S. Ct. 2587, 2610 (2022) ("Under our precedents, this is a major questions case.").

**ADDENDUM PAGE 81**

business registration requirements under section 5330 of title 31, United States Code, <u>or</u> regulations prescribed under such section."  § 1960(b)(1)(B) & (b)(2) (emphasis added). The prosecution further argues that even if its proof depended on FinCEN's interpretation of the regulations, and that interpretation constituted a "major question," FinCEN's actions would not exceed the authority given to it by Congress.  For the reasons detailed below, the court agrees with the prosecution on all points.

     **1.**     **Statutory interpretation**

     The court begins by determining whether the plain and ordinary meaning of "funds" as used in 18 U.S.C. § 1960 includes bitcoin – the virtual currency at issue here. <u>See</u> Babb v. Wilkie, 140 S. Ct. 1168, 1177 (2020) (noting that where the court determines the plain meaning of a statute based on its unambiguous words, the "judicial inquiry is complete") (quoting Desert Palace, Inc. v. Costa, 539 U.S. 90, 98 (2003)).  Courts have near unanimously found that bitcoin may constitute "funds" under § 1960 and the money laundering statute, 18 U.S.C. § 1956.  <u>See</u>, <u>e.g.</u>, United States v. Iossifov, 45 F.4th 899, 913 (6th Cir. 2022), <u>cert. denied</u>, No. 22-6343, 2023 WL 2123960 (U.S. Feb. 21, 2023); United States v. Harmon, 474 F. Supp. 3d 76, 80, 90 (D.D.C. 2020); United States v. Ologeanu, No. 5:18-CR-81-REW-MAS, 2020 WL 1676802, at *11 (E.D. Ky. Apr. 4, 2020); United States v. Stetkiw, No. 18-20579, 2019 WL 417404, at *2 (E.D. Mich. Feb. 1, 2019); United States v. Mansy, 2:15-CR-198-GZS, 2017 WL 9672554, at *1 (D. Me. May 11, 2017) (Signal, J.); United States v. Murgio, 209 F. Supp. 3d 698, 707 (S.D.N.Y. 2016); United States v. Budovsky, No. 13CR368 DLC, 2015 WL 5602853, at *14

(S.D.N.Y. Sept. 23, 2015); United States v. Faiella, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014).[20]

Freeman agrees and concedes that if the court interprets the statute consistent with these cases, his motion fails.[21]  He instead asks the court to forego statutory interpretation entirely and raises an apparently novel challenge to FinCEN's actions under the major questions doctrine.  The court addresses and rejects that argument below, see infra. § III, A, 2.  But first, it construes the operative statute.

Under 18 U.S.C. § 1960, a person commits an offense when he "knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business."  In relevant part, the statute defines the term "unlicensed money transmitting business" as "a money transmitting business which affects interstate or foreign commerce in any manner or degree" and "fails to comply with the money transmitting business registration requirements under [31 U.S.C. § 5330] or regulations prescribed under such section."  18 U.S.C. § 1960(b)(1)(B).  The version of 31 U.S.C. § 5330(d) in effect at the time of the offense conduct also defined "money transmitting

---

[20] The only contrary authority, United States v. Petix, is a report and recommendation from a Magistrate Judge in the Western District of New York that was not adopted by the district court. See 15-CR-227A, 2016 WL 7017919, at *5 (W.D.N.Y. Dec. 1, 2016).  No other court, including other judges within the Western District of New York, has adopted the Petix court's reasoning, as "[v]irtually every federal court to consider this issue has determined that the ordinary meaning of 'funds' in the federal money laundering statutes encompasses Bitcoin."  United States v. Phillips, No. 22-CR-6058CJS, 2022 WL 16990050, at *3 (W.D.N.Y. Nov. 17, 2022), report and recommendation adopted, No. 22-CR-6058, 2023 WL 2775610 (W.D.N.Y. Apr. 4, 2023).

[21] See doc. no. 176 at 19.  At oral argument, DiMezzo's counsel (who prepared and filed the motion that Freeman later joined) admitted that "if the normal rules of statutory interpretation apply, we lose . . . I grant that."  Doc. no. 268 at 9:22-23.

**ADDENDUM PAGE 83**

business" as "any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system[.]" Pub. L. No. 107-56, 115 Stat. 272, 328 (2001). In 2021, Congress amended § 5330(d) to include in the definition of money transmitting business "any other person who engages as a business in the transmission of <u>currency</u>, funds, or <u>value that substitutes for currency</u>, including any person who engages as a business in an informal money transfer system[.]" 31 U.S.C. § 5330(d)(1)(A) (emphasis added). This amended version of § 5330(d) does not apply to Freeman's conduct.

In the Superseding Indictment, the Grand Jury charged Freeman with operating, and conspiring to operate, "an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960."[22] Specifically, the indictment charged Freeman and others with operating a business that "failed to comply with the money transmitting business registration requirements set forth in Title 31, United States Code, Section 5330, and the regulations prescribed thereunder."[23]

While the indictment referenced purported unspecified violations of the "regulations," the prosecution clarified at oral argument that it could prove its case by showing that Freeman violated either the statute or the regulations. See <u>United States v. Bader</u>, 698 F.2d 553, 555 (1st Cir. 1983) ("The complaint does not use the statute's

---

[22] Superseding Indictment (doc. no. 139) at ¶ 12.

[23] <u>Id.</u> at ¶ 13; <u>see also</u> <u>id.</u> at ¶ 3 (alleging that defendants knowingly operated a business that failed to "meet registration and reporting requirements set forth in Title 18, United States Code, Section 1960, and in regulations promulgated by the United States Department of the Treasury"), ¶ 17, ¶ 20.

disjunctive 'or,' for the simple reason that, when a statute is phrased in the disjunctive, it is well-established that a criminal complaint based on that statute must be phrased in the conjunctive. . . .  It is equally well-established that the government need prove only one of the conjunctively connected offenses to warrant conviction.").[24]  It further represented that it planned to present evidence demonstrating violations of the statute, without reference to the regulations or FinCEN's guidance about the regulations.[25]  The prosecution also proposed jury instructions on the unlicensed money transmitting business counts that referenced only the statute and case law applying the statute, rather than the regulations.[26]  The court adopted a slightly modified version of these instructions – without referencing the regulations – and instructed the jury accordingly.  The court thus focuses on the statute.

---

[24] The prosecution is correct that a person may violate § 1960 by failing to comply with the registration requirements of 31 U.S.C. § 5330, but not necessarily the regulations prescribed thereunder.  For example, § 5330(a)(1) provides that "[a]ny person who owns or controls a money transmitting business shall register the business (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury" within 180 days from the "date on which the business is established." (emphasis added).  The statute alone requires registration, regardless of what the regulations say.  The statute also details the required contents of the registration, see § 5330(b), and "[s]ubject to [those] requirements," provides that the Secretary of the Treasury "shall prescribe, by regulation, the form and manner for registering a money transmitting business." § 5330(a)(2).  Freeman was not charged with failing to follow the required "form and manner" of registration under the regulations; rather, he was charged with failing to register all together.  The regulations – and FinCEN's interpretation of them – therefore have no bearing on whether he violated § 1960.

[25] In its oral order, the court clarified that it was not ruling that "removing the reg[ulations] from the criminal trial" was "legally necessary."  Doc. no. 268 at 56:3-6.  The parties were free to inject the regulations into the trial as they wished.

[26] See Freeman Proposed Jury Instructions (doc. no. 243); Prosecution Proposed Jury Instructions (doc. no. 250).  Freeman did not object to the fact that the prosecution's proposed jury instructions on the money transmitting claim did not reference the regulations.

**ADDENDUM PAGE 85**

Freeman argues in his Rule 29 motion for acquittal that the trial evidence was insufficient to prove that he was engaged in "money transmitting" under § 1960 because the transactions involved bitcoin.[27]  Under § 1960, however, "the term 'money transmitting' includes transferring <u>funds</u> on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  18 U.S.C. § 1960(b)(2) (emphasis added).  The statute does not define "funds," but "[w]hen a term goes undefined in a statute," courts determine "its ordinary meaning."  Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 566 (2012).  As several courts have recognized, the "ordinary meaning of 'funds[ ]' . . . is 'available pecuniary resources,' which essentially means, 'something generally accepted as a medium of exchange, a measure of value, or a means of payment.'"  Iossifov, 45 F.4th at 913 (quoting Stetkiw, 2019 WL 417404, at *2); <u>see</u> <u>also</u> Murgio, 209 F. Supp. 3d at 707 (adopting identical ordinary meaning of "funds," but adding that "[p]ecuniary is defined as taking the form of or consisting of money" (quoting Webster's Third New International Dictionary 921 (2002))).

"[I]t is clear that bitcoins are funds within the plain meaning of that term."  Murgio, 209 F. Supp. 3d at 707.  "Bitcoins can be accepted 'as a payment for goods and services' or bought 'directly from an exchange with [a] bank account.'"  Id. (quoting <u>Getting started with Bitcoin</u>, bitcoin, https://bitcoin.org/en/getting-started (last visited

---

[27] <u>See</u> doc. no. 265 at 2.

Sept. 16, 2016)).  Indeed, as the trial evidence here showed,[28] "[i]n today's society,

Bitcoin is often used [to] pay for things, and it may sometimes be used as a medium of

exchange that is subsequently converted to currency to pay for things."  Iossifov, 45 F.4th

at 914; see also Faiella, 39 F. Supp. 3d at 545 (finding that bitcoins "clearly qualif[y] as

'money' or 'funds'" under § 1960 because they "can be easily purchased in exchange for

ordinary currency, act[ ] as a denominator of value, and [are] used to conduct financial

transactions").[29]

     Moreover, while the plain and ordinary meaning of the statutory text

unambiguously includes bitcoin, and thus, the court is not inclined to look to the history

and purpose of § 1960, courts have held that that history and purpose nevertheless

"support[ ] the conclusion that bitcoins fall within the statute's purview."  Murgio, 209 F.

Supp. 3d at 708.  Congress enacted § 1960 to "address the fact that 'money launderers

---

[28] For example, Freeman presented testimony from business owners who accept bitcoin as payment for goods or services, such as pizza.  See Trial Tr. Day 9 Morning (doc. no. 273) at 25-26.

[29] The key term "funds" appears in multiple statutes that work together to form the basis of Freeman's unlicensed money transmitting business charges.  For example, § 1960 defines "money transmitting" as "transferring funds on behalf of the public by any and all means . . . ." Section 5330 similarly defines a "money transmitting business" as a business that "engages in the transmission of funds" and is required to file reports under 31 U.S.C. § 5313.  And the § 5313 reporting requirement applies to "financial institutions," which include businesses that "engage[ ] in the transmission of funds."  31 U.S.C. § 5312(a)(2)(R); see also Harmon, 474 F. Supp. 3d at 101 ("[C]ourts have held that 'there is virtually no substantive difference, nor did Congress intend there to be a substantive difference, between the terms 'money transmitting' in Section 1960 and 'money transmitting business' in Section 5330.'" (quoting United States v. E-Gold, Ltd., 550 F. Supp. 2d 82, 92 n. 10 (D.D.C. 2008)).  This "record of statutory usage demonstrates convincingly" that the plain and ordinary meaning of "funds" includes bitcoin.  W. Virginia Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 88 (1991).

with illicit profits ha[d] found new avenues of entry into the financial system.'"  Id.
(quoting S. Rep. No. 101-460 (1990)).  Thus, "[f]rom its inception," the statute "sought to
prevent innovative ways of transmitting money illicitly," and interpreting "funds" to
include bitcoin aligns with that purpose.  Id.; see also Faiella, 39 F. Supp. 3d at 546
(observing that "Congress designed the statute to keep pace with such evolving threats,
which is precisely why it drafted the statute to [broadly] apply to any business involved
in transferring 'funds . . . by any and all means'") (quoting 18 U.S.C. § 1960(b)(2)).

Freeman contends that because bitcoin and other virtual currency did not exist in
2001, Congress could not have anticipated the word "funds" applying to such new
financial instruments.  While Freeman is correct that bitcoin did not exist when Congress
amended the statute in 2001, this does not change the result.  "[T]he fact that a statute can
be applied in situations not expressly anticipated by Congress does not demonstrate
ambiguity[;] it demonstrates breadth."  Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 212
(1998); see also Barr v. United States, 324 U.S. 83, 90 (1945) ("[I]f Congress has made a
choice of language that fairly brings a given situation within a statute, it is unimportant
that the particular application may not have been contemplated by the legislators.");
Budovsky, 2015 WL 5602853, at *14 (finding that Congress may "address a general
problem with many variations" through broadly worded statutes like § 1960 and § 5330).
It is also well-settled that a "statute can be unambiguous without addressing every
interpretive theory offered by a party. It need only be 'plain to anyone reading the Act'

17

**ADDENDUM PAGE 88**

that the statute encompasses the conduct at issue." Salinas v. United States, 522 U.S. 52, 60 (1997) (quoting Gregory v. Ashcroft, 501 U.S. 452, 467 (1991)).[30]

In sum, the statute's plain language and structure unambiguously include bitcoin. And, to the extent that legislative intent and statutory purpose are legitimate and permissible interpretive tools, they point to the same conclusion. See Mansy, 2017 WL 9672554, at *2. For these reasons, the Superseding Indictment does not fail to state a criminal offense against Freeman for operating an unlicensed money transmitting business, or conspiring to operate such a business, and the motion to dismiss is denied. Freeman's Rule 29 argument that the trial evidence was insufficient to support the jury's conclusion that he was engaged in "money transmitting" because the transactions involved bitcoin is unavailing for the same reasons.

## 2. Major questions doctrine

Contending that the straightforward statutory interpretation principles outlined above "miss the point," Freeman asserts that the Supreme Court's recent decision in West Virginia v. EPA changed the legal landscape in such a way that FinCEN's 2013 interpretive guidance of its regulations must be invalidated. 142 S. Ct. 2587 (2022). Consequently, says Freeman, the indictment fails to state a criminal offense for violating § 1960. Freeman's argument overlooks the fact that the indictment neither depends on

---

[30] The allegedly unintended or "undesirable policy consequences" of following the statute's plain and ordinary meaning likewise do not control the interpretative analysis. Bostock v. Clayton Cnty., Georgia, 140 S. Ct. 1731, 1753 (2020) ("The place to make new legislation, or address unwanted consequences of old legislation, lies in Congress.").

**ADDENDUM PAGE 89**

nor references the FinCEN guidance, and the only agency arguably "interpreting" § 1960 for purposes of this prosecution is the Department of Justice, not FinCEN.  Indeed, the FinCEN guidance itself clarifies that it "explains only how FinCEN characterizes certain activities involving virtual currencies under the Bank Secrecy Act [31 U.S.C. § 5330] and FinCEN regulations" and "should not be interpreted as a statement by FinCEN about the extent to which those activities comport with other federal or state statutes, rules, regulations, or orders."[31]  Importantly, "the FinCEN Guidance does not even mention § 1960, much less purport to interpret the statute's use of the word 'funds.'"  Murgio, 209 F. Supp. 3d at 709.

Even if the FinCEN guidance mattered to this prosecution, however, the court is not persuaded by Freeman's arguments for at least three reasons.  First, FinCEN's regulatory interpretation is not a "major question."  Second, even if this were an extraordinary case of "deep economic and political significance," where, as here, the statutory language at issue is unambiguous, the court simply enforces the statute according to its terms and does not need to look to, let alone defer to, the agency's interpretation.  King v. Burwell, 576 U.S. 473, 486 (2015).  And third, FinCEN's interpretation is consistent with the clear statement of regulatory authority Congress granted it and thus does not run afoul of the major questions doctrine, to the extent that the doctrine applies.

---

[31] 2013 FinCEN Guidance at n.1.

a)    **Applicability**

The major questions doctrine operates as something of an exception to Chevron deference.  "Deference under Chevron to an agency's construction of a statute that it administers is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps."  Brown & Williamson, 529 U.S. at 159 (citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984)).  "In extraordinary cases, however, there may be reason to hesitate before concluding that Congress has intended such an implicit delegation."  Id.  Those extraordinary cases – "in which the history and the breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion" – call for a "different approach."  West Virginia, 142 S. Ct. at 2608. "[S]omething more than a merely plausible textual basis for the agency action is necessary.  The agency instead must point to 'clear congressional authorization' for the power it claims."  Id. at 2609 (quoting Utility Air Regulatory Group v. EPA, 573 U.S. 302, 324 (2014)); but see Yeskey, 524 U.S. at 212 (noting that "in the context of an unambiguous statutory text," arguments concerning whether Congress has made its intention clear are "irrelevant").

The West Virginia majority simply concluded that it was "a major questions case" under "[its] precedents."  Id. at 2610.  In a concurrence joined by Justice Alito and relied on by Freeman,[32] however, Justice Gorsuch summarized, based on existing case law,

---

[32] See doc. no. 176 at 15.

certain factors for courts to consider when determining whether a case implicates a "major question." Id. at 2620 (Gorsuch, J., concurring) ("[O]ur cases supply a good deal of guidance about when an agency action involves a major question for which clear congressional authority is required."). These factors counsel against applying the doctrine here.

First, "the doctrine applies when an agency claims the power to resolve a matter of great 'political significance' or end an 'earnest and profound debate across the country.'" Id. (quoting Gonzalez v. Oregon, 546 U.S. 243, 267-268 (2006)). Whether one sub-agency out of thousands within the executive branch believes that businesses which transmit bitcoin for fiat currency must register with FinCEN can hardly be described as a matter of "great political significance."[33] Nor does it purport to end an earnest and profound national debate about regulating virtual currencies. That debate is just as vibrant now as it was prior to FinCEN issuing its guidance in 2013. Importantly, Congress has not "considered and rejected bills authorizing something akin to the agency's proposed course of action," which is often a "sign than an agency is attempting to work [a]round the legislative process to resolve for itself a question of great political significance." Id. at 2621 (cleaned up).

Second, major questions arise when an agency "seeks to regulate a significant portion of the American economy or require billions of dollars in spending by private

---

[33] Nor is this court in the best position to decide what constitutes a matter of great political significance.

persons or entities." Id. (cleaned up).  Freeman contends that FinCEN seeks to regulate a significant portion of the economy through its interpretive guidance because as of November 2021, non-state-issued digital assets had a combined market capitalization of $3 trillion.  See doc. no. 176, at 10.  While undoubtedly a large figure, the argument misses the mark.  FinCEN's exercise of regulatory authority does not target the entire $3 trillion virtual currency market.  Rather, it is directed at a fraction of market participants who are in the business of transmitting virtual currencies and not already registered with FinCEN.  Freeman does not attempt to quantify the portion of the virtual currency market that FinCEN's interpretative guidance would actually affect.

Moreover, Freeman has presented no evidence that FinCEN's guidance would require billions of dollars in spending by private persons or entities.  By contrast, in West Virginia, EPA's exercise of authority would "force [dozens of] coal and gas-fired power plants to cease [operating] altogether," "eliminate thousands of jobs by 2025," and "cause consumers' electricity costs to rise by over $200 billion."  Id. at 2621-22.  Freeman has offered no evidence of similar downstream consequences here.

Third and finally, the "major questions doctrine may apply when an agency seeks to intrud[e] into an area that is the particular domain of state law."  Id. at 2621 (cleaned up).  Freeman does not meaningfully argue, or present evidence, that regulation of financial services entities and money transmitting businesses is an "area[ ] traditionally regulated by the States."  Id. (quoting Gregory, 501 U.S. at 459-460).  While Freeman is correct that New Hampshire has chosen not to require similar businesses to register with the State, that alone does not indicate that FinCEN is stepping into a particular domain of

**ADDENDUM PAGE 93**

state law.  The Federal Government and the States often regulate similar industries,

entities, or people, but sometimes regulate them differently.  Thus, unlike EPA's actions

in West Virginia, FinCEN's interpretive guidance does not create federalism concerns.

Id. at 2622 (finding that the "CPP unquestionably has an impact on federalism, as 'the

regulation of utilities is one of the most important of the functions traditionally associated

with the police power of the States.'") (quoting Arkansas Elec. Cooperative Corp. v.

Arkansas Pub. Serv. Comm'n, 461 U.S. 375, 377 (1983)).  For all of these reasons, the

major questions doctrine does not apply to FinCEN's interpretive guidance.

### b) Unambiguous statutory language, not agency guidance, controls

The Supreme Court has recognized that even in "extraordinary cases" involving

questions of "deep economic and political significance," it is the court's "task to

determine the correct reading" of the statute at issue.  King, 576 U.S. at 486 (quoting

FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159 (2000)).  "If the

statutory language is plain, [the court] must enforce it according to its terms."  Id.

(emphasis added); see also Biden v. Nebraska, 143 S. Ct. 2355, 2376 (2023) (Barrett, J.,

concurring) ("In this case, the Court applies the ordinary tools of statutory interpretation

to conclude that the HEROES Act does not authorize the Secretary's plan.  The major

questions doctrine reinforces that conclusion but is not necessary to it.") (emphasis

added).

Therefore, even assuming, without deciding, that this is such an extraordinary

case, as discussed above, see supra, § III, A, 1, the language of § 1960 and § 5330 is plain

and unambiguous, and the court enforces those statutes according to their terms.  The

statutes cover Freeman's conduct, and the prosecution could meet its burden of proving a

violation of § 1960 by relying on the statutes alone.  There is accordingly no need to look

to, or rely upon, FinCEN's interpretive guidance on the related regulations.  See

Massachusetts v. E.P.A., 549 U.S. 497, 528-29 (2007) (rejecting EPA's reading of a

statute based entirely on the unambiguous statutory text).

> ### c)  FinCEN acted within its clear Congressional delegation of authority

Freeman contends that Congress did not provide a clear statement to the Treasury

Department authorizing FinCEN's purportedly new regulatory authority until it amended

§ 5330(d) in 2021.  But assuming, without deciding, that FinCEN's interpretive

guidance[34] is a question of major economic and political significance, the agency had

"clear congressional authorization" to regulate in such a manner prior to 2021.  West

Virginia, 142 S. Ct. at 2609 (quoting Utility Air, 573 U.S. at 324).

"Extraordinary grants of regulatory authority are rarely accomplished through

'modest words,' 'vague terms,' [ ] subtle device[s]," or "ambiguous statutory text."  West

Virginia, 142 S. Ct. at 2609 (quoting Whitman v. American Trucking Association, 531

U.S. 457, 468 (2001)).  No such modesty, subtlety, or ambiguity exists here.  "Section

---

[34] It is not clear that the major questions doctrine applies to an agency's interpretative guidance on a regulation (as opposed to its construction of a statute or creation of a new regulation), which do not have the force of law.  See Perez v. Mortgage Bankers Ass'n, 135 S. Ct. 1199, 1204 (2015).  Interpretive guidance does not "create new law, right[s] or duties," but "merely clarif[ies] an existing statute or regulation."  United States v. Lott, 750 F.3d 214, 217 (2d Cir. 2014) (citation omitted).  Because the 2013 FinCEN guidance is arguably an act of regulatory authority, however, the court assumes, without deciding, that it could be subject to challenge under the major questions doctrine.

24

**ADDENDUM PAGE 95**

5330 governs the registration of money transmitting businesses with [FinCEN], E-Gold, 550 F. Supp. 2d at 96, and expressly does so by authorizing the Secretary of the Treasury to "prescribe, by regulation, the form and manner for registering a money transmitting business." 31 U.S.C. § 5330(a)(2).  As discussed above, the statute in effect at the time of Freeman's conduct broadly defined "money transmitting businesses" as "any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system." 31 U.S.C § 5330(d), Pub. L. No. 107-56, 115 Stat. 272, 328 (2001).  Therefore, the "regulations clarify the scope of Section 5330," which by its plain text covers a broad swath of activities, persons, and entities. E-Gold, 550 F. Supp. 2d at 96.

Freeman does not argue that this statutory language is vague or ambiguous, nor does he develop his argument beyond simply concluding that the language is "cryptic." Indeed, he does not offer an alternative construction, and even if he had, "genuine ambiguity requires more than a possible alternative construction." United States v. Jimenez, 507 F.3d 13, 21 (1st Cir. 2001).  He instead contends that because bitcoin did not exist in 2001, Congress could not have intended to confer on FinCEN the authority to regulate money transmitting businesses that use virtual currency.  See doc. no. 176, at 19-21.  But the court has already rejected that argument.  See supra, § III, A, 1 (quoting Yeskey, 524 U.S. at 212); see also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 499 (1985) ("[T]he fact that RICO has been applied in situations not expressly anticipated by

Congress does not demonstrate ambiguity.  It demonstrates breadth."); United States v. Southwestern Cable Co., 392 U.S. 157, 172 (1968) (noting that while Congress could not have foreseen the development of new communications technologies when it passed the Communications Act in 1934, it gave the FCC broad authority to regulate such a "new and dynamic" field through the administrative process).  There is thus more than a "colorable textual basis" in § 5330 authorizing FinCEN to issue the interpretive guidance challenged here.  West Virginia, 142 S. Ct. at 2609.

With clear authorization from Congress to regulate (and require registration of) money transmitting businesses, FinCEN acted well within its long-established regulatory authority by issuing the 2013 Guidance.  That stands in stark contrast to EPA's actions in West Virginia, other recent major questions cases, and the purpose of the doctrine altogether.

The major questions doctrine purports to address a "particular and recurring problem:  agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted."  West Virginia, 142 S. Ct. at 2609.  For example, in West Virginia, the majority found that EPA was attempting to "discover in a long-extant statute an unheralded power" to "restructure the American energy market," which was a "transformative expansion of [its] regulatory authority."  Id. at 2610 (quoting Utility Air, 573 U.S. at 324).  EPA, through its rule, was effectively mandating energy generation by natural gas, wind, solar, or other non-coal-fired sources.  In that way, the EPA was not simply regulating pollutants or pollution emissions.  It was getting into the business of making policy judgments as to the makeup of the country's energy

**ADDENDUM PAGE 97**

production industry and effectively ordering the eventual shuttering of a major segment of the nation's existing power generation sources.  EPA sought this "newfound power" in an ancillary provision of the Clean Air Act that "had rarely been used in the preceding decades."  Id.  And the agency's exercise of authority "allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."  Id.

None of these factors is present here.  FinCEN's guidance does not represent an expansion of regulatory authority into some unforeseen area of the economy or an area beyond the agency's normal expertise and subject matter.  By regulating money transmitting businesses that use bitcoin, FinCEN is simply applying its existing regulatory authority to a different type of funds.  Regulating money transmitting businesses that exchange bitcoin for fiat currency therefore fits squarely within FinCEN's "congressionally assigned mission and expertise."  West Virginia, 142 S. Ct. at 2623 (Gorsuch, J., concurring).

Nor is FinCEN "attempt[ing] to deploy an old statute focused on one problem to solve a new and different problem," which "may be a warning sign that it is acting without clear congressional authority."  Id.  The "problem" here is neither new nor different and the statute has been used to solve these exact problems since its inception. The same could not be said in other recent major questions cases.  For example, the CDC (a public health agency) did not have statutory authority to regulate the housing market through an eviction moratorium.  See Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs., 141 S. Ct. 2485, 2488-89 (2021).  And OSHA (an agency charged with regulating workplace safety) did not have the authority to set the "broad public health

measure" of a COVID vaccine mandate.  See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin., 142 S. Ct. 661, 665 (2022).

Moreover, while Congress recently amended § 5330(d) to explicitly encompass businesses that transmit virtual currencies, it has not "considered and rejected" such bills in the past.  If it had, that would suggest that FinCEN was attempting a regulatory work around these prior legislative failures.  Congress instead amended the statute in 2021 to allow FinCEN "to continue" its regulatory objectives of "safeguard[ing] the financial system from illicit activity, counter[ing] money laundering and the financing of terrorism, and promot[ing] national security" and address the fact that criminals are "increasingly rely[ing] on [virtual currencies] . . . to move illicit funds."  Pub. L. No. 116-283, 134 Stat. 3388, 4552 (2021) (emphasis added).  The amendment therefore reinforced and clarified FinCEN's existing regulatory authority; it did not create new, previously unrecognized authority.  As a result, to the extent the major questions doctrine applies to FinCEN's actions, the agency did not violate the doctrine's core principles.  Freeman's motion to dismiss and Rule 29 motion for judgment of acquittal on the unlicensed money transmitting business counts are therefore denied for these additional reasons.

### B.    Remainder of Freeman's motion for judgment of acquittal

Freeman also moves for judgment of acquittal as to the remaining counts in the Superseding Indictment (Counts 3-8).  The court grants the motion with respect to the

money laundering count (Count 3) as detailed below, and otherwise denies the motion for

the reasons stated on the record and in the prosecution's briefs and oral argument.[35]

The money laundering charge is brought under 18 U.S.C. § 1956(a)(3)(B), which

makes it a federal crime for an individual:

> with the intent . . . to conceal or disguise the nature, location, source, ownership,
> or control of property believed to be the proceeds of specified unlawful
> activity . . . [,] [to] conduct[ ] or attempt[ ] to conduct a financial transaction
> involving property represented to be the proceeds of specified unlawful activity, or
> property used to conduct or facilitate specified unlawful activity . . . .

As previously discussed, the prosecution charges Freeman with money laundering based

on an undercover agent's August 25, 2020 transaction at one of Freeman's bitcoin

exchange machines, located at Thirsty Owl in Keene, New Hampshire.  Freeman argues

that the money laundering conviction cannot stand, as the prosecution did not provide

sufficient evidence that Freeman knew that the August 25 transaction took place.

This argument hinges on the mens rea requirement that attaches to the criminal

actus reus of "conduct[ing] a financial transaction."  On its face, the statute is silent as to

whether conviction requires that the defendant have knowledge that a money laundering

transaction occurred.  In construing criminal statutes, however, courts do not treat such

silence as dispositive, given the "longstanding presumption, traceable to the common

law, that Congress intends to require a defendant to possess a culpable mental state

regarding 'each of the statutory elements that criminalize otherwise innocent conduct.'"

---

[35] See Prosecution Objection to the Rule 29 Motion (doc. no. 266); Prosecution Response to the
Rule 29 Motion (doc. no. 254); Trial Tr. Day 8 Morning (doc. no. 282) at 48:1-81:9 (oral
argument on the Rule 29 motion).

**ADDENDUM PAGE 100**

Rehaif v. United States, 139 S. Ct. 2191, 2195 (2019) (quoting United States v. X-Citement Video, Inc., 513 U.S. 64, 72 (1994)).  Accordingly, where criminal statutes are "silent on the required mental state[,]" courts "read into [the] criminal statute[ ] . . . that mens rea which is necessary to separate wrongful conduct from otherwise innocent conduct."  Ruan v. United States, 142 S. Ct. 2370, 2377 (2022) (quoting Elonis v. United States, 575 U.S. 723, 736 (2015)).  Specifically, "the mens rea [courts] have read into such statutes is often that of knowledge or intent."  Id. (citing cases).  Applying this principle here, Freeman cannot be convicted of money laundering unless he knowingly conducted a prohibited financial transaction, which includes possessing knowledge that the August 25 transaction occurred.  Significantly, the prosecution agrees with this reading of the statute.  Indeed, the Superseding Indictment alleged that Freeman "knowingly conducted"[36] the August 25 transaction, and the jury instructions repeated the same language without objection from the prosecution.[37]

Having established the culpable mental state required under the statute, the court turns to the evidence and the parties' arguments regarding its sufficiency.  The parties submitted briefs on the Rule 29 motion for acquittal following Freeman's conviction.  With respect to the money laundering count, the prosecution essentially argued that

---

[36] Doc. no. 139 at ¶ 31 (emphasis added).

[37] See Final Jury Instructions (doc. no. 256) at 31 ("Count 3 of the Indictment charges Mr. Freeman with the crime of money laundering.  The Indictment charges that, on or about August 25, 2020, . . . the defendant knowingly conducted a financial transaction involving property represented by an authorized agent of the United States government to be proceeds of unlawful activity . . . .").

Freeman participated in the August 25 transaction by giving the undercover agent permission to use the Thirsty Owl machine, with knowledge that the agent's purpose in purchasing bitcoin was to hide the source of illegal funds.[38]  The prosecution's initial briefing did not focus, however, on whether Freeman knew that the August 25 transaction <u>actually took place</u>, as opposed to whether it was intended to conceal or disguise.  Given that this is a close call, the court permitted the parties to submit supplemental briefing on this specific issue.

In its supplemental brief, the prosecution recognized that it must prove that Freeman "knowingly participated in a financial transaction" under the statute.[39]  Tellingly, in reciting supporting evidence adduced at trial, the prosecution continued to focus on Freeman's grant of permission to the agent to use the machine and the intent to conceal illegal funds—not on Freeman's knowledge that the transaction in fact occurred.

For example, the prosecution pointed out, and the evidence shows, that Freeman told the agent about his bitcoin exchange machines and assured him that he could purchase large values of bitcoin through the machines anonymously.  Freeman also expressed that he had "general knowledge that his machines were used to launder funds and facilitate frauds."[40]  Further, after learning of the illegal source of the agent's funds,

---

[38] This "intent . . . to conceal or disguise the nature, location, source, ownership, or control of" the subject funds involves a second, specific mens rea under the money laundering statute.  18 U.S.C. § 1956(a)(3)(B).  Freeman does not argue that the evidence was insufficient to prove that element, and it is thus not the subject of this motion.

[39] Prosecution Supp. Br. (doc. no. 316) at 1.

[40] <u>Id.</u> at 5.

Freeman spoke cryptically about continuing to sell bitcoin to the agent. Freeman asserted that he could not knowingly permit further transactions, and he placed emphasis on the word "knowingly," but he did not clearly and directly refuse to sell to the agent. Viewing "the communications in their entirety," the prosecution argued that "it was a rational construction of the evidence for the jury to conclude that the defendant provided the officer with a wink-and-nod to use the machine when he said, 'I can't tell you that you can use [that].'"[41]

True enough. But noticeably absent in the evidence presented at trial and highlighted by the prosecution is proof that Freeman knew that the August 25 transaction occurred. Indeed, Freeman did not witness the August 25 transaction personally, as he was some miles away from where it took place. Nor is there evidence showing, or creating the inference that, someone else (including the undercover agent himself) witnessed the transaction and informed Freeman of it. Further, at trial, the prosecution presented financial records and documents seized from Freeman's home and home office. If these records were in Freeman's possession and confirmed that the August 25 transaction occurred, the jury arguably could have inferred that Freeman possessed the requisite knowledge regarding the transaction. But none of the records or documents confirmed this key fact, a required element of proof.

Further, the prosecution has not argued, and it would be a mistake to argue, that the evidence going to Freeman's knowledge of the concealment of the source of the

---

[41] Id.

subject funds implicitly proves knowledge of the transaction's occurrence.  Indeed, a

person can have full knowledge of an individual's intent to conceal aspects of an

upcoming transaction without ever knowing that the transaction took place.

In analyzing this deficiency in the evidence, the court bears in mind that the

prosecution brought this charge based on an undercover operation.  In this context, the

prosecution and the agent had ample opportunity to avoid this gap in their evidence by

having the agent communicate with Freeman after the transaction took place, to confirm

its occurrence.  By all accounts, such a conversation did not occur.  If it did occur, the

prosecution presented no evidence of it.

In the face of this failure of proof, the prosecution attempts to salvage the money

laundering charge through evidence of two occasions in January and February 2021, in

which Freeman alerted his "confederates" over Telegram that large transactions were

completed at bitcoin machines that were not the Thirsty Owl machine.[42]  The prosecution

argues that "[t]he jury could infer [from these communications] that the defendant

monitored the transactions into his machines and knew that a large transaction occurred

on August 25, 2020."[43]  This evidence is not sufficient to support the conviction, and

instead arguably cuts against the prosecution's position.  The absence of comparable

evidence of Freeman's communications regarding the sizable August 25 transaction

---

[42] Doc. no. 316 at 6 n.2 (citing Trial Exs. 862, 863).

[43] Id.

weighs against the inference that he was either: (1) monitoring the machine that day, or (2) uncovered evidence that the transaction occurred.

As a final note, the court's analysis and conclusion are not disturbed or affected by the language in 18 U.S.C. § 1956(a)(3)(B) that makes it a crime to "attempt[ ] to conduct" a money laundering transaction. The prosecution confirmed at trial that it did not charge Freeman with an attempted money laundering offense.[44] And the Superseding Indictment did not track the statutory language by alleging that Freeman attempted to conduct a transaction under the statute. Instead, it alleged that he knowingly conducted such a transaction. Consistent with this, the prosecution does not argue that the evidence is sufficient to convict Freeman of an attempted offense, which would have required proof of Freeman's "intent to commit the substantive offense[,]" along with a "substantial step towards its commission." United States v. Turner, 501 F.3d 59, 68 (1st Cir. 2007) (internal quotation omitted).

In sum, based on the above construction of the subject statute, with which the prosecution agrees, the money laundering count required proof beyond a reasonable doubt that Freeman had knowledge that the August 25 transaction took place. The jury was ultimately left without sufficient evidence of Freeman's mental state on this matter. The court accordingly grants the motion for judgment of acquittal as to Count 3.

---

[44] Doc. no. 282 at 53:8-12.

**ADDENDUM PAGE 105**

IV.   **Conclusion**

For the reasons stated above, Freeman's oral and written[45] motions for judgment

of acquittal are GRANTED-IN-PART as to Count 3 and DENIED-IN-PART as to the

remaining counts.  Freeman's motion to dismiss[46] is DENIED.


**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  August 22, 2023

cc:    Georgiana MacDonald, AUSA
       Seth R. Aframe, AUSA
       John J. Kennedy, AUSA
       Michael T. McCormack, AUSA
       Mark L. Sisti, Esq.
       Richard Guerriero, Esq.

---

[45] Doc. no. 265.

[46] Doc. no. 176.

35

```
                    UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW HAMPSHIRE


     * * * * * * * * * * * * * * * * * * *
                                         *
     UNITED STATES OF AMERICA            *
                                         *   1:21-cr-41-JL
               v.                        *   September 11, 2023
                                         *   10:38 a.m.
     IAN FREEMAN                         *
                                         *
     * * * * * * * * * * * * * * * * * * *
```

                    TRANSCRIPT OF SENTENCING HEARING
                                 DAY 1
                BEFORE THE HONORABLE JOSEPH N. LAPLANTE


Appearances:


For the Government:          Georgiana L. MacDonald, AUSA
                             Seth R. Aframe, AUSA
                             John J. Kennedy, AUSA
                             United States Attorney's Office


For the Defendant:           Mark L. Sisti, Esq.
                             Sisti Law Offices

                             Richard Guerriero
                             Lothstein Guerriero PLLC


Probation Officer:           Sean Buckley


Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, New Hampshire 03301
                             (603)225-1442

2

<u>I N D E X</u>

<u>PAGE</u>

Statement by Karen Miller                          30

Statement by Dannela Varel                         33

Statement by Rebecca Viar                          36

```
 1                   P R O C E E D I N G S
 2          THE CLERK:  Court is now in session, has before it
 3   for consideration sentencing hearing in criminal case
 4   21-cr-41-01-JL, United States vs. Ian Freeman.
 5          THE COURT:  All right.  We're here for Mr. Freeman's
 6   sentencing hearing after a jury trial.
 7          Mr. Freeman is here represented by his counsel and
 8   there are three federal prosecutors also present in the
 9   building -- I mean in the courtroom.
10          And we have a couple of motions that were filed
11   very recently by the defendant that we should take up as a
12   preliminary matter.  They were caused by the -- the Court
13   dismissed one of the counts under Rule 29 of the Federal Rules
14   of Criminal Procedure finding that -- in a very close call, but
15   finding that the evidence to support the substantive money
16   laundering count was insufficient to support the conviction, so
17   the Court vacated that guilty verdict and dismissed the count.
18          That led to a motion for a new trial based on
19   spillover prejudice by the defense and the -- and the defense
20   also filed a motion to reconsider the Court's denial of its
21   motion to dismiss the counts involving running a money
22   transmitting business under the theory that the Bitcoin
23   involved in the case did not constitute funds under the
24   applicable federal statutes.
25          So let's -- let's address those motions first
```

1    because, of course, if I reconsidered that, it would be a

2    different sentencing and if I granted the motion for a new

3    trial, there would be no sentencing at all.  So we should -- we

4    should address these first.

5              MR. GUERRIERO:  Okay, your Honor.  Thank you.

6    Richard Guerriero for Mr. Freeman.

7              We're going to submit the merits of those motions on

8    the pleadings on -- we've made our record.  We think our

9    arguments are quite clear.

10             THE COURT:  Yup.

11             MR. GUERRIERO:  I did want to address the issue of

12   timeliness which the government raised on each motion and

13   that's not addressed in our pleadings.

14             On the motion for a new trial, the Court had a

15   status conference in which your Honor said that you were going

16   to be granting the -- the Rule 29 motion in part as to the

17   money laundering charge.

18             At that time, Attorney Sisti said, well, then, I'm

19   likely going to be moving for a new trial.  And my recollection

20   is that -- it was before I was counsel on the case, but I did

21   attend that status hearing online.  My recollection is that the

22   Court said, what's your argument, and Attorney Sisti responded,

23   I have to see the order.

24             So I think everyone, the Court and the government,

25   was on notice at that point that we would file a motion for a

1    new trial, but we needed to see the written order.

2            The written order came out. It's Document 332. It

3    came out on August 22nd and we filed a motion for new trial

4    within 14 days after that. I think under the applicable Rules

5    of Criminal Procedure and the local rules, 14 days was timely.

6            With regard to the motion to reconsider, the

7    government also raised a timeliness issue and you described the

8    memorandum order earlier as addressing the motion for new

9    trial, but it also contained the written order denying the

10    motion to dismiss the unlawful money transmitting counts.

11            Your Honor had given reasons on the record back a

12    long time ago by all accounts, a year ago, when I had filed the

13    motion in a different proceeding, and you gave oral reasons on

14    the record, but then you addressed that motion in writing and

15    you said you would write an order later to address that motion

16    in writing.

17            So in order to make sure we preserved our arguments

18    regarding the motion to dismiss, we also filed within 14 days a

19    motion to reconsider that order on the motion to dismiss the

20    unlicensed money transmitting business counts. That, likewise,

21    we believe, was timely. It was filed within 14 days of the

22    Court's written order.

23            The fact that the Court may have given people a --

24    you know, the courtesy of a notice that the order was coming,

25    that's not the same as the analysis. Our motion to reconsider

```
 1    is quite detailed.  It addresses the analysis in the Court's
 2    written order which, you know, we had the Court's reasons at
 3    the time of the oral order, but we didn't have the full-scale,
 4    broken-down legal analysis in the written order, so that's why
 5    we filed a motion to reconsider.
 6                 THE COURT:  Thank you.
 7                 MR. GUERRIERO:  Thank you.
 8                 THE COURT:  Timeliness?
 9                 MR. AFRAME:  On timeliness, as to the spillover
10    argument, Rule 33 says any motion for a new trial grounded on
11    any reason other than newly discovered evidence, which this was
12    not, must be filed within 14 days after verdict or finding of
13    guilty.
14                 If you go down to the 2005 commentary note
15    amendment, it describes a procedure where the defendant must
16    file within that 14 days but can then seek extension of time to
17    actually file and the Court can rule well beyond that period.
18                 THE COURT:  Yeah.
19                 MR. AFRAME:  So there's a technical matter and it's
20    in the footnote in the government's pleading --
21                 THE COURT:  Yeah.
22                 MR. AFRAME:  -- but it definitely says the Court can
23    do what it wants if the defendant establishes excusable
24    neglect.
25                 But since Mr. Guerriero talked about it, I think the
```

1   right procedure is the Rule 29 is filed and you file a -- a

2   Rule 33 motion and say if the Court grants a Rule 29, then I

3   want 14 days from after that to actually write my spillover

4   brief.

5           But something needs to happen within 14 days of the

6   entry of the verdict or finding of guilty.  Nothing happened

7   within that time.  I acknowledge that the commentary note says

8   the Court can excuse that failure, but I do think it was a

9   failure.

10          THE COURT:  All right.  And that's with respect to

11  the motion for -- I'm a little bit confused.

12          MR. AFRAME:  Sorry.

13          THE COURT:  I understand the argument vis-a-vis the

14  new trial motion.

15          MR. AFRAME:  That was that.

16          THE COURT:  What about the motion to reconsider?

17          MR. AFRAME:  So there is no -- first of all, there

18  is no rule of criminal procedure that allows reconsideration.

19  So the First Circuit has said that there's sort of an inherent

20  power in the Court to do that.

21          So I would say it's -- this is more in sort of a

22  laches kind of argument, that the -- the Court set forth in

23  November what the rationale was.  I didn't see any material

24  difference in the written order from what the Court said in

25  November.  I don't think there was an expectation in November

 1  there would be a written order and there was no motion to
 2  reconsider.  And then on the eve of trial, I'm sorry, of
 3  sentencing, a motion to reconsider is filed.
 4          My point was just sort of as a matter of sort of
 5  sitting on your rights, and this is an extraordinary leave to
 6  begin with, that that was -- that was too late.  But there --
 7  I cannot point you to a rule because there is no rule that
 8  even --
 9          THE COURT:  We have a local rule on motion to
10  reconsider, though.
11          MR. AFRAME:  I don't think it applies to criminal.
12          THE COURT:  It doesn't apply to criminal?
13          MR. AFRAME:  Not to criminal, I don't think.
14          THE COURT:  There's that list of rules that also --
15  can I have that?  Does he have a copy?
16          There's that list of rules that also apply to
17  criminal --
18          MR. KENNEDY:  We can cross-reference --
19          THE COURT:  Is it covered?
20          MR. KENNEDY:  I think the criminal does cross --
21  like it mentions the civil rule, but I think with a list of a
22  bunch of rules.
23          MR. GUERRIERO:  It's 7.2(d), your Honor.
24          THE COURT:  Okay.  Okay.  Motions for
25  reconsideration.  Okay.  Yeah, that's the motion for

1    reconsideration.

2            I was looking for the rule about which -- which

3    rules apply to criminal cases and whether 7.2 was covered.

4            Kellie, are you familiar with that rule?  It's like

5    a laundry list of rules.

6            THE CLERK:  Is there -- I'll look it up.  I know

7    they have the --

8            THE COURT:  It never -- it doesn't usually become an

9    issue, but --

10           THE CLERK:  Right.

11           THE COURT:  -- that's why nobody's really ...

12           MR. GUERRIERO:  I believe your Honor may be

13   referring to 1.1(d), your Honor.

14           THE COURT:  Could be.

15           MR. GUERRIERO:  And I have to say this specifically

16   excludes Civil Rule 7.2(d).

17           THE COURT:  So it doesn't apply.

18           All right.  Look.  Okay.  Anything else you want to

19   say?

20           MR. AFRAME:  On timeliness, no.

21           THE COURT:  What about merits?

22           MR. AFRAME:  So on the merits, when it comes to

23   spillover, the standard that the defendant would need to

24   establish is a high one.

25           The First Circuit has articulated that there must

```
1    be -- that the joinder of offenses must compromise a specific
2    trial right or prevent the jury from making a reliable judgment
3    about guilt or innocence such that a miscarriage of justice
4    looms.
5            Our point is we're not close to that.  The evidence
6    regarding -- first of all, the judge -- the Court's ruling on
7    the Rule 29 was on the narrow question of whether there was
8    sufficient evidence that Mr. Freeman knew of the transaction.
9    But all of the evidence otherwise, other than the sort of
10   last-day, was there a transaction, were statements by
11   Mr. Freeman made to the undercover during the time period
12   covered by the conspiracy that go to all the questions of how
13   he ran his business, what he knew, what he understood, what he
14   used his kiosks for, that he understood elderly people were
15   using them to send money.
16           All of this was evidence that, yes, it related to
17   the substantive money laundering count, but it was equally
18   admissible to the conspiracy count and it was certainly
19   admissible as nonhearsay under 8-0 -- 801(d)(2)(A), and so I
20   don't see how Mr. Freeman was prejudiced from the -- in any way
21   from the admission of that evidence because I think it would
22   have been admissible anyway.
23           THE COURT:  Right.  What about on the motion for
24   reconsideration?
25           MR. AFRAME:  I just don't --
```

```
 1              THE COURT:  If you want to address the merits.
 2              MR. AFRAME:  Yeah.  So the merits, I mean, I would
 3    just say, I mean, it's a -- as I sort of said, it's sort of a
 4    good appellate brief in the sense that it makes some arguments,
 5    but the standard is -- for a motion to reconsider is a very,
 6    very high one.  It would need a showing of newly discovered
 7    evidence, an intervening change in the law where the original
 8    decision was based on a mere -- a manifest error law was
 9    clearly unjust.
10              There's just none of that here.  The -- there are
11    arguments.  There are always arguments.  But reconsideration
12    isn't the place to rehash the arguments that we already made
13    and resolved.  There is a place to make those arguments and
14    that will come, but this isn't -- based on what this read like,
15    it wasn't a motion to reconsideration because the -- there was
16    no -- even if those arguments end up being right at the end of
17    the day, they were not a manifest error of law or clearly
18    unjust.  So I do not think reconsideration is the appropriate
19    vehicle for bringing them forward.
20              THE COURT:  Yeah.  Is it fair to say -- I mean, I --
21    the motion for reconsideration seems more like just a motion
22    to, I don't know, preserve arguments for appeal.  I mean, you
23    don't really argue that the Court made a manifest error of fact
24    or law, do you?
25              MR. GUERRIERO:  We don't argue that the Court made
```

1    an error of facts in the sense of like a witness testified --

2    there were no witnesses on this.  It's really a legal --

3         THE COURT:  Yeah.

4         MR. GUERRIERO:  It's really a legal issue.

5         There are some facts of which the Court -- I guess

6    we asked the Court to take general notice.  For example, the

7    size of the Bitcoin industry in the world economy --

8         THE COURT:  Yeah.

9         MR. GUERRIERO:  -- that's more of a matter of

10   opinion.  There's plenty of authority cited by both sides and

11   your Honor, you know, made a finding on that.  But other than

12   that, there aren't factual issues.  It's a question of a legal

13   issue.

14        The reason it was necessary for us to file that

15   motion is that when we read the written order on August 22nd,

16   we saw that there were arguments that we wanted to make sure

17   that, as you say, we preserved and put on the record exactly

18   what our legal arguments were.

19        It did appear that, respectfully, in disagreeing

20   with us, the Court may have misunderstood our legal arguments.

21   Maybe it simply disagreed for good reasons.  We'll find out on

22   appeal.  But in order to make the record clear, we needed to

23   put those on the record.

24        THE COURT:  All right.  I think both -- I think

25   both -- I think both motions are untimely, but the -- the

```
 1    motion for reconsideration is -- there's an argument -- the
 2    argument for the untimeliness of the motion for reconsideration
 3    is much better than it is for the motion for new trial.  The --
 4    there was an order on the motion to dismiss and although it was
 5    memorialized -- memorialized in that same order that came out
 6    in August of this year, the order had been issued long, long
 7    ago and there's really no reason a motion for reconsideration
 8    should be filed, you know, so many months later.  So that's --
 9    the motion for reconsideration is clearly untimely.
10            It also -- but in addition to the untimeliness, it
11    also fails on the merits.  It rehashes some old arguments and
12    it introduces -- and it makes some new ones.  And introducing
13    new arguments is impermissible in a motion for reconsideration.
14    I'll address -- I'll address those on the merits as well, but
15    they're not properly advanced in a motion for reconsideration.
16            The basic argument, of course, the basic thrust of
17    the argument, was that Mr. Freeman argued that since virtual
18    currency did not exist in 2001 when the applicable statute was
19    enacted, Congress could not have intended to authorize the
20    regulation of virtual currency like Bitcoin when it passed
21    Section 5330 in 2001.  It's sort of a plain meaning of funds
22    argument that the defense has advanced here.
23            And this case that -- the case that the defendant's
24    relying on, *Wisconsin Central Ltd. vs. United States*, I think
25    it -- I think it actually supports the Court's interpretation
```

1    of the word funds in the statute.

2          In *Wisconsin Central* -- by the way, the citation for

3    that, 138 S. Ct. 267, I'm sorry, 2067, 138 Supreme Court 2067.

4    That's a 2018 case.  But in that *Wisconsin Central* case, the

5    Supreme Court interpreted the meaning of money in the Railroad

6    Retirement Tax Act of 1937.  The majority held, the Court

7    ruled, that, quote:  While every statute's meaning is fixed at

8    the time of enactment, new applications may arise in light of

9    changes in the world.  So money, as used in that statute, must

10   always mean a medium of exchange and what qualifies as a medium

11   of exchange may depend on the facts of the day.

12          In other words, that can change over time.

13          Another -- another sort of very well known example

14   of this idea is the very famous *Bostock* case where the parties

15   acknowledged that in Title VII of the Civil Rights Act

16   pertaining to employment, it was not Congress's intent to

17   subject the workplace or to prohibit discrimination based on

18   sexual orientation or sexual identity and the Supreme Court

19   ruled that despite that that wasn't intended in the early 1960s

20   when the act was enacted, the meaning of the world sex

21   nonetheless includes sexual orientation, sexual identity.

22          And that's another sort of very clear example that

23   at least from this Court's perspective, legislative intent

24   doesn't really control these issues; the meaning of words

25   control these issues.  And that can change over time.  So the

1    Court continues to reject that on the merits.

2         There's a couple of new arguments that were advanced

3    in this motion for reconsideration.  They're based on the --

4    some of them are based on the premise that the phrase, quote,

5    valued as substitute for currency in reference to virtual

6    currency -- that's in Section 5330 -- that Congress, therefore,

7    did not support the expansion of FinCEN's -- FinCEN is

8    F-i-n-C-E-N -- FinCEN's regulatory authority for -- for the

9    period.  And this language is included in several bills in 2018

10   and 2019, which were considered and rejected.

11        Now, the defendant doesn't elaborate on the reasons

12   that these bills were rejected and whether the fate of the

13   bills was in any way connected with the phrase at issue here,

14   again, value that substitutes for currency.

15        The defendant also invokes the canon against

16   surplusage to argue that if funds included virtual currency,

17   there wouldn't have been any need for the amendment, the added

18   phrase, quote, value that substitutes for currency, in Section

19   5330.

20        The First Circuit's case, *City of Providence vs.*

21   *Barr*, 954 F.3d. 23, it's a 2020 case, First Circuit, quote:

22   Although we aspire to give statutory language more than

23   illustrative function when the plain meaning of the text

24   admits, we recognize that sometimes Congress may consider a

25   specific point important or uncertain enough to justify a

1    modicum of redundancy.

2             Quoting the *Mass Association of HMOs* case, that's at

3    194 F.3d. 176, a circuit case from 1999.  Continuing, the Court

4    said:  The canon against surplusage is not a straitjacket.  It

5    should not, therefore, be employed inflexibly to rule out

6    even -- to rule out every interpretation of a statute that

7    treats certain language as illustrative or clarifying.

8             The other point is, look, these arguments could have

9    been raised in the original motion and they were not raised and

10   a motion for reconsideration is not the proper vehicle for

11   presenting new theories in favor of dispositive motion

12   practice.

13            A party has the duty to incorporate all relevant

14   arguments in the papers that directly address the pending

15   motion.  That's the *Hudson* case, *Hudson vs. Town of Weare*,

16   quoting circuit authority, *Rocafort vs. IBM Corp.,* 334 F.3d

17   115, a 2003 case.

18            Now, the defendant also argues in the motion to

19   dismiss that Counts One and Two should have been dismissed

20   because they rely on FinCEN's 2013 interpretive guidance as

21   opposed to the statute, which Mr. Freeman argues is invalid

22   under the major questions doctrine.

23            I addressed how I read the major questions doctrine

24   in the written order.  I held that the regulations promulgated

25   under Section 5330 and FinCEN's interpretations of them were --

1    "have no bearing on whether the defendant violated section

2    1960," the money laundering statute, in Counts One and Two.

3    That's document number 332, page 14, note 24.

4            And what I tried to explain in that order was that

5    Mr. Freeman was charged with failing to register the money

6    transmitting business, a requirement in Section 5330, and he

7    was not charged with violating the regulations.  By example,

8    you know, "failing to follow the required form and manner of

9    registration under the regs."

10            That's in the same order.

11            I also ordered, "The indictment neither depends on

12    nor references the FinCEN guidance and the only agency arguably

13    interpreting Section 1960 for purposes of this prosecution is

14    the Department of Justice, not FinCEN."

15            The language of those statutes is ambiguous, but

16    they covered Mr. Freeman's conduct and the prosecution could --

17    could have met its burden of proof for a violation of Section

18    1960 by relying on the statutes alone.  So there's no need to

19    look to the FinCEN guidance, the interpretive guidance, on

20    those regs.

21            I also -- I -- I should note here, correct me if I'm

22    wrong, I don't remember an instruction for the -- to seek jury

23    unanimity on a violation of the statute as opposed to the

24    guidance.  And so there's no reason whatsoever, no record of

25    any reason, why the jury shouldn't be assumed to have

1    unanimously found a violation of the statute.

2         Now, Mr. Freeman's argued in response, though, that

3    he couldn't have satisfied Section 5330's registration

4    requirements without complying with the regulation's

5    prescribing form and manner as well as the contents of the

6    registration.

7         He points out some of Mr. Vlahakis -- is it

8    Vlahakis -- Mr. Vlahakis's testimony, that's V-l-a-h-a-k-i-s,

9    regarding registration requirements at the trial and he also

10   argues, Mr. Freeman argues, that at various points during the

11   trial the prosecution referred to his failure to file as well

12   as his failure to complete the other tasks required of a money

13   transmitter, as if the two are linked, implying, I guess, that

14   the latter, form and manner, proves the former, failure to

15   register.  And the bottom line is that Mr. -- what

16   Mr. Freeman's arguing is here is that registration required

17   adherence to the regs.

18        But it doesn't persuade the Court.  The Court

19   thought about it, but the Court's holding was that the

20   prosecution proved that the defendant failed to register a

21   money transmitting business and that by doing so, he violated

22   Section 5330, the registration requirement.  So even if it

23   follows that he also failed to comply with the related regs, it

24   doesn't affect the Court's conclusion that the prosecution

25   could have and did prove its case by relying on the statutes

1  alone.

2       In terms of these other statements purportedly made

3  by the prosecution linking the failure to file with the form

4  and manner of registration, I don't think those were argued in

5  the Rule 29 motion at all.  They don't -- they didn't seem to

6  be important at the time of that filing or focused on during

7  the trial at all and, like I said, there was no request for a

8  jury finding one way or the other so it could have -- so

9  diminution could be shown as to one or the other or both.

10      Nothing in the motion to reconsider challenges or

11  disturbs this Court's analysis and conclusions with regard to

12  the major questions doctrine.  I don't think this is a major

13  questions doctrine issue, but if I'm wrong about that, the

14  circuit court will tell us.

15      Finally, this argument advanced on the motion for

16  reconsideration, it's just basically a disagreement with the

17  Court's holding in footnote 24.  And it -- this argument

18  focuses on Section 1950(b)(1)(B) and doesn't relate or affect

19  the other theories of conviction in the case, especially

20  1960(b)(1)(C), and it doesn't relate to or affect the other

21  theories of -- like I said, it doesn't -- it doesn't relate to

22  the (C) -- (b)(1)(C), focuses only on (b)(1)(B).  And that's

23  what makes it a crime to operate the money transmitting

24  business that includes the transmission of funds that the

25  defendant knew to be derived from a criminal offense.

 1          Let's all -- look, there's also just the point that
 2     there's just no -- there's no support for this argument.  I
 3     mean, as the Court pointed out in its order, there's near
 4     unanimity.  The only -- I think the only case we could find in
 5     our research that adopted this theory about the statutory
 6     definition not covering Bitcoin, getting back to the general
 7     argument, was a U.S. magistrate judge opinion that hadn't even
 8     been adopted by the district court.  There's just no authority
 9     for this argument that's being advanced.  It doesn't mean there
10     couldn't be authority at some point, I recognize that, but I'm
11     bound by circuit authority and when I'm not -- when I don't
12     have circuit authority, I rely on persuasive authority from
13     other courts.  And all the authority favors the prosecution's
14     position and argument with respect to this issue, so the motion
15     for reconsideration is denied.
16          Now, the motion for new trial based on spillover
17     prejudice, I also think that it's untimely, but the argument
18     for timeliness is better here than it is for the motion for
19     reconsideration.  The problem -- the problem with this argument
20     is this.  It ignores the fact that the defendant was convicted
21     of conspiracy to commit money laundering or money -- I should
22     call it money laundering conspiracy, which is the proper name,
23     proper reference to it, right?
24          The -- the simple fact is -- and I don't see an
25     argument to the contrary anywhere in the defendant's papers.

1  The evidence that allegedly created the spillover prejudice

2  that -- you know, Mr. Freeman dealing with the undercover, that

3  would have been admissible evidence for the money laundering

4  conspiracy and was admissible for that and there was no request

5  during the trial for a limiting instruction that should be

6  considered as to one -- like the substantive money laundering

7  count and no other counts or anything like that, including

8  money laundering conspiracy.  This evidence was admissible.

9       So there's no prejudice.  There's no prejudice

10  because even with -- even had that count, money laundering,

11  been dismissed pretrial, the evidence still would have been

12  part of the trial.  There's no -- there's no spillover under

13  the applicable authority because the source of the spillover

14  would still have been part of the trial.

15       There's also the point that -- it's important to

16  remember why the Court -- why the Court dismissed the money

17  laundering count.  It was that there was a failure -- a very

18  close failure, by the way, it was a very close call -- that

19  the -- that the government hadn't proven the required mens rea

20  or culpable mental state.  But it wasn't the prejudicial -- the

21  so-called prejudicial aspect of that culpable mental state.

22       There were two culpable mental states involved in

23  this case.  There was the general, sort of routine, requirement

24  to prove knowledge that a knowing transaction had occurred,

25  knowingly conducted a money laundering transaction.  And

1    because there was no proof of actual knowledge that the

2    undercover transaction had been effectuated that was proven

3    with respect to Mr. Freeman, the Court vacated the jury verdict

4    and dismissed the count.

5          But there was plenty of evidence on the so-called

6    special mens rea, the knowledge of intent to conceal source of

7    funds.  That was -- there was plenty of proof of knowledge of

8    that, if not -- if not willful blindness to that actual

9    knowledge.

10          And so that's the prejudicial aspect of it,

11   according to the motion for new trial, and there was no failure

12   of proof there and that evidence was coming in anyway.

13          So it's important not to -- not to confuse or

14   conflate the two types of culpable mental state that were

15   required to be proven for the money laundering count.  The

16   failure was as to routine, general mens rea, not as to specific

17   mens rea regarding knowledge of intent to conceal source of the

18   funds.  And that's an important consideration from the Court's

19   perspective.

20          Okay.  So those motions are both denied.

21          Yes, sir.

22          OMR. GUERRIERO:  Yes, your Honor.  Thank you.  Just

23   a couple of points.

24          I want to address the two things that -- the two

25   issues the Court said were not preserved --

1          THE COURT:  Yeah.

2          MR. GUERRIERO:  -- that you -- that the Court

3    described as new issues raised in the motion to reconsider.

4          With respect to the first one, I believe the Court

5    referred to the argument that FinCEN had adopted this language,

6    value substituting --

7          THE COURT:  Yeah.

8          MR. GUERRIERO:  -- that -- that was addressed on

9    page 12 of the original motion to dismiss.  I just want to say

10   that for the record.  I will sort it out on appeal, I'm sure.

11         THE COURT:  Yup.

12         MR. GUERRIERO:  And then our argument regarding

13   the -- whether or not it was possible to register without

14   following a regulation, that was not in the original motion to

15   dismiss, you're right, but it came up at the argument on the

16   motion to dismiss and my recollection is that I argued in

17   response to that that it was not possible to comply with the

18   statute without also following regulations.

19         So I believe that should be in the transcript of

20   that hearing is my recollection.  If I'm wrong --

21         THE COURT:  Well, you -- yeah, but you argued that

22   for DiMezzo.

23         MR. GUERRIERO:  I did.

24         THE COURT:  All right.

25         MR. GUERRIERO:  And Mr. Freeman joined DiMezzo's

```
 1  motion.
 2              THE COURT:  Is that how we ran that?
 3              MR. SISTI:  That's exactly what happened.
 4              THE COURT:  Okay.  Understood.
 5              MR. GUERRIERO:  Thank you.
 6              THE COURT:  Anything you want to say about that?
 7              MR. AFRAME:  No, your Honor.
 8              THE COURT:  All right.  Let's move to the
 9  sentencing.
10              Mr. Freeman, in any criminal sentencing, the first
11  thing the Court has to do is determine what the U.S. Sentencing
12  Guidelines recommend for your sentence.  And even if the
13  Court -- the Court's not bound by that recommendation.  The
14  Court can give a sentence that is more lenient or more severe
15  than what the guidelines recommend.  But as a rule in our
16  circuit, this district court of the country, the -- the trial
17  Court's required to figure out and find what the guidelines
18  recommend.
19              So there's two -- there's two parts of that effort.
20  One is just researching the guidelines, applying it to your
21  case, which I've been doing.  The other one is reading this
22  report, this -- this presentence report.  In your case, it is
23  32 pages long.  It's written by Officer -- Probation Officer
24  Buckley, seated over there to your left, and he -- he wrote
25  that.  And then in response to correspondence with your lawyer
```

## *2020 18 USCS § 1960*

2020 United States Code Archive

**United States Code Service** > *TITLE 18. CRIMES AND CRIMINAL PROCEDURE* > *Part I. CRIMES* > *CHAPTER 95. RACKETEERING*

## § 1960. Prohibition of unlicensed money transmitting businesses

**(a)** Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

**(b)** As used in this section—

**(1)** the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and—

**(A)** is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;

**(B)** fails to comply with the money transmitting business registration requirements under *section 5330 of title 31, United States Code*, or regulations prescribed under such section; or

**(C)** otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity;

**(2)** the term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier; and

**(3)** the term "State" means any State of the United States, the District of Columbia, the Northern Mariana Islands, and any commonwealth, territory, or possession of the United States.

## History

**HISTORY:**

Added Oct. 28, 1992, *P. L. 102-550*, Title XV, Subtitle B, § 1512(a), *106 Stat. 4057*; Sept. 23, 1994, *P. L. 103-325*, Title IV, § 408(c), *108 Stat. 2252*; Oct. 26, 2001, *P. L. 107-56*, Title III, Subtitle C, § 373(a), *115 Stat. 339*; Jan. 5, 2006, *P. L. 109-162*, Title XI, Subtitle C, § 1171(a)(2), *119 Stat. 3123*.

United States Code Service
Copyright © 2024 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved. All rights reserved.

**End of Document**

### *2019 31 USCS § 5330*

2019 United States Code Archive

*United States Code Service  >  TITLE 31. MONEY AND FINANCE  >  Subtitle IV. MONEY  > CHAPTER 53. MONETARY TRANSACTIONS  >  Subchapter II. RECORDS AND REPORTS ON MONETARY INSTRUMENTS TRANSACTIONS*

## § 5330. Registration of money transmitting businesses

**(a) Registration with Secretary of the Treasury required.**

**(1)** In general. Any person who owns or controls a money transmitting business shall register the business (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury not later than the end of the 180-day period beginning on the later of—

**(A)** the date of enactment of the Money Laundering Suppression Act of 1994 [enacted Sept. 23, 1994]; or

**(B)** the date on which the business is established.

**(2)** Form and manner of registration. Subject to the requirements of subsection (b), the Secretary of the Treasury shall prescribe, by regulation, the form and manner for registering a money transmitting business pursuant to paragraph (1).

**(3)** Businesses remain subject to State law. This section shall not be construed as superseding any requirement of State law relating to money transmitting businesses operating in such State.

**(4)** False and incomplete information. The filing of false or materially incomplete information in connection with the registration of a money transmitting business shall be considered as a failure to comply with the requirements of this subchapter [*31 USCS §§ 5311* et seq.].

**(b) Contents of registration.**   The registration of a money transmitting business under subsection (a) shall include the following information:

**(1)** The name and location of the business.

**(2)** The name and address of each person who—

**(A)** owns or controls the business;

**(B)** is a director or officer of the business; or

**(C)** otherwise participates in the conduct of the affairs of the business.

**(3)** The name and address of any depository institution at which the business maintains a transaction account (as defined in section 19(b)(1)(C) of the Federal Reserve Act [*12 USCS § 461(b)(1)(C)*]).

**(4)** An estimate of the volume of business in the coming year (which shall be reported annually to the Secretary).

**(5)** Such other information as the Secretary of the Treasury may require.

**(c) Agents of money transmitting businesses.**

**(1)** Maintenance of lists of agents of money transmitting businesses. Pursuant to regulations which the Secretary of the Treasury shall prescribe, each money transmitting business shall—

**ADDENDUM PAGE 132**

(A)  maintain a list containing the names and addresses of all persons authorized to act as an agent for such business in connection with activities described in subsection (d)(1)(A) and such other information about such agents as the Secretary may require; and

(B)  make the list and other information available on request to any appropriate law enforcement agency.

(2)  Treatment of agent as money transmitting business. The Secretary of the Treasury shall prescribe regulations establishing, on the basis of such criteria as the Secretary determines to be appropriate, a threshold point for treating an agent of a money transmitting business as a money transmitting business for purposes of this section.

(d) **Definitions.**   For purposes of this section, the following definitions shall apply:

(1)  Money transmitting business. The term "money transmitting business" means any business other than the United States Postal Service which—

(A)  provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;[;]

(B)  is required to file reports under section 5313 [*31 USCS § 5313*]; and

(C)  is not a depository institution (as defined in section 5313(g) [*31 USCS § 5313(g)*]).

(2)  Money transmitting service. The term "money transmitting service" includes accepting currency or funds denominated in the currency of any country and transmitting the currency or funds, or the value of the currency or funds, by any means through a financial agency or institution, a Federal reserve bank or other facility of the Board of Governors of the Federal Reserve System, or an electronic funds transfer network.

(e) **Civil penalty for failure to comply with registration requirements.**

(1)  In general. Any person who fails to comply with any requirement of this section or any regulation prescribed under this section shall be liable to the United States for a civil penalty of $5,000 for each such violation.

(2)  Continuing violation. Each day a violation described in paragraph (1) continues shall constitute a separate violation for purposes of such paragraph.

(3)  Assessments. Any penalty imposed under this subsection shall be assessed and collected by the Secretary of the Treasury in the manner provided in section 5321 [*31 USCS § 5321*] and any such assessment shall be subject to the provisions of such section.

# History

HISTORY:

Added Sept. 23, 1994, *P. L. 103-325*, Title IV, § 408(b), *108 Stat. 2250*; Oct. 26, 2001, *P. L. 107-56*, Title III, Subtitle B, § 359(b), *115 Stat. 328*.

United States Code Service
Copyright © 2024 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved. All rights reserved.

**ADDENDUM PAGE 133**

2019 31 USCS § 5330

---

**End of Document**