No. 23-1839

# In the United States Court of Appeals for the First Circuit

————————

UNITED STATES OF AMERICA,
Appellee,

v.

IAN FREEMAN,
f/k/a Ian Bernard,
Defendant-Appellant.

————————

On Appeal from the United States District Court
for the District of New Hampshire
No. 1:22-cr-10141

————————

## BRIEF FOR THE UNITED STATES

————————

JANE E. YOUNG
United States Attorney
District of New Hampshire

GEORGIANA L. MACDONALD
JOHN J. KENNEDY
Assistant United States Attorneys

NICOLE M. ARGENTIERI
Principal Deputy Assistant
  Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

DAVID M. LIEBERMAN
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 262-6805
david.lieberman@usdoj.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iv

JURISDICTIONAL STATEMENT ............................................................ 1

ISSUES PRESENTED ................................................................................ 1

STATEMENT OF THE CASE .................................................................... 2

I.     Statement of Facts.......................................................................... 2

       A.     Bitcoin is virtual currency that can be transmitted anonymously .. 3

       B.     Freeman sold bitcoin on a don't-ask-don't-tell basis .................... 6

       C.     Scammers tricked victims into sending money to Freeman, who
              exchanged it for bitcoin and sent the bitcoin to the scammers....... 9

              1.   Freeman exchanged victim money into bitcoin and sent it to
                   the victim's scammer ........................................................... 10

              2.   Signs of fraud pervaded Freeman's transactions ................... 15

              3.   Freeman dissembled when a victim claimed fraud................ 19

       D.     Freeman paid no taxes ............................................................ 20

II.    Course of Proceedings.................................................................... 20

III.   Rulings Presented for Review ........................................................ 21

SUMMARY OF ARGUMENT .................................................................. 22

ARGUMENT .......................................................................................... 23

I.     Freeman operated an unlicensed money-transmitting business when he
       sold bitcoin ................................................................................... 23

       A.     Background ............................................................................. 24

B.  Standard of Review....................................................... 26

C.  Section 1960's plain text, purpose, and history show that it reaches bitcoin sellers like Freeman ...................................... 26

D.  Freeman's contrary statutory construction lacks merit .............. 29

E.  The major-questions doctrine has no application ...................... 37

II.  Ample evidence documented Freeman's tax evasion.......................... 44

A.  Background ............................................................... 44

B.  Standard of Review....................................................... 45

C.  The jury reasonably found that Freeman had outstanding tax obligations that he willfully evaded ........................................... 46

III.  The district court appropriately exercised its discretion in denying Freeman's new-trial motion based on evidentiary spillover................. 50

A.  Background ............................................................... 50

B.  Standard of Review....................................................... 52

C.  The record amply supports the district court's finding that no spillover occurred from the vacated money-laundering count ..... 52

D.  Alternatively, no spillover occurred because the district court erred in vacating the jury's guilty verdict on this count ....................... 55

IV.  Freeman's sentence is substantively reasonable ................................... 57

A.  Background ............................................................... 57

B.  Standard of Review....................................................... 58

C.  The district court's below-Guidelines sentence reflects an appropriate exercise of its 18 U.S.C. § 3553(a) discretion ........... 58

CONCLUSION ....................................................................... 62

CERTIFICATE OF COMPLIANCE .......................................... 63

CERTIFICATE OF SERVICE ................................................... 63

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
    594 U.S. 758 (2021) .............................................................................40, 42

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ...................................................... 41

*Bostock v. Clayton County*, 590 U.S. 644 (2020) ................................... 32, 33, 41

*Brown v. United Airlines, Inc.*, 720 F.3d 60 (1st Cir. 2013) .............................. 34

*Cal. Bankers Ass'n v Shultz*, 416 U.S. 21 (1974) ............................................... 31

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ..................................................................................... 41

*Forest Grove Sch. Dist. v. T. A.*, 557 U.S. 230 (2009) ....................................... 33

*Gonzales v. Oregon*, 546 U.S. 243 (2006) ........................................................ 41

*Hornof v. United States*, 107 F.4th 46 (1st Cir. 2024) ...................................... 39

*Howard v. United States*, 345 F.2d 126 (1st Cir. 1965) .................................... 49

*In re Rudler,* 576 F.3d 37 (1st Cir. 2009) ......................................................... 29

*Jahn v. Comm'r*, 392 Fed. Appx. 949 (3d Cir. 2010) ...................................... 48

*Jennings v. Stephens*, 574 U.S. 271 (2015) ....................................................... 55

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ......................... 35

*Neverson v. Farquharson*, 366 F.3d 32 (1st Cir. 2004) ..................................... 55

*NFIB v. Dep't of Labor.*, 595 U.S. 109 (2022) .................................................. 41

*Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) ............................................ 32

*Parlane Sportswear Co. v. Weinberger*, 513 F.2d 835 (1st Cir. 1975) .................. 35

*Puckett v. United States*, 556 U.S. 129 (2009) ................................... 60

*Salinas v. United States*, 522 U.S. 52 (1997) ..................................... 32

*Siravo v. United States*, 377 F.2d 469 (1st Cir. 1967) ......................... 48

*United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023) ........................ 54

*United States v. Alicea*, 205 F.3d 480 (1st Cir. 2000) ......................... 46

*United States v. Bruno-Campos*, 978 F.3d 801 (1st Cir. 2020) ............ 58

*United States v. Butler-Acevedo*, 656 F.3d 97 (1st Cir. 2011) ............. 59

*United States v. Coombs*, 857 F.3d 439 (1st Cir. 2017) ...................... 59

*United States v. deJesús*, 6 F.4th 141 (1st Cir. 2021) ......................... 58

*United States v. Delgado Figueroa*, 832 F.2d 691 (1st Cir. 1987) ........ 49

*United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82 (D.D.C. 2008) ........ 31

*United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014) .........28, 29

*United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013) ....................... 26

*United States v. Galindo-Serrano*, 925 F.3d 40 (1st Cir. 2019) ........... 60

*United States v. Griffin*, 524 F.3d 71 (1st Cir. 2008) ........................... 49

*United States v. Harmon*, No. 19-cr-395,
  2021 WL 1518344 (D.D.C. Apr. 16, 2021) ................................. 32

*United States v. Hiett*, 581 F.2d 1199 (5th Cir. 1978) ......................... 48

*United States v. Hogan*, 861 F.2d 312 (1st Cir. 1988) ........................ 47

*United States v. Iossifov*, 45 F.4th 899 (6th Cir. 2022) ..................................... 27

*United States v. Kayser*, 488 F.3d 1070 (9th Cir. 2007) ................................... 48

*United States v. Kirsch*, 903 F.3d 213 (2d Cir. 2018) ....................................... 55

*United States v. Lavoie*, 433 F.3d 95 (1st Cir. 2005) ....................................... 44

*United States v. Martin*, 520 F.3d 87 (1st Cir. 2008) ...................................... 58

*United States v. Millán-Machuca*, 991 F.3d 7 (1st Cir. 2021) ........................... 58

*United States v. Morales-Negron*, 974 F.3d 63 (1st Cir. 2020) ......................... 59

*United States v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016) .................28, 37

*United States v. Perez-Greaux*, 83 F.4th 1 (1st Cir. 2023) ................................ 46

*United States v. Ramirez-Frechel*, 23 F.4th 69 (1st Cir. 2022) .......................... 55

*United States v. Reyes-Santiago*, 804 F.3d 453 (1st Cir. 2015) ......................... 60

*United States v. Rivera-Morales*, 961 F.3d 1 (1st Cir. 2020) ............................. 58

*United States v. Rodríguez-Velez,* 597 F.3d 32 (1st Cir. 2010) .......................... 45

*United States v. Simon*, 12 F.4th 1, 44 (1st Cir. 2021) ...............................52, 53

*United States v. Stetkiw*, No. 18-20579,
 2019 WL 417404 (E.D. Mich. Feb. 1, 2019) ............................................. 27

*United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990) ...................................... 53

*Utility Air Regulation Group v. E.P.A.*, 573 U.S. 302 (2014) ......................40, 42

*West Virginia v. EPA*, 597 U.S. 697 (2022) .........................................38, 39, 40

**Statutes, Rules, and Other Authorities**

18 U.S.C. § 371 ................................................................................. 2

18 U.S.C. § 1956 ............................................................... 1, 2, 20, 51

18 U.S.C. § 1960 .......................................................................passim

18 U.S.C. § 3231 ............................................................................... 1

18 U.S.C. § 3553 ............................................................... 23, 57, 59

18 U.S.C. § 3742 ............................................................................... 1

26 U.S.C. § 63 ................................................................................. 47

26 U.S.C. § 7201 ....................................................................1, 2, 44

28 U.S.C. § 1291 ............................................................................... 1

31 U.S.C. § 5312 ............................................................................. 34

31 U.S.C. § 5330 .......................................................................passim

31 C.F.R. § 103.41 .......................................................................... 30

31 C.F.R. § 1010.100 ........................................................... 30, 31, 35

31 C.F.R. § 1022.380 ...............................................................30, 31

Beyond Silk Roak: Potential Risks, Threats, and Promises of Virtual Currency, Hearing Before S. Comm. on Homeland Security, 113th Cong. (2013) ..... 36

Crypto Crime in Context, Hearing Before H. Subcomm. on Digital Assets, Financial Technology and Inclusion, 118th Cong. (2023) ........................ 37

FIN-2013-G001, Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies (Mar. 18, 2013) . 25

FIN-2019-G001, Application of FinCEN's Regulations to Certain Business
Models Involving Convertible Virtual Currencies (Mar. 9, 2019) .............. 35

H.R. Rep. 107-250 (2001) .............................................................. 31

Pub. L. No. 103-325, 108 Stat. 2160 (1994) .................................. 39

Pub. L. No. 116-283, 134 Stat. 3388 (2021) ............................. 25, 34

S. Rep. No. 101-460 (1990) ........................................................ 28

## JURISDICTIONAL STATEMENT

Ian Freeman appeals the final judgment in this criminal case. The district court, which had jurisdiction under 18 U.S.C. § 3231, entered judgment on October 5, 2023, and amended judgments on October 10, 2023 and February 9, 2024. JA:2641, 2650, 2661.[1] Freeman filed a timely notice of appeal. JA:2659. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## ISSUES PRESENTED

1.      Whether a person who regularly exchanges U.S. dollars for bitcoin operates a "money transmitting business" under 31 U.S.C. § 5330(d) and, therefore, is subject to 18 U.S.C. § 1960's criminal penalties for conducting an unlicensed money-transmitting business.

2.      Whether the trial evidence supports the jury's guilty verdicts on four tax-evasion counts, in violation of 26 U.S.C. § 7201.

3.      Whether, after granting a post-verdict acquittal on a money-laundering count under 18 U.S.C. § 1956(a)(3)(B), the district court abused its discretion in denying Freeman's motion for new trial on the other counts due to alleged spillover prejudice.

4.      Whether Freeman's sentence is substantively unreasonable.

---

[1] "JA" refers to the joint appendix; "S.App." refers to the government's supplemental appendix; and "Gov't Ex." refers to a government trial exhibit.

1

## STATEMENT OF THE CASE

After an 11-day trial, Freeman was convicted of conspiracy to operate an unlicensed money-transmitting business, in violation of 18 U.S.C. § 371; operating an unlicensed money-transmitting business, in violation of 18 U.S.C. § 1960(a), (b)(1)(B), and (C); money-laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and four tax-evasion counts, in violation of 26 U.S.C. § 7201. JA:2661-2662.  The district court sentenced him to 96 months.  JA:2663.

## I.    Statement of Facts

Freeman established or affiliated with purported church organizations in Keene, New Hampshire and served as minister for one of them.  *See* JA:897, 1248 (Shire Free Church); JA:1360-1364 (Freeman's "church folder" documents for Crypto Church of New Hampshire, Church of the Invisible Hand, and NH Peace Church); JA:1456 (co-conspirator agreement for Reformed Satanic Church).  The churches lacked indicia of organized religious activities.  *See* JA:632-633 (no shrine, chapel, or meeting room); JA:740 (conspirator: "no one has ever told me they are members of the Shire Free Church"); JA:1248 (no church services or activities).  They instead served as conduits for Freeman's "church mission in selling bitcoin online to buyers around the country."  JA:818; *see also* JA:378 (Freeman: "I am the administrator of Shire BTC, the Shire Free Church's outreach program dedicated to spreading Bitcoin."); JA:763 ("[W]e in

the church believe this is a God-given mission to spread bitcoin."). Freeman also hosted the Free Talk Live radio show where, among other topics, he promoted bitcoin and cryptocurrency. JA:897, 1242-1243.

The government alleged, and the jury found, that Freeman operated an unlicensed money-transmitting business and that Freeman and others conspired to launder criminal proceeds through their various entities. As documented below, elderly victims sent their personal savings to individuals whom they met over the Internet and believed to be a romantic companion or investment partner. These were scams. After a grooming period, the scammer asked each victim to send money. The victims—spread across the United States—were advised to purchase bitcoin from Freeman.

The victims were instructed to deposit their money into Freeman-controlled accounts and to inform their banks that they were making church donations or purchasing rare coins. After confirming the deposit, Freeman transferred bitcoin to the individual who had scammed the victim. Freeman also kept a large cut as a commission.

**A. Bitcoin is virtual currency that can be transmitted anonymously.**

Bitcoin is a virtual currency. JA:346. All transactions are recorded on the Bitcoin blockchain—a publicly available ledger showing the debiting and

crediting of accounts for every bitcoin trade.  JA:349.  Anyone can access it.
JA:350.

An individual wanting to transact bitcoin needs a virtual wallet, which is
a software program that stores bitcoin.  JA:346-347.  The wallet generates public
and private keys, which are long strings of alphanumeric characters associated
with the user's bitcoin account.  JA:348.  The private key mimics a PIN number
associated with a traditional bank account.  *Ibid*.  The user needs this private key
to execute a transaction from the wallet.  JA:348-349.  Third parties then confirm
the key's legitimacy and the transaction's legitimacy by solving complex math
equations.  JA:348, 351-352.

Bitcoin transactions are pseudo anonymous.  JA:352.  Anyone can
monitor transactions associated with a particular wallet, but the wallet carries
only a generic identifier.  *Ibid*.  The blockchain does not contain the wallet user's
name, address, social security number, or other identification information.  *Ibid*.
Bitcoin transactions are also irreversible.  JA:354.  Once a user sends bitcoin to
a recipient's wallet, she or he cannot pull it back.  *Ibid*.

An individual seeking to transact with bitcoin first needs to acquire it.  One
common way involves a bitcoin exchange: the individual visits an Internet
business platform that sells bitcoin for U.S. dollars or other currency.  JA:355,
1601.  The individual confirms her or his identity by providing a driver's license,

passport, or similar document.  JA:355-356, 1607.  The exchange then charges

a small fee depending on the amount of bitcoin purchased.  *See* JA:1603-1604

(exchange charged fee up to 0.35% of transaction cost).

A buyer can also purchase bitcoin directly from a seller in various ways.

For example, the seller might have a kiosk machine that accepts the buyer's

money and then automatically transfers bitcoin.  JA:357.  Alternatively, the

seller can post an advertisement on an eBay- or Craigslist-type website catering

to bitcoin trades.  JA:356.  Buyers search the advertisements, find ones that they

like, and initiate the purchase with the seller through the website.  JA:359.  The

buyer and seller can also communicate directly, agree to terms, and conduct a

private bitcoin sale.  JA:357.

Fraud schemes sometimes use bitcoin.  In a romance scam, for instance,

the scammer befriends the victim—often an elderly person—through social

media or a dating website.  JA:606-607.  After establishing rapport, the scammer

claims to be in desperate need of funds.  JA:607.  The victim then sends money

or bitcoin to the scammer over time, depleting his or her own assets.  JA:607-

608.  Because these schemes typically involve overseas individuals and accounts,

law enforcement has difficulty identifying them.  JA:609.  Those difficulties

magnify when the scammer uses bitcoin because "[b]itcoin … clouds where the

money went even more."  JA:1454.

**B.      Freeman sold bitcoin on a don't-ask-don't-tell basis.**

1.      Freeman sold bitcoin on three platforms: he operated kiosks, JA:614-615; he posted advertisements on the localbitcoins.com website, JA:365-366; and he negotiated with buyers directly on the encrypted Telegram messaging application, JA:357, 1389, 1399-1400, 1407-1413.  Freeman also had help.  Aria DiMezzo and Renee Spinella sold bitcoin for him.  *See* JA:1035, 1456-1457 (Spinella's and DiMezzo's agreements with Freeman).   Chris Rietmann and Colleen Fordham let Freeman use bank accounts registered to their store, Route 101 Goods, to conduct his transactions.  JA:760, 768, 810. Customers also sent payment to bank accounts linked to the churches that Freeman and his co-conspirators created.  *See, e.g.*, JA:378 (Shire Free Church); JA:382 (Church of the Invisible Hand); JA:496 (New Hampshire Peace Church); JA:1216 (Reformed Satanic Church).

The business strategy was simple.   Freeman purchased bitcoin on traditional bitcoin exchanges and paid modest commissions.  *See, e.g.*, JA:1501 (Freeman: "I am a Tier 4—the top tier—at the Kraken Exchange.  This month I have sent over 1.8 million U.S. dollars in wires."); JA:1554 (0.16% commission on one transaction).  Freeman then charged substantially higher commissions when reselling the bitcoin to his customers.  *See, e.g.*, JA:965 (10-14% at kiosks); JA:464-465 (16-21% on website, 13% on Telegram).

2.    Freeman justified his high fees on the ground that "[t]he cheaper methods require you to give up personal identifying information like your bank account" whereas his bitcoin sales were "basically anonymous." JA:1497. That promised anonymity manifested itself in several ways.

Freeman instructed buyers to avoid disclosing the reason for their bitcoin purchases. His website advertisements advised: "What you do with your bitcoin is your business. Don't tell me what your plans are." JA:377. A sign above Freeman's kiosks similarly stated: "Do not tell our staff why you want to buy cryptocurrency." JA:620. Freeman also deactivated the identification features on his kiosks. *See* JA:617 (no name or identification needed to purchase bitcoin); JA:965 ("We have disabled all that nonsense."); JA:966 ("All ID factors are turned off.").

Freeman further instructed his buyers to conceal the transactions from their banks. When buyers transferred money from their accounts to Freeman, Freeman advised them to say that it was for the "[p]urchase of rare coins" or a "[c]hurch donation." JA:390, 407 *see also* JA:427 (Freeman: "Did you tell [Bank of America] I'm your rare coin dealer?"); JA:443 (Freeman instructing buyer to list "[c]hurch donation" even though purchase was for investment). When banks asked Freeman about large deposits into his account, Freeman said that "he was dealing in rare coin and that these individuals were purchasing rare

7

coins from him." JA:872. Freeman also drafted correspondence for co-conspirators with false explanations about the large deposits into their accounts. *See* JA:815-816 (email to bank stating that Colleen Fordham sold gold and silver coins); JA:1059-1060 (email to bank stating that deposits were for Renee Spinella's dominatrix services).

3.     Freeman also declined to register his entities or adopt anti-money-laundering controls. Money transmitters and other financial institutions must register with the Financial Crimes Enforcement Network (FinCEN) at the U.S. Department of Treasury. JA:540, 549. These businesses must disclose their services, locations, identifying information, and bank accounts. JA:550. They must also have an anti-money laundering program, including policies, procedures, and controls to assure compliance with federal law and to identify suspicious transactions; designation of a compliance officer; and staff training. JA:552-553. Finally, the businesses must report transactions exceeding $10,000 and suspicious transactions to FinCEN. JA:554-557. The suspicious activity reports identify the transaction, the individuals involved, and the possible victim.[2] JA:562.

---

[2] These reports, commonly referred to as SARs, list 40 suspicious activities such as currency structuring (*i.e.*, evading the $10,000 reporting requirement), indicia of fraud, or elder exploitation. JA:556-558.

Freeman, his co-conspirators, and his entities and churches never registered with FinCEN or filed suspicious activity reports. JA:575-578. In 2018, FinCEN sent a letter to three email accounts associated with one entity (Shire CryptoCoin), instructing it to register and comply with anti-money laundering and reporting obligations. JA:565-573; *see also* JA:621-622 (keenecrypto email account associated with Freeman). FinCEN received no response. JA:574. Freeman later bragged that FinCEN "sent a threatening letter to all the [cryptocurrency vending machine] operators" and "[w]e all ignored it." JA:975; *see also* S.App. Disc (Gov't Ex. 845B at 0:16-0:18, 0:45-0:47) (Freeman stating that the FinCEN letter "hit my box" and "we're just going to ignore that s**t").

## C. Scammers tricked victims into sending money to Freeman, who exchanged it for bitcoin and sent the bitcoin to the scammers.

Freeman knew that fraud schemes use bitcoin. At a 2020 gathering, Freeman noted that people have "been warned of the potential scams that are out there" and stated that "if you fall in love with a guy from Africa, I can't talk you out of it." JA:1016; S.App. Disc (Gov't Ex. 609A at 0:00-0:11). Freeman further explained that his kiosk machine was "a way for them to take … the money that they have and send it to the person that they've fallen in love with." JA:1016; S.App. Disc. (Gov't Ex. 609A at 0:20-0:28). Months later, a guest on

9

Freeman's radio show observed that older individuals (aged 55, 65, and 70) are "the target for scammers generally"; Freeman responded, "especially the romance scammers" and "they are in Africa or something like that."  S.App. Disc (Gov't Ex. 1534 at 0:10-0:23, 0:48-0:51).

These comments proved prescient.  Scammers like these directed their victims to send money to Freeman, who converted it to bitcoin and sent it to the scammers.

### 1. Freeman exchanged victim money into bitcoin and sent it to the victim's scammer.

At trial, seven witnesses—six of whom were in their late 60s or 70s—testified that a scammer had tricked them into sending money to Freeman.

a.    After his wife died, James Rossell met Mary Romeo on a dating website.  JA:1142.  They communicated daily, which "made [Rossell] feel better" in his loneliness.  JA:1144.  Romeo then asked Rossell to sign paperwork stating that they were engaged and to send her money to pay taxes on an inheritance.  JA:1145.  Romeo asked for bitcoin and provided bank account numbers; Rossell then wired money to those accounts.  JA:1146.  Rossell "d[idn't] know how [bitcoin] even work[ed]," but he sent photographs to Romeo of himself displaying his driver's license and handwritten notes stating his intent to purchase bitcoin   JA:1146-1148.

10

Rossell ultimately sent $103,000 to Romeo from his firefighter's retirement account and deceased wife's insurance. JA:1145-1146. These payments included a $67,000 wire to one of Freeman's churches. JA:1148-1149 (Church of the Invisible Hand). After Rossell's bank flagged the wire as suspicious and cancelled it, Freeman—whom Rossell did not know—called to ask why the money did not arrive. JA:1151-1152. Rossell subsequently mailed two personal checks to Freeman totaling $67,000. JA:1152-1153. Rossell never received the bitcoin that he had purportedly purchased. JA:1153.

As this occurred, chat records from localbitcoins.com showed Freeman communicating with a user named "jrossell1313" to set up bitcoin purchases. JA:441-458. As part of one transaction, this user sent Freeman the photographs that Rossell had previously sent to Romeo. JA:441-442. Rossell reviewed records for the "jrossell1313" account on localbitcoins.com and the chats between that user and Freeman. The account did not belong to Rossell, and he did not participate in those chats. JA:1156.

b.     Patrick Brown lost his $1.2-million retirement in a fraud scheme. JA:1166-1167. In fall 2020, someone posing as a law enforcement agent contacted Brown, advised that his social security number had been hacked, and instructed him to move his money into different bank accounts. JA:1168-1169. The purported agent then instructed Brown to wire his money into accounts not

in his name.  JA:1169-1170.  The agent further instructed Brown to photograph himself with a written note confirming the amount he had wired.  JA:1173.  The wire recipients included a Freeman-affiliated church.  JA:1175-1176 (New Hampshire Peace Church).  In a week, Brown executed multiple wires to the church totaling $280,000.  JA:1175-1182.

As this occurred, chat records from localbitcoins.com showed Freeman communicating with a user named "patrickbrown007" to set up bitcoin purchases.  JA:491-499.  As part of one transaction, this user sent Freeman the photograph that Brown had previously sent to the purported law enforcement agent.  JA:493-494.  Brown later reviewed the localbitcoins.com chats between Freeman and the user named "patrickbrown007"; Brown confirmed that this user was not him.  JA:1183-1184.

c.     In spring 2020, after separating from his wife, Harold Jones met a woman named Natasha online.  JA:1202-1203.  After chatting for months, Natasha asked Jones for money to hire a lawyer and to pay taxes on an inheritance.  JA:1203.  Natasha provided the name of her attorney: Raymond Miller.  JA:1204.  Jones then sent between 30 and 40 wires to accounts that Miller specified.  *Ibid.*  Jones also sent photographs of himself to Miller with a handwritten note confirming that the wires were for bitcoin purchases.  JA:1206-1208.  These wires sent thousands of dollars to the Church of the Invisible Hand,

the Reformed Satanic Church, and Aria DiMezzo.  JA:1207-1217.  Jones never received the bitcoin that he had purportedly purchased.  JA:1217.

d.    Karla Cino met Frederick Dreher on Facebook in 2016.  JA:1298. They talked over text message and phone; Dreher also sent flowers and stuffed animals.  JA:1298-1299.  Dreher stated that he worked for an oil company and that he had to pay multiple fines because one of his oil tankers was stuck and unable to reach port.  JA:1299-1300.  He then asked for help paying the fines. JA:1300.  Cino sent him $100,000, which Dreher promised to repay.  *Ibid*.

Dreher next asked Cino to become a bitcoin broker: people would wire money into Cino's account, Cino would forward that money to Freeman, and Freeman would send bitcoin to Dreher.[3]  JA:1301-1302.  Cino agreed.  *Ibid*. Wired money then appeared in her account from "[a]ll different people and places."  JA:1304.  Freeman, who "had a lot of different banks," JA:1303, messaged Cino regularly with instructions for forwarding the funds, JA:1302; *see also* JA:1308-1317 (wire transfers by Cino to Freeman, Aria DiMezzo, New Hampshire Peace Church, and Renee Spinella for bitcoin purchases).  Cino also sent photographs of herself holding the wire receipts to Freeman along with signed notes stating that she had authorized the wires.  JA:1307-1312.  Cino

---

[3] A scammer sometimes recruits the victim to become a "money mule" and create bank accounts through which the scammer launders money.  JA:608.

stopped doing this after her bank closed her account; Dreher never repaid her. JA:1305-1306.

e.     Danella Varel joined a dating website after her husband's death. JA:1468-1469.   Jerry Harmon—a Gulf of Mexico oil worker—messaged her. JA:1469.  They developed a relationship and spoke daily.  JA:1460.  Harmon eventually said he needed money to repair the oil rig.   JA:1472.   Harmon instructed Varel to send the money to Freeman.  JA:1473.  Within one week, Varel sent three wires totaling $755,000.  JA:1475-1483.  She also sent Harmon photographs of herself with a handwritten note stating that she had authorized each wire.  JA:1474-1475.  Varel did not get her money back.  JA:1484.

f.     Gary Flowers contacted Rebecca Ault, a school cafeteria manager, through a dating website in 2020.  JA:1578-1579.  They communicated regularly over Telegram.  JA:1580-1581.  Flowers then sought help, explaining that he had traveled to Turkey for business, got sick, and needed money for medical care.  JA:1581-1583.  Flowers wanted Ault to send bitcoin and instructed her to contact Freeman.  JA:1584-1585.  Ault then sent multiple wires to Freeman and the New Hampshire Peace Church for bitcoin.  JA:1587-1595.  She also sent photographs of herself to Flowers, holding a handwritten note stating that she had authorized the wire transfer to Freeman for a bitcoin purchase.  JA:1588-

1589.  All told, Ault sent $200,000 from her retirement account, which she did not get back.  JA:1595-1596.

g.    After her husband died, Nancy Triestram met Anthony Buitly-Grey online.  JA:1643.  They communicated for several years.  *Ibid*.  During that period, Buitly-Grey—an oil-rig worker—requested money and gift cards.  JA:1644-1645.  Triestram sent him a total of $16,000.  JA:1645.

At one point, Buitly-Grey reported that he had money coming in, asked Triestram to store it in her bank account, and later asked her to send it to Freeman to buy bitcoin.  JA:1645-1646.  Following his instructions, Triestram took a photo of herself with a handwritten note stating that she was buying bitcoin via wire transfer from Freeman on behalf of a woman (Connie Creach) whom she had never met.  JA:1646-1647.  Using the same procedure, Triestram also wired money to co-conspirator Aria DiMezzo.  JA:1656-1657.

Law enforcement interviewed between 30 and 40 individuals who had sent money to Freeman; each reported that another person had directed them to do so.  JA:1452-1453.

### 2.    Signs of fraud pervaded Freeman's transactions.

a.    Although Freeman knew that scammers in Africa targeted elderly victims, he bragged that "old ladies go" to his bitcoin kiosk and "drop 40K."  JA:964.  Freeman also posted international website advertisements for bitcoin

sales in Nigerian currency.  JA:1099-1100; *see also* JA:393, 440-441 (transactions with Nigerian buyers).  Finally, Freeman's computer stored chats with scores of customers, their photographs and identifications, and transaction information.  JA:1388-1451.[4]  Many of these customers were elderly.[5]  *See* JA:1396 (average age of 59 years); JA:2062 (reference by defense counsel to "a bunch of elderly individuals" displayed by the government).

b.    The messages to Freeman seeking bitcoin carried several notable features.  Some individuals claimed to be in the United States but used broken English or suspect language.  For instance, a middle-aged South Carolina woman asked about a bitcoin trade: "My account was freeze from BTC before using my partner. … My partners received the it, but I'll deposit it on his ba half and do whatever you want me to do.  We have trade before."  JA:483.  The Patrick Brown imposter (*see* p.12, *supra*) asked about direct bitcoin purchases, touting that he had "been trading offline since long using Coinbase Pro, but they have some technical issue going on, as they mention on my account, my BTC

---

[4] This saved folder contained 59 subfolders, some of which stored information on multiple customers.  JA:1566.

[5] One elderly woman struggled to comply with Freeman's instruction to send a photograph holding a note that she intended purchase bitcoin.  She messaged: "I can't hold something in one hand and take a photo with my phone in the other hand.  My hands tremble too much."  JA:490.  Freeman advised the woman to "hold the paper with [her] mouth."  *Ibid.*

are help in there." JA:492. Additionally, a woman named Brenda messaged co-conspirator Renee Spinella about bitcoin and used the term "bro." Spinella flagged the message as a potential scam to Freeman, who responded, "how many Brendas say 'bro'?" S.App. 5 (Gov't Ex. 819).

Other customers offered Freeman large quantities of cash. One customer proposed to send $200,000 by mail. JA:469. He later asked to "cash out about 500K USD from USA to [bitcoin], but [he] need[ed] to do it slowly." JA:470. Another customer in Mexico "ha[d] the money in cash" and wanted to buy 17 bitcoins, totaling $85,000. JA:466. Freeman advised him to send the cash by overnight mail. JA:467. Freeman asked no questions as to why either customer had large cash sums for which they were willing to mail to a stranger.

Finally, customers made multiple bitcoin purchases in short periods. For instance, the scammer posing as Patrick Brown executed three transactions over six days, totaling $280,000. JA:1175-1182. The scammer posing as Danella Varel also executed three transactions over six days, totaling $755,000. JA:1475-1483. This "velocity of transactions" signals a fraud risk. JA:1610.

c. Freeman conducted third-party trades, accepting money from one person and transmitting the purchased bitcoin to someone else. Freeman acknowledged the risk with these transactions. During Freeman's radio show, a caller complained that he had been defrauded into wiring $25,000 to

17

Freeman's account to purchase bitcoin for his Internet lover.  *See* S.App. Disc (Gov't Ex. 1533 at 0:00-2:20).  Another host interjected: "that's interesting, I don't do third party trades." *Id*. at 3:46-3:49. Freeman responded: "I generally don't do them either but this was a good customer." *Id*. at 3:49-3:52.

The localbitcoins.com and Telegram records, however, showed that Freeman regularly conducted third-party trades, including with the scammers who targeted the victims noted above.  Contrary to his radio-show remark, Freeman did do third-party trades with first-time customers.  *See* JA:392-393 (third-party trade between Freeman and new customer).

Some trades also had other indicia of fraud.  The James Rossell imposter (p.11, *supra*) purchased $67,000 of bitcoin for personal investment.  The imposter told Freeman that the money came from Rossell's retirement and that Rossell was cash strapped.  JA:453-454.  After the transaction, the imposter said he "ha[d] a customer that want[ed] to invest in Bitcoin." JA:458.  Freeman then accepted money from a Florida man and a Wisconsin man, and he sent the purchased bitcoin to the person posing as Rossell.  JA:459-464.  At no point did Freeman ask how a cash-strapped Texas retiree like Rossell had customers in

other states or why those customers wanted to send their bitcoin to Rossell's account instead of their own accounts.[6]

### 3. Freeman dissembled when a victim claimed fraud.

Freeman expressed no concern upon learning that one of his customers may have been defrauded. In November 2018, TD Bank inquired about a $16,100 deposit by two individuals (Jessica Alewine and Bruce Blamire) into Colleen Fordham's account. S.App. 2 (Gov't Ex. 707). Freeman responded on Fordham's behalf and informed TD Bank that he had a photograph of Blamire with a dated receipt and a signed note showing Blamire's intent to purchase bitcoin. *Ibid.* Where a customer provided that, Freeman said, the transaction is "almost always totally fine." S.App. 3. He also characterized Alewine's refund request as a scam and insisted that he was an "honest seller[] of Bitcoin." *Ibid.*

Upon learning that another of his bitcoin trades involved a scam victim, Freeman reacted: "I get to lose my bank account likely and maybe the money." JA:1101. Freeman also lamented that his buyer—the same individual who had defrauded the victim—"won't be coming back." *Ibid.*

---

[6] This sequence repeated itself. For example, an Iowa woman (Elizabeth Corley) purchased bitcoin from Freeman in November 2019. JA:1405-1406. Freeman then accepted six wire transfers—from individuals between ages 25-73 in Florida, Illinois, Nevada, New Jersey, North Carolina, and Pennsylvania— supposedly buying bitcoin for Corley. JA:1406-1411.

### D.    Freeman paid no taxes.

An FBI accountant reviewed over 50 bank accounts linked to Freeman, his co-conspirators, and the churches.  JA:1669.  She charted millions of dollars in deposits.  JA:1672-1699.

Freeman did not file tax returns.  JA:1718.  The IRS reviewed Freeman's trades and commission rates on localbitcoins.com.  JA:1718-1721.  In 2016, for instance, Freeman earned over $69,500 in commissions and owed over $19,000 in taxes.  JA:1727-1728, 1735.  Freeman owed more taxes in later years: $66,033 for 2017; $56,174 for 2018; and $140,198 for 2019.  JA:1735.  The IRS did not calculate Freeman's commissions or outstanding taxes on bitcoin trades through his kiosks or Telegram.  JA:1736.

## II.    Course of Proceedings

The grand jury indicted Freeman for conspiracy to operate, and operating, an unlicensed money-transmitting business; money-laundering conspiracy; and tax evasion.  JA:70-88.  It further indicted Freeman for money laundering, in violation 18 U.S.C. § 1956(a)(3)(B), based on an undercover agent's use of Freeman's kiosk to purchase bitcoin on August 25, 2020.  JA:79, 2275.

Before trial, Freeman moved to dismiss the two counts charging him with conspiring to operate, and operating, an unlicensed money-transmitting business.  He and a co-conspirator argued that the relevant statutes, 18 U.S.C.

§ 1960 and 31 U.S.C. § 5330, did not cover businesses that sell bitcoin.  JA:112 (adopting JA:89-111).  The district court orally denied the motion and stated that it would issue a written order.  JA:192-196.  The parties then proceeded to trial and the government presented the evidence summarized above.  The jury also heard testimony from seven fraud victims and four of Freeman's associates.  The jury found Freeman guilty.  JA:2234-2236.

In a post-trial order, the district court reaffirmed its denial of Freeman's motion to dismiss the conspiracy and substantive counts charging his operation of an unlicensed money-transmitting business, holding that the statutes covered bitcoin dealers.  JA:2278-2297.  The court, however, found insufficient evidence showing Freeman's knowledge of the August 2020 kiosk transaction and entered an acquittal on the substantive money-laundering count.  JA:2297-2303.

Freeman requested a new trial on the remaining counts, alleging spillover prejudice from the vacated charge.  JA:2445.  The district court denied the motion, JA:2502-2504, and imposed a 96-month sentence, JA:2630.

## III.   Rulings Presented for Review

Freeman renews his claim that an individual who sells bitcoin does not operate a money-transmitting business and, therefore, cannot be prosecuted under 18 U.S.C. § 1960.  He further contends that the evidence failed to prove tax evasion and that he was entitled to a new trial on all counts due to spillover

prejudice from the vacated money-laundering conviction.  Finally, Freeman asserts that his sentence is substantively unreasonable.

## SUMMARY OF ARGUMENT

1.     An individual who operates a business that "transfer[s] funds on behalf of the public by any and all means," 18 U.S.C. § 1960(b)(2), and who also fails to follow the registration requirements in 31 U.S.C. § 5330, faces criminal punishment under 18 U.S.C. § 1960(b)(1)(B).

At the time of Freeman's conduct, "any … person who engage[d] as a business in the transmission of funds" was obligated to register with the Department of Treasury. 31 U.S.C. § 5330(d)(1)(A) (2001).  Under a plain reading of this provision, Freeman engaged in the transmission of funds when he sold bitcoin through his various entities.  His deliberate failure to register with the Department of Treasury is, therefore, a federal criminal offense.  Freeman's contrary arguments rest on flawed statutory interpretation and a misguided invocation of the major-questions doctrine.

2.     Ample evidence supports the tax-evasion verdicts.  The jury reasonably credited testimony from an IRS revenue agent that Freeman owed over $280,000 in taxes based on the commissions he earned selling bitcoin on localbitcoins.com between 2016 and 2019.  The jury also reasonably found that Freeman willfully evaded his taxes based on his own words.  In one text

message, Freeman bragged that "[o]nly suckers pay tax on crypto" and questioned "the obligation to pay taxes … in the first place."  S.App. 1 (Gov't Ex. 612).

3.    The district court appropriately exercised its discretion in denying Freeman's new-trial motion premised on evidentiary spillover from the vacated money-laundering count.  The court held that the evidence related to that charge was independently admissible to support the separate money-laundering conspiracy count.  Because the jury would have seen the same evidentiary picture in a trial that omitted the vacated money-laundering count, no spillover prejudice occurred.

4.    Freeman's 96-month sentence is substantively reasonable.  The district court reasonably balanced the 18 U.S.C. § 3553(a) factors and Freeman's mitigation arguments when fixing its below-Guidelines sentence.  Although Freeman contends that he deserved greater leniency, he has not shown that the court abused its broad discretion in selecting the 96-month term.

## ARGUMENT

### I.    Freeman operated an unlicensed money-transmitting business when he sold bitcoin.

Freeman argues that he cannot be prosecuted for conspiring to operate, or operating, an unlicensed money-transmitting business because 18 U.S.C. § 1960

does not cover bitcoin-selling businesses.  The district court correctly rejected this claim.

### A.    Background

1.    Federal law makes it a crime to "knowingly conduct[], control[], manage[], supervise[], direct[], or own[] all or part of an unlicensed money transmitting business."  18 U.S.C. § 1960(a).  The term "'money transmitting' includes transferring funds on behalf of the public by any and all means." 18 U.S.C. § 1960(b)(2).  And the term "unlicensed money transmitting business" refers to a money-transmitting business that "affects interstate or foreign commerce in any manner or degree and … fails to comply with the money transmitting business registration requirements under [31 U.S.C. § 5330] or regulations prescribed under such section."  18 U.S.C. § 1960(b)(1)(B).

The cross-referenced statute, 31 U.S.C. § 5330(a), directs that "[a]ny person who owns or controls a money transmitting business shall register the business … with the Secretary of the Treasury."   At the time of Freeman's conduct, a money-transmitting business was defined to include "any … person who engages as a business in the transmission of funds."   31 U.S.C. § 5330(d)(1)(A) (2001).  Such persons had to submit a form identifying the business, its address and bank information, and the location of supporting documentation.  JA:549-550; *see also* JA:570 (free electronic registration).

24

In 2013, the Department of Treasury issued guidance stating that "[a]n administrator or exchanger that (1) accepts and transmits a convertible virtual currency or (2) buys or sells convertible virtual currency for any reason is a money transmitter under FinCEN's regulations."[7] *See* FIN-2013-G001, Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies, p.3 (Mar. 18, 2013).[8]

2.    Before trial, Freeman filed a motion to dismiss the counts charging him with conspiracy to operate, and operating, an unlicensed money-transmitting business. Freeman argued that Section 5330's registration requirement did not apply to individuals or entities that exchange virtual currencies like bitcoin. Section 1960 therefore did not criminalize his conduct.

The district court denied Freeman's motion. JA:192-196. In a post-trial order memorializing its ruling, the court held that bitcoins are "funds" within Section 1960(b)(2)'s and Section 5330's plain meaning. JA:2284, 2292-2293. It

---

[7] After the conduct at issue here, Congress amended the definition of money-transmitting business to include "any other person who engages as a business in the transmission of *currency*, funds, or *value that substitutes for currency*, including any person who engages as a business in an informal money transfer system." 31 U.S.C. § 5330(d)(1)(A) (2021) (emphasis on amended language). This revision, among many others, was done "to modernize anti-money laundering and countering the financing of terrorism laws." Pub. L. No. 116-283, 134 Stat. 3388, 4547 (2021).

[8] https://www.fincen.gov/statutes_regs/guidance/pdf/FIN-2013-G001.pdf

further found that Section 1960's purpose and history supported that conclusion. JA:2285-2286. Finally, the court deemed unpersuasive Freeman's observation that, when Congress enacted the operative version of Section 5330 in 2001, it could not have anticipated the word "funds" applying to bitcoin. JA:2286. The court likewise dismissed Freeman's invocation of the major-questions doctrine as inapplicable to the legal question. JA:2287-2297.

## B.     Standard of Review

Whether Section 1960(a) covers Freeman's conduct is a question of law subject to de novo review. *See United States v. Fernandez*, 722 F.3d 1, 8 (1st Cir. 2013).

## C.     Section 1960's plain text, purpose, and history show that it reaches bitcoin sellers like Freeman.

An individual who operates a business that "transfer[s] funds on behalf of the public by any and all means," 18 U.S.C. § 1960(b)(2), and who also fails to follow the registration requirements in 31 U.S.C. § 5330 or the associated regulations, 18 U.S.C. § 1960(b)(1)(B), faces criminal punishment. Freeman deliberately refused to register his bitcoin-selling entities with the Department of Treasury; he is accordingly subject to prosecution if he had an obligation to register under Section 5330. The district court correctly answered "yes" to that question based on the statutory text.

At the time of Freeman's conduct, "any … person who engage[d] as a business in the transmission of funds" was obligated to register. 31 U.S.C. § 5330(d)(1)(A) (2001).  As the district court explained, Freeman's bitcoin sales plainly involved the transmission of funds under this provision.

The term "funds" refers to "something generally accepted as a medium of exchange, a measure of value, or a means of payment."  *United States v. Iossifov*, 45 F.4th 899, 913 (6th Cir. 2022) (citation omitted).  That definition accordingly "encompasses any currency that can be used to pay for things."  *Id.* at 913-914.  Because "[b]itcoin is often used [to] pay for things" and serves "as a medium of exchange" for U.S. dollars and other currencies, *ibid.*, it qualifies as "funds" under Section 5330(d)(1)(A).  Accordingly, when Freeman operated various entities that transmitted bitcoin to people in exchange for U.S. dollars, he engaged in the transmission of funds and had a statutory obligation to register with the Department of Treasury.  Freeman therefore violated Section 1960(a) when he knowingly refused to do so.

This Court is not the first to address the question whether the ordinary meaning of "funds" includes bitcoin.  "[C]ourts … have unanimously determined that Bitcoin falls under th[at] term[]."  *Iossifov*, 45 F.4th at 913 (surveying decisions); *see also United States v. Stetkiw*, No. 18-20579, 2019 WL 417404, at *2 (E.D. Mich. Feb. 1, 2019) ("Federal District Courts have

27

repeatedly found that Bitcoin constitutes … 'funds' within the meaning of 18 U.S.C. § 1960.").  Freeman offers no contrary authority.

Finally, the historical backdrop confirms this conclusion.  Congress criminalized the operation of unlicensed money-transmitting businesses in Section 1960 "to address the fact that 'money launderers with illicit profits had found new avenues of entry into the financial system.'"  *United States v. Murgio*, 209 F. Supp. 3d 698, 708 (S.D.N.Y. 2016) (quoting S. Rep. No. 101-460 (1990)).  Congress was specifically "concerned that drug dealers would turn increasingly to 'nonbank financial institutions' to 'convert street currency into monetary instruments'" and drafted Section 1960's prohibition "to address this 'gaping hole in the money laundering deterrence effort.'"  *United States v. Faiella*, 39 F. Supp. 3d 544, 546 (S.D.N.Y. 2014) (quoting S. Rep. No. 101-460 (1990)).  That backdrop explains the statute's capacious language, which prohibits unlicensed businesses from "transferring funds … *by any and all means*."  18 U.S.C. § 1960(b)(2) (emphasis added).

Applying Section 1960's penalties to unlicensed bitcoin-selling businesses squarely fits this purpose: scammers use bitcoin sellers like Freeman to convert their criminal proceeds into bitcoin and transfer them oversees, frustrating efforts by law enforcement to trace the funds.  This is precisely the type of

"evolving threat[]" that "Congress designed the statute to keep pace with." *Faiella*, 39 F. Supp. 3d at 546.

As the district court concluded, JA:2287, all the key interpretative tools point in the same direction: bitcoins are "funds" under Sections 1960(b)(2) and 5330(d)(1)(A), Freeman operated a money-transmitting business when he sold bitcoin during the charged period, and he therefore had a statutory obligation to register his business with the Department of Treasury.

**D.    Freeman's contrary statutory construction lacks merit.**

Freeman accepts (Br.37) that bitcoins qualify as "funds" under the term's dictionary definition and common usage, but nonetheless urges a different construction of Sections 1960(a) and 5330.  That invitation defies the well-worn command: "If the statute's language is plain, the sole function of the courts… is to enforce it according to its terms."  *In re Rudler,* 576 F.3d 37, 44 (1st Cir. 2009) (internal quotation marks and citations omitted).  This Court should reject it.

In any event, Freeman's efforts to circumvent the plain language fail.

1.    Freeman contends (Br.30-36) that the statutory regime does not impose a registration requirement on businesses that sell bitcoin; any requirement instead derives from agency regulation and, Freeman contends, no valid Department of Treasury regulation required his registration.  That is wrong.

29

Again, Section 5330(a) directs that "[a]ny person who owns or controls a money transmitting business shall register the business … with the Secretary of the Treasury" using "the form and manner" prescribed by the Secretary. 31 U.S.C. § 3550(a)(1)-(2).  The duty to register is therefore imposed by statute, even if the manner of registration involves regulatory action.

At the time of Freeman's conduct, a money-transmitting business was defined to include "any … person who engages as a business in the transmission of funds."  31 U.S.C. § 5330(d)(1)(A) (2001).  Because Freeman's entities engaged in the transmission of funds, *see* pp.26-29, *supra*, he had a *statutory* obligation to register with the Department of Treasury.  And when Freeman knowingly operated those entities while "fail[ing] to comply with the money transmitting business registration requirements under [31 U.S.C. § 5330]," he violated 18 U.S.C. § 1960(a) and (b)(1)(B).[9]

2.     Freeman relatedly contends (Br.31-32) that any statutory obligation to register with the Department of Treasury could not take effect until after the

---

[9] The result is the same if this Court follows Freeman's (incorrect) invitation to look only at Department of Treasury regulations at the time of his conduct.  Those regulations provided that "each money services business … must register with FinCEN."  31 C.F.R. § 1022.380(a) (2016); *see also* 31 C.F.R. § 103.41 (2006) (same in earlier, superseded version).  Those regulations also defined "money services business" to include "[a]ny … person engaged in the transfer of funds."  31 C.F.R. § 1010.100(ff)(5).  Because Freeman engaged in the transfer of funds, *see* pp.26-29, *supra*, he operated a money-services business and therefore also had a *regulatory* obligation to register.

agency promulgated regulations specifying the form and manner by which a business must register.   But the Department of Treasury *had* promulgated regulations specifying the registration procedures at the time of Freeman's conduct.  *See* 31 C.F.R. § 1022.380 (registration procedures for money-services businesses); 31 C.F.R. § 1010.100(ff)(5) (defining "money service business" to include "[a]ny … person engaged in the transfer of funds"). The statutory obligation to register and the accompanying criminal penalties for noncompliance accordingly attached to Freeman's bitcoin-selling business.  *See Cal. Bankers Ass'n v Shultz*, 416 U.S. 21, 26 (1974) (noting that the Bank Secrecy "Act's civil and criminal penalties attach only upon violation of regulations promulgated by the Secretary").

3.    Freeman surmises (Br.37,46) that Congress could not have predicted the rise of bitcoin or other virtual currencies in 2001, when it enacted the version of Section 5330 applicable here.  That inference is doubtful given Congress's "explicit" intent that the statute cover all "informal value transfer banking systems," H.R. Rep. 107-250 (2001), at 63-64, and the government's prosecution of individuals for issuing digital currency following this legislation. *See United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82, 86 (D.D.C. 2008) (Section 1960 charges for operating an unlicensed money-transmitting business in October 2001).

31

In any event, the district court correctly rejected Freeman's contention as legally irrelevant: "The fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; it demonstrates breadth." JA:2286 (quoting *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)) (brackets omitted).  "It need only be plain to anyone reading the Act that the statute encompasses the conduct at issue."  *Salinas v. United States*, 522 U.S. 52, 60 (1997) (internal quotation marks and citation omitted). As explained above, Section 1960's and Section 5330's text plainly apply to Freeman's conduct in selling bitcoin.  *Cf. United States v. Harmon*, No. 19-cr-395, 2021 WL 1518344, at *7 (D.D.C. Apr. 16, 2021) (disputed statute "is sufficiently clear for the ordinary person to recognize that a bitcoin-to-bitcoin tumbler … was subject to regulation"); *id*. at *8 ("[T]he fact that defendant is the first person to be prosecuted under [Section] 1960(b)(1)(B) for operating a bitcoin tumbler does not render provision vague.").

*Bostock v. Clayton County*, 590 U.S. 644 (2020), illustrates this principle. The Supreme Court held that Title VII's broad prohibition on workplace sex discrimination extends to individuals who face discrimination because they are gay or transgendered.  *Id*. at 683.  The Court viewed its holding as a "necessary consequence" of a "plain statutory command[]."  *Ibid*.  The Court was also unmoved by suggestions that Title VII's drafters "might not have anticipated

their work would lead to this particular result," explaining that "the limits of the drafters' imagination supply no reason to ignore the law's demands." *Id*. at 653.

The same is true here: Congress's capacious language about "transferring funds … by any and all means," 18 U.S.C. § 1960(b)(2), and "person[s] who engage[] as a business in the transmission of … funds," 31 U.S.C. § 5330(d)(1)(A) (2001), plainly cover individuals who sell bitcoin. Freeman does not argue otherwise. "[T]hat should be the end of the analysis." *Bostock*, 590 U.S. at 662 (quotation marks and citation omitted).

4.    Freeman next cites (Br.46-49) Congress's 2021 decision to amend the definition of "money transmitting business" to include persons "who engage[] as a business in the transmission of currency, funds, or *value that substitutes for currency*." 18 U.S.C. § 5330(d)(1)(A) (emphasis added). From this, Freeman infers that the earlier statutory definition—which captured the "transmission of funds"—must have necessarily excluded virtual currencies.

Freeman's "[a]rguments based on subsequent legislative history should not be taken seriously." *Bostock*, 590 U.S. at 670 (citation omitted). As Freeman concedes (Br.37), "courts ha[d] consistently found that bitcoin qualifies as 'funds.'" And "Congress is presumed to [have] be[en] aware of [that] … judicial interpretation of a statute." *Forest Grove Sch. Dist. v. T. A.*, 557 U.S. 230, 239

33

(2009). Yet nothing in the 2021 amendment's text or legislative history suggests that Congress disagreed with that unanimous interpretation.

To the contrary, Congress in 2021 appears to have ratified that judicial interpretation. As the district court explained, JA:2297, Congress expressed its sense—upon inserting the new language—that FinCEN's mission "should be *to continue* to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security." Pub. L. No. 116-283, 134 Stat. 3388, 4552 (2021) (emphasis added). Congress also amended the separate definitions of "financial agency" and "financial institution" in 31 U.S.C. §§ 5312(a)(1) and (a)(2)(J) to include businesses that exchange something of "value that substitutes for currency." These markers show that Congress in 2021 was updating federal banking law to explicitly reference the growth of digital and virtual currencies; no substantive change was intended. *Cf. Brown v. United Airlines, Inc.*, 720 F.3d 60, 66 (1st Cir. 2013) (reviewing statutory landscape and concluding that "the revised language was not meant to effect any substantive change").

But even if (as Freeman infers) some lawmakers in 2021 feared that the earlier statutory language failed to reach bitcoin-selling businesses, it would not bear on the dispute here. "[T]he views of one Congress as to the meaning of statutes enacted by an earlier Congress are entitled to little if any weight."

*Parlane Sportswear Co. v. Weinberger*, 513 F.2d 835, 837 n.2 (1st Cir. 1975).  All the relevant interpretive tools confirm that Sections 1960 and 5330 encompassed these businesses at the time of Freeman's conduct.  *See* pp.26-29, *supra*.

5.     Freeman lastly suggests (Br.49-51) that FinCEN and its officials have publicly admitted that the agency lacked statutory authority to require bitcoin-selling businesses to register before 2021.  Of course, an agency's views about the scope of its own statutory authority—broad or narrow—carry no deference in the judicial inquiry.  *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).

In any event, Freeman misreads his cited sources.  He references (Br.50) FinCEN guidance on the phrase "other value that substitutes for currency" in 31 C.F.R. § 1010.100(ff)(5)(i)(A).  *See* FIN-2019-G001, Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies, p.3 & n.9 (Mar. 9, 2019).[10]  But this passage discussed a Department of Treasury regulation, not the statutory language.

Freeman next cites (Br.49-50) a 2021 bar association speech by the FinCEN Director highlighting the need to update the regulatory regime "to

---

[10] https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20 Guidance%20CVC%20FINAL%20508.pdf

account for crypto and other digital assets." That statement does not discuss the versions of Sections 1960 or 5330 in existence at the time of Freeman's conduct, much less concede that FinCEN lacked statutory authority under them to require bitcoin sellers like Freeman to register with the agency.

Finally, Freeman cites (Br.50-51) congressional testimony by the FinCEN Director in 2013 stating that the agency's updated regulatory definitions "accommodate[d] the development of new payment systems, including virtual currency." Those remarks, which reference the Department of Treasury's 2013 guidance that a virtual-currency seller qualifies as a money transmitter (p.25, *supra*), did not concede a lack of statutory authority. To the contrary, the Director cited the very language in 31 U.S.C. § 5330(a) discussed above. *See* Beyond Silk Roak: Potential Risks, Threats, and Promises of Virtual Currency, Hearing Before S. Comm. on Homeland Security, 113th Cong. (2013) (statement of Jennifer Shasky Calvery) (explaining that "'money transmitter'" is "a type of money services business already covered by the AML/CFT protections in the [Bank Secrecy Act].").[11] This testimony also aligns with the record below. The FinCEN representative testified at trial that, in 2013, the

---

[11] https://www.fincen.gov/news/testimony/statement-jennifer-shasky-calvery-director-financial-crimes-enforcement-network

agency relied on 31 U.S.C. § 5330 when concluding that bitcoin dealers like Freeman engaged in money-transmission services.[12]  JA:568-569.

One last point: in the period before 2021, the government charged bitcoin dealers under Section 1960 for failing to register their money-transmitting businesses.  *See*, *e.g.*, *Murgio*, 209 F. Supp. 3d at 706-711.  Those Executive Branch actions, coupled with their judicial ratification, foreclose Freeman's claim that the government conceded a lack of statutory authority to require such businesses to register.

### E.     The major-questions doctrine has no application.

This Court need not indulge Freeman's extensive discussion (Br.38-46) of the major-questions doctrine.  As the district court explained, the government's prosecution of Freeman turned entirely on federal statute; "the indictment neither depend[ed] on nor reference[d] the FinCEN guidance."  JA:2287-2288.  Because this case involves no "regulatory assertions" by the Department of

---

[12] Freeman's reference (Br.51-52) to a former Department of Justice trial attorney's testimony is even farther afield.  That individual did not represent the Department of Treasury or FinCEN.  In any event, the attorney stated that the 2021 amendments "codified FinCEN's previous position that the definition of a … money transmission business included businesses involved in the transmission or exchange of 'value that substitutes for currency.'"  Crypto Crime in Context, Hearing Before H. Subcomm. on Digital Assets, Financial Technology and Inclusion, 118th Cong. (2023) (testimony of Jane Khodarkovsky).  As just explained, FinCEN tethered that previous position to the language in 31 U.S.C. § 5330(a).

Treasury, *West Virginia v. EPA*, 597 U.S. 697, 722 (2022), the doctrine is not triggered.

But even if this case turned on the Department of Treasury's exercise of regulatory authority over bitcoin-selling businesses, the major-questions doctrine would still not apply.

1.    The major-questions doctrine applies only when an agency claims an "[e]xtraordinary grant[] of regulatory authority" based on "modest words, vague terms, or subtle devices," and "the history and the breadth" of the agency's asserted power "provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia*, 597 U.S. at 721, 723 (brackets, internal quotation marks, and citations omitted).  None of those features is present here.

First, the Department of Treasury's view that bitcoin-selling businesses met the statutory definition of a "money transmitting business" did not rest on modest words, vague terms, or subtle devices.  The agency instead turned to plain statutory language, which required "any … person who engages as a business in the transmission of funds" to register. 31 U.S.C. § 5330(d)(1)(A) (2001).  Freeman admits (Br.37) that every court to confront the question has agreed that the ordinary meaning of "funds" includes virtual currency like bitcoin.  This "clear congressional authorization" accordingly negates his

invocation of the major-questions doctrine. *West Virginia*, 597 U.S. at 723 (citation omitted); *see also Hornof v. United States*, 107 F.4th 46, 59 n.14 (1st Cir. 2024) (doctrine inapplicable where "the statute speaks clearly").

Second, the Department of Treasury did not claim an extraordinary grant of regulatory authority over bitcoin-selling businesses. As the district court correctly observed, the agency instead sought to register the "fraction of market participants who are in the business of transmitting virtual currencies and not already registered." JA:2291. The trial record also undercuts any attempt to frame those registration procedures as extraordinary. *Compare* JA:570 (free registration); JA:757 (co-conspirator planned to register separate business with FinCEN); JA:854-855 (small, nonprofit credit union registered with FinCEN); JA:1604 (same for bitcoin exchange), *with West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring) (asking whether agency action required "billions of dollars in spending" by private persons or entities) (citation omitted).

Third, the Department of Treasury's actions align with congressional purpose. When it first enacted 31 U.S.C. § 5330, Congress perceived a substantial problem insofar as money-transmitting businesses were largely unregulated and frequently used in sophisticated schemes to transfer criminal proceeds. *See* Pub. L. No. 103-325, § 408, 108 Stat. 2160 (1994). And in 2001, Congress expanded Section 5330(d)(1)(A)'s language to include "any … person

who engages as a business in the transmission of funds." *See* p.24, *supra*. The Department of Treasury's decision to construe that language to reach businesses that sell bitcoin not only matches its plain text, but also Congress's long-stated desire for federal money-laundering and money-transmitting statutes to keep pace with the ever-evolving universe of financial instruments. *See* p.28, *supra*. That Congress confirmed the agency's authority over bitcoin-selling businesses in 2021 further neutralizes Freeman's effort to cast this as an historic power grab. *See* p.34, *supra*; *see West Virginia*, 597 U.S. at 731 (major-questions doctrine applied in case where "Congress … ha[d] *consistently* rejected proposals to amend the [statute] to create such a program") (emphasis added).

2.      Freeman's efforts (Br.42-46) to analogize this dispute to the few Supreme Court cases implicating the major-questions doctrine fail. Two decisions addressed environmental regulations that would have had a transformative effect on the regulated industries. *See West Virginia*, 597 U.S. at 712-713 (EPA plan to regulate carbon-dioxide emissions from existing coal-power plants); *Utility Air Regulation Group v. E.P.A.*, 573 U.S. 302, 307 (2014) (EPA regulation interpreting Clean Air Act to cover greenhouse gases). Three decisions addressed regulations that lacked clear statutory authority and, in two instances, intruded on traditional areas of state regulation. *See Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 759 (2021) (CDC

nationwide eviction mortarium); *Gonzales v. Oregon*, 546 U.S. 243, 248-249 (2006) (Attorney General's prohibition on the use of controlled-substance drugs in suicides); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (FDA effort to regulate tobacco as a "drug" under the Food, Drug, and Cosmetic Act). Finally, two decisions addressed pandemic-era programs involving student-loan relief and vaccine mandates that affected tens of millions of Americans and, in one case, $430 billion in federal loans. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2362 (2023) (Department of Education student-loan forgiveness program); *NFIB v. Dep't of Labor.*, 595 U.S. 109, 112-113 (2022) (Department of Labor mandate ordering 84 million Americans to obtain COVID–19 vaccine or undergo weekly testing).

Each major-questions marker points in the opposite direction here. As explained, the statutory reference to "funds" affirmatively and unambiguously covers all currencies—traditional and virtual. *Cf. Bostock*, 590 U.S. at 680 ("This elephant has never hidden in a mousehole."). The Department of Treasury also did not seek a dramatic expansion of its regulatory power; it simply confirmed through a 2013 guidance document that bitcoin dealers had to register their businesses under an existing well-worn statutory provision, just like traditional money transmitters had long done. That guidance aligned with the congressional purpose animating the money-laundering and money-

transmitting statutes and with Congress's subsequent amendments to 31 U.S.C. § 5330 and the Bank Secrecy Act more broadly.  Further, "Freeman … presented no evidence that FinCEN's guidance would require billions of dollars in spending by private persons or entities," JA:2291, or affect "a significant portion of the American economy," *Utility Air*, 573 U.S. at 324 (internal quotation marks and citation omitted).  Finally, Freeman makes no showing that the pertinent subject matter—money laundering and transmitting—"intrudes into an area that is the particular domain of state law." *Alabama Ass'n of Realtors*, 594 U.S. at 764.

3.    Freeman's other contentions (Br.39-41) lack relevance to the major-questions doctrine.  That bitcoin and other virtual currencies operate differently than traditional currencies—*e.g.*, their reliance on a blockchain ledger and lack of connection to a government or a bank—does not bear on the question whether they meet the statutory definition of "funds."

That bitcoin and other cryptocurrencies presently have a multi-trillion-dollar market capitalization also lacks salience.  As the district court observed, "FinCEN's exercise of regulatory authority does not target the entire $3 trillion virtual currency market."  JA:2291.  The agency simply advised "a fraction of market participants who are in the business of transmitting virtual currencies and not already registered with FinCEN" that they needed to do so. *Ibid.*   And

"Freeman has offered no evidence" that compliance with those registration obligations would cause the type of "downstream consequences" that animated *West Virginia* and the Supreme Court's other major-questions decisions. *Ibid.*

Finally, Freeman's presentation reveals the fragility of his major-questions invocation. For example, he stresses (Br.41) that the price of one bitcoin grew from six cents in 2010 to $60,000 in 2024. The necessary implication of Freeman's argument, then, is that the Department of Treasury had full regulatory authority over virtual currencies at their infancy, when they lacked value or wide circulation but, at some later unidentified date, virtual currencies became such a sweeping and consequential component of the economy that any agency effort to regulate them now triggers the major-questions doctrine.

Under that anomalous approach, the Department of Treasury's authority to regulate virtual currencies or any other new financial instruments would blink in and out of existence, like a summer firefly, depending on their current popularity and capitalization in the market. And, under this approach, the agency's regulatory authority illogically wanes as the financial instrument's popularity—and the accompanying risk of fraud and criminality—increases.

The Court should reject this novel and fluid view of agency authority in favor of the plain statutory language. Because Freeman's entities transmitted "funds," he had a statutory obligation to register with the Department of

43

Treasury.  His deliberate failure to do so triggers criminal penalties under 18 U.S.C. § 1960.

## II.     Ample evidence documented Freeman's tax evasion.

Freeman contests the sufficiency of the evidence supporting the tax-evasion counts.  This claim lacks merit.

### A.     Background

Federal law authorizes punishment for "[a]ny person who willfully attempts in any manner to evade or defeat any tax."  26 U.S.C. § 7201.  The jury may convict the defendant if it finds the existence of a tax deficiency, an affirmative act constituting an evasion or attempted evasion of the tax, and willfulness.  *See United States v. Lavoie*, 433 F.3d 95, 97 (1st Cir. 2005).

At trial, an IRS revenue agent testified that she examined each bitcoin trade between 2016 and 2019 on Freeman's localbitcoins.com account. JA:1719-1721.  She then calculated Freeman's commission on each trade and his income generated from all his trades.  JA:1721-1728.  Finally, the agent calculated Freeman's tax obligations for each year, incorporating various tax deductions that the agent concluded would have been applicable.  JA:1729-1733.  The agent found that Freeman owed over $280,000 in taxes on his localbitcoins.com commissions during this four-year period.  JA:1735.  The jury further learned that Freeman did not file tax returns.  JA:1718.

On the question whether Freeman willfully evaded his taxes, the jury watched a video displaying a "[s]top paying taxes" sign at Freeman's house. JA:631. It also reviewed this text message:



**Ian Freeman**                                                    13:20
Only suckers pay tax on crypto

Also, how was the obligation to pay taxes created in the first          13:21
place? I'd like to see where I opted in, cause I didn't, unless it was under
duress.

S.App. 1 (Gov't Ex. 612). Finally, the jury reviewed messages where Freeman sought an accountant certification letter. In them, Freeman stated "I don't have any tax returns or pay stubs and only about 300K across my bank accounts … As a minister, I'm in the unusual position of not legally owning things but having the ability to control well over 2.5M in various assets, both real estate and cryptocurrency." JA:1247. The jury found Freeman guilty of tax evasion.

### B.    Standard of Review

This Court conducts a de novo review of sufficiency disputes, "appraising the proof in the light most favorable to the verdict." *United States v. Rodríguez-Velez,* 597 F.3d 32, 38 (1st Cir. 2010). The inquiry "take[s] into account both direct and circumstantial evidence." *Ibid.* In the end, "[t]he verdict must stand unless the evidence is so scant that a rational factfinder could not conclude that the government proved all the essential elements of the charged crime beyond a

reasonable doubt." *Id.* at 39 (emphasis omitted). This standard defers to the jury's resolution of factual disputes. "[W]here … the evidence can be viewed in different ways, [the Court] must honor the jury's evaluative choice among plausible, albeit competing, inferences." *Id.* at 40.

### C.     The jury reasonably found that Freeman had outstanding tax obligations that he willfully evaded.

Freeman asserts insufficient proof that he had any tax liability between 2016 and 2019 or that he acted willfully in failing to pay taxes. The jury reasonably found otherwise.

1.     The IRS revenue agent reviewed each of Freeman's trades on localbitcoins.com, calculated his commission on those trades, and then calculated the tax obligation corresponding with that income. The government also admitted the charts and tax schedules that the agent used in her analysis. DE:281:67, 71. The jury, as factfinder, had the right to accept this testimony. Such "credibility determinations are for the jury." *United States v. Alicea*, 205 F.3d 480, 483 (1st Cir. 2000). On sufficiency review, this Court does "'not … second-guess the jury's credibility determinations'"; it instead "credit[s] the government's witnesses" and "draw[s] all reasonable inferences in [the government's] favor." *United States v. Perez-Greaux*, 83 F.4th 1, 23 (1st Cir. 2023).

46

Freeman's rejoinders lack merit.  He notes (Br.60) that the IRS did not issue a formal tax assessment to Freeman.  This Court, however, has long "rejected the argument that a formal tax assessment must be made to establish evasion."  *United States v. Hogan*, 861 F.2d 312, 315 (1st Cir. 1988).  The government below adduced evidence that Freeman had a "tax due and owing" through the IRS agent's testimony, *ibid.*, which the jury could credit.

Freeman further notes (Br.61) that the agent "only reviewed a portion of Freeman's financial records, specifically those from LocalBitcoins.com, to estimate his commission rate, and then to estimate his possible tax due."  But that observation does not help him.  The agent explained that her calculation of Freeman's outstanding tax obligations "would increase" if she had also included his bitcoin trades and commissions from other platforms.  JA:1736.

Finally, Freeman observes (Br.61) that the agent did not consider the possibility that he could have filed tax returns with itemized deductions and that those deductions might have resulted in zero liability.  The jury reasonably dismissed this defense theory.  The agent testified that itemized deductions lower tax liability only where the taxpayer elects such deductions on his tax return.  JA:1741.  Because Freeman did not file tax returns, he was not eligible for any itemized deduction.  *See* 26 U.S.C. § 63(e)(1) ("Unless an individual makes an election … for the taxable year, no itemized deduction shall be allowed for the

taxable year."); *Jahn v. Comm'r*, 392 Fed. Appx. 949, 950 (3d Cir. 2010) (unpublished) ("[Taxpayer] did not file a return or properly claim itemized deductions on a return, so he was not entitled to them.").  Moreover, Freeman adduced no evidence below rebutting the government's proof that he had unreported income.  In particular, Freeman adduced no evidence at trial that he qualified for any itemized deduction or that such deduction would have lowered his tax liability to zero.   Because Freeman's efforts to attack the agent's calculations rested instead on rank speculation, the jury was under no obligation to credit them.  *See United States v. Kayser*, 488 F.3d 1070, 1073 (9th Cir. 2007) (explaining that "the burden is on the defendant to prove that he had allowable deductions that were not shown in his return, once the Government establishes unreported income") (internal quotation marks and citation omitted); *United States v. Hiett*, 581 F.2d 1199, 1202 (5th Cir. 1978) (cataloging cases holding the same).  The jury instead fairly credited the IRS agent's testimony, concluded that the government had satisfied its "ultimate burden … to show that [Freeman] received … taxable income," and found him guilty of tax evasion.  *Siravo v. United States*, 377 F.2d 469, 473 (1st Cir. 1967).

2.    Freeman bragged that "[o]nly suckers pay tax on crypto" and broadly questioned "the obligation to pay taxes … in the first place."  S.App. 1 (Gov't Ex. 612).  A reasonable jury could easily construe that statement as

displaying Freeman's "intentional violation of a known legal duty" to pay taxes. *United States v. Griffin*, 524 F.3d 71, 77 (1st Cir. 2008) (internal quotation marks and citation omitted), and, therefore, find that he acted willfully.

In response, Freeman cites (Br.62) his trial testimony that he never received an IRS letter or notification regarding a tax balance. But the government does not need to point to a specific letter that Freeman ignored; it may demonstrate scienter with any admissible evidence. Freeman further cites his trial testimony asserting a belief, based on his own research, that he lacked an obligation to file tax returns because of his various church affiliations. But "the jury was free to disbelieve [Freeman's] story" on that point. *United States v. Delgado Figueroa*, 832 F.2d 691, 696 (1st Cir. 1987). Freeman cannot claim insufficient evidence based on the jury's failure to credit his self-serving testimony. That principle is doubly true here given this Court's "admonition to give proper deference to the jury's findings of fact … in the necessarily subjective area of intent." *Howard v. United States*, 345 F.2d 126, 129 (1st Cir. 1965). On deferential sufficiency review, no basis exists for this Court to second-guess the jury's scienter finding.

III.  **The district court appropriately exercised its discretion in denying Freeman's new-trial motion based on evidentiary spillover.**

Freeman renews his claim that the district court's post-trial vacatur of one substantive money-laundering count entitled him to a new trial on all other counts.  The district court acted well within its discretion in denying relief.

A.  **Background**

1.  An undercover agent communicated with Freeman on Telegram and made multiple bitcoin purchases.  JA:932-956.  Freeman never asked about the source of the agent's cash.  JA:947-948.  In June 2020, the agent traveled to Keene, New Hampshire, and purchased $11,000 in bitcoin from Freeman's kiosk.  JA:961-967.  The agent and Freeman then chatted in person and the agent disclosed that he sold drugs.  JA:968.

The following month, the agent messaged Freeman, said he would again be traveling to Keene, and wanted to purchase $20,000 in bitcoin.  JA:975-976.  Freeman responded: "I can't sell you bitcoin because you told me too much about what you do."  JA:976.  The agent then asked whether he could still use Freeman's kiosk.  *Ibid*.  Freeman responded: "I can't KNOWINGLY assist you with financial matters."  *Ibid*.  When the agent sought clarification, Freeman replied: "You told me you sell drugs.  Therefore, to assist you with buying

bitcoin would be considered money laundering. … Sadly that means I cannot KNOWINGLY sell bitcoin to you." JA:977.

On August 25, 2020, the agent and Freeman attended a Keene meet-up where they again talked. JA:979-980. The agent asked if he could use the kiosk; Freeman responded that "the machine is still there" but "I can't tell you that you can use it." JA:981. The agent then drove to the kiosk and purchased $19,900 in bitcoin. JA:982.

The government alleged that Freeman violated 18 U.S.C. § 1956(a)(3)(B), which makes it a crime for an individual, "with the intent … to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity," to "conduct[] or attempt[] to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity." It argued that Freeman, through "the wink and the nod," authorized the agent to deposit drug proceeds into his kiosk. JA:2132.

2.     The jury found Freeman guilty on this count, but the district court entered a post-verdict judgment of acquittal. JA:2303. The court found insufficient "proof that Freeman knew that the August 25 transaction occurred." JA:2301. It noted that Freeman did not witness the kiosk transaction; it further noted the absence of evidence that anyone told Freeman of the transaction or of records in his possession documenting it. *Ibid*.

51

The district court, however, denied Freeman's motion for a new trial on the ground that this vacated count tainted the jury's verdicts on all the other counts. The court reasoned that the evidence documenting the undercover agent's dealings with Freeman would have been admissible towards the separate money-laundering-conspiracy count. JA:2503. Because "the evidence still would have been part of the trial," the court found "no spillover." *Ibid*.

### B.    Standard of Review

This Court reviews an order denying a new trial based on spillover for abuse of discretion. *United States v. Simon*, 12 F.4th 1, 44 (1st Cir. 2021).

### C.    The record amply supports the district court's finding that no spillover occurred from the vacated money-laundering count.

"[P]rejudicial spillover occurs when the evidence admitted to prove a charge as to which the defendant was acquitted was so extensive, inflammatory, and prejudicial that it necessarily spilled over into the jury's consideration of his guilt on other charges." *Simon*, 12 F.4th at 43 (internal quotation marks, brackets, and citation omitted). "To determine whether an unacceptable threat of prejudicial spillover materialized, [the Court] must evaluate whether the record evinces a serious risk that the joinder of offenses compromised a specific trial right or prevented the jury from making a reliable judgment about guilt or innocence." *Ibid*. (internal quotation marks, brackets, and citation omitted).

52

Freeman carries the burden to show "prejudice so pervasive that a miscarriage of justice looms." *Id*. at 43-44 (citation omitted).

The district court found that Freeman failed this burden, and that ruling reflected an appropriate exercise of its discretion. A defendant "hardly can be heard to complain about an untoward spillover effect" where "the government's case against [him] would have comprised essentially the same evidence even if the government had not seen fit to charge him with the [disputed count]." *Simon*, 12 F.4th at 44. Here, the district court held that the undercover agent's testimony was independently admissible towards the separate money-laundering-conspiracy count: "that evidence was coming in anyway." JA:2504. Because the jury would have seen the same evidentiary picture in a trial that omitted the substantive money-laundering count, no spillover occurred.

On appeal, Freeman fails to address the district court's admissibility ruling and, therefore, waived any argument challenging it. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). That omission forecloses this spillover claim.

Freeman instead asserts prejudice (Br.55-56) based on segments of the government's closing discussing the undercover agent's testimony. But under the district court's ruling, the agent's testimony was admissible evidence on the conspiracy count. Because the government's summation would have addressed

53

the same evidence in a trial limited to the conspiracy count, this argument necessarily fails.

Finally, for the reasons catalogued earlier in this brief, the jury heard overwhelming evidence documenting Freeman's guilt on money-laundering conspiracy, the unlicensed money-transmitting counts, and the tax-evasion counts. *See* JA:2504 (district court noting "plenty of proof" documenting Freeman's knowledge of, or willful blindness to, the source of the funds in his accounts); *United States v. Abdelaziz*, 68 F.4th 1, 68 (1st Cir. 2023) (no prejudicial spillover where evidence on other counts is "very strong"). Moreover, the government never tethered the undercover agent's testimony to the money-transmitting or tax-evasion counts, and the district court instructed the jury to "consider each charge and the evidence pertaining to it separately." JA:2183. For that additional reason, this testimony could not have tainted jury deliberations over those counts.[13]

---

[13] This spillover analysis is the same even if this Court agreed with Freeman on the first issue and vacated the money-transmitting counts due to legal insufficiency. The undercover agent's testimony was still independently admissible towards the money-laundering-conspiracy count, and overwhelming evidence proved both that count and the tax-evasion charges.

**D.    Alternatively, no spillover occurred because the district court erred in vacating the jury's guilty verdict on this count.**

This Court can also "affirm on any basis apparent[] in the record." *United States v. Ramirez-Frechel*, 23 F.4th 69, 73 (1st Cir. 2022).   Because the jury supportably found that Freeman knew the August 25 kiosk transaction occurred, the district court should have left the substantive money-laundering verdict intact, meaning that no prejudicial spillover occurred.[14]

The undercover agent and Freeman had completed multiple previous bitcoin transactions, including one with the kiosk.  Freeman further understood why the agent's desired to use Freeman's kiosk on August 25: the agent had cash from drug deals to convert to bitcoin.  Finally, the jury could reasonably view

---

[14] The government declined to cross-appeal the district court's post-verdict judgment of acquittal on this count and, therefore, does not seek reinstatement of the jury's verdict.   The government presents this argument only as an alternative basis to affirm the district court's order denying the spillover claim. *See Jennings v. Stephens*, 574 U.S. 271, 276 (2015) ("An appellee who does not take a cross-appeal may urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court.") (internal quotation marks and citation omitted); *Neverson v. Farquharson*, 366 F.3d 32, 39 (1st Cir. 2004) (respondents "entitled to [defend district court's judgment on an alternative legal ground], even if it means attacking the *reasoning* of the district court and even if they lost on the same argument below") (citations omitted); *see also United States v. Kirsch*, 903 F.3d 213, 228 n.18 (2d Cir. 2018) (government's failure to cross-appeal district court's judgment of acquittal on other related counts "d[id] not foreclose it from disputing the correctness of the district court's conclusion as to the Earth Tech and OSC incidents in arguing on appeal that [the defendant's] conviction under Count 2 should be affirmed").

Freeman's response—"the machine is still there" but "I can't tell you that you can use it"—as tacit acceptance of the transaction. JA:981. To boot, Freeman actively monitored his kiosks, alerted co-conspirators about large cash deposits into the kiosks, and directed them to empty the cash and deposit it into a bank account that he selected. *See* JA:1753 (Freeman: "35,000 into Murphy's in the last hour, major whale on site?"); JA:1752 ("whale's back at Murphy's been pumping bills in since 3:30. ... 40 percent full."); JA:1106 ("[A] couple whales at the CVM today. Box is 60 percent full."); JA:1094 ("We had a whale come in. Murphy's is at 72 percent full."); *see also* JA:1041 (agreement stating that "contractors shall at the earliest opportunity deliver the cash [from kiosk] to the bank account specified by the church administrator").

Considering the agent's transaction history, motive, and stated desire to use the kiosk alongside Freeman's cryptic response and his past practice of monitoring large kiosk deposits, the jury supportably found Freeman's knowledge of the agent's $19,900 deposit on August 25.

In entering a judgment of acquittal, the district court stressed the absence of any conversation or record documenting the agent's kiosk transaction. JA:2301. But the jury could reasonably excuse that evidentiary gap as insignificant given Freeman's decision to remove all identification features from his kiosks, JA:1018, to ensure that each transaction was "basically anonymous,"

56

JA:1497. Because the jury's verdict on this count satisfies deferential sufficiency review, it should have remained intact and, thus, cannot support Freeman's spillover claim.

## IV.  Freeman's sentence is substantively reasonable.

Freeman challenges his sentence as substantively unreasonable.  That effort fails.

### A.  Background.

The district court calculated a Sentencing Guidelines range of 210-262 months.  The government requested a sentence within that range.  JA:2570. Freeman urged a 38-month term—an 82% downward variance.  JA:2573-2579.

The district court confirmed that it had weighed the 18 U.S.C. § 3553(a) factors and Freeman's arguments for leniency, including his lack of criminal history or violence and his community support.  JA:2625-2626.  The court further noted that the bulk of fraud proceeds went to the individuals who had initiated the scams, but that Freeman also profited substantially.  JA:2626-2627. Finally, the court stressed that it had "spent a lot of time with the guidelines and … analyz[ed] [Freeman's] conduct … in light of the policy articulations." JA:2628.  Based on these considerations, the court granted a 54% variance and imposed a 96-month term.  JA:2630.

**B.   Standard of Review.**

This Court reviews the substantive reasonableness of a sentence for abuse

of discretion.  *United States v. Bruno-Campos*, 978 F.3d 801, 808 (1st Cir. 2020).

**C.   The district court's below-Guidelines sentence reflects an appropriate exercise of its 18 U.S.C. § 3553(a) discretion.**

"There is no one reasonable sentence in any given case but, rather, a

universe of reasonable sentencing outcomes."  *United States v. Rivera-Morales*, 961

F.3d 1, 20 (1st Cir. 2020) (internal quotations omitted).  This Court "simply …

determine[s] whether the sentence falls within this broad universe."  *Id*. at 21.

That is so, this Court has explained, because the sentencing court possesses

various institutional advantages, including "a superior coign of vantage, greater

familiarity with the individual case, the opportunity to see and hear the

principals and the testimony at first hand, and the cumulative experience

garnered through the sheer number of district court sentencing proceedings that

take place day by day."  *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008).

A defendant "faces a steep uphill climb to show that the length of the sentence

is unreasonable," *United States v. deJesús*, 6 F.4th 141, 150 (1st Cir. 2021),

particularly where the district court's sentence is below the Guidelines range.

*See United States v. Millán-Machuca*, 991 F.3d 7, 32 (1st Cir. 2021) ("We rarely

find a below-guidelines sentence to be substantively unreasonable.").

The district court's sentence easily passes muster under this standard. The court weighed Freeman's many mitigation arguments. JA:2625-2626. The court then catalogued its justifications for a variance below the Guidelines range, but also stressed Freeman's substantial profit from his conduct. JA:2626-2628. Finally, the court summarized its balancing of the 18 U.S.C. § 3553(a) factors. JA:2628-2630. All told, the court "weighed all of the relevant sentencing factors, and wove those factors into a plausible sentencing rationale." *United States v. Coombs*, 857 F.3d 439, 452 (1st Cir. 2017). That is all the law requires.

In contending otherwise, Freeman cites (Br.64) his minimal criminal history, non-violent past, and contributions to his community. But the district court considered those factors when fixing its sentence. Although Freeman believes he should have received a larger variance, his "disagreement with the district court's weighing of the different sentencing factors does not … constitute error." *United States v. Morales-Negron*, 974 F.3d 63, 66 (1st Cir. 2020) (internal quotation marks and citation omitted); *see also United States v. Butler-Acevedo*, 656 F.3d 97, 101 (1st Cir. 2011) ("That the district court handed down a harsher sentence than [defendant] desired does not reveal an inattentiveness to his [Section 3553(a) factors], but rather that it weighed them differently.").

Freeman further contends (Br.65-66) that his sentence is inconsistent with the punishments imposed in similar cases and highlights six defendants in other

districts. But Freeman's sentencing memorandum below did not advance a disparity argument, much less provide the district court with these six citations. JA:2305-2308. This Court accordingly reviews his claim for plain error. *See United States v. Galindo-Serrano*, 925 F.3d 40, 52 (1st Cir. 2019). To establish plain error, Freeman must show (1) error, (2) that was clear or obvious, (3) that affected substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *See Puckett v. United States*, 556 U.S. 129, 135 (2009).

Freeman has not met that tall burden. This Court "routinely reject[s] disparity claims … because complaining defendants typically fail to … compare apples to apples." *United States v. Reyes-Santiago*, 804 F.3d 453, 467 (1st Cir. 2015). For instance, a sentencing judge may recognize "the permissible distinction between []defendants who go to trial and those who plead guilty." *Ibid*. Because five of Freeman's six citations involve defendants who pleaded guilty, those cases do not provide appropriate comparators.

Freeman's cursory descriptions also fail to acknowledge "material differences between [the cited defendants'] circumstances" and his offense conduct. *Reyes-Santiago*, 804 F.3d at 467. For instance, the Probation Office in *United States v. Lebedev* calculated a Guidelines range of 63-78 months and recommended a 12-month-and-a-day sentence. *See* Gov't Sent. Mem. 8, docket

591, No. 1:15-cr-769 (S.D.N.Y). The district court here, by contrast, calculated Freeman's range at 210-262 months and adopted the Probation Office's recommended 96-month term. JA:2570, 2631. This included an enhancement for Freeman's role as a manager or leader. JA:2628-2629. These divergent circumstances foreclose any apples-to-apples disparity claim.

Finally, the district court expressly fashioned Freeman's sentence with the goal of avoiding unwarranted sentencing disparities with defendants convicted of similar conduct. JA:2628. Thus, on this record, Freeman has not shown a clear or obvious error in the court's balancing of this factor, much less one that affected his substantial rights.

# CONCLUSION

The Court should affirm.

Respectfully submitted,

JANE E. YOUNG
United States Attorney
District of New Hampshire

GEORGIANA L. MACDONALD
JOHN J. KENNEDY
Assistant United States Attorneys

NICOLE M. ARGENTIERI
Principal Deputy Assistant
 Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

/s/David M. Lieberman
DAVID M. LIEBERMAN
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 262-6805
david.lieberman@usdoj.gov

## CERTIFICATE OF COMPLAINCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,946 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared on a proportionally spaced typeface using Microsoft Word Office 365 in 14-point Calisto MT font.

/s/David M. Lieberman


## CERTIFICATE OF SERVICE

I certify that on September 27, 2024, I electronically served a copy of this brief on counsel for appellant via the Court's ECF system.

Richard Guerriero
Lothstein Guerriero, PLLC
39 Central Square, Suite 202
Keene, NH 03431

/s/David M. Lieberman