UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

NO. 23-1839
_____

**UNITED STATES,
APPELLEE**

**v.**

**IAN FREEMAN, f/k/a Ian Bernard,
DEFENDANT - APPELLANT**
_____

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE
_____

**REPLY BRIEF OF IAN FREEMAN**
_____

Richard Guerriero
1st Circuit Bar ID 1164673
Oliver Bloom
1st Circuit Bar ID 1211240
Lothstein Guerriero, PLLC
39 Central Square, Suite 202
Keene, NH 03431
(603) 352-5000
richard@nhdefender.com
oliver@nhdefender.com

Mark L. Sisti
1st Circuit Bar ID 37832
Sisti Law Offices
387 Dover Road
Chichester, NH 03258
(603) 224-4220
info@sistilawoffices.com

TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................3

REPLY REGARDING THE GOVERNMENT'S STATEMENT OF FACTS ........6

REPLY REGARDING ISSUE NO. 1: THE TRIAL COURT ERRED IN NOT GRANTING THE MOTION TO DISMISS COUNTS 1 AND 2 ..........................13

*The Government Contradicts Itself by Insisting that 31 U.S.C. § 5330 Requires Registration Without Regard to Any Regulation, But Also Claiming that Freeman's Crime Was Failing to Comply with Regulations Unilaterally Adopted by FinCEN.* ...................................................................................................13

*The Government Understates the Role of Exchanges, the Importance of Virtual Currency, and the Overall Impact of Virtual Currency on the National and World Economies* ...............................................................................................14

*The Government's Bostock Argument is Wrong* ....................................................17

*The Government's References to Major Questions Cases Omits How the Doctrine Has Shaped the Landscape* ..................................................................19

*The Government Wrongly Claims that State Interests Were Not Impacted by FinCEN's Adoption of Regulations Without Congressional Authority.* ..............22

*The Government Incorrectly Faults Freeman's Citations of Authority While Making Errors Itself* ...........................................................................................24

CONCLUSION .................................................................................................35

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a) ..........................36

CERTIFICATE OF SERVICE ............................................................................36

TABLE OF AUTHORITIES

Cases

*Alabama Ass'n of Realtors*, 594 U.S. 758 (2021).....................................................22

*Am. Council of Life Insurers v. United States DOL*, Civil Action No. 4:24-cv-00482-O, 2024 U.S. Dist. LEXIS 133158 (N.D. Tex. July 26, 2024) ................20

*Arizona v. Garland*, 2024 U.S. Dist. LEXIS 69561 (W.D. La. Apr. 16, 2024) ......21

*Bond v. United States*, 572 U.S. 844 (2014) ...................................................... 23, 24

*Bostock v. Clayton County*, 590 U.S. 644 (2020) ............................................. 17, 18

*CFTC v. McDonnell*, 287 F. Supp. 3d 213 (E.D.N.Y. 2018) ..................................22

*Chamber of Commerce of United States v. Consumer Fin. Prot. Bureau*, 691 F. Supp. 3d 730 (E.D. Tex. 2023)................................................................20

*Fed'n of Ams. for Consumer Choice, Inc. v. United States DOL*, No. 6:24-cv-163-JDK, 2024 U.S. Dist. LEXIS 131589 (E.D. Tex. July 25, 2024) ........................20

*Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230  (2009) ............................................29

*In re Rudler*, 576 F.3d 37 (1st Cir. 2009) ..............................................................28

*Kansas v. United States Dep't of Educ.*, No. 24-4041-JWB, 2024 U.S. Dist. LEXIS 116479 (D. Kan. July 2, 2024) ..................................................... 18, 20

*Kleiman v. Wright*, No. 18-CV-80176, 2018 U.S. Dist. LEXIS 216417 (S.D. Fla. Dec. 27, 2018) ...............................................................................16

*Kovac v. Wray*, 660 F. Supp. 3d 555  (N.D. Tex. 2023)..........................................21

*Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024) ...................................24

*Lorillard v. Pons*, 434 U.S. 575  (1978) ................................................................29

*Louisiana v. EEOC United States Conf. of Cath. Bishops*, 705 F. Supp. 3d 643 (W.D. La. 2024)................................................................................................19

*Louisiana v. United States Dep't of Educ.,* No. 3:24-CV-00563, 2024 U.S. Dist.

LEXIS 105645 (W.D. La. June 13, 2024) ........................................... 21

*Louisiana v. United States EPA*, No. 2:23-CV-00692, 2024 U.S. Dist. LEXIS 12124 (W.D. La. Jan. 23, 2024) .......................................................... 21

*N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291 (4th Cir. 2023) ....................................................................................................... 19

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ..... 29

*SEC v. Trendon T. Shavers & Bitcoin Sav. & Trust*, 2014 U.S. Dist. LEXIS 194382 ................................................................................................ 16

*Stone v. INS*, 514 U.S. 386 (1995) ............................................................. 29

*Tex. Bankers Ass'n v. Office of the Comptroller*, No. 2:24-CV-025-Z-BR, 2024 U.S. Dist. LEXIS 57568 (N.D. Tex. Mar. 29, 2024) ......................... 20

*Texas v. Biden*, 694 F. Supp. 3d 851 (S.D. Tex. 2023) ........................... 20

*Texas v. Cardona*, Civil Action No. 4:23-cv-00604-O, 2024 U.S. Dist. LEXIS 103452 (N.D. Tex. June 11, 2024) ..................................................... 21

*Texas v. NRC*, 78 F.4th 827 (5th Cir. 2023) ............................................. 19

*United States v. e-Gold* No. 05-CR-2497 (D.D.C. 2007) ......................... 31

*United States v. e-Gold*, 550 F. Supp. 2d 82 (D.D.C. 2008) ................... 30

*United States v. e-Gold, Ltd.*, No. 07-cr-109-ABJ-ZMF, 2022 U.S. Dist. LEXIS 32971 (D.D.C. Feb. 16, 2022) ........................................................... 22

*United States v. Faiella*, 39 F. Supp. 34 544 (S.D.N.Y. 2014) ............... 28

*United States v. Harmon*, No. 19-cr-395 (BAH), 2021 U.S. Dist. LEXIS 73504 (D.D.C. Apr. 16, 2021) ......................................................................... 30

*United States v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016) ............ 24

*United States v. Singh*, 995 F.3d 1069 (9th Cir. 2021) ............................ 26

*West Virginia v. EPA*, 597 U.S. 697 (2022) ................................... 24, 28

*Zietzke v. United States*, 426 F. Supp. 3d 758 (W.D. Wash. 2019) ......... 17

4

Statutes

18 U.S.C. § 1960 ............................................................................. passim

31 U.S.C. § 5330 ............................................................................. passim

H.R. 107-250 ................................................................................ 25, 26

NH RSA 399-G:3, VI-a ........................................................................23

Other Authorities

Andrew P. Scott, U.S. Cong. Rsch. Serv., R46486, *Telegraphs, Steamships, and Virtual Currency: An Analysis of Money Transmitter Regulation* (2020)...........22

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* (2012)................................................................................................24

Dan Awrey, *Bad Money*, 106 Cornell L. Rev. 1, 45-56 (2020) .............................22

FIN-2019-G001, Application of FinCEN's Regulations to Certain Business Models Involving Virtual Currencies (Mar. 9, 2019) ......................................................32

Financial Crimes Enforcement Conference, FinCen (Jan. 13, 2022) ......................32

Gideon Lewis-Kraus, Has Bitcoin's Elusive Creator Finally Been Unmasked? New Yorker, Oct. 8, 2024 ................................................................. 14, 15, 16

*Terrorism and Digit. Fin.: How Tech. is Changing the Threat Before H. Subcomm. on Intelligence and Counterterrorism*, 117 Cong. 25 (2001) (statement of John Eisert, Assistant Director, Department of Homeland Security). ................... 16, 17

*The Present and Future Impact of Virtual Currency: Joint Hearing before the Subcomm. on Nat'l Sec. and Int'l Trade and Fin. and the Subcomm. on Banking, Hous., and Urb. Aff.*, 113th Cong. 210 (2013)......................................................34

U.S. Department of Justice: Office of Public Affairs, *Binance and CEO Plead Guilty to Federal Charges in $4B Resolution*, Nov. 21, 2023 ............................15

Proposed Legislation and Legislative History

Pub. L. No. 116-283, 134 Stat. 3388 (2021)............................................................27

S. Rep. No. 101-460........................................................................ 24, 25

REPLY REGARDING THE GOVERNMENT'S STATEMENT OF FACTS

The government's brief presents a description of nine alleged victims and their bitcoin transactions. Gov. Br. 10-15, 19.[1] The government's description of the victims does not bear on the legal issue of whether Freeman was required to register with FinCEN, but it is relevant to the court's overall view of the case and to sentencing, so Freeman responds here.

The government mischaracterizes the alleged victims and their transactions. The alleged victims are presented as motivated by romance or altruism, rather than also by financial gain. The government wrongly implies the alleged victims did not know the risks of their transactions and were not warned. In addition, the government imputes culpability to Freeman when it is not born out by the facts. The government repeatedly describes alleged victims as not receiving bitcoin from Freeman, wrongly implying that Freeman accepted payment but never provided the bitcoin purchased. Moreover, the government incorrectly implies coordination between Freeman and the actual scammers. An examination of the record shows the inaccuracy of the government's descriptions.

---

[1] References to the record are as follows:
"Br. #" refers to the page number of Freeman's opening brief;
"Gov. Br. #" refers to the page number of the government's brief;
"Add. #" refers to the page number of the Addendum to Freeman's opening brief;
"App. #" refers to the page number of the Joint Appendix;
"DE #:#" refers to the docket entry in the district court record and the page number of the document.

James Rossell was motivated by his own financial interests, so much so that he continued to deal with the person scamming him despite warnings from his bank. Mr. Rossell thought his supposed romantic interest, Mary Romeo, was due to receive a large Malaysian inheritance. App. 1143. He lied on paperwork to claim the two were engaged and planning to marry. App. 1144-45. His purpose was to help Mary Romeo receive the large inheritance. App. 1142-45. Mr. Rossell repeatedly wrote, at his scammer's direction, that he intended to buy bitcoin from Freeman and knew the transactions were non-refundable. App. 1148-51. Even after Mr. Rossell's bank flagged one of his transfers because "they didn't think it was legitimate," he continued. App. 1151.

Patrick Brown may well have been a "money mule."[2] He was receiving suspicious deposits into his bank accounts prior to transacting with Freeman. DE:373:24. Freeman had "an extensive conversation" with Patrick Brown, who lied to Freeman and said there was no third party involved in his transactions, that he was not being coerced, and that he was buying bitcoin for investment purposes.

---

[2] The government understates what money mules do (Gov. Br. 13, n. 3). As the FBI explains, "Acting as a money mule is illegal and punishable, even if you aren't aware you're committing a crime. If you are a money mule, you could be prosecuted and incarcerated as part of a criminal money laundering conspiracy. Some of the federal charges you could face include mail fraud, wire fraud, bank fraud, money laundering, and aggravated identity theft." https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/money-mules

App. 1932-33, 1935. And when law enforcement got involved in Patrick Brown's case, Mr. Freeman "provided every bit of evidence that [he] could possibly provide" to assist with the investigation. App. 1935.

The government correctly acknowledges that Harold Jones's scammer, Natasha, "asked Jones for money to hire a lawyer and to pay taxes on an inheritance." Gov. Br. 12. The government fails to note that Jones expected a reward for his assistance. He was to receive a five percent cut of Natasha's $100 million inheritance. App. 1203. He was not motivated by love or altruism. He considered the transaction to be a "business dealing or investment." App. 1203; DE:373:16. The government writes that "Jones never received the bitcoin that he had purportedly purchased," Gov. Br. 13, but as he testified, his purchases were on behalf of a third party, Raymond Miller, the fictitious lawyer for Natasha. App. 1208-14. Lastly, Mr. Jones's banks told him he was being defrauded, but he continued to send money. App. 1205-06. He had sent large sums of money to other people both prior to and after interacting with Freeman. DE:373:15.

Karla Cino was someone for whom the government never sought restitution. DE:365:Ex. 1. That's likely because, as the government's own timeline of events indicates, she was years into a relationship with her scammer before interacting with Freeman, and the only money she sent to Freeman was money that her scammer had deposited in her account. Gov. Br. 13; App. 1298-1305. At all times

when she was interacting with Freeman, she was a "money mule," lying to her banks and lying to Freeman. App. 1307-18, 1327-28. Ms. Cino's banks, realizing that she was a "money mule," closed her accounts, yet she persisted in sending Freeman money. App. 1305-06.

Danella Varel was a "certified financial planner" who nonetheless thought it wise to send three-quarters of a million dollars to repair an oil rig on behalf of a man she had never met and writing, by hand, "I certify that I am buying bitcoins…on behalf of Rebecca Viar." App. 1468, 1475-80. This occurred after her scammer had stood her up when she flew to meet him and after he disclaimed knowledge of the roses sent to her. App. 1471-72. She never asked questions about why the transactions were "on behalf of Rebecca Viar." App. 1489. She even spoke to Freeman, who asked her a series of questions and confirmed that she wanted to send the money. App. 1481-82, 2064.

Rebecca Ault had already been sending money to her scammer, through other people, prior to interacting with Freeman, and the majority was not sent through Freeman. App. 1583-84, 1595. She too repeatedly wrote out, by hand, that she understood she was buying bitcoin and that the transactions were non-refundable. App. 1586-90. She even spoke with Freeman, who asked if she had authorized the transfer, and she said yes. App. 1591, 1600. In addition, her bank

questioned her about the transfers, and she told the banks she authorized them. App. 1599.

Likewise, the government never sought restitution for Nancy Triestram because "it could not tie her losses to the funds she sent to Freeman." DE:365:Ex. 1:7. The only bitcoin she attempted to purchase from Freeman was when she was acting as a "money mule" for her scammer. Gov. Br. 15; App. 1645-46, 1661. She too wrote out by hand that she certified she wanted to buy bitcoins from Freeman and knew the transactions were non-refundable. App. 1646-47. Freeman even requested she make corrections when there were problems with her identification photographs. App. 1648. Ms. Triestram testified that Freeman called her to confirm that she wanted to buy bitcoin on behalf of a third party, she said "yes," and he was the only person who wanted to confirm what she was doing. App. 1665.

Beyond those seven alleged victims, the government also described a transaction involving "Jessica Alewine and Bruce Blamire" [sic]. Gov. Br. 19. But as the government acknowledged in its filings regarding restitution, "Freeman may not have had direct knowledge of [their] victimization." DE:365:Ex. 1:23. *See also* DE:365:3 (describing individuals "for whom the government cannot prove Freeman's knowledge of the scam"). More importantly, and as Freeman has already detailed in his filing, Mr. Blemire pleaded guilty to false swearing, sexually abused his step-daughter, was a "money mule," and was someone who

10

FinCEN had already concluded did not lose any money, specifically the $16,100 deposit the government highlights. DE:373:33-34; Gov. Br. 19.

As to all of the foregoing, the government fails to put these bitcoin purchasers into the proper context of Freeman's overall activities. The government attempts to make hay of its interviews with 30-40 individuals who claim that another person had directed them to send money to Freeman, Gov. Br. 15, but the government fails to present that number in the context of Freeman's overall volume of trades, approximately 6,000 on LocalBitcoins alone. App. 1942. Freeman received "very few" complaints, estimated to be "less than a percentage of a percent" of his overall transactions. App. 1943-44. His LocalBitcoins feedback was "100 percent positive" with "five negatives and 14 neutrals" and "almost 1,400 positives." App. 2061.

Similarly, the government wrongly implies that Freeman was coordinating his activities with scammers, stating "Freeman transferred bitcoin to the individual who had scammed the victim," "Freeman…sent the bitcoin to the scammers," and "Freeman, who converted [money] to bitcoin and sent it to the scammers." Gov. Br. 3, 9-10. These descriptions are not accurate. Freeman transferred bitcoin to the wallet address provided by the purchaser - the government's alleged victim. Freeman had no idea who controlled the wallet; as the government acknowledges in its brief, "the wallet carries only a generic identifier" and the "blockchain does

11

not contain the wallet user's name, address, social security number, or other

identification information." Gov. Br. 4.

REPLY REGARDING ISSUE NO. 1: THE TRIAL COURT ERRED IN NOT GRANTING THE MOTION TO DISMISS COUNTS 1 AND 2.

*The Government Contradicts Itself by Insisting that 31 U.S.C. § 5330 Requires Registration Without Regard to Any Regulation, But Also Claiming that Freeman's Crime Was Failing to Comply with Regulations Unilaterally Adopted by FinCEN.*

The government claims any duty to register existed independent of FinCEN's regulations. Gov. Br. 30-31. The government is wrong.

The government's brief cites trial testimony by Theodore Vlahakis, a senior compliance officer at FinCEN. *See, e.g.*, Gov. Br. 8, 24. Yet, Vlahakis testified that the crime was for failing to comply with FinCEN's regulations. He said that FinCEN requires those who sell bitcoin to register as money transmitters "[b]ecause FinCEN has guidance that explicitly states" that. App. 544. *See also* App. 547, 549, 568-69. He described the 2013 guidance that "laid out the compliance obligations for users of virtual currency, exchanges of virtual currency, and administrators of virtual currency." App. 546. He explicitly linked the letter that FinCEN had sent to one of Freeman's businesses to that very guidance. App. 568-74. Vlahakis testified that registration requires FinCEN Form 107. App. 549-50. And that form has multiple references to the implementing regulations.[3] And that form was how FinCEN determined if Freeman had registered. App. 575. Similarly, Vlahakis testified about FinCEN's e-filing system, App. 570, which,

---

[3] https://www.irs.gov/pub/irs-tege/fin107_msbreg.pdf

expressly states that compliance with FinCEN's regulations is necessary to comply with the statute: "[r]egulations implementing Title II of the [Bank Secrecy Act] appear at 31 CFR chapter X," and that "information collected on the reports is required to be provided pursuant to Title 31 U.S.C., *as implemented by FinCEN regulations found throughout 31 CFR chapter X*." (emphasis added).[4] The government is simply wrong to conclude that anyone could register as a money-transmitter by any means other than the regulations unilaterally adopted by FinCEN without authorization from Congress.

*The Government Understates the Role of Exchanges, the Importance of Virtual Currency, and the Overall Impact of Virtual Currency on the National and World Economies.*

In denying the applicability of the major questions doctrine, the government downplays both the scale of virtual currency and the significance of the Department of Treasury's unilateral assertion of regulatory authority. Gov. Br. 41-42.

First, virtual currencies are a significant sector of the economy. As one recent news story explained, bitcoin is "the world's tenth most valuable asset" and its "market capitalization, about $1.2 trillion, ranks between those of Meta and Berkshire Hathaway." Gideon Lewis-Kraus, Has Bitcoin's Elusive Creator Finally

---

[4] https://www.gpo.gov/fdsys/pkg/FR-2012-02-29/pdf/2012-4756.pdf

Been Unmasked? New Yorker, Oct. 8, 2024.[5] Specifically regarding cryptocurrency exchanges, in the Binance case, the government touted a virtual currency exchange's guilty plea to money laundering and unlicensed money transmitting charges, pointing out how "U.S. consumers…conducted trillions of dollars in transactions on the platform, generating over $1.6 billion in profit" for the exchange. U.S. Department of Justice: Office of Public Affairs, *Binance and CEO Plead Guilty to Federal Charges in $4B Resolution*, Nov. 21, 2023.[6]

Likewise, the government highlights the district court's assertion that "the agency sought…to register only the 'fraction of market participants who are in the business of transmitting virtual currencies and not already registered.'" Gov. Br. 39 (quoting App. 2291). This is incorrect for two reasons. First, the fact that some companies have already complied with FinCEN's unilateral power grab does not undercut Freeman's argument that FinCEN lacked congressional authorization for that move or that there were significant compliance costs associated with registration. The government itself noted how the registration requirements applied to both small businesses and bitcoin exchanges. Gov. Br. 39.

---

[5] https://www.newyorker.com/tech/annals-of-technology/has-bitcoins-elusive-creator-finally-been-unmasked
[6] https://www.justice.gov/opa/pr/binance-and-ceo-plead-guilty-federal-charges-4b-resolution

Second, the government understates the role exchanges play in the circulation and adoption of virtual currency. According to one federal court, there "are two methods of acquiring bitcoins. The first is simply receiving bitcoins from someone. The second way one can acquire a bitcoin is by 'mining' them." *Kleiman v. Wright*, No. 18-CV-80176, 2018 U.S. Dist. LEXIS 216417, at *3-4 (S.D. Fla. Dec. 27, 2018). *See also SEC v. Trendon T. Shavers & Bitcoin Sav. & Trust*, 2014 U.S. Dist. LEXIS 194382, *16 n.4 (describing three ways to obtain bitcoin: mining, purchasing, or selling something and accepting payment in bitcoin). Because virtual currencies lack a central authority (like a central bank) for creation and distribution, the only way to obtain virtual currencies besides "mining," is to purchase or trade with someone who already has them, whether through an exchange, a kiosk, or directly via trade. *See* Gov. Br. 3-4. As one recent news story explained, "access to the cryptocurrency more or less depends on exchanges that have proved exceedingly vulnerable to both fraud and regulation." Lewis-Kraus, *supra*. And the government knows this. One official testified before Congress in 2021 that "[w]henever monetary exchanges are made, a chokepoint is created," before proceeding to discuss FinCEN's 2013 guidance and how the government used that regulatory authority to go after exchanges. *Terrorism and Digit. Fin.: How Tech. is Changing the Threat Before H. Subcomm. on Intelligence and Counterterrorism*, 117 Cong. 25, 14 (2001) (statement of John Eisert, Assistant

Director, Department of Homeland Security).[7] *Cf. Zietzke v. United States*, 426 F. Supp. 3d 758, 762 (W.D. Wash. 2019) ("Although cryptocurrency transactions can occur directly between individuals, those transactions are often handled through digital currency exchanges.").

Freeman made these arguments to the district court, pointing out the importance of virtual currencies in the national and world economies, App. 95-99; Add. 43-44, and that FinCEN, and its officials, had acknowledged the significance of virtual currencies. App. 99-102, 2453-59. The government's arguments in its brief do not refute the Freeman's point.

*The Government's Bostock Argument is Wrong.*

The government's brief suggests the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020) "illustrates" that "Congress's capacious language…plainly covers individuals who sell bitcoin." Gov. Br. 32-33. This is not correct. The *Bostock* court "proceed[ed] on the assumption that 'sex'…refer[ed] only to biological distinctions between male and female," *Bostock*, 590 U.S. at 655, but nonetheless found discrimination in violation of Title VII because for "an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in

---

[7] https://www.congress.gov/117/chrg/CHRG-117hhrg45867/CHRG-117hhrg45867.pdf

part because of sex." *Id.* at 662. The Court relied on a definition of "sex" known and understood at the time Title VII was adopted. *Id.* at 654-56. But here, blockchain-based virtual currencies did not exist at the time the anti-money laundering laws were passed in 1994 or 2001. In other words, Title VII applies to sexual discrimination because sexual differences existed at the time the law was passed; 18 U.S.C. § 1960 and 31 U.S.C. § 5330 do not apply to virtual currency because virtual currency did not exist—it had not been invented—at the time that the law was enacted.

Furthermore, the "major questions doctrine could not have been raised in *Bostock* because that case involved a claim of individual discrimination under Title VII; it was not a challenge to agency action." *Kansas v. United States Dep't of Educ.*, No. 24-4041-JWB, 2024 U.S. Dist. LEXIS 116479, at *39-40 (D. Kan. July 2, 2024).

Third, the Court in *Bostock* instructs courts to "interpret a statute in accord with the ordinary public meaning of its terms *at the time of its enactment*." *Bostock*, 590 U.S. at 654 (italics added). It further warns, if "judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives" and "we would deny the people the right to continue relying on the original meaning of the law they

18

have counted on to settle their rights and obligations." *Id.* at 644-55 (2020). As Freeman has consistently emphasized, whether one looks to when the Bank Secrecy Act was amended in 1992, 1994, or 2001, no one could have possibly imagined or interpreted the word "funds" to include blockchain based virtual currency.

*The Government's References to Major Questions Cases Omits How the Doctrine Has Shaped the Landscape.*

Contrary to the government's assertions that there is some monetary threshold for the major questions doctrine to apply or that the major questions doctrine is applicable only to certain areas, Gov. Br. 40-42, numerous federal courts have invoked the doctrine in a wide variety of areas, including <u>nuclear waste disposal</u>, *Texas v. NRC*, 78 F.4th 827, 844 (5th Cir. 2023) (holding that nuclear waste disposal "is an issue of great economic and political significance" and that the Atomic Energy Act did not confer on the NRC authority to license private parties to store the waste) (quotation omitted); <u>fisheries bycatch</u>, *N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 296-302 (4th Cir. 2023) ("whether returning bycatch qualifies as a 'discharge' of a 'pollutant' under the [Clean Water] Act is a major question"); <u>abortion</u>, *Louisiana v. EEOC United States Conf. of Cath. Bishops*, 705 F. Supp. 3d 643, 659 (W.D. La. 2024) (holding that the "EEOC's use of its regulatory power to insert the issue of abortion into a

19

law designed to ensure healthy pregnancies for America's working mothers squarely implicates the 'major questions doctrine'"); the Labor Department's definition of a fiduciary, *Fed'n of Ams. for Consumer Choice, Inc. v. United States DOL*, No. 6:24-cv-163-JDK, 2024 U.S. Dist. LEXIS 131589, at *39 (E.D. Tex. July 25, 2024) (finding that the Department of Labor's new rule redefining the term "fiduciary" violates the major questions doctrine); *Am. Council of Life Insurers v. United States DOL*, Civil Action No. 4:24-cv-00482-O, 2024 U.S. Dist. LEXIS 133158, at *10 n.6 (N.D. Tex. July 26, 2024) (same); federal banking agencies' regulations, *Tex. Bankers Ass'n v. Office of the Comptroller*, No. 2:24-CV-025-Z-BR, 2024 U.S. Dist. LEXIS 57568, at *22-23 (N.D. Tex. Mar. 29, 2024) (holding that changes to the Community Reinvestment Act implicate the major questions doctrine); the CFPB's efforts to fight discrimination, *Chamber of Commerce of United States v. Consumer Fin. Prot. Bureau*, 691 F. Supp. 3d 730, 740 (E.D. Tex. 2023) ("The choice whether the CFPB has authority to police the financial-services industry for discrimination against any group that the agency deems protected, or for lack of introspection about statistical disparities concerning any such group, is a question of major economic and political significance"); minimum wage rules for federal contractors, *Texas v. Biden*, 694 F. Supp. 3d 851, 866-69 (S.D. Tex. 2023); sex and gender identity, *Kansas v. United States Dep't of Educ. Supra* (holding that the Department of Education's Final Rule regarding the

definition of sex discrimination violates the major questions doctrine); *Louisiana v. United States Dep't of Educ.,* No. 3:24-CV-00563, 2024 U.S. Dist. LEXIS 105645, at *34-39 (W.D. La. June 13, 2024) (same); *Texas v. Cardona*, Civil Action No. 4:23-cv-00604-O, 2024 U.S. Dist. LEXIS 103452, at *104-18 (N.D. Tex. June 11, 2024) (same); asylum policies, *Arizona v. Garland*, 2024 U.S. Dist. LEXIS 69561, at *23-25 (W.D. La. Apr. 16, 2024) (holding that changes to immigration asylum law implicates the major questions doctrine); the EPA's disparate impact mandates, *Louisiana v. United States EPA*, No. 2:23-CV-00692, 2024 U.S. Dist. LEXIS 12124, at *80-84 (W.D. La. Jan. 23, 2024); and the TSA terrorist watchlist, *Kovac v. Wray*, 660 F. Supp. 3d 555, 565 (N.D. Tex. 2023) ("the Court concludes that the watchlist has vast political significance under the Supreme Court's current formulation of the major-questions doctrine").

Whether or not these cases are ultimately decided on major questions grounds, the point remains that there is no monetary threshold or requirement that the regulatory overreach affect tens of millions of Americans before the major questions doctrine applies. Gov. Br. 41. But if the cases described above involved questions of "vast economic and political significance," so did FinCEN's unilateral attempt to regulate virtual currencies.

21

*The Government Wrongly Claims that State Interests Were Not Impacted by FinCEN's Adoption of Regulations Without Congressional Authority.*

The government claims there is no showing that regulation of virtual currency "intrudes into an area that is the particular domain of state law." Gov. Br. 42 (citation omitted). But as the government must recognize, money transmission primarily concerns state law, and thus, FinCEN's unilateral expansion of its authority to capture virtual currencies "intrudes into an area that is the particular domain of state law." *Alabama Ass'n of Realtors*, 594 U.S. 758, 764 (2021). As the Congressional Research Service explains, "[m]oney transmitters are regulated and licensed at the state level" and "[a]lthough specific federal laws and regulations apply to money transmitters…49 unique state regulatory frameworks determine the general oversight and regulation of money transmitters." Andrew P. Scott, U.S. Cong. Rsch. Serv., R46486, *Telegraphs, Steamships, and Virtual Currency: An Analysis of Money Transmitter Regulation* (2020). *See also United States v. E-Gold, Ltd.*, No. 07-cr-109-ABJ-ZMF, 2022 U.S. Dist. LEXIS 32971, at *16-17 (D.D.C. Feb. 16, 2022) (citing same); *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 259 (E.D.N.Y. 2018) (quoting a *Wall Street Journal* article that "money-transmission services that operate in the U.S. are primarily state-regulated"). *See generally* Dan Awrey, *Bad Money*, 106 Cornell L. Rev. 1, 45-56 (2020) (surveying state regulations and noting "the bulk of the prudential regulation to which MSBs are subject is written, monitored, and enforced at the state level").

22

In his motion to dismiss, Freeman brought the difference between state and federal policy regarding registration of virtual currency sellers to the district court's attention. "In this case, New Hampshire has explicitly exempted sellers of virtual currency from money transmission licensing requirements." App. 101. *See also* Add. 93; NH RSA 399-G:3, VI-a. In addition, as explained during the trial, Freeman had been advised by a New Hampshire attorney that he was not required to register his business. App. 1634-38. Thus, since this is an area of state regulation and since New Hampshire chose not to regulate this specific activity, allowing FinCEN to regulate sellers of virtual currency without authority from Congress creates a conflict between state and federal policy even though Congress never weighed in on the issue.

As the Supreme Court explained in *Bond v. United States*, 572 U.S. 844 (2014), "[b]ecause our constitutional structure leaves local criminal activity primarily to the States, we have generally declined to read federal law as intruding on that responsibility, unless Congress has clearly indicated that the law should have such reach." *Id.* at 848. It added that "it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Id.* at 858 (quotations and citation omitted). When "ambiguity derives from the improbably broad reach of the key statutory definition" and there are "deeply serious consequences of

adopting such a boundless reading," the Court "insist[s] on a clear indication that Congress meant to reach" that far and intrude on the delicate federal balance. *Id.* at 859-60. *See also West Virginia v. EPA*, 597 U.S. 697, 744 (2022) (Gorsuch, J., concurring) ("To preserve the 'proper balance between the States and the Federal Government' and enforce limits on Congress's Commerce Clause power, courts must 'be certain of Congress's intent' before finding that it 'legislate[d] in areas traditionally regulated by the States'") (citation omitted); *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2286 n.5 (2024) (citing *Bond* for the proposition that the "federalism canon tells courts to presume federal statutes do not preempt state laws because of the sovereignty States enjoy under the Constitution"); Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 250 (2012) (the "Presumption Against Federal Preemption" says that a "federal statute is presumed to supplement rather than displace state law").

*The Government Incorrectly Faults Freeman's Citations of Authority While Making Errors Itself.*

The government faults Freeman for "misread[ing] his cited sources." Gov. Br. 35, but it is the government that has its history and sources wrong. So, for instance, the government cites to *United States v. Murgio*, 209 F. Supp. 3d 698, 708 (S.D.N.Y. 2016) and S. Rep. No. 101-460 for the claim that "Congress criminalized the operation of unlicensed money-transmitting businesses in Section

1960 to address the fact that money launderers with illicit profits had found new avenues of entry into the financial system." Gov. Br. 28 (quotation and citation omitted). But S. Rep. No. 101-460 concerned a bill that *never became law*. Congress did not pass anti-money laundering legislation until 1992. *See* App. 118. Moreover, the quoted language was not what the Senate Report found, but rather summarizing testimony by Peter Nunez, an Assistant Secretary of the Treasury for Enforcement. *See* S. Rep. No. 101-460 ("Peter Nunez, the Assistant Secretary of the Treasury for Enforcement, testified before the Committee in May that "[i]t is undisputed that as Bank Secrecy Act compliance by banks has improved, drug money launderers have and will continue to turn to [nonbank financial institutions] to convert street currency into monetary instruments and even to transmit abroad the proceeds of drug sales."). The reference to a "gaping hole in the money laundering deterrence efforts" also comes from Nunez's testimony and in that instance, his testimony was about the problems that had arisen as a result of state versus federal regulation of money transmitting businesses. *See id.* ("Since the Federal government has left regulation of these businesses to the States and the States have not devoted sufficient resources to the effort, these industries represent a gaping hole in the money laundering deterrence effort.").

Similarly, the government cites to H.R. 107-250 to claim that Congress had the "explicit intent that the statute cover all informal value transfer banking

systems." Gov. Br. 31 (quotation omitted). However, the "explicit" intent of Congress was to "mak[e] explicit that hawala-type[8] systems are covered by certain statutory requirements." H.R. 107-250 (2001) at 44. *See also id.* at 63-64 ("Although the Committee believes that informal value transfer banking systems *like hawalas* are already adequately covered by references to money transmitting businesses in certain provisions of existing law, this section makes that understanding explicit.") (italics added). It strains credulity to imagine that when Congress was addressing, in the wake of 9/11, a money transmission system "like the ancient South Asian money exchange system called hawala," *id.* at 35, that it was also predicting the 21st century rise of blockchain-based virtual currency.

Finally, when the government finally turns to Congress's 2021 decision to authorize regulation of virtual currency, it claims that Congress was merely "ratif[y]ing [a] judicial interpretation" and "no substantive change was intended." Gov. Br. 34. But, as the full text from Pub. L. No. 116-283 shows, much more was

---

[8] "Hawala is a system designed to transfer funds from point to point outside of formal money transmission channels without the physical movement of money. Typically, the system is used to transfer funds from one country to another through hawala brokers. A broker in one country receives money and then communicates with a broker in the country receiving the transfer. The broker in the receiving country then pays out an equivalent amount (deducting for fees) to the recipient in the appropriate currency. Hawala transactions are discreet. They typically involve minimal record-keeping, are not subject to government regulation and are premised on trust." *United States v. Singh*, 995 F.3d 1069, 1073 (9th Cir. 2021).

intended. It was the sense of Congress that "the mission of FinCEN should be to continue to safeguard the financial system from illicit activity, counter money launder and the financing of terrorism, and promote national security…". Pub. L. No. 116-283, 134 Stat. 3388, 4552 (2021). Only two paragraphs later did Congress explain that "although the use and trading of virtual currencies are legal practices, some terrorists and criminals, including transnational criminal organizations, seek to exploit vulnerabilities in the global financial system and increasingly rely on substitutes for currency, including emerging payment methods (such as virtual currencies), to move illicit funds" and therefore that FinCEN should make sure that "steps to address emerging methods of such illicit financing are high priorities." *Id.* FinCEN's mission may have continued to be countering money laundering, but Congress did not direct it to address virtual currency until 2021.

The government admits as much. It says "Congress in 2021 appears to have ratified [a] judicial interpretation," Gov. Br. 34, that "Congress confirmed the agency's authority over bitcoin-selling businesses in 2021," Gov. Br. 40, that the "Department of Treasury…simply confirmed through a 2013 guidance document," Gov. Br. 41, and that the "guidance aligned with the congressional purpose animating the money-laundering and money-transmitting statutes and with Congress's subsequent amendments…". Gov. Br. 41-42. But as Freeman as repeatedly emphasized, this is not how our country makes laws. Courts and

agencies do not write them; Congress does. *See West Virginia v. EPA*, 597 U.S. at 736-740 (Gorsuch, J., concurring).

The government fares no better when it comes to its citations to judicial decisions. So, for instance, it quotes *United States v. Faiella*, 39 F. Supp. 34 544, 546 (S.D.N.Y. 2014) to suggest that virtual currencies were the type of "evolving threat that Congress designed the statute to keep pace with." Gov. Br. 29 (cleaned up, quotation omitted). However, a careful reading of that decision shows that Judge Rakoff wrote that it was "*likely* that Congress designed the statute" to that effect. *Faiella*, 39 F. Supp. 3d at 546 (italics added). Not only did that court cite S. Rep. 101-460, which, as noted above, never became law, but it was also the court guessing at Congressional intent, but as the subsequent legislative history shows, it was not until 2021 that Congress decided to act.

Likewise, two paragraphs later, the government cites to *In re Rudler*, 576 F.3d 37, 44 (1st Cir. 2009) for the proposition that "If the statute's language is plain, the sole function of the courts…is to enforce it according to its terms." Gov. Br. 29. Omitted in that ellipsis is crucial language: "If the statute's language is plain, the sole function of the courts – *at least where the disposition required by the text is not absurd* – is to enforce it according to its terms." *Rudler*, 576 F.3d at 44 (italics added, quotation and citation omitted). But it is Freeman's very point

that it would be absurd to imagine that Congress in 1994 or 2001 could predict the creation and tremendous growth of blockchain-based virtual currencies.

The government's inaccurate quote of *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239 (2009), is especially concerning. In attempting to argue that Congress was clarifying preexisting law rather than expanding the scope of the statute, the government quotes *Forest Grove* for the proposition that "Congress is presumed to [have] be[en] aware of [that] … judicial interpretation of a statute." Gov. Br. 33. But what the Supreme Court actually said in *Forest Grove* was that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation *when it re-enacts a statute without change*." *Forest Grove School Dist.*, 557 U.S. at 239 (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)) (italics added). Leaving out those key words – "when it reacts a statute without change" – makes all the difference. The result is that the government misreads *Forest Grove* and ignores the Supreme Court authority cited by Freeman in his brief, holding that when Congress acts to amend a statute, it is presumed to have intended a "real and substantial" change because Congress does not engage in "meaningless exercises." Br. 48-49 (citing *Stone v. INS*, 514 U.S. 386, 397 (1995); *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 57-58 (2006)).

Congress did not reenact the money-laundering statute without change, as Freeman has repeatedly explained, it added the language "value that substitutes for currency" for a very specific reason: to capture virtual currencies. App. 94-95, 100-101; Br. 28-30, 47-52. The obvious purpose was to bring virtual currency within the scope of the statute for the first time.

Two more citations bear discussion. First, the government cites to *United States v. Harmon*, No. 19-cr-395 (BAH), 2021 U.S. Dist. LEXIS 73504 (D.D.C. Apr. 16, 2021) to support the claim that Section 1960's and Section 5330's texts plainly apply to Freeman's conduct." Gov. Br. 32. But Harmon was prosecuted under 18 U.S.C. 1960(a) for failure to obtain the appropriate money transmitting license from the District of Columbia. *Harmon*, 2021 U.S. Dist. LEXIS 73504 at *1. As that court explained, the "*MTA's* [the District of Columbia's Money Transmitters Act, D.C. Code § 26-1023(c)] *title, text, and announced purpose* make clear that the statute governs "money transmitting" broadly in the District of Columbia and is sufficiently clear for the ordinary purpose." *Id.* at *18 (italics added). In short, it has nothing to do with whether Congress captured virtual currency in its 2001 definition of a money-transmitting business.

Second, the government points to *United States v. e-Gold*, 550 F. Supp. 2d 82, 86 (D.D.C. 2008), as an example of the "government's prosecution of individuals for issuing digital currency following [the 2001] legislation." Gov. Br.

31. That case stands for the proposition that §5330 requires implementing regulations, Br. 32-33, but the case has nothing to do blockchain-based virtual currencies. The opinion was written before the block chain was invented; e-Gold does not use the blockchain and instead relies on a "digital currency exchanger" to convert conventional currency into e-Gold, the latter of which is backed by "actual gold bullion and other precious metals." *e-Gold*, 550 F. Supp. 2d at 85. The only similarity with virtual currency is that both exist on the internet. Moreover, the *e-Gold* indictment explicitly relied on FinCEN's implementing regulations. Indictment at ¶¶ 10-12, 50, 76, *United States v. E-Gold* No. 05-CR-2497 (D.D.C. 2007).[9]

Finally, the government challenges Freeman's references to various government officials. Gov. Br. 35-37. Regarding the claim that the passage Freeman cited "discussed a Department of Treasury regulation, not the statutory language," Gov. Br. 35, Freeman has consistently argued that the statutory language cannot be read independent of the implementing regulations. Br. 32-33; Add. 22-23. These FinCEN interpretations matter because it was only as a result of them that "[p]ersons accepting and transmitting [convertible virtual currency] are required (like any money transmitter) to register with FinCEN as an MSB and

---

[9] Available at
https://www.justice.gov/archive/criminal/ceos/pressreleases/downloads/DC%20egold%20indictment.pdf

comply" with various recordkeeping requirements. FIN-2019-G001, Application of

FinCEN's Regulations to Certain Business Models Involving Virtual Currencies, p.

12 (Mar. 9, 2019); App. 544-574 (Vlahakis trial testimony); Br. 35 ("Ian Freeman

is charged with operating an unlicensed money transmitting business, meaning that

he didn't register the business with FinCEN," quoting from the government's

opening argument in this case at App. 305).

Next, the government's claim that the 2021 bar association speech by the

FinCEN director did "not discuss the versions of Section 1960 or 5330" is equally

off base. The bar association speech was at an event entitled the "Financial Crimes

Enforcement Conference" and Mr. Das clearly spoke about the anti-money

laundering regime when he described the "first transformation of the anti-money

laundering/counter-terrorist financing (AML/CFT) regulatory regime *writ large*."

Himamauli Das, Prepared Remarks of FinCEN Acting Director Him

Das, Delivered Virtually at the American Bankers Association/American Bar

Association Financial Crimes Enforcement Conference, FinCen (Jan. 13, 2022)

(italics in original).[10] His remarks are worth quoting:

> Until recently, the overarching legal foundation of our regime was an artifact
> of the moment it was most recently updated – in the wake of 9/11 – and like
> most 21-year-old things, it has not entirely kept up with the times. Just as
> earlier incarnations of the Bank Secrecy Act were laser-focused on
> countering drug-related financial flows, the updates in the USA PATRIOT

---

[10] https://www.fincen.gov/news/speeches/prepared-remarks-fincen-acting-director-
him-das-delivered-virtually-american-bankers

> Act really emphasized disrupting the money flows of groups like al Qaida. It never anticipated the challenges of the 2020s: digital assets, strategic corruption, an explosion of kleptocrats hiding their wealth in American shell companies, or artificial intelligence that could help us recognize these crimes and others.

*Id.* He further acknowledged that "our legal foundation was in many respects built, as the aphorism goes, 'to fight the last war.' Or at least that was the case until 2021, when Congress passed the Anti-Money Laundering Act of 2020." *Id.* This act "touched off a new, post-post-9/11 era for anti-money laundering , giving FinCEN the authority to, quote, 'streamline, modernize, and update the AML/CFT regime of the United States,' and that, indeed, is what we are doing." *Id.* Acting Director Das could not have been clearer about how Congress's new law gave FinCEN authority to tackle new challenges under the Bank Secrecy Act, of which, Sections 1960 and 5330 are a part.

Regarding Director Shasky Calvery's statements to Congress in 2013, she did concede a lack of statutory authority when she explained how virtual currencies "provides a loophole from AML/CFT regulatory safeguards in most countries around the world." And she explained how "to address growing concerns…FinCEN released two regulations which update several definitions and provide the needed flexibility to accommodate innovation in the payment system space, including virtual currencies, under our pre-existing regulatory framework" and then "issued additional guidance to further clarify the compliance obligations

for those virtual currency actors covered by our regulations." *The Present and Future Impact of Virtual Currency: Joint Hearing before the Subcomm. on Nat'l Sec. and Int'l Trade and Fin. and the Subcomm. on Banking, Hous., and Urb. Aff.*, 113th Cong. 210, 5 (2013).[11] Calvery could not have clearer that FinCEN used regulations to capture virtual currencies under the BSA framework, but as Freeman argues, that was a decision that belonged to Congress.

---

[11] https://www.congress.gov/113/chrg/CHRG-113shrg87095/CHRG-113shrg87095.pdf

CONCLUSION

For all of the foregoing reasons, Freeman requests that the court grant the

relief sought in his original brief.

Date: October 18, 2024

/s/ *Richard Guerriero*
Richard Guerriero
1st Circuit Bar ID 1164673
Oliver Bloom
1st Circuit Bar ID 1211240
Lothstein Guerriero, PLLC
39 Central Square, Suite 202
Keene, NH 03431
(603) 352-5000
richard@nhdefender.com
oliver@nhdefender.com

Mark L. Sisti
1st Circuit Bar ID 37832
Sisti Law Offices
387 Dover Road
Chichester, NH 03258
(603) 224-4220
info@sistilawoffices.com

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)

I, Richard Guerriero, hereby certify that the foregoing brief of Appellant

Ian Freeman complies with the type-volume limitation of FRAP 32(a):

1. This reply brief contains 6,401 words, not including the parts of the brief

exempted by FRAP 32(a).

2. This reply brief has been prepared in a proportionally spaced typeface

using Microsoft Word for Office 365 (2024) in 14-point Times New Roman.

/s/ *Richard Guerriero*
Richard Guerriero
1st Circuit Bar ID 1164673
NH Bar ID 10530

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion was forwarded by

electronic mail through the ECF system on October 18, 2024, to Assistant United

States Attorneys David Lieberman, Georgiana MacDonald, and John Kennedy, of

the United States Attorney's Office, 55 Pleasant Street, 4th Floor Concord, NH

03301. A copy of the motion was mailed by U.S. Mail to Appellant, Ian Freeman,

34755-509, at the FMC Devens, 42 Patton Rd, Devens, MA 01434.

Filing on October 18, 2024.

/s/ *Richard Guerriero*
Richard Guerriero
1st Circuit Bar ID 1164673
NH Bar ID 10530