# United States Court of Appeals
## For the First Circuit

---

No. 23-1839

UNITED STATES,

Appellee,

v.

IAN FREEMAN,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

---

Before

Gelpí, Lipez, and Thompson, Circuit Judges.

---

Richard Guerriero, with whom Oliver Bloom, Lothstein Guerriero, PLLC, Mark L. Sisti, and Sisti Law Offices were on brief, for appellant.
David M. Lieberman, Attorney, Appellate Section, Criminal Division, U.S. Department of Justice, with whom Jane E. Young, United States Attorney, Georgina L. MacDonald, Assistant United States Attorney, John J. Kennedy, Assistant United States Attorney, Nicole M. Argentieri, Principal Deputy Assistant Attorney General, Lisa H. Miller, Deputy Assistant Attorney General, were on brief, for appellee.

---

July 29, 2025

---

THOMPSON, **Circuit Judge**. Ian Freeman ("Freeman") is, by his own description, a radio talk show host and church founder promoting peace, liberty, individual freedom, and morality. Freeman began selling bitcoin in 2014 as part of his mission to promote peace. The government, which launched an investigation into his bitcoin sales, took a different view of Freeman's conduct and convinced a jury to convict Freeman on counts of conspiracy to operate an unlicensed money transmitting business, operation of an unlicensed money transmitting business, conspiracy to commit money laundering, money laundering, and tax evasion. Post-verdict, the district court acquitted Freeman on the substantive money laundering count based on the insufficiency of the evidence. On appeal, Freeman argues that the district court should never have allowed the money-transmitting-business charges to reach trial, because something called the "major questions doctrine" — which governs how we read statutes that convey regulatory authority to administrative agencies — requires us to interpret the relevant statutes as not permitting agency regulation of virtual currencies like bitcoin. He also claims that the district court should have acquitted him based on the insufficiency of the evidence on his tax evasion charge and granted him a new trial on the remaining money laundering conspiracy count due to prejudicial evidentiary spillover. Finally, he claims that even if his convictions stand, the district court's imposition of a 96-month sentence is

substantively unreasonable. Having carefully considered all Freeman's arguments, we affirm.

## BACKGROUND

Freeman's trial was an 11-day affair at which more than thirty witnesses testified. This appeal does not require us to recount every in-and-out of the evidence presented at trial, but to better orient the reader, we start with a brief overview of the events leading to Freeman's arrest. From there, we'll dive into the merits of each of Freeman's arguments on appeal, filling in the necessary factual details and announcing our standard of review as we go.[1]

### Freeman's Bitcoin Business

Courts throughout the country have offered thorough descriptions of what bitcoin is and how it works. All that a reader need understand for today's opinion is that bitcoin is a virtual currency, with no physical coinage or government backing.[2]

---

[1] Because Freeman raises a sufficiency of the evidence challenge to his tax evasion count, we'll present the facts relevant to that count in the light most favorable to the jury's verdict once we get there. See United States v. Paz-Alvarez, 799 F.3d 12, 18 (1st Cir. 2015). For the overview of Freeman's bitcoin sales that follows, however, we summarize the trial record in a "balanced" fashion, because the manner in which we relate these background facts does not impact our analysis of Freeman's remaining claims of error. See United States v. Burgos-Montes, 786 F.3d 92, 99 (1st Cir. 2015).

[2] In everyday speech, the phrase virtual currency would seemingly capture any currency that exists on a computer in a non-physical form (for instance, currency used in video games to

Instead bitcoin is stored in a software program referred to as a "wallet."  When bitcoin is moved from one wallet to another, the transfer is accounted for on a public, cryptographic ledger called the blockchain.  Perkins, <u>supra</u>, at 1, 7.  But although the ledger is public and each wallet uniquely identifiable from other wallets, bitcoin offers relative anonymity compared to traditional bank transactions, because there is no information associated with a wallet that can identify who owns the wallet.  (By contrast, a bank customer must provide personal information to a bank to open an account and conduct transactions.)  And unlike electronic payments sent through banks, which can sometimes be cancelled or reversed, there is no way for a sender to claw back bitcoin once it has been sent.[3]

---

buy items in that game).  <u>See</u> David W. Perkins, Cong. Rsch. Serv., R45427, Cryptocurrency: The Economics of Money and Selected Policy Issues 1 n.2 (2020) (distinguishing between cryptocurrencies and other "digital representations of value").  For the purposes of today's opinion, unless we note otherwise, we use the phrase virtual currency to refer to cryptocurrencies like bitcoin, which can act as an alternative to traditional government-issued currency (we'll refer to this as "fiat currency") and which use cryptographic protocols (i.e., methods of sending information through codes) to ensure that transactions are accurately recorded.  <u>Id.</u> at 1 n.2, 3-4, 7-8.

[3] This opinion is not meant to be a comprehensive or authoritative account of bitcoin or cryptocurrencies, or of any advancements made in this arena since this case was appealed.  Our recitation of the history, function, and value of bitcoin is drawn from the parties' presentation to the district court and jury below and in their briefs to us.

To run his bitcoin business, Freeman acquired bitcoin from large virtual currency exchanges for relatively small commissions (0.16% in one example) and then resold it to his customers while charging higher commissions (upwards of 10% in many cases). Freeman conducted sales through three platforms. First, he used bitcoin "kiosks" or "ATMs," physical machines in which a customer could deposit "fiat currency," scan a QR code associated with a bitcoin wallet, and receive a corresponding amount of bitcoin in their wallet. Second, he posted advertisements and communicated with customers on a website called localbitcoins.com, which allowed users to buy and sell bitcoin from each other, much as other websites allow users to buy and sell goods. Finally, Freeman engaged in direct negotiations with buyers on the messaging software Telegram.

Freeman had what he called a Know Your Customer procedure for buyers who were purchasing through localbitcoins.com or Telegram. He asked prospective customers to send him a photograph of their driver's license and a photograph of themselves holding a handwritten note indicating that they intended to purchase bitcoin. Sometimes, he would also ask for customers' phone numbers to confirm that they intended to buy bitcoin. These procedures did not apply to purchases made at Freeman's bitcoin kiosks, which did not require any form of personal verification, even though kiosk operators can and do impose various verification

requirements.[4]    Across  all  three  of  his  platforms,  Freeman
instituted another policy —— one which eschewed any inquiries into
*why* his customers were purchasing bitcoin.  But it is questionable,
as we'll explain, that such a no-ask policy truly insulated Freeman
from the knowledge that his services were being used by customers
who were, in fact, scammers and money launderers.

The  government  sought  to  show  that  even  when  Freeman
implemented his Know Your Customer procedures, he ignored multiple
red  flags  that  would  have  suggested  money  laundering  or  scams.
For    instance,    Freeman    permitted    individuals    to    execute
transactions for hundreds of thousands of dollars within the course
of a week, and worked with individuals seeking to exchange hundreds
of thousands of dollars in cash.  He also conducted transactions
in which he accepted payment from one person but delivered bitcoin
to another —— something the government calls a "third-party trade."
In  consummating  these  third-party  transactions,  Freeman  sent
individuals,  whom  the  evidence  strongly  suggested  were  scam
artists,  bitcoin  paid  for  by  individuals  over  the  age  of  50,
despite finding out in many cases that the elderly individuals
paying for the bitcoin were geographically distant both from the

---

[4] For instance, a government investigator testified at trial
that  other  bitcoin  kiosks  required  him  to  scan  a  piece  of
government-issued identification (like a driver's license), enter
a non-prepaid phone number, provide his name, and communicate with
the owner or operator of the kiosk to verify his purchases.

recipient of the bitcoin and from others paying to send bitcoin to the same recipient. And Freeman continued to trade with individuals after encountering signs that they were not who they claimed to be.

To establish money laundering, the government called an undercover agent who had made multiple bitcoin purchases from Freeman through Telegram and at a kiosk in New Hampshire. After building a rapport with Freeman through Telegram messages, the agent joined Freeman at a social gathering in New Hampshire and explained to Freeman that he was buying bitcoin with money he earned selling drugs. After this disclosure, Freeman wrote to the agent that he could not "KNOWINGLY sell bitcoin" to the agent and refused to conduct business with him over Telegram. He nevertheless invited the agent to continue socializing with him. At a gathering in Keene, New Hampshire less than a month later, the agent asked Freeman if the kiosk he had previously used was still available. Freeman responded that the kiosk was still there and said, "I can't tell you that you can use it." The agent went to the kiosk, located in a bar, and purchased nearly $20,000 in bitcoin. That same night, the agent also taped Freeman saying in a conversation with friends (including the agent) over drinks that "if you fall in love with a guy from Africa, I can't talk you out of it" and describing his kiosks as a way for smitten victims to

"take the money that they have and send it to the person they've fallen in love with."

In the summer of 2018, the Financial Crimes Enforcement Network ("FinCEN") of the United States Treasury Department sent correspondence to an email address associated with Freeman stating that "Shire Cryptocoin," purportedly one of Freeman's businesses, must register with FinCEN as a money transmitting business and comply with other anti-money-laundering regulations.[5]  Ignoring this directive, Freeman never registered this entity or any of his businesses with FinCEN.  He also did not file tax returns from 2016 through 2019.

**Procedural History**

The indictment alleged that Freeman (as well as several co-defendants) exchanged more than $10 million worth of government-backed currency for bitcoin between May 25, 2016 and March 15, 2021.  In relevant part, the indictment charged Freeman

---

[5]  It's not clear whether Freeman himself used the name "Shire Cryptocoin" in connection with any of his businesses.  Also, to be exact, FinCEN wrote that Shire Cryptocoin was a money *services* business.   Under FinCEN's regulations, money transmitting businesses are a subcategory of money services businesses (which are all required to register).   31 C.F.R. § 1010.100(ff)(5) (defining money transmitter as type of money services business); id. § 1022.380(a)(1) (requiring registration of money services businesses).   For the sake of simplicity, this opinion will primarily use the term "money transmitting business" or "money transmitter" as resolution of this case does not require us to make fine distinctions between money transmitting businesses and other categories of money services businesses.

with operation of an unlicensed money transmitting business, conspiracy to operate an unlicensed money transmitting business, money laundering, and conspiracy to commit money laundering, based on this conduct. It also charged Freeman with several counts of tax evasion for not paying taxes on income he received from his bitcoin sales. Freeman joined a motion to dismiss filed by one of his co-defendants regarding the counts related to operation of an unlicensed money transmitting business, 18 U.S.C. § 1960, which invoked the major questions doctrine and argued that businesses dealing in virtual currency do not come within the statutory definition of money transmitting businesses (more on the statutory scheme and relevant definition to come in our analysis). The district court denied the motion to dismiss in an oral ruling from the bench, and Freeman proceeded to trial. At the end of an 11-day trial, a jury convicted Freeman on all counts.

Freeman had moved for a judgment of acquittal after the close of the government's evidence, and renewed that motion after trial, arguing that insufficient evidence supported each count. The district court partially granted that motion, ruling that there was insufficient evidence that Freeman knowingly laundered money, but upheld the remaining convictions (including the conspiracy to commit money laundering count). In the same written order, the district court recognized that Freeman had incorporated by reference his earlier motion to dismiss arguments regarding the

- 9 -

major questions doctrine and rejected those arguments anew.
Thereafter, Freeman moved for a new trial based on spillover
prejudice from the evidence related to the money laundering count.
He also moved for reconsideration of the court's ruling on the
motion to dismiss.  The district court denied both motions, ruling
that they were untimely and unmeritorious.

At sentencing, the district court calculated the
recommended range under the United States Sentencing Guidelines as
210 to 262 months.  It then granted Freeman's motion for a variance
and sentenced Freeman to 96 months in prison.[6]

**DISCUSSION**

**Motion to Dismiss Counts Related to Operation of an Unlicensed
Money Transmitting Business**

Freeman's appeal largely centers on the major questions
doctrine, a jurisprudential principle fleshed out in a line of
cases emanating from the Supreme Court.  The doctrine's purpose is
to prevent administrative agencies from expanding their regulatory
powers beyond that which Congress has granted.  See, e.g., Biden
v. Nebraska, 600 U.S. 477 (2023); West Virginia v. EPA, 597 U.S.
697 (2022); Util. Air Regul. Grp. v. EPA, 573 U.S. 302 (2014).  To
understand why cases about the scope of an agency's regulatory

---

[6] More precisely, the district court sentenced Freeman to 60
months of imprisonment on tax evasion and the counts related to
operation of a money transmitting business to be served
concurrently with a 96-month sentence for conspiracy to commit
money laundering.

power are relevant to Freeman's prosecution for operation of an unlicensed money transmitting business and his defense thereto, we need to take a closer look at the statute under which Freeman was prosecuted.

The indictment charged Freeman with violating 18 U.S.C. § 1960 ("Section 1960").  In relevant part, that statute punishes anyone who "knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business."  Id. § 1960(a).  "[M]oney transmitting," according to the statute, "includes transferring funds on behalf of the public by any and all means."  Id. § 1960(b)(2).  And an "unlicensed money transmitting business" means one that "fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section."  Id. § 1960(b)(1)(B).

Thus, to understand what it means for a money transmitting business to be unlicensed, we must flip to 31 U.S.C § 5330 ("Section 5330"), which requires "[a]ny person who owns or controls a money transmitting business" to register that business "with the Secretary of the Treasury."  How can someone tell if they need to register?  Section 5330 defines "money transmitting business" to include one "who engages as a business in the transmission of currency, funds, or value that substitutes for

currency, including any person who engages as a business in an informal money transfer system." Id. § 5330(d)(1).

Because the government has deemed his financial endeavors to be money transmitting businesses, the Section 1960 crime Freeman is charged with is triggered by his failure to comply with Section 5330(a)(1)'s requirement that such money transmitting businesses must register with FinCEN (which is a subdivision of the Treasury Department).[7]  However, if, as Freeman contends, Section 5330 does not cover businesses such as his that trade bitcoin (i.e., if he does not operate a money transmitting business with registration requirements), he was not violating Section 5330, and by extension no criminal liability under Section 1960 would attach to him.

Of significance to Freeman's argument is one particular feature of Section 5330.  As Freeman points out, when the indictment against him was filed, the definition in Section 5330(d)(1) looked a little different: it did not include the word

----

[7] Eagle-eyed readers will have remembered that Section 5330(a)(1) referred to registration with the Secretary of the Treasury and never mentioned FinCEN. The Secretary of the Treasury delegated regulatory responsibilities under Section 5330 (which is part of the Bank Secrecy Act) to FinCEN. See generally U.S. Gov't Accountability Off., GAO/GGD-98-18, Money Laundering: FinCEN Needs to Better Communicate Regulatory Priorities and Time Lines 1 (1998).  For simplicity's sake, any time Section 5330 gives certain responsibilities to the Secretary of the Treasury, we will substitute in FinCEN as the office of the Treasury Department that carries out that work.

"currency" or the phrase "value that substitutes for currency."
Instead, the only noun in the list of items being transmitted was
"funds."    Uniting and Strengthening America by Providing
Appropriate Tools Required to Intercept and Obstruct Terrorism Act
("USA PATRIOT Act") of 2001, Pub. L. No. 107-56 § 359(b), 115 Stat.
272, 328 (2001) (codified as amended at 31 U.S.C. § 5330(d)(1)).
In this language difference lies the rub of Freeman's grievance.

For simplicity's sake, we'll refer to the definition of
money transmitting business in effect during the existence of
Freeman's bitcoin business as the "effective definition" and the
new definition, which was enacted in 2021 (more on this legislative
history in a moment), as the "current definition."  See William M.
(Mac) Thornberry National Defense Authorization Act for Fiscal
Year 2021 ("NDAA"), Pub. L. No. 116-283 § 6102(d)(2)(A)(i), 134
Stat. 3388, 4552-53 (2021) (codified as amended at 31 U.S.C.
§ 5330(d)).[8]  Unless we specify otherwise, our analysis (and the

---

[8] For those tracking the dates, it may seem strange that we're
saying the current version of Section 5330 was not effective for
the purposes of this prosecution, even though the indictment
alleges that violations of Section 1960 continued until the date
of Freeman's arrest, March 15, 2021, which was more than three
months after the current definition became law on January 1, 2021.
NDAA § 6102(d)(2)(A)(i), 134 Stat. at 4552-53.  Freeman points out
that under Section 5330(a)(1), any person who owns or controls a
money transmitting business has 180 days to register, and so his
time to register under the updated definition had not expired by
the time the government put a stop to his business.  31 U.S.C.
§ 5330(a)(1).  The government does not dispute this explanation of
why the current version of Section 5330 is ineffective and has not

cases we cite) refers to the effective definition of money transmitting business in Section 5330(d)(1).[9]

An attentive reader may now be wondering what any of this has to do with the power of an administrative agency. And, as we'll see, the government says we shouldn't take up the major questions doctrine at all because agency authority is not implicated in these proceedings. This is how Freeman contends the doctrine factors into this dispute. According to Freeman, Section 5330's effective definition of "money transmitting business" cannot be properly understood to cover businesses dealing in virtual currencies like bitcoin, because (and here's where the link to an administrative agency arises) Section 5330(a)(2) instructs FinCEN to "prescribe, by regulation, the form and manner for registering a money transmitting business." 31 U.S.C. § 5330(a)(2). Thus, the 2001 effective definition of money transmitting business, which refers to the transmission of "funds," seemingly applies to both the statutory registration requirement in Section 5330(a)(1) and to the scope of FinCEN's

_____

argued that we should analyze the post-amendment conduct any differently from the pre-amendment conduct. And we thus focus our attention on the prior, effective definition.

[9] Section 1960 had not been amended since Freeman's offending conduct began, and neither party asserts that any prior amendments to Section 1960 are relevant to our resolution of this case. See Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162 § 1171(a)(2), 119 Stat. 2960, 3123 (2006) (striking surplus words from Section 1960(b)(1)(C)).

regulatory authority under Section 5330(a)(2). The major questions doctrine arises, says Freeman, because we should not conclude that Congress intended to grant FinCEN regulatory authority over virtual currencies that did not exist in 2001, solely by virtue of Congress's use of the word "funds" in the effective definition in Section 5330(d)(1). And how we interpret the effective definition necessarily circumscribes the scope of the statutory registration requirement in Section 5330(a)(1). In other words, the statutory assumption underlying Freeman's prosecution (i.e., that Congress's use of the word "funds" in Section 5330(d)(1) covers virtual currencies) fails under the major questions doctrine, because, according to Freeman, such an interpretation runs contrary to congressional intent.

Ultimately then, Freeman's appeal poses the following question for us: does the effective definition of "money transmitting business" in Section 5330 capture businesses that transmit virtual currency? In our opinion, the usual principles of statutory construction say, resoundingly, yes, and we'll take a step back to briefly explain why. We'll then dive into the heart of Freeman's appeal and assess whether the major questions doctrine nonetheless "provide[s] a reason to hesitate" before definitively saying yes and adopting that construction. West Virginia, 597 U.S. at 721 (citation and quotation marks omitted). Because this is a matter of statutory construction, our standard of review is

de novo.  See United States v. McGlashan, 78 F.4th 1, 6 (1st Cir. 2023).

### Traditional Plain Meaning Analysis

We start by analyzing Sections 1960 and 5330 without reference to the major questions doctrine.  In interpreting a statute, we strive "to effectuate congressional intent." City of Providence v. Barr, 954 F.3d 23, 31 (1st Cir. 2020).  Our usual starting place for such an inquiry is the statutory text itself. Id.  "[W]e interpret a statute's words based on their plain and ordinary meaning at the time of the statute's enactment." United States v. Abreu, 106 F.4th 1, 12 (1st Cir.) (citing Bostock v. Clayton County, 590 U.S. 644, 654 (2020)), cert. denied, 145 S. Ct. 425 (2024); City of Providence, 954 F.3d at 31 ("When Congress uses a term in a statute and does not define it, we generally assume that the term carries its plain and ordinary meaning.").

In this case, the parties ask us to define a specific word, "funds," in Sections 1960 and 5330.[10]  Other courts have been asked to respond to this same query and those who have done so have concluded this: that the plain meaning of "funds" is "money" or "something generally accepted as a medium of exchange, a measure of value, or a means of payment." United States v. Murgio, 209 F.

---

[10] The parties analyze the meaning of the word "funds" under both statutes, and neither suggests that the term "funds" should be interpreted differently between Sections 1960 and 5330.  Thus, we discuss the meaning of the term "funds" under both statutes.

Supp. 3d 698, 707 (S.D.N.Y. 2016) (quoting Webster's Third New International Dictionary 921 (2002)); see also United States v. Faiella, 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014) (citing Merriam Webster Online). Premised on this definition, with which the government agrees, other courts have found that bitcoin falls within the plain meaning of "funds" and that Sections 1960 and 5330 therefore capture businesses that sell bitcoin to customers in exchange for government-issued currency. See, e.g., United States v. Stetkiw, No. 18-20579, 2019 WL 417404, at *2 (E.D. Mich. Feb. 1, 2019) (concluding that bitcoin transactions constitute "money transmitting" within the meaning of Section 1960); United States v. Mansy, No. 2:15-cr-198-GZS, 2017 WL 9672554, at *1 (D. Me. May 11, 2017) (same) (collecting cases); Murgio, 209 F. Supp. 3d at 707-11, 714 (concluding that bitcoin are funds within the plain meaning of Section 1960 and that indictment sufficiently alleged failure to comply with Section 5330's registration requirements). We agree with this judicial reasoning because bitcoin can be and is used as a currency to make sales and purchases and, therefore, nicely fits the definition of "funds."[11] Murgio, 209 F. Supp. 3d at 707; see also United States v. Iossifov, 45 F.4th 899, 913-14 (6th Cir. 2022) (concluding that bitcoin is a

---

[11] For instance, the evidence at trial showed that the bar where one of Freeman's kiosks was located accepted bitcoin in exchange for food.

medium of exchange and qualifies as "funds" within the meaning of the federal money laundering statute, 18 U.S.C. § 1956); United States v. Harmon, 474 F. Supp. 3d 76, 88-94, 100-09 (D.D.C. 2020) (concluding that for similar reasons bitcoin is "money" within the meaning of the District of Columbia's Money Transmitters Act and separately concluding that defendant operated an "unlicensed money transmitting business" within the meaning of Section 1960 where its "core business was receiving bitcoin and transmitting that bitcoin to another location or person").

Within our ordinary interpretive framework, our inquiry into whether the word "funds" covers bitcoin would usually end here, as there is no reason to look past the statutory text itself if that text is unambiguous and consistent with a coherent statutory scheme. Penobscot Nation v. Frey, 3 F.4th 484, 490 (1st Cir. 2021); City of Providence, 954 F.3d at 31-32 ("Other tools of statutory interpretation, such as legislative history, customarily carry significant weight only when the text is ambiguous or its plain meaning leads to an absurd result."). Indeed Freeman admits that he has "never argued" that "the ordinary meaning of 'funds'" does not "encompass[] bitcoin." But as we've already alluded to, Freeman insists that we cannot stop here because his is "an exceptional case" wherein ordinary rules of statutory construction cannot be relied upon to answer the question of whether bitcoin qualifies as "funds." Rather, only an examination of the major

questions doctrine (which takes a deeper dive into congressional intent) can do that, so we turn to it now.  A heads-up here to the gentle reader:  Freeman offers us a slew of arguments as to why he should prevail on this issue, so we beg your patience as we work our way through his various contentions.

### Major Questions Doctrine

Before we delve into the details of the major questions doctrine, we pause to address the government's threshold assertion that we "need not indulge" Freeman's invocation of the doctrine at all because his criminal prosecution involved no "regulatory assertions" whatsoever by the Department of Treasury.  Rather, it argues "the indictment neither depended on nor referenced the FinCEN guidance" and as such, the major questions doctrine "is not triggered" here.  However, we think the government's position oversimplifies Freeman's argument and here's why.

As our preface noted, the "major questions doctrine" can arise in cases where we are asked to interpret a legislative enactment that "confers authority upon an administrative agency" in the executive branch to implement its terms.  West Virginia, 597 U.S. at 721. Here, Freeman's argument centers on the effective definition of money transmitting business in Section 5330(d)(1). That statutory definition governs the scope of what businesses are required to register under Section 5330(a)(1), and in consequence, what businesses might be subject to criminal penalties under

Section 1960(b)(1)(B) for failure to comply with that registration requirement.[12]   See United States v. Budovsky, No. 13-cr-00368, 2015 WL 5602853, at *9 (S.D.N.Y. Sept. 23, 2015) ("[C]riminal liability under § 1960(b)(1)(B) rests in part on a failure to comply with registration requirements, including those set forth in § 5330 or in § 5330's regulations."). Simultaneously, the effective definition (what constitutes a money transmitting business) governs the scope of the regulations FinCEN can promulgate in the next subsection, Section 5330(a)(2). See, e.g., Ratzlaf v. United States, 510 U.S. 135, 141-43 (1994) (explaining that willful violation has same meaning under some provisions of the Bank Secrecy Act, 31 U.S.C. §§ 5322, 5324, as it does in other provisions, 31 U.S.C. §§ 5314, 5316); United States v. Abbas, 100 F.4th 267, 284 (1st Cir.) (concluding that "proceeds" has same

---

[12] While summarizing the nature of Freeman's convictions in its brief, the government claims that Freeman was also convicted under Section 1960(b)(1)(C). Section 1960(b)(1)(C) defines an unlicensed money transmitting business seemingly independently from Section 5330. See 18 U.S.C. § 1960(b)(1)(C) (defining term to mean a money transmitting business "otherwise involv[ing] the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity"). The government does not argue, however, that we can ignore Section 5330 because the jury convicted Freeman under Section 1960(b)(1)(C), presumably because the verdict form did not ask the jury to indicate which of the two subsections Freeman had violated. Even if the record could support such an argument, we would treat it as waived given the government's failure to brief the issue. See Mass. Lobstermen's Ass'n v. Menashes, 127 F.4th 398, 403 n.2 (1st Cir. 2025).

meaning in different subsections of criminal money laundering statute, 18 U.S.C. § 1956), cert. denied, 145 S. Ct. 319 (2024). This statutory scheme makes clear that the legislation's substantive provisions work hand in hand with those provisions granting regulatory authority to FinCEN to implement the terms of the statute itself. Given the necessary interplay between the statutory and regulatory provisions, we agree with Freeman that skirting the major questions doctrine would incorrectly treat the statutory registration requirement as completely divorced from any of FinCEN's regulatory authority. Indeed, as Freeman pointed out during oral argument, requiring a business to register by statute means very little without a corresponding mechanism by which said business can, in fact, register. For the registration requirement in Section 5330(a)(1), the regulations FinCEN promulgates under Section 5330(a)(2) appear to be that mechanism. And although the government would like us to conclude the major questions doctrine has no place here, it offers no direct response to this point. All this to say, Freeman steps over the threshold of identifying a statute which, at least in part, confers regulatory authority upon an administrative agency, a power Freeman insists Congress never intended to delegate.[13]

---

[13] We acknowledge that this is a somewhat unusual case for the invocation of the major questions doctrine: FinCEN is not a party and Freeman is seeking to overturn his conviction, not to enjoin

Having explained the relationship between this case and FinCEN's regulation of money transmitting businesses, we must now determine "whether Congress in fact meant to confer the power the agency has asserted" as the major questions doctrine requires us to do. West Virginia, 597 U.S. at 721 (quoting FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159 (2000)). "In the ordinary case," this consideration "has no great effect on the appropriate analysis." Id. But the Supreme Court has recognized the existence of "extraordinary cases." Id. In such instances, we cannot conclude that Congress granted an agency authority "to exercise powers of vast economic and political significance" unless the statutory text "speaks clearly" of such a grant. Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs., 594 U.S. 758,

---

FinCEN's regulatory act. Nevertheless, the heart of this appeal is the effective definition of money transmitting business in Section 5330(d)(1), a definition that applies both to Sections 5330(a)(1) and (a)(2). Blinding ourselves (as the government requests) to the reality that our interpretation of Section 5330(d)(1) impacts not only Freeman's criminal liability, but also the scope of FinCEN's regulatory authority, undermines the coherency and consistency of the statutory scheme. See Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 222 (2008). Our sister circuits too have seen fit to consider the application of the major questions doctrine in cases where the relevant administrative agency is not a party and is not actively making "regulatory assertions" in that litigation. See United States v. White, 97 F.4th 532, 540 (7th Cir.) (considering major questions challenge to Sentencing Commission's authority in a criminal case), cert. denied, 145 S. Ct. 293 (2024); N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC, 76 F.4th 291, 296-301 (4th Cir. 2023) (applying major questions doctrine in suit between environmental advocacy group and shrimp trawlers).

764 (2021) (quotation marks omitted) (quoting <u>Util. Air Regul. Grp.</u>, 573 U.S. at 324).   In basic terms, the major questions doctrine tells us that when an administrative agency in the executive branch wants to do something that is an extraordinarily big deal, it must show that Congress clearly gave it permission to do so in the statutory text.   <u>See</u> <u>Nebraska</u>, 600 U.S. at 514 (Barrett, J., concurring) (analogizing major questions doctrine to expectation that a parent authorizing a babysitter to take the children on an overnight trip would provide "much more clarity than a general instruction to 'make sure the kids have fun'").

What, then, makes for an extraordinary case?  The Supreme Court defines it in broad strokes as one "in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority."  <u>West Virginia</u>, 597 U.S. at 721 (quoting <u>Brown & Williamson</u>, 529 U.S. at 159-60).   Within this rather wide framework, our sister circuits, in carefully examining what the Supreme Court has said about the breadth of an agency's authority to regulate, have zeroed in on certain "hallmarks that should send us searching for clear authorization from Congress."[14]

---

[14] Our circuit has addressed the major questions doctrine only in passing since the doctrine was formalized in <u>West Virginia</u>. <u>See</u> <u>Hornof</u> v. <u>United States</u>, 107 F.4th 46, 59 n.14 (2024) (noting

N.C. Coastal Fisheries, 76 F.4th at 297 (recognizing that doctrine
is more likely to apply where the agency's asserted powers are
inconsistent with congressional intent, conflict with a distinct
and existing statutory scheme, raise federalism concerns, "fall[]
outside the agency's traditional expertise," are rooted in "an
ancillary provision" of a statute, or are drawn from "old statutes
against a backdrop of an agency failing to invoke them
previously"); see also Bradford v. U.S. Dep't of Lab., 101 F.4th
707, 725-28 (10th Cir. 2024) (rejecting application of major
questions doctrine where agency did not "locate expansive
authority in modest words, vague terms or ancillary provisions,"
was not regulating private industry, did not "discover regulatory
authority for the first time in a long-extant statute," and did
not "lack[] expertise in the relevant area of policymaking"
(citation modified)), cert. denied, 145 S. Ct. 1047 (2025). Our
review of the Supreme Court's precedent and of our sister circuits'
helpful interpretation of it convinces us that this case lacks the
hallmarks of a major questions case. We'll explain our thinking
below around the two organizing principles identified by the
Supreme Court, starting with "the history and the breadth" of
FinCEN's assertion of authority and follow that with addressing

---

that statute enabling Coast Guard to regulate oil tankers "speak[s]
clearly").

its "economic and political significance."[15] <u>West Virginia</u>, 597 U.S. at 721; <u>see</u> <u>Nebraska</u> v. <u>Su</u>, 121 F.4th 1, 14 (9th Cir. 2024) (identifying a "two-prong framework").

**History and Breadth of FinCEN's Assertion**

<u>History</u>

To understand the "history and breadth" of FinCEN's regulation as is relevant here, a short history of Section 5330 is in order.[16] As part of a statutory scheme (the Bank Secrecy Act) designed to combat money laundering, Congress has long required "money transmitting businesses" to register with the Treasury Department. Riegle Community Development and Regulatory Improvement Act of 1994, Pub. L. No. 103-325 § 408, 108 Stat. 2160, 2249-51 (1994) (codified at 31 U.S.C. § 5330). In the wake of the September 11, 2001 terrorist attacks, Congress that year amended

---

[15] In so doing, we acknowledge that the major questions doctrine has been an area of dynamic development in the last few years, and it is not always clear what factors fall under which prong. For instance, a discussion of the wider statutory scheme and legislative history might well be introduced as a relevant piece of the agency's regulatory history or as indicative of the political significance of the regulatory assertion. In today's decision, we place less importance on categorizing the relevant characteristics and focus on whether the facts of this case, stripped of Freeman's rhetorical flourishes, actually fit into the major questions precedent.

[16] Our focus is on the legislative history of Section 5330 rather than Section 1960, because (1) that is what the parties briefed and (2) Section 5330, which enables agency regulation, is more squarely implicated by the major questions doctrine than Section 1960, which focuses on the circumstances of criminal liability.

the definition of "money transmitting business" in Section 5330 to include "any other person who engages as a business in the transmission of funds, including any person who engages as a business in an *informal money transfer system* or any network of people who engage as a business in facilitating the transfer of money domestically or internationally *outside of the conventional financial institutions system*."   USA PATRIOT Act § 359(b), 115 Stat. at 328 (emphases added).   According to the report of the Committee on Financial Services, the amendment did not expand the definition of money transmitting business, but instead clarified that the existing definition reached black market, non-bank money exchangers —— what the Committee referred to as "informal value transfer banking systems" —— which helped to fund terrorist and criminal organizations.   H.R. Rep. No. 107-250, at 34, 63-64 (2001).

This was the effective version of Section 5330 when bitcoin came into being in 2008.   Perkins, <u>supra</u>, at 2.   In Freeman's telling though, FinCEN's first step towards the regulation of bitcoin didn't occur until 2011, when FinCEN updated its regulatory definition of "money transmission services" to require the "acceptance of currency, funds, or other *value that substitutes for currency* from one person."   Bank Secrecy Act Regulations; Definitions and Other Regulations Relating to Money Services Businesses, 76 Fed. Reg. 43585, 43596 (July 21, 2011)

(codified at 31 C.F.R. § 1010.100(ff)(5)) (emphasis added).  Such a theory, he argues, is consistent with the guidance FinCEN issued in 2013 which, for the first time, stated that "value that substitutes for currency" includes virtual currencies. Specifically, the guidance said, "[t]he definition of a money transmitter does not differentiate between real currencies and convertible virtual currencies.  Accepting and transmitting anything of value that substitutes for currency makes a person a money transmitter under the regulations implementing the [Bank Secrecy Act]."[17]  FinCEN, FIN-2013-G001, Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies, at 3 (2013).  Freeman says the fact that FinCEN never sought to regulate bitcoin before 2013 demonstrates the agency's understanding of its statutory inability to do so.  Needless to say, the government takes issue with Freeman's historical

---

[17] FinCEN laid out precise definitions for "real currency," "convertible currency," and "virtual currency" in its 2013 guidance.  FIN-2013-G001, at 3.  For the purposes of this opinion, it suffices to say that "real currency" is equivalent to what we have been calling "fiat currency" and that bitcoin is a form of "convertible virtual currency."  The guidance clarified that the fact that a business exchanged bitcoin instead of fiat currency would not exempt it from registration as a money transmitter.  Id. at 2 (explaining that "a person engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency" is a money transmitter under FinCEN's regulation).

interpretation,[18] but neither party has pointed to any evidence that FinCEN engaged in any enforcement activities against businesses transmitting bitcoin which sought to compel them to register (or comply with other regulations) prior to issuance of the 2013 guidance.  And for the purposes of this opinion, we'll operate with the understanding that FinCEN, at least, first began to regulate businesses that transmit virtual currencies in 2013. Doing so lets us focus on the parties' key dispute:  whether FinCEN, nonetheless, had statutory authority to regulate virtual currencies when it issued the 2013 guidance.

Freeman would like us to conclude it "inconceivable" (as he tells it) that the single word "funds" as contained in the effective version could refer to virtual currency, but we believe his focus on that single word is misplaced and here's why.  In full, the effective definition (when bitcoin was created) specified that businesses engaged in the "transmission of funds" could include an "informal money transfer system . . . outside of the conventional financial institutions system."  USA PATRIOT Act § 359(b), 115 Stat. at 328.  Bitcoin and virtual currencies seem

---

[18] Freeman takes the view that FinCEN did not begin regulating bitcoin until "long after the invention of bitcoin" in 2008, when it added the phrase "value that substitutes for currency" into its regulations and then interpreted that phrase to refer to virtual currencies.  The government claims that FinCEN was regulating virtual currencies all along and that FinCEN's actions in 2011 and 2013 merely "confirmed" its existing regulatory scheme.

to fall within this broad definition of a system that allows users to transfer money without the participation of banks or other traditional money movers.  Freeman argues that in utilizing this language in the 2001 amendment, Congress intended to target a different informal money system -- "the ancient South Asian money exchange system called hawala" and other "hawala-type systems."[19] But we find this to be a strained reading of the Committee Report accompanying the 2001 legislation.  A more natural reading is that Congress was more generally concerned about "underground black market banking systems," whatever the form, H.R. Rep. No. 107-250, at 33, and described hawalas as simply one example of the "informal value transfer banking systems" on which FinCEN should focus attention, id. at 63-64.  Moreover, Congress highlighted particular characteristics of "value transfer systems" that are equally true of today's bitcoin use, including that such systems frequently operated through "messages relating to receipt or disbursement of funds" rather than transfer of physical funds themselves, and that they were preferred by criminals because of

---

[19] According to the findings of the House Committee on Financial Services, "hawala" is the word for an "ancient South Asian money exchange system" which "consists of an international network of non-bank financial agents, often built on trusted family or cultural relationships."  H.R. Rep. No. 107-250, at 34.  These trusted relationships permit value to be transferred based on messages rather than the physical movement of funds from one party to another.  Id.  Presumably, when Freeman refers to "hawala-type systems," he refers to value transfer systems that function in a similar manner.

"the lack of record-keeping and opportunity for anonymity." Id. at 34. Importantly, Congress believed that these sorts of alternative transfer systems were "already adequately covered" by the pre-2001 version of Section 5330. Id. at 63-64. The Committee Report gives us no reason to think that a non-bank system allowing people to transfer value using messages between trusted parties should be treated differently than one which accomplishes the same purpose using cryptographic protocols between strangers.

And even if we adopted Freeman's approach and looked at the word "funds" in isolation, we'd be hard-pressed to think it "inconceivable" that Congress would have intended "funds" to reach cryptocurrency given that judicial decisions dating back to 2008 had already interpreted "funds" expansively to capture non-physical currency. See, e.g., United States v. E-Gold, Ltd., 550 F. Supp. 2d 82, 85, 94-97 (D.D.C. 2008) (concluding that Section 5330's definition of money transmitting business included internet service which allowed users to exchange fiat currency for digital currency).[20]

---

[20] We are mindful, as Freeman points out, that the virtual currency at issue in E-Gold is not a "cryptocurrency" like bitcoin. See 550 F. Supp. 2d at 85; FIN-2013-G001, at 3 & n.13 (describing e-currencies and e-precious metals as a system where a broker or dealer electronically distributes digital certificates of ownership of fiat currency or precious metals); see also supra note 2. But the fact that e-gold was backed by precious metals while bitcoin transactions are recorded on a cryptographic ledger is not a difference-maker in our current analysis because FinCEN

Nor does Freeman, relative to his historical argument, make a showing that FinCEN has engaged in the sort of about-face agency behavior typically found in the major questions cases. That is significant because the Supreme Court, in applying the doctrine, has particularly scrutinized with suspicion when an agency reverses course on its long-standing decision not to regulate in a particular field or in a particular manner. See West Virginia, 597 U.S. at 710-11, 713, 724 (striking regulation requiring electricity generators to undergo sector-wide switch to sources that produced less carbon dioxide, where EPA had previously only exercised power under Section 111 of the Clean Air Act to set emissions limits for individual plants). FinCEN had no history of explicitly disclaiming its authority to regulate virtual currency (or any other type of "informal transfer banking system") prior to its 2011 and 2013 updates to its regulatory regime. Cf. Brown & Williamson, 529 U.S. at 143-48 (concluding that the Food and Drug Administration's ("FDA") decades-long position that it had no jurisdiction over tobacco products and Congress's implicit ratification of that position in subsequent tobacco-specific

---

views and treats both "e-precious metals" and cryptocurrencies as convertible virtual currencies. 2013 Guidance at 3. Nor do we understand why Freeman highlights that "the e-Gold indictment explicitly relied on FinCEN's implementing regulations" as a point of distinction. After all, Freeman similarly claims his prosecution relies on FinCEN's implementing regulations (which is the premise for applying the major questions doctrine).

legislation demonstrated a lack of legislative intent to delegate authority over tobacco products to the FDA).

And simply because FinCEN declined to exercise such authority prior to issuance of the 2013 guidance can hardly, by our lights, be held against it; by Freeman's count, the agency acted only five years after bitcoin was invented.[21]  The five-year delay —— if we can call it such —— is understandable because the money laundering risk posed by bitcoin and other cryptocurrencies (and thus the need for targeted regulation) may not have been instantly apparent upon bitcoin's invention.  Cf. Ocean State Tactical, LLC v. Rhode Island, 95 F.4th 38, 50 (1st Cir. 2024) ("Law advances more slowly than the technology it regulates, but must nonetheless be able to respond when the ramifications of a technological development become more apparent over time.").  Plus five years is a far cry from the decades of regulatory inaction emphasized in the Supreme Court's major questions cases.  See, e.g., West Virginia, 597 U.S. at 734 (noting that "it is pertinent to our analysis that EPA has acted consistent with such a limitation [on its regulatory power] for the first four decades of the statute's existence"); Ala. Ass'n of Realtors, 594 U.S. at 761

---

[21] In fact, FinCEN proposed the addition of the phrase "value that substitutes for currency" as early as 2009, the year following bitcoin's invention.  Amendment to the Bank Secrecy Act Regulations-Definitions and Other Regulations Relating to Money Services Businesses, 74 Fed. Reg. 22129, 22137, 22142 (proposed May 12, 2009) (to be codified at 31 C.F.R. pt. 103).

(explaining that 1944 statutory provision had "rarely been invoked —— and never before to justify an eviction moratorium"; instead "[r]egulations under this authority have generally been limited to quarantining infected individuals and prohibiting the import or sale of animals known to transmit disease"). In 2008, cryptocurrencies were an emerging technology whose significance within the money transfer marketplace was less than clear. Freeman's own brief indicates that the market capitalization of bitcoin in July 2010, roughly two years after its invention, was only $200,000, a pittance in the nation's overall financial scheme, and perhaps one not yet worthy of an expenditure of the limited resources Congress appropriates to FinCEN.

"Subsequent" History

Unable to find a firm foothold in the history leading up to FinCEN's exercise of regulatory authority over bitcoin, Freeman points to events that occurred after FinCEN's issuance of the 2013 guidance. Reliance on this sort of "subsequent" history is rather unorthodox. As the government notes, we've previously warned against using the views of a later Congress to interpret "the meaning of statutes enacted by an earlier Congress" when conducting traditional statutory interpretation. Parlane Sportswear Co. v. Weinberger, 513 F.2d 835, 837 n.2 (1st Cir. 1975); see also Bruesewitz v. Wyeth LLC, 562 U.S. 223, 242 (2011) ("Post-enactment legislative history (a contradiction in terms) is not a legitimate

tool of statutory interpretation."); <u>Doe</u> v. <u>Chao</u>, 540 U.S. 614, 626–27 (2004) ("[W]e have said repeatedly that subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment." (citation and quotation marks omitted)).  Tellingly, Freeman does not cite to a single major questions case when arguing that these subsequent events call for an alternative interpretation of Section 5330. But as best we can glean, he believes that certain events post-dating the 2013 guidance amount to noteworthy hallmarks of the major questions cases.

First, Freeman discusses subsequent legislative activity related to the regulation of virtual currencies, including failed legislation and the 2021 amendment that enacted the current definition of "money transmitting business" in Section 5330, and concludes that Congress "considered and repeatedly rejected legislation" that would have expressly empowered FinCEN to regulate virtual currencies.  Second, Freeman identifies statements that FinCEN made regarding virtual currencies after issuing the 2013 guidance and claims the statements reveal that "the agency recognized that the statute did not authorize the regulation" but nevertheless "expanded" its authority "before the authorization from Congress."  Accepting Freeman's characterization of these occurrences, we see there may be some

facial resemblance between these facts and a major questions case.
See Util. Air Regul. Grp., 573 U.S. at 321 (explaining that "EPA
itself has repeatedly acknowledged" that proposed regulation
"would overthrow" the "structure and design" of the enabling act);
Brown & Williamson, 529 U.S. at 144 (explaining that "Congress
has acted against the backdrop of the FDA's consistent and repeated
statements that it lacked authority under the FDCA to regulate
tobacco" and "considered and rejected bills that would have granted
the FDA such jurisdiction"). But given the Supreme Court's
eschewal of the importance of post-enactment legislative history
outside the major questions context, we express skepticism of these
events' relevance. See Bruesewitz, 562 U.S. at 242; Chao, 540
U.S. at 626-27. That said, despite our skepticism, in the absence
of a clear statement by the Supreme Court that subsequent history
has no bearing on the major questions determination,[22] and given
the presence of thorough briefing from both parties on the point,
we will consider whether what happened after FinCEN issued its
2013 guidance influences our analysis of Freeman's argument.

_____

[22] In some instances, the Court's major questions cases have
referenced congressional acts or omissions that post-date the
agency's challenged regulatory assertion, but without relying on
them to resolve the major questions determination. See Ala. Ass'n
of Realtors, 594 U.S. at 760, 766 (recounting Congress's failure
to enact multiple extensions of CDC's challenged eviction
moratorium and noting that "Congress was on notice that a further
extension would almost surely require new legislation, yet it
failed to act in the several weeks leading up to the moratorium's
expiration").

In our view, the subsequent history only confirms that FinCEN's interpretation of the breadth of its authority to regulate was consistent with congressional intent. That is because "when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 845-46 (1986) (citation omitted) (concluding that deference to agency's interpretation was warranted where Congress had twice amended the statute without overruling the agency's assertion of jurisdiction); see Am. Forest Res. Council v. United States, 77 F.4th 787, 801 n.16 (D.C. Cir. 2023), cert. denied, 144 S. Ct. 1110 (2024); Strickland v. Me. Dep't of Hum. Servs., 96 F.3d 542, 547 (1st Cir. 1996). Typically, courts invoke this principle of statutory interpretation to infer legislative approval from Congress's silence and inaction, such as when Congress re-enacts a statute without amendment to the portion on which the agency has relied. See Clean Harbors Env't Servs., Inc. v. Herman, 146 F.3d 12, 20 (1st Cir. 1998); Strickland, 96 F.3d at 547. We think it applies with even more force when, as here, an agency informs Congress of its interpretation of its statutory authority and Congress affirmatively revises the relevant statute to codify that interpretation. See Altman v.

SEC, 666 F.3d 1322, 1326 (D.C. Cir. 2011) (upholding SEC's interpretation of enabling statute and explaining that SEC's rules of practice were codified in 2002); cf. Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc., 576 U.S. 519, 537-38 (2015) (explaining that Congress "presupposed" the existence of disparate impact claims under the Fair Housing Act when it subsequently added exemptions from disparate impact claims into the statute). And to repeat, that's exactly what happened here.

In the years following FinCEN's issuance of the 2013 guidance, FinCEN informed Congress on multiple occasions that it had been regulating virtual currency exchangers as businesses that transmit "value that substitutes for currency." Illicit Use of Virtual Currency and the Law Enforcement Response: Hearing Before the Subcomm. on Terrorism and Illicit Fin. of the H. Comm. on Fin. Servs. 9, 25 (2018) (statement of Thomas Ott, Associate Director, FinCEN Enf't Division) (testifying that "value that substitutes for currency" is "sufficient to cover virtual currency") [hereinafter H. Hrg. 115-102]; The Present and Future Impact of Virtual Currency: Joint Hearing Before the Subcomm. on Econ. Pol'y and Subcomm. on Nat'l Sec. and Int'l Trade and Fin. of the S. Comm. on Banking, Hous., and Urban Affs., 113th Cong. 8, 11 (2013) (statement of Jennifer Shasky Calvery, Director, FinCEN) (testifying that FinCEN was "able to cover [virtual currency] under our pre-existing definitions and regulations, which include the

concept of other value that substitutes for currency")
[hereinafter S. Hrg. 113-210]. Indeed FinCEN wrote to a Senate
committee that FinCEN "would not object to Congress considering
codifying elements of money transmission to involve the
transmission of currency, as well as value that substitutes for
currency." Combatting Money Laundering and Other Forms of Illicit
Finance: Regulator and Law Enforcement Perspective on Reform:
Hearing Before the S. Comm. on Banking, Hous., and Urb. Affs.,
115th Cong. 59, 62 (2018) (written statement of Kenneth A. Blanco,
Director, FinCEN). As we previewed earlier, Congress subsequently
added "currency" and "value that substitutes for currency" into
the definition of "money transmitting business" in Section
5330(d)(1). NDAA § 6102(d)(1)(2), 134 Stat. at 4553. In our view,
that Congress not only declined to criticize or correct FinCEN's
approach (despite having been informed of it on more than one
occasion), but instead chose to codify it, strongly suggests that
FinCEN's interpretation was consistent with Congress's intent.

Freeman takes an alternative view of the same sequence
of events, arguing that we should treat the 2021 amendment instead
as evidence that the effective definition could not have supported
FinCEN's earlier reading. This view relies on a principle of
statutory interpretation that tells us to give meaning to the words
of a statute in a manner that avoids redundancies. See City of
Providence, 954 F.3d at 43. (We usually call this principle the

canon against superfluities or canon against surplusage.)  To follow Freeman's logic, if "funds" pre-2021 already captured virtual currencies, it would be unnecessary to add language to the statute that also refers to virtual currencies.  Because it is undisputed that Congress intended the addition of the phrase "value that substitutes for currency" to refer to virtual currencies, see NDAA § 6102(a) 134 Stat. at 4552, we should presume that the previous formulation of the statute did not capture this meaning.

But we have previously warned that the canon against superfluities "is not a straitjacket" and "should not, therefore, be employed inflexibly to rule out every interpretation of a statute that treats certain language as illustrative or clarifying." City of Providence, 954 F.3d at 43 (concluding that amendment "appears calculated to remove any doubt" that executive officer could exercise particular power consistent with pre-existing statutory authority).  The prefatory language to the 2021 amendment, NDAA § 6102(a), 134 Stat. at 4552, supports reading the addition of "value that substitutes for currency" as stressing that regulation of virtual currencies should be a FinCEN priority, rather than as giving FinCEN permission to regulate virtual currencies for the first time.  NDAA § 6102(a)(4), 134 Stat. at 4552 (explaining that FinCEN should "mak[e] sure that steps to address emerging methods of such illicit financing [like virtual currencies] are high priorities"); see Jerman v. Carlisle,

McNellie, Rini, Kramer & Ulrich LPA, 559 U.S. 573, 592 (2010)
(explaining that "Congress may simply have intended to codify
existing judicial interpretations to remove any potential for
doubt in jurisdictions where courts had not yet addressed the
issue").

And it's worth noting that Congress also has a history
of revising the Section 5330 definition of "money transmitting
businesses" for the purpose of clarification, rather than
substantive expansion. H.R. Rep. No. 107-250, at 63-64 ("Although
the Committee believes that informal value transfer banking
systems like hawalas are already adequately covered by references
to money transmitting businesses in certain provisions of existing
law, this section makes that understanding explicit."). Under
these circumstances, we need not blindly apply the canon against
surplusage to invalidate an agency regulation that Congress deemed
worthy of codification. See Bufkin v. Collins, 145 S. Ct. 728,
742 (2025) ("[S]ometimes the better overall reading of the statute
contains some redundancy." (citation omitted)); City of
Providence, 954 F.3d at 43.

Freeman nevertheless insists that "Congress struggled
with deciding how to classify and regulate virtual currencies" and
"considered and repeatedly rejected legislation to assign
regulatory authority to agencies like FinCEN." See West Virginia,
597 U.S. at 731. But his position does not hold up to scrutiny.

To begin with, the legislative record simply doesn't show the sort of "struggle" that Freeman claims exists. In support of his contention, Freeman first points to the FinCEN Improvement Acts of 2018 and 2019, two bills that passed in the House of Representatives but failed in the Senate. H.R. 6411, 115th Cong. (2018); H.R. 1414, 116th Cong. (2019). In relevant portion, these bills would have revised FinCEN's duty and power to "[c]oordinate with financial intelligence units in other countries on anti-terrorism and anti-money laundering initiatives," 31 U.S.C. § 310(b)(2)(H), to specifically "includ[e] matters involving emerging technologies or value that substitutes for currency." H.R. 6411, § 3; H.R. 1414, § 3. But those bills did not address the definition of money transmitting business. Freeman also points us to the Improving Laundering Laws and Increasing Comprehensive Information Tracking of Criminal Activity in Shell Holdings Act ("ILLICIT Cash Act"), S. 2563 § 308, 116th Cong. (2019), which would have revised the definition of "money transmitting business" in Section 5330 to include "value that substitutes for currency." Freeman emphasizes that this bill "failed to even make it out of committee." Yet he concedes that the text of this bill eventually "formed the basis for the [anti-money laundering] provisions of the 2021 NDAA." In other words, while Congress did fail to pass the ILLICIT Cash Act, it adopted the relevant language from this

bill two terms later as part of the 2021 amendment.  NDAA § 6102, 134 Stat. at 4552-53.  Let us further explain.

In a major questions case, an agency's assertion that it can regulate in a manner in which Congress has refused to legislate might give us reason to question whether the agency is contravening congressional intent.  See West Virginia, 597 U.S. at 731 (applying major questions doctrine where EPA enacted program to reduce greenhouse gas emissions despite Congress's rejection of similar proposals); Ala. Ass'n of Realtors, 594 U.S. at 760 (explaining that Centers for Disease Control ("CDC") "decided to do what Congress had not" by imposing administrative eviction moratorium after Congress declined to extend its own statutory moratorium).  But what we've chronicled as per Freeman's argument is hardly the sort of history that calls for application of the major questions doctrine.  FinCEN did not watch Congress reject a proposal to regulate virtual currency exchanges as money transmitting businesses, only to sua sponte take up the same proposal itself.  Instead, the bills that Freeman identifies were all introduced after FinCEN started regulating virtual currencies in 2013, and each bill would have codified FinCEN's "value that substitutes for currency" formulation, rather than curtailing any perceived administrative overreach.  The bill containing the broadest amendment ultimately was incorporated into legislation that passed, codifying FinCEN's interpretation.  See NDAA § 6102, 134

Stat. at 4552-53; ILLICIT Cash Act S. 2563 § 308.  None of the Supreme Court's major questions cases have overturned agency action when a Congress takes the agency interpretation being challenged and chooses to enact it into law.[23]

Finally, Freeman claims that "FinCEN admitted that it had to expand its authority beyond the statutory language to capture virtual currency."  He seemingly raises this argument because at times, the Supreme Court has emphasized that the agency's express disclaimer of its authority to regulate a particular industry or in a particular manner shows that a later attempt to assert the same authority exceeds the bounds of the

_____

[23] The Supreme Court came closest to doing so in Alabama Association of Realtors, 594 U.S. 758.  That case involved a challenge to an eviction moratorium issued by the CDC after Congress had allowed a legislative eviction moratorium to expire. Id. at 760.  When the CDC's administrative moratorium was set to expire for the first time, Congress passed legislation extending the CDC's moratorium for one month, but subsequently declined to extend the moratorium any further.  Id.  The CDC nevertheless renewed the moratorium several times.  Id.  The Court's analysis in its per curiam opinion focused on the political and economic significance of the eviction moratorium rather than on whether Congress's subsequent legislative activity (and inactivity) amounted to tacit approval (or disapproval) of the moratorium. Id. at 764-65.  In any event, Congress's one-month extension of the eviction moratorium did not amount to a word-for-word codification of the agency's interpretation of its statutory authority into the enabling statute, as occurred in this case. See Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 502, 134 Stat. 1182, 2078-2079 (2020) (stating simply that CDC's order "is extended through January 31, 2021" without amending enabling statute).  And, moreover, Freeman does not attempt to argue that Alabama Association of Realtors stands for the proposition that the major questions doctrine applies even when Congress expressly approves of the agency's decision.

governing statute.  See Util. Air Regul. Grp., 573 U.S. at 321
("EPA itself has repeatedly acknowledged that applying the PSD and
Title V permitting requirements to greenhouse gases would be
inconsistent with —— in fact, would overthrow —— the Act's
structure and design."); Brown & Williamson, 529 U.S. at 146
(noting FDA's "disavowal of jurisdiction" over tobacco products).
But we see no such history of disclaimer here.  The supposed agency
admissions Freeman refers to in support of his argument are various
statements made by FinCEN officials in testimony before Congress
and in a bar association speech.  See, e.g., Crypto Crime in
Context: Breaking Down the Illicit Activity in Digital Assets:
Hearing Before the Subcomm. on Digit. Assets, Fin. Tech. and
Inclusion of the H. Comm. on Fin. Servs., 118th Cong. (2023)
(witness statement of Jane Khodarkovsky, Former Trial Att'y and
Hum. Trafficking Fin. Specialist, Dep't of Justice) (no official
transcript of hearing available) (quoted material appears on page
11 of written witness statement), https://perma.cc/7RBZ-CPWX
[hereinafter Khodarkovsky Statement]; H. Hrg. 115-102, supra, at
9, 25 (statement of Thomas Ott, Associate Director, FinCEN Enf't
Division); S. Hrg. 113-210, supra, at 5, 36 (statement of Jennifer
Shasky Calvery, Director, FinCEN); FinCEN, Prepared Remarks of
FinCEN Acting Dir. Him Das Delivered Virtually at the American
Bankers Association/ American Bar Association Financial Crimes
Enforcement Conference (Jan. 13, 2022), https://perma.cc/JXQ9-

BLNR.  In Freeman's telling, these statements acknowledge that FinCEN lacked statutory authorization to regulate virtual currency.

As an initial matter, we note that Freeman's argument appears to be an odd fit with the major questions cases, where a later assertion of authority contradicts an earlier disclaimer. That is so because each of the statements Freeman references post-date FinCEN's assertion in 2013, that virtual currency exchangers were subject to its regulations.  And when we take a closer look at the statements Freeman has identified, we do not see FinCEN acknowledging any discrepancy between its statutory authority and its regulatory assertion (as Freeman claims it has). Most of these statements express FinCEN's concerns that virtual currencies might not be adequately addressed by the pre-existing regulatory framework (rather than concerns about any gap in the statutory scheme) and inform Congress of how FinCEN had updated its definitions to be in sync with Congress's statutory intent. See, e.g., S. Hrg. 113-210, supra, at 5, 36 (warning that virtual currencies are preferred by "[i]llicit actors" in part because they "provide[] a loophole from the [anti-money laundering and combatting the financing of terrorism] regulatory safeguards in most countries around the world" and explaining that FinCEN's regulatory guidance, rulings, and updates "have been able to accommodate the development of new payment systems, including

virtual currency"); H. Hrg. 115-102, supra, at 9, 25 (statement of Thomas Ott, Associate Director, FinCEN Enf't Division) (recounting regulatory acts intended to address virtual currencies and testifying that the "regulatory regime right now, that we have in place, is sufficient to cover virtual currency . . . whether or not . . . a money transmitter is located within the continental United States"); Das, supra ("[W]e need a regulatory regime to match, one that accounts for crypto and other digital assets, evolution in the payments space, and other innovations that are driving the creation of new products, services, and delivery channels.").[24]   Another simply acknowledges the codification of FinCEN's existing interpretation in 2021.  Khodarkovsky Statement, supra, at 11.  None of these statements amounts to an admission that FinCEN lacked statutory authority to regulate virtual currency exchangers as money transmitting businesses.

Freeman also latches onto the following sentence from a 2019 guidance document issued by FinCEN stating, "The term 'other

---

[24] Freeman also claims that "[a] former acting director of FinCEN, Himamauli Das, stated that the 2021 updates to the Patriot Act, including the amendment to § 5330, were necessary because the 2001 law 'never anticipated the challenges of the 2020s: digital assets . . . .'"  Appellant's Br. 49 (alterations in original) (quoting Das, supra).  But of course, Congress did not need to "anticipate" the application of Section 5330 to virtual currencies in order for FinCEN to apply the statute's plain terms.  See Bostock, 590 U.S. at 683.  Nor does a high-level remark on the need to modernize the anti-money laundering legal framework amount to an admission that FinCEN had no statutory authority over virtual currencies until passage of the 2021 law.

value that substitutes for currency' encompasses situations in which the transmission does not involve currency, or funds, but instead involves something that the parties to a transaction recognize has value that is equivalent to or can substitute for currency." FinCEN, Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies, FIN-2019-G001, at 4 (2019).[25]  According to Freeman, this sentence shows that FinCEN recognized that "funds" are different from "value that substitutes for currency" and "that the word 'funds' in the 2001 version of § 5330 did not capture virtual currency." We note, however, that the 2019 guidance does not mention Section 5330 at all and does not attempt to define the meaning of "funds," even within the limited universe of the guidance document.  Elsewhere in the same document, the word "funds" is used when referring to convertible virtual currencies.  FIN-2019-G001, at 15, 19 (referring to "funds" held in virtual currency wallets and "funds" accepted and retransmitted by service providers that anonymize virtual currency transactions).  To read FinCEN's use of "funds" in this guidance document as a disclaimer of its statutory authority to regulate virtual currency under Section 5330 would simply blink reality.

---

[25] Freeman's brief incorrectly identifies the source of this sentence as the 2013 guidance.  The language Freeman quotes actually appears in a separate document.  FIN-2019-G001, at 4.

Breadth

With the relevant history in mind, we examine the breadth of the power FinCEN has asserted, another factor the Supreme Court has directed us to consider as we decide if "hesitation" is called for before we affirm an agency's claim of regulatory authority. See West Virginia, 597 U.S. at 721.  To begin, we do not buy Freeman's argument that FinCEN "claim[ed] to discover in a long-extant statute an unheralded power." Util. Air Regul. Grp., 573 U.S. at 324.  In requiring virtual currency transmitters to register, FinCEN was not regulating in an "unheralded" or "unprecedented" manner, West Virginia, 597 U.S. at 724-25, 728 (citations omitted) (explaining that EPA had never before attempted to systemically reduce emissions by "'shifting' polluting activity 'from dirtier to cleaner sources'" (citations omitted)), nor was FinCEN relying on an obscure, "ancillary" or "gap filler" statutory provision, id. at 724.  To the contrary, that agency has continuously relied on Section 5330 as authority to regulate money transmitters since 1994.  See Riegle Community Development and Regulatory Improvement Act of 1994, Pub. L. No. 103-325 § 408, 108 Stat. 2160, 2249-51 (1994) (codified at 31 U.S.C. § 5330).  All it did in 2013 was explicitly specify that businesses transmitting virtual currency would be treated the same as those transmitting physical currency.  In short, this "unheralded power" argument is doomed because FinCEN's regulation

of bitcoin is not the kind of "unprecedented" program, one so unlike FinCEN's historical approach to regulation, that would call for application of the major questions doctrine. See Biden v. Missouri, 595 U.S. 87, 90-91, 94 (2022) (holding that Secretary of Health and Human Services did not exceed statutory authority in promulgating rule conditioning receipt of Medicaid and Medicare funds on vaccination of healthcare providers where "the Secretary routinely imposes conditions of participation that relate to the qualifications and duties of healthcare workers"); cf. Nebraska, 600 U.S. at 501 (reversing program by Secretary of Education to cancel loan obligations where "Secretary has never previously claimed powers of this magnitude under the HEROES Act" and "past waivers and modifications issued under the Act have been extremely modest and narrow in scope"); Ala. Ass'n of Realtors, 594 U.S. at 765 (concluding that CDC could not impose eviction moratorium in counties experiencing substantial or high levels of COVID-19 transmission where since the enactment of the claimed statutory authority in 1944, "no regulation premised on it has even begun to approach the size or scope of the eviction moratorium").

Nor in challenging FinCEN's breadth of reach does Freeman attempt to argue that FinCEN's exercise of regulatory authority over virtual currency transmitters somehow falls outside its "sphere of expertise." See Nat'l Fed'n of Indep. Bus. v. OSHA, 595 U.S. 109, 117-18 (2022) (explaining that a "broad public health

- 49 -

measure[]," like a vaccine mandate, was "outside of OSHA's sphere of expertise" and was not authorized by 29 U.S.C. § 655(b)). FinCEN's enumerated statutory duties and powers specifically include analysis of "emerging trends and methods in money laundering and other financial crimes" and the identification of "emerging threats" and "emerging technology" to assist in federal investigations and in countering money laundering and terrorism. See 31 U.S.C. 310(b)(2)(C)(v), (b)(2)(M)-(N); cf. Missouri, 595 U.S. at 93 (affirming vaccine mandate for healthcare workers promulgated under the Secretary of Health and Human Services' authority to pass regulation "necessary in the interest of the health and safety of individuals who are furnished services").

Ultimately, and in the absence of facts suggesting FinCEN tried to wield unheralded power, or regulate in an area beyond its expertise, what Freeman's case seems to boil down to is this: Congress, in amending Section 5330 in 2001, simply could not have intended to regulate something that did not yet exist. But there is nothing compelling about this timing-of-events argument. Taken to its logical conclusion, Freeman's argument more or less advocates for a principle of statutory construction that exempts new technologies from existing statutory schemes unless Congress had somehow foreseen the course of technological innovation and had expressly accounted for it ahead of time. But no such legal principle exists that we are aware of. Cf. Steele

v. <u>Comm'r of Soc. Sec.</u>, 51 F.4th 1059, 1060-61 (11th Cir. 2022) (certifying questions related to whether a child conceived via in vitro fertilization with cryo-preserved sperm after father's death was entitled to benefits as father's child under the Social Security Act and Florida law), <u>certified question answered</u>, 385 So. 3d 587 (Fla. 2024); <u>Application of Sarkar</u>, 588 F.2d 1330, 1333 (C.C.P.A. 1978) ("Congress cannot be expected to foresee, or to annually amend [the Patent Act] to incorporate, every future breakthrough onto entirely new technological terrain."). Courts routinely enforce "plain statutory commands" even where Congress may not have expected the statute to apply to certain factual situations at the time of passage. <u>See</u> <u>Bostock</u>, 590 U.S. at 683.

The only case Freeman cites in support of his timing theory is <u>National Federation of Independent Business</u> v. <u>OSHA</u>. 595 U.S. at 114-19. According to Freeman, the Supreme Court rightly rejected the Occupational Health and Safety Administration's ("OSHA") "attempt to impose a COVID vaccine mandate based on a statutory provision adopted 50 years before the pandemic," and, says Freeman, "[t]he same principles [should] apply here." Yet nothing in the decision suggests that the Court based its opinion on the fact that COVID-19 was a "new" virus that did not exist when Congress enacted the Occupational Safety and Health Act in 1970. <u>See</u> <u>id.</u> at 114. Instead, the Court's focus was the unprecedented nature of OSHA's action in mandating

universal vaccination and the apparent disconnect between such a vaccine mandate and OSHA's actual sphere of expertise.  Id. at 119 ("OSHA, in its half century of existence, has never before adopted a broad public health regulation of this kind —— addressing a threat that is untethered, in any causal sense, from the workplace.").  Giving some credence to Freeman's assertion, the reasoning in National Federation might resonate with us if, say, FinCEN decided to regulate materials used to manufacture illegal drugs on the basis that fewer illegal drug sales would reduce money laundering.  Freeman's view of National Federation's holding appears to be an alternate reality in which OSHA had long exercised statutory authority to issue vaccine mandates to address viral spread, only for the Supreme Court to strike down its COVID-19 vaccine mandate on the basis that COVID-19 was a new type of virus with an extraordinary and unforeseen impact on the United States. That simply is not what National Federation is about, and there is no coherent analogy between the unprecedented nature of OSHA's regulatory assertion in that case and what happened here.

Put differently, under Freeman's characterization of National Federation, the major questions doctrine would apply any time an agency relied on a long extant statute to regulate an impactful new technology.  This would transform a legal doctrine meant for extraordinary cases into a commonplace principle of statutory interpretation.  Because nothing in the history or

breadth of FinCEN's regulation of money transmitting businesses calls for application of the major questions doctrine, we turn now to the political and economic significance of the regulation to see if those considerations are difference-makers.

### Political and Economic Significance

#### Political Significance

Freeman asserts that virtual currencies have "provoked much political debate" (though he identifies no specific example of it), and by this assertion seems to suggest that political debate equates to political significance.  As best we can tell, he relies on his account of the legislative history of Section 5330 (which we've just explained only shows Congress's approval of FinCEN's regulation of virtual currencies) rather than on any meaningful or controversial legislative flashpoint that might call into question Congress's intent to regulate virtual currencies. To his nebulous "provoked much political debate" political significance contention, Freeman, in his reply brief, adds a federalism concern ―― that FinCEN's regulation of virtual currencies "intrudes into an area that is the particular domain of state law." See Ala. Ass'n of Realtors, 594 U.S. at 764.  We think this after-thought argument is likely waived, given that he had

every reason to make it in his opening brief.[26]  United States v.
Tosi, 897 F.3d 12, 15 (1st Cir. 2018) ("[A]rguments available at
the outset but raised for the first time in a reply brief need not
be considered.").  Even if we were to give him the courtesy of the
doubt, his only support for this federalism proposition is a single
sentence from a Congressional Research Service report indicating
that "[m]oney transmitters are regulated and licensed at the state
level."  See Andrew P. Scott, Cong. Rsch. Serv., R46486,
Telegraphs, Steamships, and Virtual Currency: An Analysis of Money
Transmitter Regulation 1 n.1 (2020).  That federal and state anti-
money laundering regulatory regimes might co-exist hardly
demonstrates that the registration requirement is "significantly
alter[ing] the balance between federal and state power and the
power of the Government over private property" in the same manner
as an eviction moratorium.  See Ala. Ass'n of Realtors, 594 U.S.
at 764 (reasoning that "the landlord-tenant relationship" is a
"particular domain of state law" upon which eviction moratorium

---

[26] Freeman claims that this argument properly responds to the
government's assertion that he had not made any showing of an
intrusion into the particular domain of state law and is thus a
proper subject for a reply brief.  See Wills v. Brown Univ., 184
F.3d 20, 27 (1st Cir. 1999) ("Reply briefs are to counter the
appellee's arguments, not to offer new theories of error for the
first time.").  In our view, Freeman is not responding to a
counterargument.  He is belatedly raising an argument which the
government pointed out he had neglected to include in his opening
brief.  See United States v. Mojica-Ramos, 103 F.4th 844, 849 n.3
(1st Cir. 2024).

intrudes).  Accordingly, we see no indication that when FinCEN began regulating virtual currencies in 2013, it was acting on a question of vast political significance.

Economic Significance

Freeman puts some more elbow grease into his argument regarding economic significance, citing statistics to show the growth in the bitcoin market in the last decade and a half. According to Freemans's sources, the overall market capitalization of bitcoin grew from less than $200,000 to approximately $1.2 trillion between July 2010 and May 2024, and virtual currencies combined had a total market capitalization of approximately $2.22 trillion in July 2024.  But Freeman's citation to the value of bitcoin and other virtual currencies misunderstands the nature of our inquiry in at least two ways.  First, the major questions cases direct our attention to, inter alia, the economic significance of the agency's assertion of regulatory power, not just the size of the industry being regulated.  West Virginia, 597 U.S. at 721. For instance, in applying the major questions doctrine to a Department of Education attempt to cancel student debt, the Supreme Court did not cite to the total amount of outstanding student loan debt nationwide; instead it calculated the economic impact based on an estimated total amount of debt to be cancelled by the agency. Nebraska, 600 U.S. at 496, 502 (emphasizing cancellation of $430 billion in federal debt for 43 million Americans, presumably based

on planned cancellation of $10,000 for each qualifying borrower). Similarly, in cases holding that the Environmental Protection Agency had exceeded its statutory authority, the Court's focus was on the cost of compliance, not merely on the size of energy sector. West Virginia, 597 U.S. at 714 (emphasizing that "EPA's own modeling concluded that the rule would entail billions of dollars in compliance costs"); Util. Air Regul. Grp., 573 U.S. at 321-22 (describing growth in administrative and permitting costs that would result from the proposed rule).

As the district court recognized below (and the government repeats on appeal), FinCEN has not banned all transactions in virtual currency or attempted to regulate all users of virtual currency (such as those who use virtual currency to purchase other goods or services). See FIN-2013-G001, at 2 (explaining that a "user who obtains convertible virtual currency and uses it to purchase real or virtual goods or services is . . . not subject to FinCEN's registration, reporting, and recordkeeping regulations."). Instead, it is simply requiring businesses that transmit virtual currencies to register.[27]   Thus,

_____

[27] This opinion focuses on the registration requirement under Section 5330 and does not address other aspects of compliance for money transmitting businesses, such as reporting. See FIN-2013-G001, at 2. This is because neither party has developed any argument about the other regulatory requirements, and so we have no information to go on. See Borrás-Borrero v. Corporación del Fondo del Seguro del Estado, 958 F.3d 26, 34 (1st Cir. 2020)

the relevant question, in our view, is whether the cost of complying with FinCEN's regulation is so high that we should hesitate before assuming that FinCEN was permitted to enact such a regulation. Freeman has made no attempt to demonstrate the cost of compliance. By contrast, the government cites trial testimony suggesting that registration is free and that other small businesses that exchanged virtual currencies complied or planned to comply with the registration requirement. Indeed Freeman's breathless account of the rise of virtual currencies suggests that FinCEN's regulation placed no meaningful economic burden on the industry.

Second, it seems rather puzzling for Freeman to argue to us that FinCEN undertook an extraordinary expansion of its regulatory authority in 2013, by citing to the market capitalization of bitcoin and other virtual currencies eleven years later in May and July of 2024. To illustrate the problem with Freeman's approach, we look to the motion to dismiss papers (joined by Freeman), which asserted that the relevant data point was the overall market capitalization of "non-state issued digital assets" in November 2021, estimated to be $3 trillion. Apparently, in less than three years, the market capitalization of virtual

_____

(explaining that "we are generally reluctant to venture beyond the ambit of the parties' arguments to decide an issue without full briefing").

currencies fell by roughly $800 billion (which would be more than a quarter of the 2021 value). By relying on this data, does Freeman intend to assert that a legal defense positing that regulation of virtual currencies is a major question would have been more likely to succeed in November 2021 than in July 2024? Clearly it would be absurd to hold that FinCEN's regulatory authority waxes and wanes with the price of volatile assets like bitcoin. In our view, the relevant inquiry is whether regulation of virtual currencies was a matter of vast political and economic significance at or around the time FinCEN purportedly decided to exercise its authority (back in 2011 and 2013). See West Virginia, 597 U.S. at 714 (noting an estimate of compliance costs that would total billions of dollars from a 2015 regulatory impact analysis as support for the economic significance of a 2015 rule); Ala. Ass'n of Realtors, 594 U.S. at 764 (treating "nearly $50 billion in emergency rental assistance" passed in January 2021 as "a reasonable proxy" of the economic impact of eviction moratorium imposed in 2020 and extended into 2021 (citing Temporary Halt in Residential Evictions in Communities With Substantial or High Transmission of COVID-19 To Prevent the Further Spread of COVID-19, 86 Fed. Reg. 43244, 43247 (Aug. 6, 2021))). According to the motion to dismiss papers, the market capitalization of bitcoin was only $1.17 billion in May 2013, as opposed to the $1.2 trillion figure from May 2024 that Freeman would like us to focus on. The

fact that the relevant industry grows substantially while subject
to a regulatory scheme does not heighten the economic significance
of the regulatory assertion.   If anything, greater growth would
seem to suggest a financial marketplace unhampered by FinCEN's
regulatory scheme.

* * *

Summing up, Freeman's appeal is chock-full of major-
questions   rhetoric,   but   under   scrutiny,   it   bears   little
resemblance to the line of extraordinary cases the Supreme Court
has held triggers the major questions doctrine.   Requiring money
transmitting businesses that deal in virtual currency to register
is not a matter of such vast political and economic significance,
nor so broad as to be inconsistent with FinCEN's history, that we
should "hesitate" to interpret Section 5330 consistent with the
existence  of  such  regulation.   <u>West Virginia</u>, 597 U.S. at 721
(citation omitted).   Because there is no major question, we need
not reach the question of whether Congress spoke with sufficient
clarity to permit FinCEN's to registration requirement for money
transmitters dealing in virtual currencies.[28]   We thus affirm the
district court's ruling on the motion to dismiss the indictment.

---

[28] That said, we have difficulty imagining how Congress could
have spoken more clearly under these circumstances, where (1) the
plain  meaning  of  "funds"  includes  virtual  currency;  (2)  the
effective statute also explicitly refers to "an informal money
transfer system" and "the transfer of money . . . outside of the

**Sufficiency of Tax Evasion Evidence**

We turn now to Freeman's claim that the government presented insufficient evidence of tax evasion to support his conviction. Because Freeman preserved this argument below, we conduct de novo review of the district court's denial of his motion for judgment of acquittal. See United States v. Soler-Montalvo, 44 F.4th 1, 7 (1st Cir. 2022). To resolve a sufficiency challenge, we examine "the evidence, both direct and circumstantial, in the light most favorable to the prosecution," and will uphold the conviction if "in this light, any reasonable jury could find all the elements of the crime beyond a reasonable doubt." United States v. Azubike, 564 F.3d 59, 64 (1st Cir. 2009) (citations omitted). In other words, we do not need to conclude that "the government succeeded in eliminating every possible theory consistent with the defendant's innocence," only that "the guilty verdict finds support in a plausible rendition of the record." Soler-Montalvo, 44 F.4th at 7 (quoting United States v. Seary-Colón, 997 F.3d 1, 11, 14 (1st Cir. 2021)). To sustain a tax evasion conviction, the government had to prove three elements:

conventional financial institutions system," USA PATRIOT Act § 359(b), 115 Stat. at 328; (3) the legislative history of the effective definition supports application of the statute to emerging technologies for the transfer of value outside of traditional banks; and (4) Congress was aware of and subsequently codified the agency's interpretation. See Hornof, 107 F.4th at 59 n.28 (dismissing major questions argument in a footnote on the basis that "the statute speaks clearly").

"(1) the existence of a tax deficiency, (2) an affirmative act constituting an evasion or attempted evasion of the tax, and (3) willfulness." <u>United States</u> v. <u>Lavoie</u>, 433 F.3d 95, 97 (1st Cir. 2005). Freeman claims that the government failed to carry its burden on the first and third elements.

The government can prove a tax deficiency exists by showing that the defendant did not file a tax return and had a tax liability pursuant to the tax code. <u>See</u> <u>United States</u> v. <u>Hogan</u>, 861 F.2d 312, 315 (1st Cir. 1988) (citing <u>United States</u> v. <u>Dack</u>, 747 F.2d 1172, 1174 (7th Cir. 1984)). To make its case here, the government called a revenue agent of the Internal Revenue Service ("IRS"), Colleen Ranahan, to testify. Ranahan testified that Freeman had not filed tax returns for the years 2016, 2017, 2018, and 2019. Ranahan also testified that Freeman owed taxes on income he received from localbitcoins.com from those four years. To determine tax liability, she calculated his total annual profit from trades made on localbitcoins.com, using information gleaned from Freeman's advertisements and trade history. She also identified certain deductions that would have reduced Freeman's tax liability, including a self-employment tax adjustment, a qualified business income deduction, and the standard deduction and personal exemptions applicable to every taxpayer. Based on those deductions and the total profit, Ranahan calculated the amount that Freeman would have owed in taxes for that income:

$19,182.65 in 2016, $66,033.55 in 2017, $56,174.21 in 2018, and $140,198.28 in 2019.  This was sufficient evidence to show that Freeman had a tax deficiency from 2016-2019.  See Hogan, 861 F.2d at 315-16; United States v. Russell, 998 F.2d 1001 (1st Cir. 1993) (unpublished table decision) (affirming conviction based on failure to file tax return and rejecting argument that no liability existed because IRS could not make a valid assessment without a tax return).

Freeman does not dispute Ranahan's method for determining his profits from localbitcoins.com or the accuracy of her calculations.  Freeman primarily argues that Ranahan did not have a complete view of his finances from 2016 through 2019 and admitted on the witness stand that he might well have no liability.[29]  To get our bearings, we start with one aspect of Ranahan's testimony.  On cross-examination, Ranahan admitted that her calculation of Freeman's tax liability was based on a standard deduction instead of itemized deductions for "things like overhead," "property tax," and "charitable giving."  She further agreed that "if [Freeman] went through an itemization . . . he may

---

[29] Freeman also emphasizes that the IRS never sent him an audit letter explaining that he owed taxes, but whether the IRS conducted a formal assessment of Freeman's liability and forewarned him is irrelevant to whether he actually owed those taxes.  See Hogan, 861 F.2d at 315-16 (rejecting insufficiency challenge based on lack of "proper assessment of the tax due and owing").

owe nothing." Read in context, Ranahan agreed to the hypothetical possibility that if Freeman had submitted a tax return with itemized deductions, those deductions could have reduced his tax liability to zero.

But the government was not required to disprove every hypothetical version of events in which Freeman was innocent. See Soler-Montalvo, 44 F.4th at 7. Although the government bore the ultimate burden of persuasion to show that a tax was due and owing, the rule "uniformly applied in tax evasion cases" is "that evidence of unexplained receipts," that is, a tax liability, "shifts to the taxpayer" (here, Freeman) "the burden of coming forward with evidence as to the amount of offsetting expenses." Siravo v. United States, 377 F.2d 469, 473 (1st Cir. 1967); see also United States v. Stayback, 212 F.2d 313, 317 (3d Cir. 1954); United States v. Hiett, 581 F.2d 1199, 1202 (5th Cir. 1978); Elwert v. United States, 231 F.2d 928, 933 (9th Cir. 1956). Here, the government identified unreported income from localbitcoins.com and applied deductions based on the available information, which shifted to Freeman the burden of producing evidence rebutting Ranahan's tax calculation. Siravo, 377 F.2d at 472. Freeman never did. He is not entitled to attack the government's case on appeal with hypothetical facts which might have exonerated him. See United States v. Davenport, 824 F.2d 1511, 1516-17 (7th Cir. 1987) ("It is neither necessary nor reasonably practicable to require the

government to prove that there are no other conceivable deductions of any sort to which the defendant might be entitled in the absence of some indication that they may in fact exist."); Clark v. United States, 211 F.2d 100, 103 (8th Cir. 1954) (explaining that government need not "prove the non-existence of any other deductions than those which the taxpayer has claimed in his return" to establish prima facie tax evasion case).

Another problem for Freeman is that taxpayers are not automatically entitled to itemized deductions. Instead, under the tax code, "no itemized deduction shall be allowed" unless the taxpayer "makes an election" on his or her tax return. 26 U.S.C. § 63(e)(1)-(2). Thus, even if Freeman had presented evidence of a factual basis for claiming itemized deductions, he was not entitled to those deductions under the tax code, because he never filed a tax return, much less elected to itemize deductions. See George v. Comm'r of Internal Revenue, 821 F. App'x 76, 77 (3d Cir. 2020) (concluding that taxpayer's "arguments regarding itemized deductions are meritless" because "the Internal Revenue Code's statutory language makes clear that, absent a filed return that makes the appropriate election, a taxpayer is not entitled to itemize"). Thus, the fact that Ranahan could not eliminate the possibility that Freeman would have been entitled to an itemized deduction is not a thing which renders the evidence insufficient.

As to willfulness, the government must prove that Freeman voluntarily and intentionally violated a known legal duty to pay taxes on his income. United States v. Stierhoff, 549 F.3d 19, 26 (1st Cir. 2008) (quoting Cheek v. United States, 498 U.S. 192, 201 (1991)). Willfulness "may be inferred from 'any conduct, the likely effect of which would be to mislead or to conceal.'" Id. (quoting Spies v. United States, 317 U.S. 492, 499 (1943)) (identifying defendant's "employment of aliases and nominee entities when conducting business," "pervasive use of non-interest-bearing accounts (which do not trigger mechanical reporting of income earned)," and regular use of cash or "untraceable money orders" even though "checks normally would be used" as facts supporting inference of willfulness (citations omitted)); see United States v. Zanghi, 189 F.3d 71, 81 (1st Cir. 1999) (holding that "[c]onsistent patterns of understatement coupled with conduct tending to conceal" was sufficient to sustain willful tax evasion conviction). Such conduct includes a defendant's "persistent failure to file income tax returns over several years," especially where the defendant "earn[ed] substantial income" during those years. Stierhoff, 549 F.3d at 26-27 (first citing United States v. Greenlee, 517 F.2d 899, 903 (3d Cir. 1975); and then citing United States v. Bohrer, 807 F.2d 159, 162 (10th Cir. 1986)). Freeman is correct, of course, that "ignorance of the law is a defense in tax evasion cases" and a

defendant who "possessed a good-faith, subjective belief that he did not owe taxes on the income in question" is innocent.  United States v. McGill, 953 F.2d 10, 12 (1st Cir. 1992).  Even so, the government may prove its case by showing willful blindness, that is a showing that the defendant "recogniz[ed] the likelihood of wrongdoing," but "nonetheless consciously refuse[d] to take basic investigatory steps."  United States v. Anthony, 545 F.3d 60, 64, 65 (1st Cir. 2008) (citation omitted).  This is because "*deliberate* ignorance of a duty to pay taxes is contrary to a good-faith belief."  Id. at 65 (emphasis added).[30]

We think the government presented sufficient evidence of concealment to permit a jury to infer that Freeman acted willfully. For a period of four years, Freeman earned a substantial amount of income and never reported that income or filed a tax return on it. He accepted large cash transactions by mail.  And when customers sent him money through bank wires, he instructed them to lie to their banks about the purpose of their purchase, often telling

---

[30] Our analysis that follows does not draw a fine line between evidence relevant to "willfulness" and evidence relevant to "willful blindness," as some of the government's evidence supports both theories.  See Azubike, 564 F.3d at 67 (explaining that evidence need not "be placed in either an actual knowledge or a deliberate ignorance category" (quoting United States v. Griffin, 524 F.3d 71, 79 (1st Cir. 2008))).  Freeman does not challenge the appropriateness of the willful blindness instruction, only the sufficiency of the evidence, so whether there was "separate and distinct" evidence of willful blindness is not an issue in this case.  Id.

them to call it a "church donation."  During trial, the jury also heard that Freeman was conducting business through multiple churches: Shire Free Church, the Church of the Invisible Hand, the New Hampshire Peace Church, and the Crypto Church of New Hampshire. And there was evidence that at least some of these churches were organized simply as nominal entities for Freeman to invoke at his convenience.[31]

The government also offered evidence suggesting that Freeman had a political or philosophical objection to paying taxes. Such an objection, however sincerely held, does not negate willfulness.  United States v. Bonneau, 970 F.2d 929, 932 (1st Cir. 1992) (citing Cheek, 498 U.S. at 205).  Freeman displayed a sign on his front porch that read "Stop paying taxes."  In a text message to an acquaintance, Freeman wrote "[o]nly suckers pay tax on crypto" and complained that he never "opted in" to the

_____

[31] For instance, one of Freeman's friends signed the formation documents of the Crypto Church of New Hampshire as a director or trustee.  At trial, the friend testified that apart from signing the formation documents, he had no other participation in the activities of the church and did not know what its religious principles were.  Another acquaintance testified that Freeman would discuss his church "[w]hen he needed it as a legal entity for some legal reason."  Freeman reportedly asked that same acquaintance to prepare an accountant certification letter to send to a cryptocurrency exchange because he was "in the unusual position of not legally owning things but having the ability to control well over 2.5M in various assets."  The acquaintance, who was not a certified accountant, prepared a letter stating that Freeman held "$2.4 million in various liquid assets" without reference to a church.

"obligation to pay taxes." A rational reading of this statement is that Freeman was aware that there might be a general obligation to pay taxes on the sale of virtual currencies, but deliberately blinded himself as to whether that obligation applied to him. Combined with the evidence of concealment, the jury had sufficient evidence of both willfulness and willful blindness to convict Freeman of tax evasion.

Of course, that is not to say that the government's evidence left him no room to argue his innocence. As Freeman points out, there is no evidence that he received any letter or notification from the IRS regarding taxes owed. But the absence of certain types of evidence (such as notification letters) does not make the evidence insufficient. While the jury may infer willfulness from the presence of such evidence, "it is by no means a necessary part of the needed mosaic of proof." Stierhoff, 549 F.3d at 26. Freeman also cites to his own testimony that he held a sincere belief he had no tax liability because, according to his own research, "churches under the IRS rules don't pay taxes." Certainly, if the jury credited Freeman's testimony and determined that he sincerely believed that he had no tax liability, it would have been "duty bound to acquit." McGill, 953 F.2d at 12. But the jury was also free to disbelieve this testimony, especially in light of the evidence we've just described tending to show willful opposition to the tax laws. See United States v. Nishnianidze,

342 F.3d 6, 14 (1st Cir. 2003) ("We are mindful that the jury's duty is to assess credibility, and it may accept or reject, in whole or in part, any testimony."). As an appellate court, our role is simply to verify that the evidence, viewed in a light most favorable to the guilty verdict, was sufficient to sustain all elements of the offense. See Seary-Colón, 997 F.3d at 12. With that in mind, we presume the jury discredited the testimony supporting Freeman's good faith belief as it was permitted to do. See United States v. Tierney, 266 F.3d 37, 40 (1st Cir. 2001) (explaining that appellate court does not "second-guess" the jury's credibility calls and "make[s] all credibility choices in favor of the verdict"); see also Bonneau, 970 F.2d at 933 (acknowledging that defendant could believe both that wages were not income under the tax code and that tax laws were unconstitutional "at the same time," but affirming guilty verdict where "the force and persistence of the defendant's views on the constitutional issue certainly were evidence for the jury to consider in deciding what he actually believed"); United States v. Street, 370 F. App'x 343, 345 (3d Cir. 2010) ("The jury was free to reject [defendant's] testimony that he was acting with a good faith belief he was not required to file tax returns."). As laid out above, the evidence of a tax deficiency and Freeman's willfulness were sufficient to sustain a verdict. We thus affirm Freeman's convictions for tax evasion.

**Spillover Prejudice**

In a final attack on his convictions, Freeman asserts that we should order a new trial because he was acquitted of the money laundering charge by the district court after the trial. His theory is that "the evidence admitted to prove [the money laundering] charge as to which [he] was acquitted was so extensive, inflammatory, and prejudicial that it necessarily spilled over into the jury's consideration of his guilt on other charges."[32] See United States v. Correia, 55 F.4th 12, 36 (1st Cir. 2022) (citation and quotation marks omitted). In previous cases, we've sometimes described this type of claim as "spillover prejudice" or "evidentiary spillover." United States v. Abdelaziz, 68 F.4th 1, 60-61 (1st Cir. 2023). As the defendant, Freeman bears the burden to "show 'prejudice so pervasive that a miscarriage of justice looms'" if we do not remand for a new trial. Correia, 55 F.4th at 36-37 (quoting United States v. Simon, 12 F.4th 1, 43-44 (1st Cir. 2021)). We review the district court's denial of a new trial on this basis for abuse of discretion. Id. at 36.

Freeman argues, as he did below in his motion for a new trial, that "[t]he government relied heavily on the money

---

[32] Freeman's brief asserts that his spillover prejudice argument would be "even stronger" if we vacated his other convictions for operation of an unlicensed money transmitting business and tax evasion. Because we do not vacate those convictions, we do not need to consider whether any evidence spilled over from those charges.

laundering charge to paint Freeman as a person connected to the sale of illegal drugs and to enhance his culpability for otherwise regulatory offenses."  In his appellate brief and his motion, Freeman points to portions of the government's opening statement and closing argument which referred to Freeman's interactions with the undercover agent, and especially his awareness that the agent purportedly was exchanging his drug proceeds for bitcoin.  The district court rejected his argument on the basis that any evidence regarding Freeman's interactions with the undercover agent would have been admissible to prove the allegation that Freeman conspired to commit money laundering (a conviction which Freeman was not acquitted of post-trial).[33]  Even though this was the basis for the district court's decision and emphasized in the government's appellate brief, Freeman has offered us no explanation as to what evidence regarding the undercover agent would have been excluded if the direct money laundering charge had been left out of the trial.  We agree with the district court that the undercover agent's discussion of purported drug proceeds with Freeman was relevant to establishing whether Freeman conspired with the

---

[33] The district court granted Freeman's motion for judgment of acquittal only as to the direct money laundering conviction, on the basis that there was not sufficient evidence presented that Freeman knew that the undercover agent went to the bitcoin kiosk after Freeman told the agent that the kiosk was still there.  The district court did not acquit Freeman of *conspiracy* to commit money laundering, a decision that Freeman has not challenged.

undercover agent to perpetrate money laundering and thus could have been admitted even if the underlying money laundering charge had never been brought.  See United States v. George, 761 F.3d 42, 48-49 (1st Cir. 2014) (concluding that sufficient evidence supported conviction for conspiracy to commit money laundering in part where that appellant had a conversation with his co-conspirator regarding the "caper" in which co-conspirator obtained ill-gotten gains); see also United States v. Tum, 707 F.3d 68, 74 (1st Cir. 2013) (explaining that to be liable for conspiracy, a defendant must be a "willing participant" and know the "essential nature" of the "collective endeavor").  Thus, we affirm the district court's refusal to grant Freeman a new trial for evidentiary spillover.[34]  See Correia, 55 F.4th at 37 (affirming denial of motion for new trial where any retrial on the "still-

---

[34] The cases in which we have granted a new trial for evidentiary spillover tend to involve multiple defendants or multiple conspiracies.  See, e.g., United States v. Weadick, 15 F.4th 1, 16 (1st Cir. 2021) ("Some amount of spillover is inherent in trying multiple defendants together.").  In such cases, "one defendant allegedly may not be involved at all in one of the conspiracies, but may suffer from the evidence in support of the other defendants in those other conspiracies." United States v. Chan, 981 F.3d 39, 54-55 (1st Cir. 2020).  Here, Freeman was tried alone and he makes no argument that confusion arose from the fact that he was charged with two conspiracies.  Thus, this case lacks many of the factors that create a high risk of prejudicial spillover.  Cf. United States v. Martínez, 994 F.3d 1, 15 (2021) (referring to risk that direct evidence of a co-defendant's corrupt intent and involvement in multiple schemes may have unfairly prejudiced appellant).

standing convictions . . . would have involved much of the same evidence" as the evidence in support of the dismissed counts).

### Substantive Reasonableness of the Sentence

We turn now to Freeman's challenge to the substantive reasonableness of his 96-month sentence, which represented a substantial downward variance from the 210- to 262-month sentence recommended by the United States Sentencing Guidelines. Freeman is in for an "uphill" battle. See United States v. Dávila-Bonilla, 968 F.3d 1, 12 (1st Cir. 2020). We analyze Freeman's preserved sentencing arguments "under the deferential abuse of discretion standard, reviewing findings of fact for clear error and issues of law de novo." United States v. Pupo, 995 F.3d 23, 29 (1st Cir. 2021) (citations omitted). And we must affirm the sentence so long as the district court articulated a "plausible sentencing rationale" and "reached a defensible result." Id. (quotation marks omitted) (quoting United States v. Flores-Quiñones, 985 F.3d 128, 133 (1st Cir. 2021)). Under these standards, sentences falling significantly below the guidelines range, as here, are "rarely" disturbed for substantive unreasonableness. See, e.g., United States v. Rivera-Gerena, 112 F.4th 67, 73 (1st Cir. 2024); United States v. Millán-Machuca, 991 F.3d 7, 32 (1st Cir. 2021)).

None of Freeman's arguments convince us that this is one of those rare cases. Freeman begins by listing several mitigating factors, including his "minimal" criminal history, the lack of any

evidence that he engaged in violent conduct, and his strong community support. To the extent that Freeman is arguing that the district court overlooked these factors, the record compels the opposite conclusion. In imposing the sentence, the district court explicitly referenced Freeman's "peace advocacy," "his lack of a violent history, his many supporters, many of whom submitted letters to the Court vouching for him and his character," and "his lack of prior significant incarceration." The court believed that these were among the factors that "make a variance below the guideline sentencing range appropriate in this case." Against this, the district court noted aggravating factors, some of which were reflected in the guidelines range, including the enhancement Freeman received as a "manager or leader" and the impact of the crimes on his victims. It also noted that Freeman had a criminal history but characterized it as "not substantial." Considering all these circumstances, the court decided on "a very serious sentence" of 96 months, which it emphasized was "less than half of the low end of the guideline sentencing range" —— though more than the 38 months Freeman asked for. Given the district court's express attention to the factors identified by Freeman in his brief to us, we readily conclude that the district court articulated a plausible sentencing rationale. See United States v. Fuentes-Moreno, 954 F.3d 383, 396-97 (1st Cir. 2020) (concluding that the district court's consideration of the seriousness of the offense

and "recitation of [the defendant's] personal characteristics" show that the sentence was "plausibly reasoned" (citation omitted)). And we further conclude that this below-the-guidelines-sentence was defensible, even if Freeman may wish that the district court had given the mitigating factors more weight or disregarded some of the aggravating factors. See Pupo, 995 F.3d at 32 ("[W]e cannot assign error to a well-reasoned decision simply because the district judge chose not to attach more weight to certain mitigating factors."); Dávila-Bonilla, 968 F.3d at 12 (explaining that the district judge's failure to attach more weight to mitigating factors does not render challenged sentence implausible or indefensible); United States v. Montijo-Maysonet, 974 F.3d 34, 54-55 (1st Cir. 2020) (concluding that a 37-month downward variance was substantively reasonable, despite appellant's argument that the sentence was still too harsh); United States v. Floyd, 740 F.3d 22, 39 (1st Cir. 2014) (describing substantive reasonableness challenge to 84-month sentence which varied from a 121- to 151- month guidelines range as "a pipe dream").

Freeman also points to six other "virtual currency related money laundering crimes" from around the country, in which the defendants were sentenced to between four and 36 months. As an initial matter, the government asserts that this sentencing disparity argument was not preserved because Freeman only objected

generally to the substantive reasonableness of this sentence below. As a result, the government says Freeman forfeited the argument and we must review this claim for plain error, a standard that is even tougher on appellants than the abuse of discretion standard advocated for by Freeman and which we've been relying on thus far. United States v. Cruz-Ramos, 987 F.3d 27, 44 (1st Cir. 2021) ("[T]he hard-to-satisfy plain-error standard requires a defendant to show error; plainness; an adverse effect on his substantial rights; and a serious compromise of the fairness, integrity, or reputation of the trial."). We need not expend ink on this preservation dispute, however, because Freeman's disparity argument fails even if we apply the more lenient, but still deferential, abuse of discretion standard. See United States v. Jiménez, 946 F.3d 8, 15 (1st Cir. 2019) (applying abuse of discretion standard to avoid "somewhat blurred" issue regarding standard of review for unpreserved substantive reasonableness challenge (citation omitted)).

Freeman is right that 18 U.S.C. § 3553(a)(6) reflects a goal of avoiding unwarranted "sentencing disparities among like criminals who commit like crimes" across the nation. United States v. Romero, 906 F.3d 196, 211 (1st Cir. 2018). However, a sentencing disparity is not unwarranted "if material differences between the defendant and the proposed comparator[s] suffice to explain the divergence." Id. (alteration in original) (quoting

United States v. Demers, 842 F.3d 8, 15 (1st Cir. 2016)); United States v. Gonzalez, 981 F.3d 11, 23 (1st Cir. 2020) ("[W]hen a defendant makes a claim of sentencing disparity, he 'must compare apples to apples.'" (citation omitted)).  Such differences can include whether the defendant pled guilty or went to trial, details from the defendant's personal or criminal histories, and differences in the sentencing guidelines' advisory range.  See, e.g., United States v. De La Cruz, 91 F.4th 550, 552-53, 555 (1st Cir. 2024) (rejecting claim of 45-month sentencing disparity between co-defendants where co-defendant had "a much lower advisory sentencing guideline range" and played a different role in the offense); Gonzalez, 981 F.3d at 23 (rejecting disparity claim where comparator committed one murder and pled guilty, but appellant committed two murders and elected to stand trial).

Here, Freeman asks us to compare him to other defendants sentenced for processing millions of dollars in virtual currency and cherry picks the aspects of those cases most similar to his own.  Cf. United States v. Rosario, __ F.4th __, 2025 WL 1831040, at *5 (1st Cir. July 3, 2025) (rejecting disparity claim where the defendant did not provide "the necessary information to determine whether" his proposed comparators were "identically situated," such as their criminal histories, "the specific circumstances of their plea agreements," or "the particularities of their crime-spree conduct").  But even with our limited insight into the

details of these cases, we see several obvious differences. The guidelines ranges calculated for each of these defendants were apparently far lower than Freeman's 210-262 months.[35] See De La Cruz, 91 F.4th at 552-53. Half of these defendants were not sentenced for any of the same charges faced by Freeman.[36] See United States v. Bishoff, 58 F.4th 18, 26 (1st Cir. 2023) (rejecting sentencing disparity claim between co-defendants in part because co-defendants were charged with different gun-related offenses). None of the cited cases include tax evasion charges. Setting that aside, five of the six defendants pled guilty rather

---

[35] Transcript of Sentencing Hearing at 17:2-3, United States v. Randol, 23-cr-00440 (C.D. Cal. Jan. 17, 2024), ECF No. 56 (six to 12 months); Government Sentencing Memorandum at 2, United States v. Farace, No. 21-cr-00294 (D. Md. Dec. 15, 2023), ECF No. 92 (parties agreed to seek a sentence between 19 and 30 months based on consensus that guidelines range was 30 to 37 months); Government's Sentencing Memorandum at 3, United States v. Zhao, 23-cr-00179 (W.D. Wash. Nov. 21, 2023), ECF No. 78 (arguing for range of 12 to 18 months); Transcript of Sentencing Hearing at 5:8, United States v. Mejia, No. 21-cr-00008 (C.D. Cal. Nov. 18, 2021), ECF No. 44 (57 to 71 months); Defendant's Sentencing Memorandum at 2, United States v. Tetley, No. 17-cr-00738 (C.D. Cal. June 4, 2018), ECF No. 32 (uncontested range of 46 to 57 months); Defendant's Sentencing Memorandum at 27, United States v. Lebedev, No. 15-cr-00769 (S.D.N.Y. Aug. 29, 2017), ECF No. 585 (108 to 135 months as calculated by probation, 10 to 16 months as argued by defendant).

[36] Judgment at 1, Unites States v. Zhao, 23-cr-00179, ECF No. 90 (one count of failure to maintain an effective anti-money laundering program); Transcript of Sentencing Hearing at 26:2-5, Randol, 23-cr-00440, ECF No. 56 (same); Amended Judgment at 1-2, Lebedev, 15-cr-00769, ECF No. 748 (various bribery and fraud charges).

than taking their case to trial.[37]  Most also had no prior
convictions, unlike Freeman.[38]  Finally, the district court in
Freeman's case noted that Freeman was receiving an upward
adjustment to his sentencing guidelines range based on his role as
a manager or leader.  Freeman has cited nothing to suggest that
any of the defendants had a similarly culpable leadership role in
their own offenses.  See United States v. Coplin-Benjamin, 79 F.4th
36, 44 (1st Cir. 2023) (holding that sentencing disparity was
warranted where appellant was found to be leader of conspiracy,
but co-defendants were "mere participant[s]").  Freeman has thus
not established that these comparators were similarly situated to
him such that a valid sentencing disparity claim exists.  See,
e.g., United States v. Candelario, 105 F.4th 20, 24 (1st Cir. 2024)
(concluding that no unwarranted discrepancy between co-defendants
existed where difference in guidelines range was "critical datum
in a disparity analysis"); Jiménez, 946 F.3d at 15-16 (rejecting
appellant's claim that sentence "well below the guidelines range"

---

[37] Plea Agreement, Zhao, 23-cr-00179, ECF No. 31; Transcript
of Sentencing Hearing at 26:22-23, Randol, 23-cr-00440, ECF No. 56
(noting acceptance of responsibility deduction from offense
level); Plea Agreement, Farace, 21-cr-00294, ECF No. 79; Plea
Agreement, Mejia, No. 21-cr-00008, ECF No. 5; Judgment at 1,
Tetley, 17-cr-00738, ECF No. 45.

[38] Defendant's Sentencing Memorandum at 8, Zhao, 23-cr-00179,
ECF No. 82; Government's Sentencing Memorandum at 3, Farace, 21-
cr-00294, ECF No. 92; Government's Sentencing Memorandum at 16,
Tetley, 17-cr-00738, ECF No. 31; Defendant's Sentencing Memorandum
at 32, Lebedev, 15-cr-0069, ECF No. 585.

was unreasonable based on disparity with national average fraud sentence where appellant "has not offered evidence that would show that her circumstances are sufficiently similar to the national median fraud defendant to create a meaningful point of comparison").

In sum, Freeman has failed to show that his sentence was substantively unreasonable, either based on the district court's assessment of the Section 3553(a) sentencing factors or based on any disparity with similarly situated defendants. Accordingly, we affirm his sentence.

## **CONCLUSION**

For the reasons stated, we affirm.