UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

NO. 23-1839

_____

**UNITED STATES,
APPELLEE**

v.

**IAN FREEMAN, f/k/a Ian Bernard,
DEFENDANT - APPELLANT**

_____

**APPELLANT'S PETITION FOR
PANEL REHEARING OR REHEARING *EN BANC***

_____

Richard Guerriero
1st Circuit Bar ID 1164673
Oliver Bloom
1st Circuit Bar ID 1211240
Lothstein Guerriero, PLLC
39 Central Square, Suite 202
Keene, NH 03431
(603) 352-5000
richard@nhdefender.com
oliver@nhdefender.com

Mark L. Sisti
1st Circuit Bar ID 37832
Sisti Law Offices
387 Dover Road
Chichester, NH 03258
(603) 224-4220
info@sistilawoffices.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................2

TABLE OF AUTHORITIES ............................................................................3

STATEMENTS REQUIRED BY FED. Rs. APP. P. 40(b)(1) and (2) .....................4

STATEMENT OF THE CASE.........................................................................5

REASONS WHY REHEARING IS WARRANTED ..................................................6

   I.   THE PANEL MISAPPREHENDED THE HISTORY OF THIS AREA OF REGULATION WHEN IT ANALOGIZED VIRTUAL CURRENCY TO INFORMAL METHODS OF TRANSFER SUCH AS HAWALAS .....................6

   II.   THE PANEL MISAPPREHENDED THE BREADTH OF THIS AREA OF REGULATION BASED ON ERRONEOUS CONCLUSIONS REGARDING THE ECONOMIC SIGNIFICANCE OF THE LICENSING OF VIRTUAL CURRENCY SELLERS ...................................................................11

CONCLUSION ................................................................................................13

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a) ...........................14

CERTIFICATE OF SERVICE ............................................................................15

# **TABLE OF AUTHORITIES**

**Cases**

*Narragansett Indian Tribe v. Rhode Island*, 449 F.3d 16, 18 (1st Cir. 2006) ...........5

*United States v. Freeman*, Appeal No. 23-1839, slip op. (1st Cir. 2025), *reported at* ___ F.4th ___, 2025 U.S. App. LEXIS 18866 (1st Cir. July 29, 2025)... 4, 5, 7, 8, 12

*West Virginia v. E.P.A.*, 597 U.S. 697 (2022) ........................................................4

**Statutes**

31 U.S.C. §5330 ......................................................................................................5

H.R. Rep. No. 107-250 .........................................................................................7, 8

USA PATRIOT Act in 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001)..............6, 7

**Other Authorities**

147 Cong. Rec. H6938 (daily ed. Oct. 17, 2001) .....................................................11

147 Cong. Rec. H7202 (daily ed. Oct. 23, 2001) .....................................................11

147 Cong. Rec. S10563 (daily ed. Oct. 11, 2021) ...................................................12

2002 National Money Laundering Strategy (July 2002) .........................................10

A Report to the Congress in Accordance with Section 359 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Nov. 2002)................................................10

FinCEN Advisory 33, Informal Value Transfer Systems (March 2003) ................12

**Rules**

Fed. R. App. P. 40 .....................................................................................................4

## STATEMENTS REQUIRED BY FED. Rs. APP. P. 40(b)(1) and (2)

Pursuant to Fed. R. App. P. 40, Mr. Freeman respectfully requests that the Court reconsider its holding in *United States v. Freeman*, Appeal No. 23-1839, slip op. (1st Cir. 2025), *reported at* ___ F.4th ___, 2025 U.S. App. LEXIS 18866 (1st Cir. July 29, 2025) [hereafter *Freeman*, slip. op.] that the major questions doctrine, as explained by the United States Supreme Court in *West Virginia v. E.P.A.*, 597 U.S. 697 (2022), does not apply in this case.

The panel decision misapprehends and conflicts with the decision of the United States Supreme Court in *West Virginia v. E.P.A.*, and the major questions doctrine as explained in that case. Specifically, the panel decision reached incorrect conclusions regarding both the history and the breadth of federal agency attempts to regulate sellers of virtual currency, with the result that the panel incorrectly found the major questions doctrine to be inapplicable. Freeman asks that the panel decision be reconsidered.

Freeman further asks for *en banc* review because this case involves a question of exceptional importance about which there is no on-point First Circuit decision. *Narragansett Indian Tribe v. Rhode Island*, 449 F.3d 16, 18 (1st Cir. 2006) (en banc review granted to "answer a challenging question of first impression"). As the panel decision notes, other circuits have addressed the major

questions doctrine, but this circuit has only noted it in passing. *Freeman*, slip op. at 23, n. 14.

The specific question in this case is: whether application of the major questions doctrine when interpreting 31 U.S.C. §5330 requires a finding that Congress had not authorized the federal agency, FinCEN, to require licensing of virtual currency sellers prior to 2021.

## STATEMENT OF THE CASE[1]

Ian Freeman appealed convictions based on the government's allegations that he committed various crimes when he was selling bitcoin from 2016 to 2021. The charges against Freeman included charges relating to his failure to obtain a license from FinCEN, a federal agency, to sell bitcoin. In the district court, Freeman moved to dismiss those counts and challenged the authority of that federal agency to require him to be licensed to sell virtual currency.

Specifically, Freeman contended that, during the relevant time period for this case, Congress had not authorized any federal agency to issue regulations requiring the registration of sellers of virtual currency. As argued by Freeman, the applicable statute, 31 U.S.C. § 5330, only authorized requiring registration of those who were engaged in the transmission of "funds." That law was written in 2001

---

[1] A full statement of the case and all issues raised is contained in Freeman's opening brief and the panel's decision. A condensed and focused statement of the case is offered here for context.

before virtual currency existed and before Congress could have intended that single word, "funds," to include something that did not yet exist. Moreover, because of the scope and importance of virtual currency in today's economy, the Supreme Court's major questions doctrine instructs that agencies may not claim expansive powers from long extant and cryptic passages in a statute. Finally, legislative history shows that FinCEN, the regulatory agency, sought a change to bring virtual currency within the scope of the statute, confirming that the statute did not previously capture virtual currency.

The district court judge denied Freeman's motion to dismiss the licensing charges. Freeman was convicted of those charges, and others, at trial. He appealed on all counts, raising a number of errors. The panel decision rejected Freeman's major questions argument and his challenge to the licensing counts. As explained below, the panel decision erroneously concluded that the major questions doctrine does not apply in Freeman's case and thus erroneously affirmed the district court. Freeman now seeks reconsideration of the panel decision.

## **REASONS WHY REHEARING IS WARRANTED**

### I. THE PANEL MISAPPREHENDED THE HISTORY OF THIS AREA OF REGULATION WHEN IT ANALOGIZED VIRTUAL CURRENCY TO INFORMAL METHODS OF TRANSFER SUCH AS HAWALAS .

The panel found that Freeman's reading of the language from the USA PATRIOT Act in 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001), as focused on

hawala-like transfer systems, was "strained" and that a "more natural reading" was that "Congress was more generally concerned about 'underground black market banking systems,' whatever the form." *Freeman*, slip op. at 29 (quoting H.R. Rep. No. 107-250 at 33). It then suggested that bitcoin was similar to these systems because "such systems frequently operated through 'messages relating to receipt or disbursement of funds' rather than transfer of physical funds themselves" and because "they were preferred by criminals because of 'the lack of record-keeping and opportunity for anonymity.'" *Freeman*, slip op. at 29-30 (quoting H.R. Rep. No. 107-250 at 34). The panel thought "[b]itcoin and virtual currencies seem to fall within this broad definition of [an informal money transfer] system that allows users to transfer money without the participation of banks or other traditional money movers." *Freeman*, slip op. at 28-29.

 Respectfully, Freeman believes H.R. Rep. No. 107-250 is clear that the "informal money transfer system" referenced in the USA PATRIOT Act, Pub. L. No. 107-56 § 359(b), 115 Stat. 272, 328 (2001) was targeting hawalas or their equivalents, not virtual currency. Despite superficial similarities, hawala and like systems are not similar to virtual currencies based on the blockchain. Hawala is "an ancient South Asian money exchange <u>system</u> which consists of an international network of non-bank financial agents, often <u>built on trusted family or cultural relationships</u>." *Freeman*, slip op. at 29, n. 2 (quotations and citation omitted,

7

underline added). Bitcoin, by contrast, is a "virtual currency, with no physical coinage or government backing" whose transfers are "accounted for on a public, cryptographic ledger called the blockchain." *Id.* at 3-4. Hawala is a system; bitcoin is a currency. Hawala relies on trusted intermediaries to facilitate unrecorded transactions; bitcoin relies on the immutable blockchain where all transactions are recorded.

Furthermore, the legislative history quoted by the panel confirms that Congress was targeting hawalas (and their equivalents). Congress called the relevant section "Reporting of suspicious activities by informal underground banking systems, such as hawalas." H.R. Rep. No. 107-250 at 16, 63. Likewise, when Congress spoke of the "lack of record-keeping and opportunity for anonymity," it was referring to "international cash couriers as well as…informal banking systems, like the ancient South Asian money exchange system called hawala." *Id.* at 34. Since virtual currencies did not exist in 2001, when Congress spoke of "informal value transfer banking systems like hawalas," it was speaking to other, similar systems, not something that had not been invented. *Id.* at 63.

Congress also required the "Secretary of the Treasury to report to Congress within one year…on the need for any additional legislation relating to informal value transfer banking systems" including whether the "threshold for the filing of suspicious activity reports (SARs) should be lowered for hawalas and similar

8

systems." *Id.* at 64. When FinCEN responded, it explained how "the types of informal or unconventional entities operating outside of the mainstream financial system" include "hawala, hundi, fei ch'ien, hoe kuan, hui k'uan, and many others" and how "[h]istorically, these informal entities have been labeled by various terms including 'alternative remittance systems,' 'underground banks,' and 'informal value transfer systems.'" A Report to the Congress in Accordance with Section 359 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Nov. 2002) at 4.

Similarly, the National Money Laundering Strategy from July 2002 describes how "[n]on-traditional systems, known generally as alternative remittance systems, refer to a family of monetary remittance systems that provide for the transfer of value outside of the regulated financial industry" and such systems "including hawala, rely primarily on trust and the extensive use of connections, such as family relationships and regional ethnic affiliations." 2002 National Money Laundering Strategy (July 2002) at 21. It adds, "[t]hese systems are known by a variety of names reflecting ethnic or national origins pre-dating the emergence of modern banking and other financial institutions" including "*hawala, hundi, fei ch'ien, phoe kuan, hui k'uan, ch'iao hui and nging sing kek.*" *Id.* at n. 25. FinCEN's "strategy" was "(1) to force terrorist financiers to reduce reliance on hawala and similar systems and to channel their money into more transparent,

9

formal financial transactions; (2) to regulate hawaladars so that legitimate hawaladars comply with financial reporting structures; and (3) to target the illegal use of hawala for intensive investigations." *Id.* at 22. Systems that "pre-dat[e] the emergence of modern banking" and rely on "family relationships and regional ethnic affiliations" simply have nothing to do with virtual currencies.

The Congressional record from the time of the bill's passage likewise confirms the focus was on hawalas and their equivalents. The chairwoman of the House Subcommittee on Oversight and Investigation said "[t]his legislation takes the first important step to combat hawala by enforcing the law against unlicensed money transmitting businesses." 147 Cong. Rec. H6938 (daily ed. Oct. 17, 2001) (statement of Rep. Kelly). *See also id.* at H6936 (statement of Rep. Oxley) (describing "underground black market banking operations, like the ancient South Asian Hawala money transfer system"); *id.* at H6942 (statement of Rep. Bereuter) (describing how the legislation enhances "law enforcement's ability to address informal banking systems used by terrorists such as the South Asian 'hawala' system"); *id.* at H6943 (statement of Rep. Jackson-Lee) (describing how the bill "provides for increased investigatory ability to infiltrate terrorist cells and infrastructure, irrespective of whether such cells utilize normal financial institutions such as banks, or whether they use more clandestine underground 'hawala' financial systems"); 147 Cong. Rec. H7202 (daily ed. Oct. 23, 2001)

(statement of Rep. LaFalce) (describing how the "PATRIOT Act takes aim at hawalas, the underground banking system that is used by international terrorists like al-Qaeda" and "reins in the operation of hawalas by requiring hawalas to register with our government or face criminal prosecution"); 147 Cong. Rec. S10563 (daily ed. Oct. 11, 2021) (statement of Sen. Sarbanes) (describing how the bill "deal[s] with underground banking systems such as the Hawala").

A FinCEN Advisory from March 2003 also documented how that agency interpreted Section 359 of the USA PATRIOT Act to target informal value transfer systems or IVTS, which "pre-date western banking systems and existed as far back as 5800 BC." FinCEN Advisory 33, Informal Value Transfer Systems (March 2003) at 1.

## II. THE PANEL MISAPPREHENDED THE BREADTH OF THIS AREA OF REGULATION BASED ON ERRONEOUS CONCLUSIONS REGARDING THE ECONOMIC SIGNIFICANCE OF THE LICENSING OF VIRTUAL CURRENCY SELLERS.

The panel agreed with the district court that "FinCEN has not banned all transactions in virtual currency or attempted to regulate all users of virtual currency…[i]nstead, it is simply requiring businesses that transmit virtual currencies to register." *Freeman*, slip op. at 56. It further suggested that "FinCEN's regulation placed no meaningful economic burden on the industry." *Id.* at 57. The panel's analysis fails to consider how Freeman's Reply Brief explained the unique

"role exchanges play in the circulation and adoption of virtual currency." Reply Brief at 16.

Specifically, the Reply explained how, because there is no central authority like a central bank for the virtual currencies' creation and distribution, "the only way to obtain virtual currencies besides 'mining,' is to purchase or trade with someone who already has them, whether through an exchange, a kiosk, or directly via trade." Reply at 16 (citing Gov. Br. 3-4). The Reply quoted a report that "access to the cryptocurrency more or less depends on exchanges…". Reply at 16. It noted that a government official testified to the linkage between exchanges and regulation as a "chokepoint" in the system. *Id.* Thus, to purchase virtual currency essentially requires the use of an exchange and therefore essentially any potential user of virtual currency is required to follow the regulations unilaterally promulgated by FinCEN. In short, the breadth of FinCEN's attempt at regulation extended to all virtual currency sellers, who were in turn the source of almost all virtual currency.

## **CONCLUSION**

The panel decision should be reconsidered and the court should find that the major questions doctrine applies in this case. Freeman respectfully requests that the court grant this petition for rehearing and rehearing *en banc*, and, after reconsideration of the entire appeal, reverse the trial court's denial of appellant's motion to dismiss counts 1 and 2 of the indictment, enter judgments of acquittal on the four tax evasion counts, order a new trial on any remaining charges.

Date: August 22, 2025

/s/ *Richard Guerriero*
Richard Guerriero
1st Circuit Bar ID 1164673
Oliver Bloom
1st Circuit Bar ID 1211240
Lothstein Guerriero, PLLC
39 Central Square, Suite 202
Keene, NH 03431
(603) 352-5000
richard@nhdefender.com
oliver@nhdefender.com

Mark L. Sisti
1st Circuit Bar ID
Sisti Law Offices
387 Dover Road
Chichester, NH 03258
(603) 224-4220
info@sistilawoffices.com

# CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)

I, Richard Guerriero, hereby certify that the foregoing brief of Appellant Ian Freeman complies with the type-volume limitation of FRAP 32 and 40:

1. This petition for rehearing contains less than 3900 words, pursuant to FRAP 40(d)(3), not including the parts of the brief exempted by FRAP 32(a)(f).

2. This brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 (2025) in 14-point Times New Roman.

/s/ *Richard Guerriero*
Richard Guerriero
1st Circuit Bar ID 1164673
NH Bar ID 10530

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion was forwarded by electronic mail through the ECF system on August 22, 2025, to Assistant United States Attorneys David Lieberman and John Kennedy, of the United States Attorney's Office, 55 Pleasant Street, 4th Floor Concord, NH 03301. A copy of the motion was mailed by U.S. Mail to Appellant, Ian Freeman, 34755-509, at the FMC Devens, 42 Patton Rd, Devens, MA 01434.

Filing on August 22, 2025.

/s/ *Richard Guerriero*
Richard Guerriero
1st Circuit Bar ID 1164673
NH Bar ID 10530